**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**

| | |
|---|---|
| CHRISTOPHER MACHADO, Individually and on Behalf of All Others Similarly Situated,<br><br>Plaintiff,<br><br>v.<br><br>ENDURANCE INTERNATIONAL GROUP HOLDINGS, INC., HARI RAVICHANDRAN, and TIVANKA ELLAWALA,<br><br>Defendants. | Case No. 1:15-cv-11775-GAO<br><br>**AMENDED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS**<br><br>**<u>JURY TRIAL DEMANDED</u>** |

Lead Plaintiff Christopher Machado ("Plaintiff"), by and through his attorneys, alleges the following upon information and belief, except as to those allegations concerning Plaintiff, which are alleged upon personal knowledge. Plaintiff's information and belief is based upon, among other things, his counsel's investigation, which includes without limitation: (a) review and analysis of regulatory filings made by Endurance International Group Holdings, Inc. ("Endurance" or the "Company"), with the United States ("U.S.") Securities and Exchange Commission ("SEC"); (b) review and analysis of press releases and media reports issued by and disseminated by Endurance; and (c) review of other publicly available information concerning Endurance.

## I. NATURE OF THE ACTION

1. This is a class action on behalf of purchasers of Endurance securities between February 25, 2014 and November 2, 2015, inclusive (the "Class Period"), seeking to pursue remedies under the Securities Exchange Act of 1934 (the "Exchange Act").

2. Endurance provides cloud-based platform solutions for small and medium-sized businesses ("SMBs"). The Company purportedly has approximately 4.1 million subscribers globally with over 150 products and services including domains, website builders, web hosting, email, security, storage, site backup, search engine optimization, search engine marketing, social media services, website analytics, mobile device tools and productivity and e-commerce solutions.

3. Throughout the Class Period, Endurance repeatedly told potential investors and analysts that it was pursuing a growth strategy based on a two-pronged approach of increasing the Company's total number of subscribers while simultaneously increasing the average revenue generated per subscriber ("ARPS").

4. During the Class Period, Endurance routinely touted increases in the Company's ARPS as proof that it was executing on this strategy. In addition, the Company highlighted and told investors to focus on increases in the number of customers paying over $500 per year for Endurance products and services ("+$500 subscribers") and increases in the average number of products sold per subscriber ("PPS"). According to the Defendants, increases in +$500 subscribers and PPS would be the primary drivers of ARPS.

5. The results reported by Defendants painted a picture-perfect growth-pattern for +$500 subscriber and PPS spanning the entire Class Period. As the below charts reflect, the growth in reported +$500 subscriber and PPS metrics seemed almost too good to be true:






6. Even when ARPS numbers began to falter in fiscal year 2015, Defendants pointed to +$500 subscribers and PPS growth as reason to be confident in the Company's future ARPS growth potential.

7. It turns out, however, that the +$500 subscribers and PPS metrics actually were too good to be true. As the Company has admitted, these numbers were overstated, and Defendants have yet to report the true numbers from the Class Period.

8. In addition, since Endurance's growth strategy was based on increasing total number of subscribers as well as ARPS, investors and analysts were interested in the Company's ability to retain customers – which is commonly expressed in the industry as the company's "churn rate." Churn rate is loosely defined as the percentage of the company's total subscriber

base that the company loses during a given period. The lower a company's churn rate, the better the company is at retaining its subscriber base, and thus, growing its total subscriber number.

9. Defendants represented that the churn rate was "doing really well," but repeatedly declined (when asked) to reveal the actual churn rate. Defendants intentionally omitted this information. Instead, Defendants shifted the conversation to the Company's "MRR" (or "cash churn") metric – a metric which seemed comparable to the churn rate metric – but which served to conceal the Company's churn rate and thus mislead investors. Amazingly, Defendants reported an unwavering MRR of 99% (or a cash churn of 1%) per month for the entire Class Period. However, as later revealed by Defendants, the true churn rate was approximately 20% for fiscal year 2014.

10. During the Class Period, Defendants painted a strong growth picture of increasing ARPS – or at least increasing ARPS drivers – and healthy subscriber retention. However, in reality, the Company was bleeding subscribers and taking on low revenue subscribers in order to offset the bleed. This practice was driving down the Company's ARPS. In response, Defendants pointed to overstated and misleading ARPS drivers to instill confidence in future ARPS growth. In addition, the Company touted "1% cash churn" while the true churn rate was approximately 20% for fiscal year 2014 – a dismal result compared to competitors' rates.

11. On April 28, 2015, research firm Gotham City Research LLC ("Gotham") published a report entitled "Endurance International Group: A Web of Deceit." The report cast doubt on certain of the Company's metrics, claiming they were inaccurate or misleading, including the Company's churn rate and ARPS. With respect to Endurance's churn rate, Gotham alleged that Endurance's true churn rate was extraordinarily high and that Endurance's representations of its churn rate to the public were misleading. On this news, shares of

Endurance declined $2.24 per share, over 10%, to close on April 28, 2015, at $19.70 per share, on unusually heavy volume.

12. Only after faced with intense scrutiny, and the issues raised by the Gotham report, did Defendants admit the true churn rate. On May 5, 2015, during the quarterly conference call with investors and analysts, Defendant Ravichandran disclosed that the Company's true churn rate was 20% for fiscal year 2014 – which was dismal compared to competitors' rates. On this news, shares of Endurance declined $0.47 per share, or 2.3%, to close on May 5, 2015, at $19.18 per share.

13. Thereafter, on November 2, 2015, during the quarterly earnings conference call with investors and analysts, the Company revealed that the previously reported figures for at least two of Endurance's most highly touted metrics (+$500 subscribers and PPS) had been overstated. Despite the Defendants' high-profile prior reporting of three metrics (*i.e.*, MRRR, +$500 subscribers and PPS) throughout the Class Period, Endurance did an unexpected about-face and told it investors that it was "not showing [these] three performance metric[s] this quarter." The Company's lone excuse was that it had "recently identified an error while migrating some data from our legacy business intelligence system [("BI")] to an upgraded BI system which impacted these metrics." Endurance attempted to reassure investors by claiming that the "[BI] system is completely separate from the [Enterprise Resource Planning ("ERP")] system that produces our financial and subscriber data." While the Company promised that it "will provide updated metrics information as soon as it is available,"[1] Endurance expressly

[1] As of the date of this Amended Complaint (December 8, 2015), the Company has still not made good on its promise to provide the real figures for these metrics during the Class Period. The Company's subsequent Quarterly Report on Form 10-Q filed with the SEC on November 6, 2015, indicated that Endurance is in the "process of recalculating and verifying [the] revised numbers for these metrics" and that the " revised figures for both the number of subscribers

admitted that "[r]evised numbers for both the number of product per subs and number of 500-plus subs are expected to be lower than the previously reported numbers." On this news, shares of Endurance declined $2.21 per share, or 16.5%, to close on November 2, 2015, at $11.12 per share.

14. As Endurance has admitted, during the Class Period, Endurance overstated key metrics (+$500 subscribers and PPS). Moreover, the Company has admitted that during the Class Period, the Company's ERP contained (purportedly) accurate "financial and subscriber data." By their own admission, Defendants recklessly reported and touted inflated +$500 subscribers and PPS metrics even though the Company's "separate" ERP system – which it used for purposes of tracking and reporting its financial results and subscriber data – contained (purportedly) more reliable yet lower numbers. The discrepancies in the data between the BI system and the ERP system would have alerted Endurance and the Defendants that the information generated by the BI system was unreliable. As such, Defendants choice to use the higher figures generated from the BI system (that did not jive with information available from the ERP system) for purposes of reporting +$500 subscribers and PPS metrics constituted severe recklessness.

15. As a result of Defendants' wrongful acts and omissions, and the precipitous decline in the market value of the Company's securities, Plaintiff and other Class members have suffered significant losses and damages.

## II. JURISDICTION AND VENUE

16. The claims asserted herein arise under Sections 10(b) and 20(a) of the Exchange

---

paying us $500 or more per year and the number of products per subscriber will be lower than our previously reported figures for those metrics." The Company's Quarterly Report also, reiterated its yet unfulfilled promise to investors (and the SEC) to "provide updated information for MRR and these other performance metrics once it is available."

Act (15 U.S.C. §§78j(b) and 78t(a)) and Rule 10b-5 promulgated thereunder by the SEC (17 C.F.R. § 240.10b-5).

17. This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §1331 and Section 27 of the Exchange Act (15 U.S.C. §78aa).

18. Venue is proper in this Judicial District pursuant to 28 U.S.C. §1391(b) and Section 27 of the Exchange Act (15 U.S.C. §78aa(c)). Substantial acts in furtherance of the alleged fraud or the effects of the fraud have occurred in this Judicial District. Many of the acts charged herein, including the preparation and dissemination of materially false and/or misleading information, occurred in substantial part in this Judicial District. Additionally, Endurance's principal executive offices are located within this Judicial District.

19. In connection with the acts, transactions, and conduct alleged herein, Defendants directly and indirectly used the means and instrumentalities of interstate commerce, including the United States mail, interstate telephone communications, and the facilities of a national securities exchange.

## III. PARTIES

20. Plaintiff Christopher Machado, as set forth in the accompanying certification, incorporated by reference herein, purchased Endurance common stock during the Class Period, and suffered damages as a result of the federal securities law violations and false and/or misleading statements and/or material omissions alleged herein.

21. Defendant Endurance is a Delaware corporation with its principal executive offices located at 10 Corporate Drive, Suite 300, Burlington, Massachusetts 01803.

22. Defendant Hari Ravichandran ("Ravichandran") was, at all relevant times, Chief Executive Officer ("CEO") of Endurance. Ravichandran is a founder of Endurance, and has served as a director of the Company periodically since its inception and continuously since 2007.

23. Defendant Tivanka Ellawala ("Ellawala") was, at all relevant times, Chief Financial Officer ("CFO") of Endurance until September, 2015. On August 3, 2015, Endurance announced that Ellawala would be stepping down as CFO of Endurance effective September 2015. Marc Montagner replaced Ellawala.

24. Defendants Ravichandran and Ellawala are collectively referred to hereinafter as the "Individual Defendants." The Individual Defendants, because of their positions with the Company, possessed the power and authority to control the contents of Endurance's reports to the SEC, press releases and presentations to securities analysts, money and portfolio managers and institutional investors, *i.e.*, the market. Each defendant was provided with copies of the Company's reports and press releases alleged herein to be misleading prior to, or shortly after, their issuance and had the ability and opportunity to prevent their issuance or cause them to be corrected. Because of their positions and access to material non-public information available to them, each of these defendants knew that the adverse facts specified herein had not been disclosed to, and were being concealed from, the public, and that the positive representations which were being made were then materially false and/or misleading. The Individual Defendants are liable for the false statements pleaded herein, as those statements were each "group-published" information, the result of the collective actions of the Individual Defendants.

## IV. BACKGROUND

25. Endurance provides web solutions for small and medium-sized businesses ("SMBs"). The Company's products and services include domains, website builders, web

hosting, email, security, storage, site backup, search engine optimization, search engine marketing, social media services, website analytics, mobile device tools and productivity, and e-commerce solutions.

**A. Endurance's Growth Strategy**

26. Throughout the Class Period, Endurance's growth strategy was centered on the two-pronged approach of (1) increasing the number of customers subscribed to the Company's products or services, and (2) increasing the average amount of revenue generated per subscriber by upselling those subscribers on one or more of the Company's purported 150 products and services. The Company continually informed investors of this strategy throughout the Class Period.

27. For Example, Defendant Ravichandran explained the strategy during the quarterly earnings conference call with investors and analysts on February 25, 2014:

> Given that we have so many new investors, who are still getting to know the company, we thought it might be useful to spend some time giving a high-level overview of Endurance. Our mission is to deliver superior cloud-based solutions that help small and medium-sized businesses succeed online. ***Our company's strategy is based on two simple principles. Organically adding more high-quality subscribers to our platform and selling our subscribers more value-added services***.
>
> * * *
>
> The second important aspect to our strategy involves increasing our average revenue per subscriber or ARPS, which we accomplished by distributing a broad portfolio of products across multiple points of engagement. We regularly add products to our broad portfolio and deploy those products via highly engaging customer touch points. Combined with our robust subscriber acquisition funnel, this strategy has a compounding effect that helps drive sustainable organic revenue growth.

28. Again, on February 28, 2014, the Company stated that "We believe total subscribers and ARPS will continue to be the key drivers of our revenue growth in the future,

and we intend to drive growth in both of these metrics by leveraging the strengths of our approach to serving the SMB market" in the Company's Annual Report filed on Form 10-K with the SEC.

29. The Company's emphasis on the two-pronged growth strategy continued in subsequent SEC filings throughout Fiscal year 2014. In the Quarterly Reports filed on Form 10-Q with the SEC on May 9, 2014, August 8, 2014, and November 7, 2014, under the heading "Growth Strategy," the Company stated: "We believe total subscribers and ARPS will continue to be the key drivers of our revenue growth in the future, and we intend to drive growth in both of these metrics by leveraging the strengths of our approach to serving the SMB market."

30. Defendants maintained the same growth strategy into fiscal year 2015. During the February 23, 2015 quarterly earnings conference call with investors and analysts, Defendant Ravichandran stated: "We continue to focus on our two key growth drivers of adding more subscribers to our platform and increasing our average revenue per subscriber called ARPS."

31. Defendants also emphasized that Endurance would continue the same growth strategy into the new fiscal year in the Company's Annual Report filed on Form 10-K with the SEC on February 27, 2015: "We believe total subscribers and ARPS will continue to be the key drivers of our revenue growth in the future, and we intend to drive growth in both of these metrics by leveraging the strengths of our approach to serving the SMB market."

32. Even after Gotham's report on the Company published in late April 2015, Defendant Ravichandran emphasized that total subscriber and average revenue per subscriber increases were the key to the Company's future growth. On May 5, 2015, during the quarterly earnings conference call with investors and analysts, Ravichandran stated: "We continue to

identify five key areas of focus on building upon our success to date and supporting our key growth drivers of subscriber and ARPS growth."

33. Finally, on August 4, 2015, Defendant Ravichandran identified ARPS growth as key to Endurance's long-term growth and success during the last quarterly earnings conference call with investors and analysts before the end of the Class Period:

> Our longer-term growth will be driven by our success in executing toward our initiatives in both the existing business and through M&A, and we see continued opportunity in the SMB market. We're very keen to capture market share by onboarding new subscribers with the introduction of new gateway products and utilizing our proven upsell model which we expect to drive better ARPS and subscriber retention over time.

**B. Endurance Reported and Touted Its Average Revenue Per Subscriber**

34. As a purported key driver of the Company's growth, the Company tracked and reported the average revenue per subscriber as a "key metric." Average Revenue Per Subscriber ("ARPS") is defined by the Endurance's Annual Report filed with the SEC on Form 10-K on February 28, 2014 as "the amount of revenue Endurance recognizes from subscribers in a period divided by the average of the number of total subscribers at the beginning of the period and at the end of the period."

35. Throughout the Class Period, Defendants touted the Company's ARPS in press releases, conference calls, and SEC filings.

36. The Company highlighted the importance or ARPS by reporting it under the heading "Key Metrics" in all Form 10-K and Form 10-Q filings. ARPS was one of seven key metrics for the fiscal year 2013 10-K and all 10-Qs filed in fiscal year 2014. ARPS was one of only 5 key metrics reported in the fiscal year 2014 10-K and the Q1 2015 10-Q. Finally, ARPS was one of only four key metrics listed in the Q2 and Q3 2015 10-Qs.

37. In addition, ARPS growth was consistently touted in quarterly results press releases.

38. For example, in the first paragraph of Endurance's quarterly earnings press release published on February 25, 2014, the Company stated: "we continued to increase our average revenue per subscriber (ARPS), which grew to $13.15 for the quarter." The Company also announced under the heading "Fourth Quarter Highlights" that:

> ARPS was $13.15 for the fourth quarter of 2013, representing a sequential increase of $0.01 from $13.14 for the third quarter of 2013. Apart from acquisitions completed in 2012, ARPS grew 9%, or $0.96, to $11.54 for the fourth quarter of 2013 from $10.58 for the fourth quarter of 2012.

39. Again, in the first paragraph of Endurance's quarterly earnings press release published on May 6, 2014, the Company touted: "Average revenue per subscriber, or ARPS, increased to $14.18, $13.45 before the impact of Directi, compared to $12.90 in the first quarter of 2013."

40. Subsequently, although ARPS was not touted in the first paragraph of the Company's quarterly press releases, it was still touted under the "highlights" section of the Company's quarterly earnings press releases. For example, in the press release published on August 7, 2014, as one of only three bullet points under the heading "Second Quarter Operating Highlights," the Company announce:

> Average revenue per subscriber (ARPS) was $14.33, an increase of 10 percent compared to $13.01 for the same period a year ago. Excluding the impact of Directi, ARPS was $13.35, an increase of 3 percent compared to $13.01 in the same period a year ago.

41. Again, on November 4, 2014, Endurance touted ARPS growth in its quarterly earnings press release. Therein, as one of only four bullet points under the heading "Third Quarter Operating Highlights," the Company announce:

> Average revenue per subscriber (ARPS) was $14.49, an increase of 10 percent compared to $13.14 for Q3 2013. Excluding the impact of Directi, ARPS was $13.54, an increase of 3 percent compared to $13.14 for Q3 2013 and an increase of $0.19 over Q2 2014.

42. Finally, on February 23, 2015, at the end of the last quarter for which Endurance saw positive quarter-over-quarter ARPS results, the Company touted ARPS in its quarterly results press release. As one of only four bullet points under the heading "Full Year & Fourth Quarter Operating Highlights," the Company announce:

> For the year, average revenue per subscriber ("ARPS") was $14.48, an increase of 11 percent compared to $13.09 in fiscal 2013. Excluding the impact of Directi, ARPS was $13.58, an increase of 4 percent compared to $13.09 in fiscal 2013. ARPS was $14.78 for the fourth quarter, an increase of 12 percent compared to $13.15 for fourth quarter 2013. Excluding the impact of Directi, ARPS was $13.86, an increase of 5 percent compared to $13.15 for fourth quarter 2013.

### C. Endurance Focused on and Touted the Number of Subscribers Paying More Than $500 Per Year and the Average Number of Products Per Subscriber as Drivers of Average Revenue Per Subscriber

43. In conjunction with ARPS, Endurance purportedly tracked the number of subscribers paying $500 or more per year for the Company's products and services ("+$500 subscribers"). Endurance also purportedly tracked the average number of products sold per subscriber ("PPS"). Endurance claimed that +$500 subscribers and PPS were both primary drivers of ARPS and touted increases in +$500 subscribers and PPS as evidence of ARPS growth potential.

44. For example, Defendant Ellwalla attributed ARPS growth to +$500 subscriber growth in during the earnings conference call on February 25, 2014, stating:

> Our average revenue per subscriber grew to $13.09 per month for the year. Excluding the impact of 2012 acquisition, the year-over-year growth was 9%. Underlying this increasing ARPS is strong growth amongst those subscribers paying $500 or more per year with us, which increased by approximately 20,000 in 2013 to nearly 100,000 by the year end.

45. In addition, the Company stated "We expect ARPS to increase as we sell more products and services to existing subscribers . . . ." in its Annual Report filed on Form 10-K with the SEC on February 28, 2014.

46. The Company also stated "We expect ARPS to increase as we increase sales to existing and new subscribers by offering additional products and services . . . ." in every Quarterly Report filed on Form 10-Q with the SEC during the 2014 fiscal year.

47. Defendants continued to emphasize the importance of upselling subscribers to drive ARPS at the end of fiscal year 2014, and into fiscal year 2015. In the Annual Reports filed with the SEC on Form 10-K on February 27, 2015, the Company stated "We expect ARPS to increase as we increase sales to existing and new subscribers by offering additional relevant products and services . . . ."

48. In addition, Endurance attributed positive ARPS growth to +$500 subscribers and PPS increases in the Company's SEC filings in fiscal year 2015. For example, in the Quarterly Report filed with the SEC on Form 10-Q on May 11, 2015, the Company stated:

> ARPS increased from $14.18 for the three months ended March 31, 2014 to $14.37 for the three months ended March 31, 2015. ***This growth in ARPS was driven primarily by an increase in the average number of products purchased per subscriber*** in addition to an initial web presence subscription for our major brands, which rose from 4.3 products per subscriber for the three months ended March 31, 2014 to 4.8 products per subscriber for the three months ended March 31, 2015; ***an increase in the number of subscribers of our major brands who spend more than $500 per year*** with us from 106,000 for the three months ended March 31, 2014 to 142,000 for the three months ended March 31, 2015; and an increase in premium domains sold through our BuyDomains and Directi businesses.

(Emphasis added).

49. Even when the Company was experiencing negative ARPS results, Ravichandran pointed to the Company's purported +$500 subscribers and PPS numbers as reason to remain

confident in the Company's future ARPS prospects. During the quarterly earnings conference call with investors and analysts on August 4, 2015, after reporting poor ARPS results, Defendant Ravichandran stated: "The increase in high-value subscribers and the increase in product attach rates give us confidence in our underlying ability to monetize our base of subscribers and grow ARPS over time."

50. Finally, the Company again attributed purportedly positive ARPS results to increases in +$500 subscribers and PPS in the Quarterly Report filed with the SEC on Form 10-Q on August 7, 2015. Therein, the Company stated:

> ARPS increased from $14.26 for the six months ended June 30, 2014 to $14.35 for the six months ended June 30, 2015. ***This $0.09 growth in ARPS, was driven primarily by an increase in the average number of products purchased per subscriber*** in addition to an initial web presence subscription for our major brands, which rose from 4.5 products per subscriber as of June 30, 2014 to 5.0 products per subscriber as of June 30, 2015; ***an increase in the number of subscribers of our major brands who spend more than $500 per year*** with us from 114,000 as of June 30, 2014 to 150,000 as of June 30, 2015; and an increase in premium domains sold through our BuyDomains and Directi businesses.

(Emphasis added).

**D. Endurance's Focus on Total Subscribers and Deceptive Use of "Churn Rate"**

51. As stated by Defendants, Endurance's growth strategy was based increasing ARPS as well as increasing the total number of subscribers to the Company's products and services. The Company purported tracked its subscriber count under the metric "Total Subscribers" and reported subscriber increases in press releases, conference calls, and SEC filings.

52. Endurance's total subscriber count is impacted by its ability to acquire subscribers, but it is also impacted by the Company's ability to retain current subscribers. In the web hosting industry, the measure of a Company's ability to retain customers is commonly

expressed as the Company's "churn rate" (or commonly, just "churn"). Typically, churn rate is defined as the percentage of subscribers to a service that discontinue their subscription to that service in a given time period. A low churn rate is evidence of a company's ability to retain current customers.

53. Endurance's competitors report churn. For example, GoDaddy Inc. ("GoDaddy") reports annual subscriber churn below 15%. Web.com Group, Inc. ("Web.com") – which defines churn as "customer cancellations in the quarter divided by the sum of the number of subscribers at the beginning of the quarter and the gross number of new subscribers added during the quarter, divided by three months – reports a churn rate of 1% per month.

54. However, Endurance did not typically report churn in its published materials. Instead, Endurance published "Monthly Recurring Revenue retention rate" ("MRR retention rate" or "MRR"), which the Company would also deceptively call "cash churn."

55. As described in the Company's Annual Report filed with the SEC on Form 10-K on February 28, 2014, Endurance calculated MRR "by taking the retained recurring value of subscription revenue of all active subscribers at the end of the prior period and dividing it into the retained recurring value of subscription revenue for those same subscribers at the end of the period presented."

56. "Cash churn," by definition, will be lower than (and thus conceal) subscriber churn as long as a company continues to, on average, upsell or otherwise increase the revenue generated from its current customer base. For example, if a business has 10 subscribers at the beginning of a period, each paying $10 per period, but loses 1 of its subscribers over the course of that period, the business' subscriber churn rate is 10% for the period. However, if the business can upsell the remaining 9 customers by $1 each, the business will still take in $99 for

the period (9 subscribers multiplied by $11 per subscriber). Compared to the $100 per period the Company was generating from its customers at the beginning of the period (10 subscribers multiplied by $10 per subscriber), the result is a loss of $1, or a cash churn rate of 1%.

57. Endurance's business model involved upselling its customer base. In addition, subscriptions to Endurance's products and services were routinely structured so that a subscriber would pay lower amounts at the start of service, but higher amounts the longer the subscriber subscribed to the product or service. These factors caused Endurance's cash churn to be lower than – and conceal – Endurance's poor subscriber churn.

## V. DEFENDANTS' MATERIALLY FALSE AND/OR MISLEADING STATEMENTS REGARDING THE NUMBER OF SUBSCRIBERS PAYING MORE THAN $500 PER YEAR AND THE AVERAGE NUMBER OF PRODUCTS PER SUBSCRIBER ISSUED DURING THE CLASS PERIOD

58. Throughout the Class Period, Defendants reported the number of +$500 subscribers and PPS. However, the reports were false and overstated.

59. On February 25, 2014, during the quarterly earnings conference call with investors and analysts, Defendant Ellawala stated:

> Our average revenue per subscriber grew to $13.09 per month for the year. . . . Underlying this increasing ARPS is strong growth amongst those subscribers paying $500 or more per year with us, which increased by approximately 20,000 in 2013 to nearly 100,000 by the year end.

60. On February 28, 2015, the Company confirmed and restated the results reported on the February 25, 2014 conference call. In the Company's Annual Report filed with the SEC on Form 10-K for the fiscal year ended December 31, 2013, the Company stated "The number of subscribers paying $500 or more per year for our products and services grew from approximately 73,000 as of December 31, 2011 to nearly 100,000 as of December 31, 2013." The Company's Form 10-K was signed by Defendant Ravichandran.

61. The statements contained in ¶¶59-60 are materially false and/or misleading because the number of subscribers paying $500 or more per year was lower than reported, as admitted during the Company's quarterly earnings conference call with investors and analysts on November 2, 2015.

62. On May 6, 2014, Defendant Ellawala again reported false +$500 subscriber numbers, and this time false PPS numbers, during the quarterly earnings conference call with investors and analysts. Defendant Ellawala stated:

> Average revenue per subscriber growth was also strong in the first quarter, increasing by $1.28 over the first quarter of 2013 to $14.18. Excluding Directi, average earnings per subscriber grew to $13.45, which is a $0.55 increase over the first quarter of 2013 and a $0.30 increase over the prior quarter. Increased product adoption rate again led this growth as the number of additional products sold per subscriber increased to 4.3 from 3.5 products per subscriber in the first quarter of 2013. Furthermore, the total number of subscribers paying us $500 or more per year also grew to 106,000, 6,000 more than just 3 months prior.

63. The statement contained in ¶62 is materially false and/or misleading because the number of subscribers paying $500 or more per year and the average number of products per subscriber were lower than reported, as admitted during the Company's quarterly earnings conference call with investors and analysts on November 2, 2015.

64. On August 7, 2014, Defendant Ellawala reported false +$500 subscriber and PPS numbers during the quarterly earnings conference call with investors and analysts. Specifically, Defendant Ellawala stated:

> Average revenue per subscriber and net subscriber add reflect typical seasonality in the business, as billings tend to be highest in the first quarter. In addition, product adoption rate increased growing to an average of 4.5 products per subscriber in the quarter from 3.7 products per subscriber in the second quarter of 2013. The number of subscribers who spend more than $500 per year on our products and services also increased to 114,000, an increase of 8,000 over the last quarter and a 14,000 increase over the end of last year.

65. In addition, During the question and answer portion of the same call, Defendant Ravichandran again reported and touted false +$500 subscriber results. In top of that, Defendant Ravichandran emphasized the importance of +$500 subscribers to ARPS growth. Specifically, Defendant Ravichandran stated:

> **Heath P. Terry – Analyst**
>
> I guess maybe to follow up a little bit on Stephen's question. But the increase that we saw on ARPS is that being driven either by specific services that are – that you're seeing more adoption of, maybe the mobile application side or is it higher prices on existing offerings that you're seeing there? . . . .
>
> **Defendant Ravichandran**
>
> Sure. I'd be happy to. So on the product side for your first question, Heath, I would say basically a lot of the benefit still coming for us I would say still from production adoption. Pricing, we are playing around with a little bit and trying to figure out what the right price points for different products are. So I would say probably a bit more skewed towards more product adoption versus the high priced product plans. But I do think that as you look at certain vintage cohorts more recently, as some of these new higher price products have become available, we certainly see good adoption there as well. But for the second quarter, I would say it's much more skewed towards additional product adoption versus at sort of the mid-to-lower end pricing versus a lot of higher end product adoption, even though that has been pretty robust as Tiv said in his remarks. ***We grew that $500 plus subscriber base by 8,000-ish subscribers, which was the strongest quarter-over-quarter growth since we've started reporting.*** So that's been positive. ***And we continue to keep pushing both levers and we feel that they both have a lot of benefit, product adoption, pricing, and higher priced products, all of them***.

(Emphasis added).

66. The statement contained in ¶¶64-65 are materially false and/or misleading because the number of subscribers paying $500 or more per year and the average number of products per subscriber were lower than reported, as admitted during the Company's quarterly earnings conference call with investors and analysts on November 2, 2015.

67. On November 4, 2014, Defendant Ellawala reported false +$500 subscriber and PPS numbers during the quarterly earnings conference call with investors and analysts. Specifically, Defendant Ellawala stated:

> Our average revenue per subscriber grew to $14.49, an increase of $1.35 from $13.14 in third quarter of 2013. Excluding Directi, our average revenue per subscriber grew to $13.54, a $0.40 or 3% increase from the third quarter of 2013. In addition, product attachment rates for our major brands increased, growing to an average of 4.6 products per subscriber in addition to an initial web presence subscription. This is up from 3.9 products per subscriber in the third quarter of 2013. The approximate number of subscribers of our major brands who spend more than $500 per year with us increased to 121,000 or 7,000 more than last quarter and 21,000 more than the end of last year.

68. The statement contained in ¶67 is materially false and/or misleading because the number of subscribers paying $500 or more per year and the average number of products per subscriber were lower than reported, as admitted during the Company's quarterly earnings conference call with investors and analysts on November 2, 2015.

69. Again, on February 23, 2015, Defendant Ellawala reported false +$500 subscriber and PPS numbers during the quarterly earnings conference call with investors and analysts. Specifically, Defendant Ellawala stated:

> Our average revenue per subscriber grew to $14.78 in the fourth quarter, an increase of $1.63 or 12% from $13.15 in the fourth quarter of 2013. Excluding Directi, our average revenue per subscriber grew to $13.86 or $0.71, a 5% increase from the fourth quarter of 2013. In addition, product attachment rates for our major brands increased, growing to an average of 4.7 products per subscriber, in addition to the initial web presence subscription, up from 4.1 products per subscriber in the fourth quarter of 2013. The approximate number of subscribers for our major brands who spend more than $500 per year with us increased to 131,000 or 10,000 more than last quarter and 32,000 more than the end of last year.

70. On February 27, 2015, the Company confirmed and restated the results reported on the February 23, 2015 conference call. In the Company's Annual Report, signed by

Defendant Ravichandran, and filed with the SEC on Form 10-K for the fiscal year ended December 31, 2014, the Company, in relevant part, stated:

> As of December 31, 2012, 2013 and 2014, subscribers of our major brands had purchased an average of 3.3, 4.1 and 4.7 products from us in addition to an initial web presence subscription. The number of subscribers of our major brands paying $500 or more per year for our products and services grew from approximately 73,000 as of December 31, 2011 to nearly 130,000 as of December 31, 2014.

71. The statement contained in ¶¶69-70 were materially false and/or misleading because the number of subscribers paying $500 or more per year and the average number of products per subscriber were lower than reported, as admitted during the Company's quarterly earnings conference call with investors and analysts on November 2, 2015.

72. On May 5, 2015, Defendant Ellawala again reported false +$500 subscriber and PPS numbers during the quarterly earnings conference call with investors and analysts. Specifically, Defendant Ellawala stated:

> During Q1, our average revenue per subscriber grew to $14.37, or 1% higher than the first quarter of 2014. The strong net subscriber additions which typically come with lower introductory pricing, as well as the impact of lower average revenue per subscribers on Arvixe, affected our average revenue per subscriber growth on a year-over-year basis. We expect our ARPS growth to normalize as we complete the integration of acquired subscribers and drive our upsell and cross sell opportunities as we have done in the past. We remain comfortable with on boarding new subscribers at introductory pricing as long as we are improving marketing yields and subscriber acquisition costs as this allows us to keep our subscriber lifetime values near historical levels, while on-boarding new subscribers and driving scale. The fundamentals behind our ARPS growth remain strong. Product attachment rates for our major brands increased, growing to an average of 4.8 products per subscriber in addition to an initial web presence subscription, up from 4.3 products per subscriber in the first quarter of 2014. Second, the number of subscribers of our major brands who spend more than $500 per year with us increased to approximately 142,000, or 11,000 more than last quarter, and 36,000 more than in Q1 of 2014, representing year-over-year growth of 34%.

73. On May 11, 2015, the Company confirmed and restated the false +$500 and PPS numbers previously reported on the May 5, 2015 conference call. On May 11, 2015, Endurance

filed its Quarterly Report with the SEC on Form 10-Q for the fiscal quarter ended March 31, 2015. The Company's Form 10-Q was signed by Defendant Ellawala. Therein, the Company, in relevant part, stated:

> ARPS increased from $14.18 for the three months ended March 31, 2014 to $14.37 for the three months ended March 31, 2015. This growth in ARPS was driven primarily by an increase in the average number of products purchased per subscriber in addition to an initial web presence subscription for our major brands, which rose from 4.3 products per subscriber for the three months ended March 31, 2014 to 4.8 products per subscriber for the three months ended March 31, 2015; an increase in the number of subscribers of our major brands who spend more than $500 per year with us from 106,000 for the three months ended March 31, 2014 to 142,000 for the three months ended March 31, 2015; and an increase in premium domains sold through our BuyDomains and Directi businesses.

74. The statement contained in ¶¶72-73 were materially false and/or misleading because the number of subscribers paying $500 or more per year and the average number of products per subscriber were lower than reported, as admitted during the Company's quarterly earnings conference call with investors and analysts on November 2, 2015.

75. Again, on August 4, 2015, Defendant Ellawala reported false +$500 subscriber and PPS numbers during the quarterly earnings conference call with investors and analysts. Specifically, Defendant Ellawala stated:

> Average revenue per subscriber in Q2 remained robust at $14.30, a decrease of $0.03 over Q2 of 2014. As a reminder, ARPS growth rates can be impacted by factors such as introductory pricing for new subscribers, our ability to migrate and increase product attach rates for subscribers acquired through M&A, and our ability to upsell existing subscribers. Given the opportunity to increase the number of subscribers on our platform and our proven formula for significant cash on cash returns once they're onboarded, we will continue to focus on building our subscriber base in the medium term which we expect will compress ARPS growth in favor of subscriber growth. The number of subscribers in our major brands spending over $500 per year with us increased 32% to 150,000 from 114,000 in Q2 of 2014. The average number of additional products per subscriber we sold over and above the base solution bundle for our major brands reached 5, an increase from 4.5 in Q2 2014. The increase in high-value subscribers and the

> increase in product attach rates give us confidence in our underlying ability to monetize our base of subscribers and grow ARPS over time.

76. During the question and answer portion of the same call, Defendant Ravichandran touted the number of subscribers paying $500 or more per year its relation to the health of the business. Specifically, Ravichandran stated:

> So the number of subscriber spending over $500 with us, it's gone up year-over-year by about 32%. It's at about 150,000 of them now as compared to 114,000 in Q2 of 2014. So, pretty good, robust increase. A lot of it are coming again from the introduction of new products, both on the frontend whereas customers are getting onboarded, we're able to price segment a little bit better. But also from our existing base of customers, graduating up as we get better and better with product distribution. So, we're pretty excited about that opportunity set.

77. On August 7, 2015, the Company confirmed and restated the false +$500 subscriber and PPS numbers announce during the August 4, 2015 conference call. On August 7, 2015 Endurance filed its Quarterly Report with the SEC on Form 10-Q for the fiscal quarter ended June 30, 2015. The Company's Form 10-Q was signed by Defendant Ellawala. Therein, the Company, in relevant part, stated:

> ARPS increased from $14.26 for the six months ended June 30, 2014 to $14.35 for the six months ended June 30, 2015. This $0.09 growth in ARPS, was driven primarily by an increase in the average number of products purchased per subscriber in addition to an initial web presence subscription for our major brands, which rose from 4.5 products per subscriber as of June 30, 2014 to 5.0 products per subscriber as of June 30, 2015; an increase in the number of subscribers of our major brands who spend more than $500 per year with us from 114,000 as of June 30, 2014 to 150,000 as of June 30, 2015; and an increase in premium domains sold through our BuyDomains and Directi businesses.

78. The statement contained in ¶¶75-77 were materially false and/or misleading because the number of subscribers paying $500 or more per year and the average number of products per subscriber were lower than reported, as admitted during the Company's quarterly earnings conference call with investors and analysts on November 2, 2015.

## VI. DEFENDANTS' MATERIALLY FALSE AND/OR MISLEADING STATEMENTS REGARDING THE COMPANY'S CHURN RATE ISSUED DURING THE CLASS PERIOD

79. Endurance touted its subscriber churn rate while, throughout the Class Period, hiding the true subscriber churn rate by shifting the discussion to the topic of cash churn whenever churn was brought up by analysts or investors.

80. On May 6, 2014, Defendant Ravichandran claimed that the Company looks at the subscriber churn rate, and that subscriber churn continues to "keep doing really well" during the Company's quarterly earnings conference call with investors and analysts,:

> **Gray Powell - Analyst**
>
> And then on the competitive side. I mean can you just kind of talk about what you're seeing in the market? Anecdotally we've heard that one of the larger players in the space is acting a little bit more rational as they prep for an IPO. I'm just curious what you're seeing?
>
> **Defendant Ravichandran**
>
> Sure. I mean so we'll just call it out. GoDaddy is the one that you're referring to, and in general we've kind of co-existed with the folks at GoDaddy for the last ten years. In general we've always thought -- found them to be thoughtful, good operators of their business. The benefit we both have is that it's quite a large space.
>
> There's been good amount of room for both them to grow and for us to grow. Their go-to-market strategy has been very different than ours. They've gone to market traditionally with a domain-led solution while we go out to market with web presence. They've done it by building a big brand with a lot of offline marketing. We've done that by really purely online marketing and success-based marketing.
>
> So really we have not had a lot of channel conflict with the folks at GoDaddy and really at the end of the day we look at the metrics, we look at the SACs, ***we look at the churn rates***, we look at our net subscriber addition, ***we look at MMR***. ***All of those metrics continue to keep doing really well***, and that's not that inconsistent with the last eight or ten years we've all coexisted together in the space.

(Emphasis added).

81. The statement contained in ¶80 is materially false and/or misleading because the Company's subscriber churn rate was 20% in fiscal year 2014, as admitted on the May 5, 2015 quarterly earning conference call with investors and analysts, which is very high compared to competitors, and was not "doing really well" as claimed by Ravichandran.

82. In addition, throughout the Class period, Defendants shifted the discussion to the topic of "cash churn" or MRR when investors and analysts asked about "churn" in order to conceal the Company's poor churn rate.

83. For example, on August 12, 2014, at the Oppenheimer Technology, Internet & Communication Conference, an investor/analyst specifically asked about Endurance's churn rate. Defendant Ellawala shifted the conversation away from discussing subscriber churn, stating "And our churn rates; well, we publish cash churn rates. Our MRR churn rate was about 1% a month or 99% renewal per month, which then equates to about 88% to 89% cash renewal rates year-over-year."

84. Again, during the question and answer portion of the conference, an investor/analyst asked Ravichandran about churn, stating "So maybe talk a little about – I mean, you said churn is basically 1% a month. Basically, what is your lifetime value of a customer and have you been around long enough to know?" And again, Ravichandran changed the topic to instead talk about cash churn, stating "churn, again, as we said, the cash churn is about 1%."

85. The statements contained in ¶¶83-84 are materially false and/or misleading because the Company's subscriber churn rate was 20% in fiscal year 2014, as admitted on the May 5, 2015 quarterly earnings conference call with investors and analysts, which is very high compared to competitors. In addition, shifting discussion to a similarly-named metric – that by

definition would almost always produces a more favorable "churn rate" – was misleading because it concealed Endurance's poor subscriber churn rate.

86. Defendants also routinely touted Endurance's purported 1% cash churn per month, which made Endurance's churn rate appear comparable to Web.com's 1% per month or GoDaddy's approximately 15% per year.

87. For example, on September 11, 2014, during the Goldman Sachs Communacopia Conference, an analyst/investor asked Ravichandran generally about customer acquisition and return on investment. Ravichandran responded in part by mentioning "1% cash churn per month."

88. Again, on December 2, 2014, Ravichandran touted the Company's churn rate, stating "churn has been very consistent, so we're still generating kind of 1% cash churn a month, which is about an eight-year useful life for customers" at the Credit Suisse Technology Conference.

89. On January 13, 2015, Ravichandran touted the Company's churn rate at the Needham Growth Conference, stating:

> Cash churn rate a month is about 11.5% to 12% cash churn a year. So, it's a great thing about our business is that it's almost all recurring. It doesn't vary very much. It's a very kind of Steady Eddy business, because you've got four million, almost, customers that are paying you small amounts of dollars every month, that's all auto pay, it's credit card based. So, a variance in terms of revenue, up or down, is typically unusual in our business, because the churn rates are pretty low as well.

90. During the same event, Defendant Ravichandran again touted churn rate, making the same %1 claim, stating:

> Our marginal economics are pretty spectacular. So you end up with about $12 of contribution margin per customer. You've got about 1% churn rate; so useful life is about eight years. So you end up with about $1,200 plus of total contribution profit per customer over the course of their life on a PV basis.

91. The statements contained in ¶¶87-90 are materially misleading because the Company's subscriber churn rate was 20% in fiscal year 2014, as admitted on the May 5, 2015 quarterly earnings conference call with investors and analysts, which is very high compared to competitors. In addition, touting 1% "cash churn" while "churn" has a clear definition within the industry (it applies to subscriber churn) tends to mislead investors and analysts given that "cash churn" tends to conceal poor subscriber churn.

92. On February 23, 2015, Ravichandran discussed subscriber churn and gave investors reason to be confident in Endurance's subscriber churn, while never disclosing the true subscriber churn rate, during the Company's quarterly earnings conference call with investors and analysts:

> On the churn side, we have the good benefit of having a very tenured base of customer. What we've found with small businesses in our churn anyway, we find that 80% plus of our customers leave us because they're going out of business. 80% of churn happens because they're leaving, that their business is not performing anymore. So what we find though is that that number starts to get to be smaller and smaller in terms of churn number as businesses get older because the infant mortality in the first 14 months, 15 months of a small business lifecycle, there's a lot of risk as business. So as we get older as our base gets tenured, we keep getting good benefit from getting into the long tail of the survival curve where churn rates go down. The net impact of both of those really drives the net subscriber number and it is something that has been performing well for us as a business.

93. The statement contained in ¶92 is materially false and/or misleading because the Company's subscriber churn rate was 20% in fiscal year 2014, as admitted on the May 5, 2015 quarterly conference call with investors and analysts, which is very high compared to competitors. In addition, given such poor churn rates, it was not true and/or misleading for Ravichandran to claim that "we keep getting good benefit from getting into the long tail of the survival curve where churn rates go down" since any benefit was far outweighed by other subscriber losses, resulting in Endurance's poor churn rate.

94. On March 4, 2015, at the Morgan Stanley Technology Media and Telecom Conference, Ravichandran was asked to "review some of the trends in your churn which I know has always been very impressive." Ravichandran responded by, again, shifting the discussion away from subscriber churn, to talk about cash churn, stating:

> From the SMB standpoint, our churn that we kind of guide to is a cash churn number externally. It's about 1% a month, about 88% renewal rate on an annualized basis. So the good news is going into this year, we knew that 88% of the revenue base from last year was already in the bag, right.

95. The statement contained in ¶94 is materially misleading because the Company's subscriber churn rate was approximately 20% in fiscal year 2014, as admitted on the May 5, 2015 quarterly earnings conference call with investors and analysts, which is very high compared to competitors. In addition, shifting discussion to a similarly-named metric – that by definition would almost always produces a more favorable "churn rate" – concealed Endurance's poor subscriber churn rate.

## VII. <u>LOSS CAUSATION AND DEFENDANTS' STATEMENTS ISSUED AT THE END OF THE CLASS PERIOD</u>

96. On April 28, 2015, research firm Gotham City Research LLC published a report entitled "Endurance International Group: A Web of Deceit." The report cast doubt on certain of the Company's metrics, claiming they were inaccurate or misleading – including the Company's churn rate and ARPS (of which, +$500 subscribers and PPS are key drivers). With respect to ARPS, the report alleged:

> **Average Revenue per Subscriber is Down -13%, Not Up +11%**
>
> * * *
>
> **Reported Average Revenue per Subscriber ("ARPS") is Growing but Actual ARPS is Declining**

Despite the related party transactions, suspect international revenue, undisclosed subsidiary, and the undisclosed subsidiary's lies, perhaps Endurance possesses a strong core business. After all, EIGI reports very strong ARPU (they call it "ARPS" or Average Revenue per Subscriber", which in tech-land is similar to "Camp Store Sales") of over -10%:

**EIGI's Reported ARPS**

| | 2011 | 2012 | 2013 | 2014 |
|---|---|---|---|---|
| Adjusted revenue | | $ 474,115 | $ 528,119 | $ 651,945 |
| Total subscribers | 2,845 | 3,223 | 3,502 | 4,087 |
| Reported ARPS | $12.84 | $12.92 | $13.09 | $14.48 |
| % change | | 0.62% | 1.32% | 10.62% |

Revenue in 1,000s of $s, and total subscribers in 1,000s

Not only is EIGI's reported ARPS growing, Endurance appears to be outperforming its peers:

**EIGI ARPU & ARPU Growth vs Peers**

| | 2012 | 2013 | 2014 |
|---|---|---|---|
| GDDY | $7.75 | $8.67 | $9.50 |
| WWWW | $13.44 | $14.24 | $14.62 |
| EIGI | $12.92 | $13.09 | $14.48 |
| | | % change in ARPU | |
| GDDY | | 11.8% | 9.6% |
| WWWW | | 6.0% | 2.7% |
| EIGI | | 1.3% | 10.6% |

Icing on the cake: Directi's ARPS looks breathtakingly amazing and "accretive" to overall ARPS. The implied Directi ARPS is $72 per month or 5x-6x EIGI's historical ARPS:

**DIRECTI ARPS ACCORDING TO EIG**

| | 2013 | 2014 |
|---|---|---|
| Directi revenue | n.a. | $48,499 |
| Directi subscribers | n.a. | 56 |
| **Directi ARPS** | n.a. | **$72.17** |
| **EIGI Reported ARPS** | $13.09 | $14.48 |

$ & subscribers in 1,000s except ARPS

We estimate that EIGI's true ARPS actually declined in 2014 by around - 13%:

**EIGI Actual 2014 ARPS Declined**

| | 2011 | 2012 | 2013 | 2014 |
|---|---|---|---|---|
| Adjusted revenue | | $ 474,115 | $ 528,119 | $ 651,945 |
| total subscribers - reported | 2,845 | 3,223 | 3,502 | 4,031 |
| Directi end subscribers | | | 1,000 | 1,000 |
| total subscribers - actual | | | 4,502 | 5,031 |
| Reported ARPS | ###### | $12.92 | $13.09 | $14.48 |
| **Actual ARPS** | **12.84** | **$12.92** | **$13.09** | **$11.40** |
| % growth in ARPS | | $ 0.01 | 1.3% | (12.9%) |

All figures except ARPS are in 1,000s
total subscribers subtracts the 56 implied directi resellers.

**How Endurance's 'Subscriber' is not necessarily a subscriber**
Gotham City Research believes that a subscriber is a subscriber. The definition is and should be quite simple. In fact, Godaddy seems to agree (their definition of a subscriber is simple and clean relative to EIGI's). Endurance, on the other hand, defines a subscriber as either a customer or a reseller (a reseller may account for lOs if not 100s of customers).

According to Endurance International Group4:

Total Subscribers = Subscribers (excluding Directi) + Directi’s Resellers

According to Gotham City Research:

Total Subscribers = Subscribers (excluding Directi) + Directi's Subscribers

When it comes to Endurance's recent acquisition, Directi, EIGI adds Directi's resellers as subscribers to EIGI's total subscriber count, rather than Direct's end subscribers. We can't think of any good reasons for doing this, given that Endurance includes its end subscribers in its subscriber count.

*The customers added as* a *result of Directi includes* a *significant number of resellers, which reduces the total amount of Directi's contribution* to *total subscribers* ***because we count onlv the resellers. and not their end customers, as subscribers.***

EIGI includes the above clarification, that it counts Directi's resellers (as customers), and not its end customers, only in the 10Q not the 10K.




**Additional Ways Endurance's ARPS is Misrepresented**

Endurance obfuscates the definition of a subscriber further than illustrated above:

- In Q4 2014 the company changed the definition of a subscriber (which added increases subscribers), and did not discuss this change on the quarterly call.
- EIGI does not count as subscribers those who purchase only domain names as subscribers (but they count the revenue!).
- EIGI does not count subscribers those who access solutions via resellers as subscribers. The directi adjustment we make does not account for domestic resellers that EIGI counts as subscribers.

Investors rely on accurate figures from companies so that they can then make their investment decisions accordingly. Clearly CEO Ravichandran and the Company's misrepresentations regarding ARPS betray that trust.

WWWW, EIGI's most comparable peer (and whose shares have declined -36% over the last 12 months), has recently warned about ARPS declining:

> *"ARPU is expected* to *decline sequentially in the first quarter of 2015, primarily due to the issues that impacted our DIY and DIFM businesses in the fourth quarter of 2014."*

**Endurance's ARPS Don't Add Up - A common symptom in cases where numbers are fabricated**

Unsurprisingly, EIGI's reported ARPS does not add up to the calculated amounts derived from using the figures they disclose:

**ARPS Numbers Don't Reconcile**

| | 2011 | | 2012 | | 2013 | | 2014 |
|---|---|---|---|---|---|---|---|
| Adjusted revenue | | $ | 474,115 | $ | 528,119 | $ | 651,945 |
| total subscribers | 2,845 | | 3,223 | | 3,502 | | 4,087 |
| Reported ARPS | $12.84 | | $12.92 | | $13.09 | | $14.48 |
| Calculated ARPS | | $ | 13.02 | $ | 13.09 | $ | 14.32 |
| Irregularity | | $ | 0.10 | $ | (0.00) | $ | (0.16) |

Their reported ARPS excluding Directi do not add up either.

**Godaddy's ARPU is Lower than Endurance's ARPU - Possible Explanations**

Even with the correct Directi adjustments, EIGl's ARPU exceeds Godaddy's. Possible explanations:

- Endurance's slippery total subscriber definition may account for the entire variation. For example, Endurance may count certain domestic resellers as subscribers, rather than counting the end customers. This may sufficiently lower EIGI's ARPU.
- Endurance may attractive far more suspect accounts, e.g. malware/spam accounts. These accounts are probably very profitable on a per subscriber basis (we explore this further in the following sections).

97. With respect to churn, Gotham shed light on the misleading nature of Endurance's reported "cash churn." Specifically, Gotham alleged that "EIGI's True Churn is Very High." Gotham noted that "The implied churn rate of 1% (since EIGI does not disclose churn), implies the company has industry leading churn" which Gotham pointed out, was likely false:

EIGI's CEO has claimed that:

> "85% to sometimes it's higher than 90% of the subscriber churn that happens is businesses just going out of business. So this is off the churn number. 85% to 90% would be people going out of business."

So if we are to trust Ravichandran and EIGI, churn is %1 per month, and 85%-90% of that is from "people going out of business." Yet US statistics regarding business survival consistently shows that businesses closure (due to failure or voluntary closure) within the first year has been a remarkably steady 20-25% the 1994-2010 period.

> Ravichandran's explanation would imply that new customers hosting on EIGI brands only close shop at a rate of 10%- 11%, significantly less than the 20-26% historical rate. We don't think that's the case, especially coupled with the significant service outages, customer complaints, integration issues, and other problems we've discussed in prior sections.

98. On news of Gotham's report on the Company, shares of Endurance declined $2.24 per share, over 10%, to close on April 28, 2015, at $19.70 per share, on unusually heavy volume.

99. As fiscal year 2015 continued, despite the Company's emphasis on the increases in +$500 subscribers and PPS, which it touted as drivers of ARPS, the Company's quarter-to-quarter ARPS results began to decline.

100. On May 5, 2015, Endurance issued a press release disclosing that ARPS for the first quarter of fiscal year 2015 was $14.37, a decrease of $0.41 compared to the quarter prior. The press release was entitled "Endurance International Group Reports 2015 First Quarter Results." Therein, the Company stated:

> **<u>First Quarter Operating Highlights</u>**
>
> - Total subscribers on platform were approximately 4.206 million, an increase of approximately 119,000 in the first quarter. See "Total Subscribers" below.
>
> - Average revenue per subscriber (ARPS) was $14.37, an increase of 1 percent compared to $14.18 for the first quarter of 2014.

101. On the same day, during the quarterly conference call with investors and analysts, Defendant Ravichandran disclosed that the Company's churn rate was approximately 20% for fiscal year 2014:

> Given that we manage our business to cash flow, we believe the most appropriate way to evaluate our churn is to look at cash churn. To help with this, we report monthly recurring revenue retention rate or MRR. MRR is a combination of both subscriber churn and of increases in cash collected from subscribers as we sell more products to them. Our MRR has consistently been approximately 99% or

> 1% monthly cash churn or approximately 12% annually. ***Our pure subscriber churn in 2014 was approximately 20% annually***.

(Emphasis added).

102. On this news, shares of Endurance declined $0.47 per share, or 2.3%, to close on May 5, 2015, at $19.18 per share.

103. On August 4, 2015, Endurance issued a press release disclosing that ARPS declined even further, to $14.30 for the quarter, a decrease of $0.07 from the quarter prior. The press release was entitled "Endurance International Group Reports 2015 Second Quarter Results." Therein, the Company stated:

> **<u>Second Quarter Operating Highlights</u>**
>
> - Total subscribers on platform were approximately 4.394 million, including approximately 86,000 subscribers from businesses acquired during the quarter. See "Total Subscribers" below.
>
> - Average revenue per subscriber (ARPS) was $14.30, compared to $14.33 for the second quarter of 2014.
>
> - During the quarter, the company acquired assets of Verio and Site5. The total cash consideration for these acquisitions is expected to be approximately $36 million.

104. On the same day, Oppenheimer & Co. Inc. published an analyst report on Endurance. The report, discussing the slowdown in ARPS, stated that the Company needed to increase quality disclosures surrounding the company's newly added subscribers and ARPS drivers. The report noted that the lack of clarity in the Company's disclosures surrounding ARPS was leading Oppenheimer to question whether the Company was adding lower quality subscribers, that were paying less, and which could lead to higher churn rates over time.

105. On this news, shares of Endurance declined $2.41 per share, or 11.7%, to close on August 4, 2015, at $18.12 per share.

106. However, the same day, during the Company's earnings conference call with investors and analysts, Defendant Ravichandran reassured investors regarding the Company's falling ARPS by citing the false increases in +$500 subscribers and PPS, stating "the increase in high-value subscribers and the increase in product attach rates give us confidence in our underlying ability to monetize our base of subscribers and grow ARPS over time."

107. Finally, on November 2, 2015, the truth regarding +$500 subscribers and PPS was finally revealed. During the quarterly earnings conference call with investors and analysts, the Company disclosed that past representations of the number of subscribers paying $500 or more per year and the number of products per subscriber were false. The Company, in relevant part, stated:

> Turning to other metrics, I would like to mention that we are not showing three performance metric this quarter, monthly recurring revenue or MRR, number of product per subs, PPS, and the number of subscribers paying us over $500 per year. We recently identified an error while migrating some data from our legacy business intelligence system to an upgraded BI system which impacted these metrics. We're on the process of recalculating these numbers. This system is completely separate from the ERP system that produces our financial and subscriber data. We believe that our previously reported MRR numbers will remain at 99% for at least the last four quarters.
>
> Revised numbers for both the number of product per subs and number of 500-plus subs are expected to be lower than the previously reported numbers. This does not impact our GAAP financial result, adjusted revenue, adjusted EBITDA, free cash flow, or unlevered free cash flow metrics. This also does not impact our subscriber comp, churn, unit economics. We will provide updated metrics information as soon as it is available.
>
> The purpose of the PPS and the 500-plus metrics was to provide additional insights to element that can directionally impact ARPS.

108. On this news, shares of Endurance declined $2.21 per share, or 16.5%, to close on November 2, 2015, at $11.12 per share.

109. On November 6, 2015, Endurance elaborated on the reason it was not reporting the three performance metrics identified in the earnings call, and reiterated that the recalculated +$500 subscriber and PPS numbers will be lower than previously reported. In the Company's Quarterly Report filed with the SEC on Form 10-Q, the Company stated:

> We are not reporting monthly recurring revenue, or MRR, retention rate figures in this Quarterly Report on Form 10-Q because we recently identified errors in our business intelligence system that impacted MRR as well as two of our other previously reported performance metrics, the number of products per subscriber and the number of subscribers paying us $500 or more per year. We are in the process of recalculating and verifying revised numbers for these metrics using an upgraded version of the business intelligence system that we believe has corrected these errors. Based on the work we have done to date, we believe that our previously reported MRR figures will remain at 99% for at least the last four quarters, which is as far back as we have completed our preliminary assessment, and that ***our revised figures for both the number of subscribers paying us $500 or more per year and the number of products per subscriber will be lower than our previously reported figures for those metrics***. These are preliminary conclusions and are subject to change based on the final results of our recalculation and verification process. These errors only affect these three performance metrics and do not impact our GAAP financial results, our adjusted EBITDA, free cash flow or unlevered free cash flow metrics, ARPS, or total subscriber figures. We intend to provide updated information for MRR and these other performance metrics once it is available.

(Emphasis added).

## VIII. <u>ADDITIONAL SCIENTER ALLEGATIONS</u>

### A. Management Was Heavily Focused On ARPS and Drivers of ARPS

110. Throughout the Class Period, management pursued a growth strategy based in large part on increasing the Company's ARPS. See ¶¶26-33. To that end, Defendants also aimed to increase +$500 subscribers and PPS numbers because Defendants viewed them as primary ARPS drivers. See ¶¶43-50.

111. In addition, Defendants encouraged investors and analysts to focus on ARPS by consistently reiterating that ARPS was key to the Company's growth strategy and touting ARPS

results in quarterly press releases, conference calls, and SEC filings. See ¶¶34-42. Specifically, ARPS was labeled a "key driver" of Endurance's growth, and the Company consistently touted ARPS under the "highlights" section of quarterly results press releases.

112. Defendants also encouraged investors and analysts to focus on +$500 subscribers and PPS results by pointing to them as primary ARPS drivers, and Defendant Ravichandran even reassured investors by citing the Company's purportedly strong +$500 subscriber and PPS growth after the Company reported poor ARPS results in August, 2015. See ¶49.

113. Given that ARPS, and the ARPS drivers were a central focus of Defendants' growth strategy and a central focus of the image of the Company that Defendants projected to investors and analysts, Defendants likely paid close attention to those ARPS drivers. Therefore, Defendants must have known, or at least must have recklessly disregarded, the fact that their reported number of subscribers paying more than $500 per year and the average number of products per subscriber were overstated.

**B. The Primary Drivers of ARPS Were Increasing as ARPS Was Decreasing**

114. Management was reporting decreasing ARPS numbers while at the same time reporting increases in the purported drivers of ARPS. This fact strengthens the inference that Defendants recklessly disregard the fact that the number of +$500 subscribers and PPS were overstated.

115. In the first and second quarters of 2015, Defendants reported decreasing ARPS of $14.37 (down from $14.78 a quarter prior), and $14.30, respectively.

116. For the same periods, Defendants reported an increase in the number of +$500 subscribers: 142,000 (up from 130,000 a quarter prior), and 150,000, respectively.

117. In addition, for the same periods, Defendant reported an increase in PPS: 4.8 (up from 4.7 a quarter prior), and 5.0, respectively. See chart, below.




118. The apparent inconsistency between decreasing ARPS on the one hand, and increasing ARPS drivers on the other, should have prompted Defendants to investigate the cause of the discrepancy.

119. This is especially the case given that, throughout the Class Period, Defendants actively monitored ARPS and ARPS drivers. Defendants claimed that they monitored the non-GAAP financial measures – including ARPS – in every 10-K and 10-Q financial report filed during the Class Period. In addition, during the November 4, 2014 quarterly earnings conference call, Defendant Ravichandran stated that Defendants were monitoring on a daily basis "subscriber events," including "cash billings" and "product take-up rates" – which are closely related to +$500 subscribers and PPS:

> We monitor tens of millions of subscriber events including cash billings, subscriber adds and losses, product take-up rates and marketing spend on a daily basis. Consequently, we're improving our ability to intervene and drive sales and marketing campaigns on a real-time basis thereby maximizing the ROI on our sales, support, and marketing investments.

120. In addition, Defendants admit that they had another system that produced financial and subscriber data. In the Nov 2, 2015 conference call, CFO Marc Montagner stated

> We recently identified an error while migrating some data from our legacy business intelligence system to an upgraded BI system which impacted these metrics. We're in the process of recalculating these numbers. ***This system is completely separate from the ERP system that produces our financial and subscriber data***.

(Emphasis added).

121. Given the inconsistency between ARPS and ARPS drivers, Defendants' claims that they continually monitored those metrics, and the claim that they had another system that tracked financial and subscriber data, Defendants must have recklessly disregarded the fact that the +$500 subscribers and PPS numbers they were reporting were false.

### C. Subscribers Paying more than $500 Per Year Accounted for Approximately 11% of the Company's Revenue

122. The subscribers paying more than $500 per month account for a large portion of Endurance's revenue. Since management was focused on revenue, they would have also been focused on the +$500 subscribers. Therefore, Defendants knew or recklessly disregarded the fact that their reported +$500 subscriber numbers were false.

123. Defendant Ravichandran stated that subscribers paying more than $500 per year account for approximately 11% of total revenue. During the Company's quarterly earnings conference call with investors and analysts on February 23, 2015, the following exchange occurred:

**Mitch P. Bartlett - Analyst**

Yeah. Good afternoon. I'm focused on the sub growth that you're seeing at the high-end of over $500 of revenues per year, it seems like 10,000 that you added in the quarter, 8% sequential growth, 32% year-over-year growth that's got to be fueling your ARPU in a pretty strong way and also the number of products. Do you think there is just a natural evolution that's happening within the sub base or are you just offering that many more them any more products that people are finding interesting to add?

**Defendant Ravichandran**

That's a great question, Mitch. From our perspective, it's really two dimensions. One is really it's almost like a needle in the haystack problem for us where you've got four million customers. You've got one customer that might have a yoga studio and somebody else is the baker and the fragmentation is so vast within this SMB marketplace, it's hard to find products that are appealing to all these customers or finding pockets of customers to whom certain high price products are going to be valuable is a big data challenge and we've been working on that for the last couple of years. We're getting better and better at identifying pockets of value within in our customer base, made some big strides last year, we've made some investments into the data management platform we've brought in some pretty senior and excellent talent into that mix as well. So we're getting better and better at fitting products to the customer base and that's driving better take rates. At the same time, as people consume the product, you also learn a lot about what other products they need, so that's also fueling quite a bit of information and knowledge about what products would drive high value for these pockets of customers and how we can get them to adopt them better. So obviously with – ***if you did the math at $500 plus, that's about 2.5% to 3% of base that's accounting for 10.5%, 11% of revenue, so that definitely has been a lot of goodness for the average revenue per subscriber side of it. So I think that's positive. We see quite a bit more opportunity there going into this year, going into next year because we're only going to get better and better at this strategy.*** On the product take rate, on the more ubiquitous generic products where people are paying us between $15 and $20 a year per product, the benefit that we see there is as people get more and more engaged, the distribution there has gotten better as well. But that's the strategy we've had since 2007-2008 timeframe, that continues to grow very nicely, and the

(Emphasis added).

124. In addition, Defendant Ellawala stated that "we like to push ourselves and make sure that we're delivering kind of the best quarter possible. So a lot of the times as I tell our exec team here we're always fighting for that last 1% of revenues or 2%, we're always sort of working

on it" during the February 23, 2015 quarterly earnings conference call with investors and analysts.

125. Given that subscribers paying over $500 per year accounts for approximately 11% of Endurance's revenue and that management is "always fighting for that last 1% of revenues" Individual Defendants must have known, or were reckless in not knowing, that their reported +$500 subscriber numbers were overstated.

**D. The Defendants Ravichandran and Ellawala Were Motivated to Inflate the Company's Stock Price in Anticipation of the Offering in Late 2014**

126. Defendants Ravichandran and Ellawala knew their reported +$500 subscribers and PPS numbers were false and that subscriber churn was poor, but touted the metrics anyways in order to build investor confidence in the Company's ARPS and subscriber retention rates. They did this, in part, to inflate the Company's stock price so that they could personally benefit in the Company's November 21, 2014 offering.

127. On or around November 21, 2014, Endurance conducted a public offering of 3,000,000 shares. Selling stockholders also sold 10,000,000 shares in the offering, for a total offering of 13,000,000 shares. The offering price was $14.50 per share, or $13.92, after the underwriting discount. The underwriters held a 30-day option to purchase an additional 1,950,000 shares, which they exercised.

128. Both Defendants Ravichandran and Ellawala sold shares they beneficially owned as "selling stockholders" in the offering.

129. Ravichandran sold 819,280 shares plus 122,892 more pursuant to the underwriters' option, for a total of 942,172 shares. At $13.92 per share, after the underwriting discount, Ravichandran received $13,115,034 in the offering.

130. Ellawala sold 18,542 shares plus 2,781 more pursuant to the underwriters' option, for a total of 21,323 shares. At $13.92 per share, after the underwriting discount, Ellawala received $296,816 in the offering.

131. Defendants Ravichandran and Ellawala were motivated to inflate the Company's stock price in order to maximize the offering price, and as a result, maximize their own personal financial benefit as selling stockholders in the offering.

132. As discussed above, ARPS was a metric that Defendants, investors, and analysts were focused on in evaluating the health of Endurance. The number of +$500 subscribers and PPS were primary drivers of ARPS. In addition, +$500 subscribers accounted for more than 10% of Endurance's revenue and subscriber churn rate was a topic of focus for investors and analysts.

133. Defendants Ravichandran and Ellawala knew, or were reckless in not knowing, that their reported number of +$500 subscribers and PPS were false, and that their statements regarding churn rate were false and/or misleading, but chose to tout those metrics anyway. They did this in order to enhance the appearance of ARPS's health, the Company's churn rate, and as a result, Endurance's health to inflate Endurance's stock price to maximize their personal benefit in the offering.

### E. A Former Employee Confirmed That the Company's +$500 Subscriber and PPS Numbers Were Unreliable

134. A former employee ("CW1") confirmed that part of the system that the Company used to track the number of products customers were subscribed to, and the amount subscribers were paying, was unreliable and produced inflated numbers. Defendants recklessly disregarded that the Company's internal data was unreliable.

135. Endurance acquired HostGator.com LLC ("HostGator") in July 2012. HostGator was and still is one of Endurance's largest subsidiaries. HostGator is now identified by Endurance as one of Endurance's "brands."

136. CW1 was the Billing and Cancellations Supervisor at HostGator. CW1 reported to Christopher Zak, who reported to Patrick Pelanne, the COO of HostGator, who in turn reported to Adam Farrar, the CEO of HostGator. CW1 left HostGator in April 2014.

137. CW1 stated that HostGator used a billing system called "GatorBill" and was unaware of any other system by which data regarding HostGator's subscribers, amount subscribers were paying, and the number of products per subscriber could realistically be obtained.

138. CW also stated that GatorBill had many bugs and that the existence of these bugs was well known within HostGator. The CW explained that GatorBill would routinely:

(a) overcharge (or double-charge) subscribers for products they ordered,

(b) fail to remove products or subscriptions subscribers canceled, and

(c) associate products and services with a subscriber's account even if the subscriber was not paying for, or using, those products or service.

139. As an example, CW1 indicated that, on at least one occasion, GatorBill sent out over 50,000 bills to customers in error.

140. In response to the bugs, GatorBill management put a system put a system in place so that employees could repot the bugs. CW1 indicated that he and his co-workers spent so much time reporting bugs that they joked that they were GatorBill de-buggers more than they were billing-related employees. CW1 indicated that the issues were not being fixed when they were reported.

141. CW1 stated that the he would not trust any query of GatorBill regarding the number of products per subscriber, the revenue being generated from subscribers, or any metric derived from such queries, because of the bugs.

142. CW1 had two conversations with Patrick Pelanne – the Chief Operating Officer of HostGator since September 2012, and the Vice President of System Operations at Endurance since February 2014 – regarding GatorBill's unreliability.

143. Given GatorBill's well known bugs and the fact that GatorBill's unreliability was specifically discussed on at least two occasions with Endurance's Vice President of System Operations, Endurance management recklessly disregarded the fact that the +$500 subscriber and PPS numbers the Company obtained from the GatorBill system were unreliable – and thus that the numbers disseminated by Defendants were misleading.

## IX. CLASS ACTION ALLEGATIONS

144. Plaintiff brings this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a class, consisting of all those who purchased Endurance's securities between February 25, 2014 and November 2, 2015, inclusive (the "Class Period") and who were damaged thereby (the "Class"). Excluded from the Class are Defendants, the officers and directors of the Company, at all relevant times, members of their immediate families and their legal representatives, heirs, successors or assigns and any entity in which Defendants have or had a controlling interest.

145. The members of the Class are so numerous that joinder of all members is impracticable. Throughout the Class Period, Endurance's securities were actively traded on the Nasdaq Stock Market (the "NASDAQ"). While the exact number of Class members is unknown to Plaintiff at this time and can only be ascertained through appropriate discovery, Plaintiff

believes that there are hundreds or thousands of members in the proposed Class. Millions of Endurance shares were traded publicly during the Class Period on the NASDAQ. As of February 20, 2015, Endurance had 132,358,092 shares of common stock outstanding. Record owners and other members of the Class may be identified from records maintained by Endurance or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

146. Plaintiff's claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

147. Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation.

148. Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

(a) whether the federal securities laws were violated by Defendants' acts as alleged herein;

(b) whether statements made by Defendants to the investing public during the Class Period omitted and/or misrepresented material facts about the business, operations, and prospects of Endurance; and

(c) to what extent the members of the Class have sustained damages and the proper measure of damages.

149. A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of

individual litigation makes it impossible for members of the Class to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

## X. UNDISCLOSED ADVERSE FACTS

150. The market for Endurance's securities was open, well-developed and efficient at all relevant times. As a result of these materially false and/or misleading statements, and/or failures to disclose, Endurance's securities traded at artificially inflated prices during the Class Period. Plaintiff and other members of the Class purchased or otherwise acquired Endurance's securities relying upon the integrity of the market price of the Company's securities and market information relating to Endurance, and have been damaged thereby.

151. During the Class Period, Defendants materially misled the investing public, thereby inflating the price of Endurance's securities, by publicly issuing false and/or misleading statements and/or omitting to disclose material facts necessary to make Defendants' statements, as set forth herein, not false and/or misleading. Said statements and omissions were materially false and/or misleading in that they failed to disclose material adverse information and/or misrepresented the truth about Endurance's business, operations, and prospects as alleged herein.

152. At all relevant times, the material misrepresentations and omissions particularized in this Complaint directly or proximately caused or were a substantial contributing cause of the damages sustained by Plaintiff and other members of the Class. As described herein, during the Class Period, Defendants made or caused to be made a series of materially false and/or misleading statements about Endurance's financial well-being and prospects. These material misstatements and/or omissions had the cause and effect of creating in the market an unrealistically positive assessment of the Company and its financial well-being and prospects, thus causing the Company's securities to be overvalued and artificially inflated at all relevant times. Defendants' materially false and/or misleading statements during

the Class Period resulted in Plaintiff and other members of the Class purchasing the Company's securities at artificially inflated prices, thus causing the damages complained of herein.

## XI. APPLICABILITY OF PRESUMPTION OF RELIANCE (FRAUD-ON-THE-MARKET DOCTRINE)

153. The market for Endurance's securities was open, well-developed and efficient at all relevant times. As a result of the materially false and/or misleading statements and/or failures to disclose, Endurance's securities traded at artificially inflated prices during the Class Period. On April 23, 2015, the Company's stock closed at a Class Period high of $23.03 per share. Plaintiff and other members of the Class purchased or otherwise acquired the Company's securities relying upon the integrity of the market price of Endurance's securities and market information relating to Endurance, and have been damaged thereby.

154. During the Class Period, the artificial inflation of Endurance's stock was caused by the material misrepresentations and/or omissions particularized in this Complaint causing the damages sustained by Plaintiff and other members of the Class. As described herein, during the Class Period, Defendants made or caused to be made a series of materially false and/or misleading statements about Endurance's business, prospects, and operations. These material misstatements and/or omissions created an unrealistically positive assessment of Endurance and its business, operations, and prospects, thus causing the price of the Company's securities to be artificially inflated at all relevant times, and when disclosed, negatively affected the value of the Company stock. Defendants' materially false and/or misleading statements during the Class Period resulted in Plaintiff and other members of the Class purchasing the Company's securities at such artificially inflated prices, and each of them has been damaged as a result.

155. At all relevant times, the market for Endurance's securities was an efficient market for the following reasons, among others:

(a) Endurance stock met the requirements for listing, and was listed and actively traded on the NASDAQ, a highly efficient and automated market;

(b) As a regulated issuer, Endurance filed periodic public reports with the SEC and/or the NASDAQ;

(c) Endurance regularly communicated with public investors *via* established market communication mechanisms, including through regular dissemination of press releases on the national circuits of major newswire services and through other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services; and/or

(d) Endurance was followed by securities analysts employed by brokerage firms who wrote reports about the Company, and these reports were distributed to the sales force and certain customers of their respective brokerage firms. Each of these reports was publicly available and entered the public marketplace.

156. As a result of the foregoing, the market for Endurance's securities promptly digested current information regarding Endurance from all publicly available sources and reflected such information in Endurance's stock price. Under these circumstances, all purchasers of Endurance's securities during the Class Period suffered similar injury through their purchase of Endurance's securities at artificially inflated prices and a presumption of reliance applies.

## XII. <u>NO SAFE HARBOR</u>

157. The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the allegedly false statements pleaded in this Complaint. The statements alleged to be false and misleading herein all relate to then-existing facts and conditions. In addition, to the extent certain of the statements alleged to be false may be

characterized as forward looking, they were not identified as "forward-looking statements" when made and there were no meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements. In the alternative, to the extent that the statutory safe harbor is determined to apply to any forward-looking statements pleaded herein, Defendants are liable for those false forward-looking statements because at the time each of those forward-looking statements was made, the speaker had actual knowledge that the forward-looking statement was materially false or misleading, and/or the forward-looking statement was authorized or approved by an executive officer of Endurance who knew that the statement was false when made.

## XIII. COUNTS

### FIRST CLAIM
### Violation of Section 10(b) of The Exchange Act and Rule 10b-5 Promulgated Thereunder Against All Defendants

158. Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

159. During the Class Period, Defendants carried out a plan, scheme and course of conduct which was intended to and, throughout the Class Period, did: (i) deceive the investing public, including Plaintiff and other Class members, as alleged herein; and (ii) cause Plaintiff and other members of the Class to purchase Endurance's securities at artificially inflated prices. In furtherance of this unlawful scheme, plan and course of conduct, defendants, and each of them, took the actions set forth herein.

160. Defendants (i) employed devices, schemes, and artifices to defraud; (ii) made untrue statements of material fact and/or omitted to state material facts necessary to make the statements not misleading; and (iii) engaged in acts, practices, and a course of business which

operated as a fraud and deceit upon the purchasers of the Company's securities in an effort to maintain artificially high market prices for Endurance's securities in violation of Section 10(b) of the Exchange Act and Rule 10b-5. All Defendants are sued either as primary participants in the wrongful and illegal conduct charged herein or as controlling persons as alleged below.

161. Defendants, individually and in concert, directly and indirectly, by the use, means or instrumentalities of interstate commerce and/or of the mails, engaged and participated in a continuous course of conduct to conceal adverse material information about Endurance's financial well-being and prospects, as specified herein.

162. These defendants employed devices, schemes and artifices to defraud, while in possession of material adverse non-public information and engaged in acts, practices, and a course of conduct as alleged herein in an effort to assure investors of Endurance's value and performance and continued substantial growth, which included the making of, or the participation in the making of, untrue statements of material facts and/or omitting to state material facts necessary in order to make the statements made about Endurance and its business operations and future prospects in light of the circumstances under which they were made, not misleading, as set forth more particularly herein, and engaged in transactions, practices and a course of business which operated as a fraud and deceit upon the purchasers of the Company's securities during the Class Period.

163. Each of the Individual Defendants' primary liability, and controlling person liability, arises from the following facts: (i) the Individual Defendants were high-level executives and/or directors at the Company during the Class Period and members of the Company's management team or had control thereof; (ii) each of these defendants, by virtue of their responsibilities and activities as a senior officer and/or director of the Company, was privy to and

participated in the creation, development and reporting of the Company's internal budgets, plans, projections and/or reports; (iii) each of these defendants enjoyed significant personal contact and familiarity with the other defendants and was advised of, and had access to, other members of the Company's management team, internal reports and other data and information about the Company's finances, operations, and sales at all relevant times; and (iv) each of these defendants was aware of the Company's dissemination of information to the investing public which they knew and/or recklessly disregarded was materially false and misleading.

164. The defendants had actual knowledge of the misrepresentations and/or omissions of material facts set forth herein, or acted with reckless disregard for the truth in that they failed to ascertain and to disclose such facts, even though such facts were available to them. Such defendants' material misrepresentations and/or omissions were done knowingly or recklessly and for the purpose and effect of concealing Endurance's financial well-being and prospects from the investing public and supporting the artificially inflated price of its securities. As demonstrated by Defendants' overstatements and/or misstatements of the Company's business, operations, financial well-being, and prospects throughout the Class Period, Defendants, if they did not have actual knowledge of the misrepresentations and/or omissions alleged, were reckless in failing to obtain such knowledge by deliberately refraining from taking those steps necessary to discover whether those statements were false or misleading.

165. As a result of the dissemination of the materially false and/or misleading information and/or failure to disclose material facts, as set forth above, the market price of Endurance's securities was artificially inflated during the Class Period. In ignorance of the fact that market prices of the Company's securities were artificially inflated, and relying directly or indirectly on the false and misleading statements made by Defendants, or upon the integrity of

the market in which the securities trades, and/or in the absence of material adverse information that was known to or recklessly disregarded by Defendants, but not disclosed in public statements by Defendants during the Class Period, Plaintiff and the other members of the Class acquired Endurance's securities during the Class Period at artificially high prices and were damaged thereby.

166. At the time of said misrepresentations and/or omissions, Plaintiff and other members of the Class were ignorant of their falsity, and believed them to be true. Had Plaintiff and the other members of the Class and the marketplace known the truth regarding the problems that Endurance was experiencing, which were not disclosed by Defendants, Plaintiff and other members of the Class would not have purchased or otherwise acquired their Endurance securities, or, if they had acquired such securities during the Class Period, they would not have done so at the artificially inflated prices which they paid.

167. By virtue of the foregoing, Defendants have violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

168. As a direct and proximate result of Defendants' wrongful conduct, Plaintiff and the other members of the Class suffered damages in connection with their respective purchases and sales of the Company's securities during the Class Period.

## SECOND CLAIM
## Violation of Section 20(a) of
## The Exchange Act Against the Individual Defendants

169. Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

170. The Individual Defendants acted as controlling persons of Endurance within the meaning of Section 20(a) of the Exchange Act as alleged herein. By virtue of their high-level positions, and their ownership and contractual rights, participation in and/or awareness of the

Company's operations and/or intimate knowledge of the false financial statements filed by the Company with the SEC and disseminated to the investing public, the Individual Defendants had the power to influence and control and did influence and control, directly or indirectly, the decision-making of the Company, including the content and dissemination of the various statements which Plaintiff contends are false and misleading. The Individual Defendants were provided with or had unlimited access to copies of the Company's reports, press releases, public filings and other statements alleged by Plaintiff to be misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected.

171. In particular, each of these Defendants had direct and supervisory involvement in the day-to-day operations of the Company and, therefore, is presumed to have had the power to control or influence the particular transactions giving rise to the securities violations as alleged herein, and exercised the same.

172. As set forth above, Endurance and the Individual Defendants each violated Section 10(b) and Rule 10b-5 by their acts and/or omissions as alleged in this Complaint. By virtue of their positions as controlling persons, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act. As a direct and proximate result of Defendants' wrongful conduct, Plaintiff and other members of the Class suffered damages in connection with their purchases of the Company's securities during the Class Period.

## XIV. <u>PRAYER FOR RELIEF</u>

WHEREFORE, Plaintiff prays for relief and judgment, as follows:

(a) Determining that this action is a proper class action under Rule 23 of the Federal Rules of Civil Procedure;

(b) Awarding compensatory damages in favor of Plaintiff and the other Class members against all defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

(c) Awarding Plaintiff and the Class their reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

(d) Such other and further relief as the Court may deem just and proper.

## XV. JURY TRIAL DEMANDED

Plaintiff hereby demands a trial by jury.

DATED: December 8, 2015

**BLOCK & LEVITON LLP**

By: *<u>/s/ Jason M. Leviton</u>*

Jason M. Leviton (BBO #678331)
155 Federal Street, Suite 400
Boston, MA 02110
Telephone: (617) 398-5600
Facsimile: (617) 507-6020
Jason@blockesq.com

**GLANCY PRONGAY & MURRAY LLP**
Lionel Z. Glancy
Robert V. Prongay
Casey E. Sadler
Charles H. Linehan
1925 Century Park East, Suite 2100
Los Angeles, CA 90067
Telephone: (310) 201-9150
Facsimile: (310) 201-9160

**LAW OFFICES OF HOWARD G. SMITH**
Howard G. Smith
3070 Bristol Pike, Suite 112
Bensalem, PA 19020
Telephone: (215) 638-4847
Facsimile: (215) 638-4867

***Attorneys for Plaintiff Christopher Machado***

## CERTIFICATE OF SERVICE

I hereby certify that this document filed through the CM/ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF).

Dated: December 8, 2015

*/s/ Jason M. Leviton*
Jason M. Leviton