# UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| CHRISTOPHER MACHADO, Individually and on Behalf of All Others Similarly Situated,<br><br>Plaintiff,<br><br>v.<br><br>ENDURANCE INTERNATIONAL GROUP HOLDINGS, INC., HARI RAVICHANDRAN, and TIVANKA ELLAWALA,<br><br>Defendants. | Case No. 1:15-cv-11775-GAO<br><br>**SECOND AMENDED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS**<br><br>**JURY TRIAL DEMANDED** |

# TABLE OF CONTENTS

I.    NATURE OF THE ACTION ............................................................................. 1

II.    JURISDICTION AND VENUE .................................................................... 11

III.    PARTIES ......................................................................................................... 12

IV.    BACKGROUND ............................................................................................. 13

    A.    Endurance's Two-Pronged Growth Strategy, and the Two Metrics that Tracked Endurance's Execution of Its Growth Strategy: Total Subscribers, and ARPS ... 14

    B.    Endurance Reported and Touted Its Total Subscriber and Average Revenue Per Subscriber Growth Throughout the Class Period .................................................. 16

    C.    Endurance Focused on and Touted the Number of Subscribers Paying More Than $500 Per Year and the Average Number of Products Per Subscriber as Drivers of Average Revenue Per Subscriber........................................................................ 16

    D.    Endurance's Focus on Total Subscribers and Deceptive Use of "Churn Rate" ... 17

V.    SUMMARY OF DEFENDANTS' FRAUD..................................................... 19

    A.    The Company Published False and/or Misleading Total Subscribers Figures Because the Company Failed to Inform Investors of Inactive Customers Improperly Included in the Count, and Their Subsequent Exclusion in Q4 2014 19

    B.    The Company Published False and/or Misleading ARPS Figures Because the Company Failed to Inform Investors that an Increasing Percentage of the Company's ARPS was Due to "Domain Monetization" and Not Organic Subscriber Revenue Growth .............................................................................. 22

    C.    The Company Published Inflated +$500 Subscribers Figures and PPS Figures Which Inaccurately Portrayed Steady Growth .................................................... 25

VI.    ADDITIONAL SCIENTER ALLEGATIONS................................................ 29

    A.    Management Was Heavily Focused on ARPS and Drivers of ARPS ................. 29

    B.    The Primary Drivers of ARPS Were Purportedly Increasing as ARPS Was Decreasing........................................................................................................... 30

    C.    The Elimination of Inactive Customers Unbelievably Had No Effect on PPS..... 32

D.      Subscribers Paying More Than $500 Per Year Accounted for Approximately 11% of the Company's Revenue ........................................................................ 33

E.      The Defendants Ravichandran and Ellawala Were Motivated to Inflate the Company's Stock Price in Anticipation of the Offering in Late 2014 ................ 34

F.      A Former Employee Confirmed That the Company's +$500 Subscriber Figures were Unreliable ........................................................................................ 36

VII.    DEFENDANTS' MATERIALLY FALSE AND/OR MISLEADING STATEMENTS REGARDING TOTAL SUBSCRIBERS, ARPS, +$500 SUBSCRIBERS, AND PPS ISSUED DURING THE CLASS PERIOD .................................................... 36

A.      Defendants' Materially False and/or Misleading Statements Regarding Fiscal Year 2013 .................................................................................................... 38

B.      Defendants' Materially False and/or Misleading Statements Regarding the First Fiscal Quarter of 2014 .................................................................................... 40

C.      Defendants' Materially False and/or Misleading Statements Regarding the Second Fiscal Quarter of 2014 .................................................................................... 42

D.      Defendants' Materially False and/or Misleading Statements Regarding the Third Fiscal Quarter of 2014 .................................................................................... 44

E.      Defendants' Materially False and/or Misleading Statements Regarding Fiscal Year 2014 .................................................................................................... 47

F.      Defendants' Materially False and/or Misleading Statements Regarding the First Fiscal Quarter of 2015 .................................................................................... 50

G.      Defendants' Materially False and/or Misleading Statements Regarding the Second Fiscal Quarter of 2015 .................................................................................... 52

H.      Defendants' Materially False and/or Misleading Statements Regarding the Third Fiscal Quarter of 2015 .................................................................................... 56

VIII.   DEFENDANTS' MATERIALLY FALSE AND/OR MISLEADING STATEMENTS REGARDING THE COMPANY'S CHURN RATE ISSUED DURING THE CLASS PERIOD ........................................................................................................ 58

IX.     LOSS CAUSATION AND DEFENDANTS' STATEMENTS ISSUED AT THE END OF THE CLASS PERIOD ................................................................................ 62

X.      CLASS ACTION ALLEGATIONS ................................................................ 74

XI.    UNDISCLOSED ADVERSE FACTS ............................................................................ 75

XII.   APPLICABILITY OF PRESUMPTION OF RELIANCE (FRAUD-ON-THE-MARKET
       DOCTRINE) ...................................................................................................... 76

XIII.  NO SAFE HARBOR ................................................................................................. 79

XIV.   COUNTS .................................................................................................................. 79

XV.    PRAYER FOR RELIEF .............................................................................................. 84

XVI.   JURY TRIAL DEMANDED ......................................................................................... 84

1.      Lead Plaintiff Christopher Machado ("Plaintiff"), by and through his attorneys, alleges the following upon information and belief, except as to those allegations concerning Plaintiff, which are alleged upon personal knowledge. Plaintiff's information and belief is based upon, among other things, his counsel's investigation, which includes without limitation: (a) review and analysis of regulatory filings made by Endurance International Group Holdings, Inc. ("Endurance" or the "Company"), with the United States ("U.S.") Securities and Exchange Commission ("SEC"); (b) review and analysis of press releases and media reports issued by and disseminated by Endurance; (c) interviews with former Endurance employees; and (d) review of other publicly available information concerning Endurance.

## I.      <u>NATURE OF THE ACTION</u>

2.      This is a class action on behalf of purchasers of Endurance securities between February 25, 2014 and February 29, 2016, inclusive (the "Class Period"), seeking to pursue remedies under §§ 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act"). During the Class Period, the Company and certain officers of the Company reported false and/or misleading metrics figures relating to Company's total subscriber count, the number of products the Company's customers were purchasing, and the amount customers were paying for those products.  On December 10, 2015, as part of an SEC investigation into the Company, Endurance received a subpoena from the SEC's Boston Regional Office, requiring the production of certain documents, including documents related to Endurance's metrics.

3.      Endurance provides cloud-based platform solutions for small and medium-sized businesses ("SMBs").  The Company purportedly has approximately 4.6 million subscribers globally and offers over 150 products and services including domains, website builders, web hosting, email, security, storage, site backup, search engine optimization, search engine

marketing, social media services, website analytics, mobile device tools and productivity and e-commerce solutions aimed at SMBs.

4.      Endurance's growth strategy, which the Company constantly reiterated to investors and analysts, was based on a two-pronged strategy of (1) increasing the Company's subscriber base while (2) simultaneously increasing the average revenue generated per subscriber.   The Company tracked the size of its subscriber base under a metric "Total Subscribers," and tracked the average revenue generated per subscriber under the metric "Average Revenue Per Subscriber" (or "ARPS").   During the Class Period, Defendants routinely touted increases in the Company's Total Subscribers and ARPS as proof that it was executing this strategy.

5.      In addition to Total Subscribers and ARPS, the Company highlighted two additional metrics that Defendants claimed were "drivers" of ARPS: the number of customers paying over $500 per year for Endurance products and services ("+$500 subscribers") and the average number of products sold per subscriber ("PPS").   Defendants routinely attributed Endurance's purportedly positive ARPS results to increases in +$500 subscribers and PPS, and cited positive +$500 subscribers and PPS results as evidence of ARPS growth potential.

6.      Quarterly and annual results reported by Defendants painted a picture-perfect growth-pattern for +$500 subscribers and PPS, spanning nearly the entire Class Period.   As the below charts reflect,[1] the reported growth in +$500 subscriber and PPS metrics was an impressive upward stepping pattern:

[Charts on next page]

---

[1] The charts represent +$500 subscribers and PPS data as reported by the Company at the end of each fiscal quarter in the company's press releases, investor conference calls, and/or SEC filings.





7.      Defendants pointed to these perfect growth patterns to instill investor confidence in ARPS.  For example, when the Company reported some negative ARPS results in 2015, Defendants assuaged investors' concerns by pointing to +$500 subscribers and PPS growth as reason to be confident in the Company's future ARPS growth potential.

8.      It turns out, however, that the Company's reported picture-perfect +$500 subscribers and PPS growth was a fabrication.  The corrected figures, eventually published by Endurance in February 2016, illustrate that +$500 subscriber growth was near flat, and that quarter-to-quarter declines in PPS were more common than quarter-to-quarter increases.  In February 2016, Endurance issued the following Corrections to +$500 subscribers and PPS:





9.      Not only did Endurance publish false and misleading figures related to ARPS drivers (+$500 subscribers and PPS), Endurance published false and/or misleading ARPS figures

as well.  The Company reported increasing ARPS throughout the class period, until Q4 2014,[2]

when ARPS began a gradual decline:



10.     However, these ARPS figures were misleading because Defendants failed to
disclose that, beginning in Q4 2014, and continuing throughout the Class Period, ARPS became
increasingly inflated do to the Company's misleading treatment of domain-related revenue and
customers.  In September of 2014, the Company acquired the assets of the BuyDomains business
of NameMedia, Inc. ("BuyDomains").   As a result of the acquisition, Endurance's domain-
related revenue became an ever-increasing portion of the Company's total revenue.   Yet,

---

[2] The Company's fiscal year runs from January 1 to December 31, with each fiscal quarter
spanning three months.  As a shorthand, fiscal quarters are represented as "Q[quarter number]
[fiscal year]." For example, the fourth quarter of fiscal year 2014 which runs from October 1
through December 31, 2014 will be represented as "Q4 2014."

Endurance did not count customers that only purchased domains ("domain-only customers") in its Total Subscribers metric. The net effect of the Company's treatment of domain-only customers and domain revenue artificially inflated ARPS, which softened the ARPS drop in Q4 2014, and provided increasing support to ARPS through the end of the Class Period. For example, exclusion of domain revenue from Q3 2014 would decrease ARPS for that period by $0.07, but excluding domain revenue from Q3 2015 would decrease ARPS for that period by $0.77.

11.     In addition to the Company's false and misleading statement relating to the ARPS prong of the Company's growth strategy, the Company engaged in fraudulent conduct with respect to the other prong of its growth strategy: Total Subscribers.

12.     Endurance reported consistently increasing Total Subscribers throughout the Class Period. Defendants failed to disclose, however, that the Q4 2013, Q1 2014, Q2 2014, and Q3 2014 Total Subscribers figures were overstated because the Company improperly included inactive customers in the published figures. Moreover, when the Company eliminated the inactive customers from Total Subscribers in Q4 2014, rather than disclose the elimination to investors, Endurance changed the definition of Total Subscribers to include more of the Company's customers, in order to conceal the elimination of inactive customers.

13.     The Defendants also deceptively concealed the rate at which the Company was losing customers. To gain additional insight into the Company's Total Subscribers metric (and thus subscriber growth), investors and analysts were interested in the Company's ability to retain customers—which is commonly expressed in the industry as the company's "churn rate." A company's "churn rate" is loosely defined as the percentage of the company's total subscriber

base that the company loses during a given period.  The lower a company's churn rate, the better the company is at retaining its subscriber base, and thus, growing its total subscriber number.

14.     Defendants represented that the churn rate was "doing really well," but repeatedly declined (when asked) to reveal Endurance's actual churn rate.  Defendants intentionally omitted this information.  Instead, Defendants shifted the conversation to the Company's "MRR" (or "cash churn") metric—a metric which seemed comparable to the churn rate metric—but which actually served to conceal the Company's churn rate and thus mislead investors.  Amazingly, Defendants reported an unwavering MRR of 99% (or a cash churn of 1%) per month for the entire Class Period.  However, as later revealed by Defendants, the true churn rate was approximately 20% for fiscal year 2014.

15.     During the Class Period, Defendants painted a strong growth picture of increasing Total Subscribers, and increasing ARPS—or at least increasing ARPS drivers—and healthy subscriber growth and retention.  But, in reality, the Company was bleeding subscribers and taking on low revenue subscribers in order to offset the bleed.  This practice was driving down the Company's ARPS.  In response, Defendants pointed to false and/or misleading ARPS, ARPS drivers, Total Subscribers, and churn metrics to instill confidence in the Company's health and growth potential.

16.     However, the truth regarding Defendants multi-faceted scheme eventually and gradually found its way to the investing public.

17.     At the conclusion of Q4 2014, the Company reported a quarter-to-quarter decline in the Company's ARPS while, the same day, following the pattern of prior quarters, reporting steady +$500 subscribers and PPS growth.  Because these three metrics should be directly correlated (increased ARPS drivers should lead to increased ARPS), this ARPS decrease

indicated to investors that there may be issues with Company's reported +$500 subscribers and PPS figures.  On this news, shares of Endurance fell $0.80, or 4%, to close at $19.09 on February 23, 2015

18.     On April 28, 2015, research firm Gotham City Research LLC ("Gotham") published a report entitled "Endurance International Group: A Web of Deceit."  The report cast doubt on certain of the Company's metrics including the Company's churn rate, Total Subscribers, and ARPS.  Gotham alleged in the report that the Company's ARPS were overstated, and pointed out the Company had changed its definition of Total Subscribers in Q4 2014.  Gotham also pointed out that Endurance did not include domain-only purchasers in the Company's definition of Total Subscribers, and claimed that the Company's churn rate was much higher than Endurance claimed.  On this news, shares of Endurance declined $2.24 per share, over 10%, to close on April 28, 2015, at $19.70 per share, on unusually heavy volume.

19.     Only after faced with Gotham's Report, did Defendants admit the true churn rate. On May 5, 2015, during the quarterly conference call with investors and analysts, Defendant Ravichandran disclosed that the Company's true churn rate was 20% for fiscal year 2014— which was dismal compared to competitors' rates.  In addition, in a press release issued the same day, the Company again revealed a quarter-to-quarter ARPS decline while reporting steady +$500 subscribers and PPS growth, casting further doubt on the accuracy of the Company's +$500 subscribers and PPS figures.  On this news, shares of Endurance declined $0.47 per share, or 2.3%, to close on May 5, 2015, at $19.18 per share.

20.     On August 4, 2015, the Company again announced an ARPS decline, but steady +$500 subscribers and PPS growth, which cast even more doubt on Endurance's +$500 subscribers and PPS figures.  Indeed, in response to the Company's ARPS disclosure, one of the

Company's analysts, Oppenheimer & Co. Inc., published a report calling on Endurance to increase quality disclosures surrounding ARPS and added subscribers.  On this news, shares of Endurance declined $2.41 per share, or 11.7%, to close on August 4, 2015, at $18.12 per share, on unusually heavy volume.

21.     It was not until November 2, 2015, during the quarterly earnings conference call with investors and analysts, that the Defendants revealed that Endurance's previously reported figures for +$500 subscribers and PPS were inaccurate.  Despite Defendants' high-profile prior reporting of +$500 subscribers and PPS throughout the Class Period, Endurance did an about-face and told it investors that it would not be publishing +$500 subscriber and PPS for Q3 2015. The Company's lone excuse was that it had "recently identified an error while migrating some data from our legacy business intelligence system [("BI")] to an upgraded BI system which impacted these metrics" without providing any detail regarding the alleged "error."  Endurance attempted to reassure investors by claiming that the "[BI] system is completely separate from the [Enterprise Resource Planning ("ERP")] system that produces our financial and subscriber data." The Company promised that it would "provide updated metrics information as soon as it is available."  On this news, shares of Endurance declined $2.21 per share, or 16.5%, to close on November 2, 2015, at $11.12 per share.

22.     Then on December 9, 2015, the Company admitted in a letter filed with the SEC that its domain related revenue had been inflating ARPS figures since Q4 2014, shortly after the Company acquired BuyDomains.  Specifically, the Company stated: "[domain monetization adjusted revenue's] exclusion from our ARPS calculation would have resulted in ARPS being

$0.07, $0.25, $0.43 and $0.77 lower for those periods, respectively."[3]

23.     On December 16, 2015, after the close of market, the Company disclosed that on December 10, 2015, as part of an SEC investigation of the Company, Endurance received a subpoena from the SEC's Boston Regional Office, requiring the production of certain documents, including documents related to Endurance's metrics.   On this news, shares of Endurance declined $1.81 per share, or 13.9%, to close on December 17, 2015, at $11.20 per share, on unusually heavy volume.

24.     Finally, in February 2016, in connection with the Company's Q4 2015 results conference call and 10-K year-end Annual Report filing, the Company published revised +$500 subscribers and PPS figures for Q4 2013 through Q2 2015.  The revise figures revealed near-flat +$500 subscribers growth, and PPS that experienced more quarter-to-quarter declines than quarter-to-quarter increases, in direct contradiction to Defendants claims throughout the Class Period:



---

[3] There appears to be a typographical error in the Company's response.  The Company stated that exclusion of domain revenue would decrease ARPS by $0.25 for 2014, and $0.43 for the nine months ended September 30, 2014.  The reverse is probably correct: exclusion of domain revenue would decrease ARPS by ***$0.43 for 2014***, and ***$0.25 for the nine months ended September 30, 2014***.



Additionally, in explaining the unexpected spike in the revised Q4 2014 PPS, from 5.0 to 5.6, the Company revealed for the first time that it had eliminated inactive customers from the Company's Total Subscribers figure in Q4 2014, and that the spike was caused by the elimination of inactive customers.

25.     As Defendants admit, during the Class Period, Defendants issued false and/or misleading metrics that were "key" to Endurance's growth: Total Subscribers, ARPS, +$500 subscribers, and PPS, and churn rate.  As a result of Defendants' wrongful acts and omissions, and the precipitous decline in the market value of the Company's securities, Plaintiff and other Class members have suffered significant losses and damages.

## II.     <u>JURISDICTION AND VENUE</u>

26.     The claims asserted herein arise under Sections 10(b) and 20(a) of the Exchange Act (15 U.S.C. §§78j(b) and 78t(a)) and Rule 10b-5 promulgated thereunder by the SEC (17 C.F.R. § 240.10b-5).

27.     This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §1331 and Section 27 of the Exchange Act (15 U.S.C. §78aa).

28.     Venue is proper in this Judicial District pursuant to 28 U.S.C. §1391(b) and Section 27 of the Exchange Act (15 U.S.C. §78aa(c)).  Substantial acts in furtherance of the alleged fraud or the effects of the fraud have occurred in this Judicial District.  Many of the acts

charged herein, including the preparation and dissemination of materially false and/or misleading information, occurred in substantial part in this Judicial District.   Additionally, Endurance's principal executive offices are located within this Judicial District.

29.    In connection with the acts, transactions, and conduct alleged herein, Defendants directly and indirectly used the means and instrumentalities of interstate commerce, including the United States mail, interstate telephone communications, and the facilities of a national securities exchange.

## III.    PARTIES

30.    Plaintiff Christopher Machado, as set forth in a previously-filed certification (Dkt. No. 1-3), incorporated by reference herein, purchased Endurance common stock during the Class Period, and suffered damages as a result of the federal securities law violations and false and/or misleading statements and/or material omissions alleged herein.

31.    Defendant Endurance is a Delaware corporation with its principal executive offices located at 10 Corporate Drive, Suite 300, Burlington, Massachusetts 01803.   During the Class Period, Endurance, through its officers and directors, published periodic filings with the SEC and made public statements that, as alleged herein, contained material misrepresentations and omissions that artificially inflated the price of the Company's common stock.   Endurance's common stock trades under the ticker symbol "EIGI" on the NASDAQ Stock Market, which is an efficient market.

32.    Defendant Hari Ravichandran ("Ravichandran") was, at all relevant times, Chief Executive Officer ("CEO") of Endurance.   Ravichandran is a founder of Endurance, and has served as a director of the Company periodically since its inception and continuously since 2007.

33.     Defendant Tivanka Ellawala ("Ellawala") was, at all relevant times, Chief Financial Officer ("CFO") of Endurance until September, 2015.  On August 3, 2015, Endurance announced that Ellawala would be stepping down as CFO of Endurance effective September 2015.  Marc Montagner replaced Ellawala.

34.     Defendants Ravichandran and Ellawala are collectively referred to hereinafter as the "Individual Defendants."   The Individual Defendants, because of their positions with the Company, possessed the power and authority to control the contents of Endurance's reports to the SEC, press releases and presentations to securities analysts, money and portfolio managers and institutional investors, *i.e.*, the market.   Each defendant was provided with copies of the Company's reports and press releases alleged herein to be misleading prior to, or shortly after, their issuance and had the ability and opportunity to prevent their issuance or cause them to be corrected.   Because of their positions and access to material non-public information available to them, each of these defendants knew that the adverse facts specified herein had not been disclosed to, and were being concealed from, the public, and that the positive representations which were being made were then materially false and/or misleading.   The Individual Defendants are liable for the false statements pleaded herein, as those statements were each "group-published" information, the result of the collective actions of the Individual Defendants.

## IV.   **BACKGROUND**

35.     Endurance provides web solutions for SMBs.   The Company's products and services include domains, website builders, web hosting, email, security, storage, site backup, search engine optimization, search engine marketing, social media services, website analytics, mobile device tools and productivity, and e-commerce solutions.   Some of Endurance's products and services are subscription-based—customers pay for the product or service in installments

over a period of time—and some of the Company's products are not subscription-based—the customer pays a one-time cost for the product or service.  Included in the subscription-based products is Endurance's web hosting service, and included in the non-subscription-based products are website domain names.

**A.**  **Endurance's Two-Pronged Growth Strategy, and the Two Metrics that Tracked Endurance's Execution of Its Growth Strategy: Total Subscribers, and ARPS**

36.  Throughout the Class Period, Endurance's growth strategy was centered on the two-pronged approach of (1) increasing the number of customers subscribed to the Company's products or services, and (2) increasing the average amount of revenue generated per subscriber by upselling those subscribers on one or more of the Company's purported 150 products and services.  The Company repeatedly informed investors of this strategy throughout the Class Period.  For example, Defendant Ravichandran noted the strategy during the quarterly earnings conference call with investors and analysts on February 25, 2014:

> Our company's strategy is based on two simple principles. Organically adding more high-quality subscribers to our platform and selling our subscribers more value-added services.

37.  The Company tracked and reported "Total Subscribers," a metric designed to provide insight into Endurance's execution of the first prong of its growth strategy.  "Total Subscribers" is defined in Endurance's Annual Report filed with the SEC on Form 10-K on February 28, 2014: "We define total subscribers as those that, as of the end of a period, are subscribing directly to our web presence solutions on a paid basis."  The definition also contained notable exclusions that are explained to the extent they are relevant below.

38.  The Company also tracked and reported "Average Revenue Per Subscriber" (or "ARPS"), a metric designed to provide insight into Endurance's execution of the second prong

of its growth strategy.  ARPS is defined in the Endurance's Annual Report filed with the SEC on Form 10-K on February 28, 2014 as "the amount of revenue Endurance recognizes from subscribers in a period divided by the average of the number of total subscribers at the beginning of the period and at the end of the period."

39.     The Company reiterated its growth strategy, and the important role Total Subscribers and ARPS played in that strategy, on all quarterly and annual reports filed with the SEC at the end of fiscal years 2013 and throughout fiscal year 2014.  In the Company's Annual Reports filed on Form 10-K for the fiscal years 2013 and 2014 on February 28, 2014 and February 27, 2015, as well as the Quarterly Reports filed on Form 10-Q with the SEC on May 9, 2014, August 8, 2014, and November 7, 2014, the Company stated: "We believe total subscribers and ARPS will continue to be the key drivers of our revenue growth in the future, and we intend to drive growth in both of these metrics by leveraging the strengths of our approach to serving the SMB market."

40.     Defendants maintained the same growth strategy into fiscal year 2015 and emphasized the strategy during quarterly earnings conference calls with analysts and investors. On February 23, 2015, Defendant Ravichandran stated: "We continue to focus on our two key growth drivers of adding more subscribers to our platform and increasing our average revenue per subscriber called ARPS."  Then again on May 5, 2015, Ravichandran stated: "We continue . . . supporting our key growth drivers of subscriber and ARPS growth."  Finally, on August 4, 2015, Ravichandran identified ARPS growth as key to Endurance's long-term growth and success:

> Our longer-term growth will be driven by our success in executing toward our initiatives in both the existing business and through M&A, and we see continued opportunity in the SMB market. We're very keen to capture market share by onboarding new subscribers with the introduction of new gateway products and

utilizing our proven upsell model which we expect to drive better ARPS and subscriber retention over time.

**B.     Endurance Reported and Touted Its Total Subscriber and Average Revenue Per Subscriber Growth Throughout the Class Period**

41.     As purported key drivers of the Company's growth, the Company tracked, reported, and highlighted Total Subscribers and ARPS Growth.  Throughout the Class Period, Defendants touted the Company's Total Subscribers and ARPS Growth in press releases, conference calls, and SEC filings.

42.     The Company highlighted the importance of Total Subscribers and ARPS by reporting them under the heading "Key Metrics" in all Form 10-K and Form 10-Q filings.  Total Subscribers and ARPS growth was also consistently touted in quarterly results press releases, typically appearing in the first paragraph of the press release, or alternatively, the "highlights" section of the press release.

**C.     Endurance Focused on and Touted the Number of Subscribers Paying More Than $500 Per Year and the Average Number of Products Per Subscriber as Drivers of Average Revenue Per Subscriber**

43.     In conjunction with ARPS, Endurance also tracked and reported the number of subscribers paying $500 or more per year for the Company's products and services ("+$500 subscribers"), and the average number of products sold per subscriber ("PPS").   +$500 subscribers and PPS were metrics that purportedly provided additional insight into the Company's ability to increase ARPS.

44.     The Company claimed that increasing +$500 subscribers and PPS would drive increases in ARPS, and, as such the Company touted increases in +$500 subscribers and PPS as evidence of ARPS health and growth potential.   For example, Defendant Ellwalla attributed

ARPS growth to +$500 subscriber growth during the quarterly earnings conference call on February 25, 2014:

> Our average revenue per subscriber grew to $13.09 per month for the year. Excluding the impact of 2012 acquisition, the year-over-year growth was 9%. Underlying this increasing ARPS is strong growth amongst those subscribers paying $500 or more per year with us, which increased by approximately 20,000 in 2013 to nearly 100,000 by the year end.

The Company also pointed to +$500 subscriber and PPS growth as ARPS drivers in the Company's SEC filings. For example, in its Annual Report filed on Form 10-K with the SEC on February 28, 2014, the Company stated: "We expect ARPS to increase as we sell more products and services to existing subscribers . . . ."

45. Even when the Company was experiencing negative ARPS results in Q2 2015, Ravichandran pointed to the Company's purported +$500 subscribers and PPS figures as reason to remain confident in the Company's future ARPS growth potential. During the quarterly earnings conference call with investors and analysts on August 4, 2015, after reporting poor ARPS results, Defendant Ravichandran stated: "The increase in high-value subscribers and the increase in product attach rates give us confidence in our underlying ability to monetize our base of subscribers and grow ARPS over time."

**D.  Endurance's Focus on Total Subscribers and Deceptive Use of "Churn Rate"**

46. As explained above, Endurance's growth strategy was also based on increasing Total Subscribers. Endurance's Total Subscribers metric is impacted by the Company's ability to acquire subscribers, but it is also impacted by the Company's ability to retain its current subscribers. In the web hosting industry, the measure of a company's ability to retain customers is commonly expressed as the Company's "churn rate" (or commonly, just "churn"). Typically, churn rate is measured as the percentage of subscribers to a service that discontinue their

subscription to that service in a given time period.  A low churn rate, therefore, is evidence of a company's ability to retain current customers.

47.     Endurance's competitors report churn.  For example, GoDaddy Inc. ("GoDaddy") reports annual subscriber churn below 15%.  Web.com Group, Inc. ("Web.com")—which defines churn as "customer cancellations in the quarter divided by the sum of the number of subscribers at the beginning of the quarter and the gross number of new subscribers added during the quarter, divided by three months"—reports a churn rate of 1% per month.

48.     However, Endurance did not typically report churn in its SEC filings.  Instead, Endurance published "Monthly Recurring Revenue retention rate" ("MRR retention rate" or "MRR"), which the Company would also deceptively call "cash churn" during conference calls. As described in the Company's Annual Report filed with the SEC on Form 10-K on February 28, 2014, Endurance calculated MRR "by taking the retained recurring value of subscription revenue of all active subscribers at the end of the prior period and dividing it into the retained recurring value of subscription revenue for those same subscribers at the end of the period presented."

49.     "Cash churn," by definition, will typically be lower than (and thus conceal) subscriber churn as long as a company continues to, on average, upsell or otherwise increase the revenue generated from its current customer base.  For example, if a business has ten subscribers at the beginning of a period, each paying $10 per period, but loses one of its subscribers over the course of that period, the business' subscriber churn rate is 10% for the period.  However, if the business can upsell the remaining 9 customers by $1 each, the business will still take in $99 for the period (9 subscribers multiplied by $11 per subscriber).  Compared to the $100 per period the Company was generating from its customers at the beginning of the period (10 subscribers multiplied by $10 per subscriber), the result is a loss of $1, or a cash churn rate of 1%.

50.    Endurance's business model deceptively concealed Endurance's poor subscriber churn: first by focusing on upselling its customer base; and second by structuring subscriptions to Endurance's products and services so that a subscriber would pay lower amounts at the start of service, but higher amounts the longer the subscriber subscribed to the product or service.  These practices caused Endurance's cash churn to be lower than—and conceal—Endurance's poor subscriber churn.

## V.    <u>SUMMARY OF DEFENDANTS' FRAUD</u>

51.    The Company engaged in a scheme involving the manipulation of metric definitions and data, and the concealment of material events affecting the Company's key growth metrics (Total Subscribers, ARPS, +$500 subscribers, and PPS) in order to conceal the Company's poor underlying economic reality, and instead portray an image of healthy growth to investors.  The Company's scheme resulted in the publication of false and/or misleading Total Subscribers and ARPS figures—the two metrics at the heart of the Company's growth strategy— as well as +$500 subscribers and PPS, the two metrics that purportedly provided insight into the Company's ARPS health and drove ARPS growth.

### A.    **The Company Published False and/or Misleading Total Subscribers Figures Because the Company Failed to Inform Investors of Inactive Customers Improperly Included in the Count, and Their Subsequent Exclusion in Q4 2014**

52.    As described above in ¶¶36-37, growing the Company's Total Subscribers was one of two prongs in the Company's two-pronged growth strategy.  As such, the Company routinely touted Total Subscribers growth to investors in the Company's quarterly results press releases and on investor conference calls.

53.    From Q4 2013 through Q3 2015, the Company reported steady Total Subscribers growth:



54.     However, in reality, the Company's Q4 2013, as well as Q1 2014, Q2 2014, and Q3 2014 Total Subscribers figures were overstated because they improperly included "inactive customers."  As admitted by the Company in its Annual Report filed on Form 10-K with the SEC on February 29, 2016, the Company adjusted its Total Subscribers figure in Q4 2014 to "eliminate inactive customers that were first identified as inactive in that quarter."

55.     Moreover, the Company's Q4 2014, and all subsequent Total Subscribers figures reported during the Class Period were misleading because the Company failed to inform investors of the Q4 2014 adjustment until February of 2016.  As such, the Total Subscriber figures post-elimination of inactive customers were not directly comparable to pre-elimination

Total Subscribers figures, and it was misleading for the Company to compare them (explicitly or implicitly).

56.     Not only did the Company fail to inform investors of the adjustment until February 2016, the Company deceptively changed the definition of its Total Subscribers metric in Q4 2014 to include more subscribers, and thus conceal the effect of the elimination of inactive subscribers from Total Subscribers.  The Company's Annual Report filed with the SEC on Form 10-K on February 27, 2015, stated: "in the fourth quarter of 2014, we modified our definition of total subscribers to better reflect our expanding product mix by including paid subscribers to all of our subscription-based products, rather than limiting the definition to paid subscribers to our web presence solutions."  However, the Company failed to mention, let alone discuss, this important change in the definition of a metric that the company described as "key" to Endurance's growth on the Q4 2014 conference call with investors.  In fact, when discussing the Company's relatively weak Total Subscriber growth in Q4 2014, instead of informing investors of the elimination of inactive customers, Defendant Ellawala misleadingly blamed the weak growth on "seasonality": "as a reminder, our Q4 subscriber adds are typically down sequentially from other quarters due to end of year seasonality."

57.     Through the elimination of inactive customers, and manipulation of the Company's Total Subscribers definition, the Defendants were able to fine-tune the results they wanted, when they wanted them.  Inclusion of inactive customers inflated the Company's Total Subscriber count when Defendants desired that result, and the subsequent elimination of inactive customers, while decreasing Total Subscribers, supported the Company's ARPS (when Defendants desired *that* result) by eliminating part of the Company's subscriber base, which comprises the denominator of the ARPS metric.

58.     Defendants knew, or recklessly disregarded the fact that their representations of Q4, 2013, Q1 2014, Q2 2014, and Q3 2014 Total Subscribers figures were materially false and/or misleading because: (1) Defendants would have been closely monitoring, or were deliberately reckless in failing to monitor, a metric that quantifies one prong of Endurance's two-pronged growth strategy; and (2) Defendants shifted the definition of Total Subscribers in an attempt to conceal the elimination of inactive customers, which indicates that Defendants knew, or were deliberately reckless in not knowing, that the Company was improperly including inactive customers in Total Subscribers.

59.     Defendants knew, or recklessly disregarded the fact that their representations of Q4 2014, Q1 2015, Q2, 2015, and Q3 2015 Total Subscribers figures were materially false and/or misleading for the reasons described in ¶58 and because: (1) Defendants knew, or were deliberately reckless in not knowing, about the elimination of inactive customers from a metric that represents one prong of Endurance's two-pronged growth strategy; and (2) Individual Defendants knew about, or were deliberately reckless in not knowing about the change in definition of a metric that represents one prong of Endurance's two-pronged growth strategy.

**B.     The Company Published False and/or Misleading ARPS Figures Because the Company Failed to Inform Investors that an Increasing Percentage of the Company's ARPS was Due to "Domain Monetization" and Not Organic Subscriber Revenue Growth**

60.     As described above in ¶¶36-38, growing the Company's ARPS was one of two prongs in the Company's growth strategy.  As such, the Company routinely touted ARPS growth to investors in the Company's quarterly results press releases and on investor conference calls.

61.     From Q4 2013 through Q3 2015, the Company reported the following ARPS results demonstrating increasing ARPS up to Q3 2014, and then decreasing ARPS from Q4 2014 onward:



62.     However, the Company failed to disclose that an increasing percentage of the Company's ARPS was due to the sale of domains.  While the Company was including revenue generated from domain sales in the ARPS revenue numerator, the Company was not including domain-only customers in the denominator—since domain-only customers are not "subscribers." In November 2015, the SEC requested a clarifying statement from Endurance regarding the amount of ARPS actually attributable to subscribers.  As admitted by the Company in its SEC response letter dated December 9, 2015, the Company stated that "the contribution of domain monetization activities to our adjusted revenue has been insignificant, but has been increasing beginning in 2014 due primarily to our acquisition of BuyDomains in September 2014."  Getting into the specific figures, the Company stated: "Our domain monetization adjusted revenue was

$3.0 million in 2013, $19.1 million in 2014, $8.2 million for the nine months ended September 30, 2014 and $29.7 million for the nine months ended September 30, 2015, and *its exclusion from our ARPS calculation would have resulted in ARPS being $0.07, $0.25, $0.43 and $0.77 lower for those periods, respectively*."[4]

63.     By failing to inform investors that an increasing portion of ARPS was attributable to non-subscriber domain sales after the acquisition of BuyDomains in September 2014, Defendants published ARPS results that were misleading in that the metric was not truly "an indicator of [Endurance's] ability to optimize [its] mix of products and services and pricing and sell products and services to new and existing subscribers" as claimed by the Company.  Rather, ARPS was a metric so distorted by the Company's product mix shift to domains, that it provided little insight into the Company's ability to grow subscriber revenue.  In fact, absent domain revenue's impact on ARPS, the drop in ARPS would have been far more substantial from Q4 2014 through the End of the Class Period, and would have given investors a clear indication that the Company was in major trouble.

64.     Defendants knew, or recklessly disregarded the fact that their representations of ARPS after the acquisition of BuyDomains in September 2014 were materially false and/or misleading because: (1) Defendants would have been closely monitoring, or were deliberately reckless in failing to monitor, a metric that quantifies one prong of Endurance's two-pronged growth strategy; (2) Defendants knew, or were reckless in not knowing, that domain revenue was included in ARPS, but that domain-only customers were not counted as subscribers—thus

---

[4] There appears to be a typographical error in the Company's response.  The Company stated that exclusion of domain revenue would decrease ARPS by $0.25 for 2014, and $0.43 for the nine months ended September 30, 2014.  The reverse is probably correct: exclusion of domain revenue would decrease ARPS by *$0.43 for 2014*, and *$0.25 for the nine months ended September 30, 2014*.

causing an ARPS inflation; and (3) Defendants knew, or were reckless in not knowing that domain-related revenue was accounting for an increasing portion of Endurance's total revenue.

**C.    The Company Published Inflated +$500 Subscribers Figures and PPS Figures Which Inaccurately Portrayed Steady Growth**

65.    Growing the Company's ARPS was one of two prongs in the Company's growth strategy, and as described in ¶¶43-45, +$500 subscribers and PPS were indicators of ARPS health and drivers of ARPS growth.  As such, the Company routinely touted +$500 subscriber and PPS growth to investors on the Company's quarterly investor conference calls and in certain SEC filings.

66.    From Q4 2013 through Q2 2015, the Company reported the following +$500 subscriber results:



67.     However, the Company failed to disclose that its published +$500 subscriber results were overstated.   The Company published +$500 subscriber figures that grew from 99,000 to 150,000 between Q4 2013 and Q2 2015 (51.5% growth over the Class period).   In reality, and as disclosed by the Company in February 2016, +$500 subscribers grew from 82,000 to 92,000 between Q4 2013 and Q2 2015 (only 12.2% growth over the Class Period).   The Company published a chart in February 2016, illustrating the overstatement:



68.     In addition, from Q4 2013 through Q2 2015, the Company reported the following PPS results:

\*      \*      \*

**[THE REMAINDER OF THIS PAGE IS INTENTIONALLY LEFT BLANK]**



69.     However, the Company failed to disclose that its published PPS results were misleading because PPS was not growing in a perfect stepping patter as portrayed by the Company.   As disclosed by the Company in February 2016, the Company experienced more quarter-to-quarter PPS declines than increases.   The Company published a chart in February 2016, illustrating the extent of the false PPS representation:



70.    The Company first revealed that its previously issued +$500 subscriber and PPS figures were false during the Company's quarterly investor conference call on November 2, 2015.   On that call, the Company attributed the false figures to an "error" in the Company's business intelligence system, but did not elaborate on what the error was.

71.    Oddly, the Company only claimed that +$500 subscribers, PPS, and MRR were affected by the error.    The Company noted during the conference call that the business intelligence system was "completely separate from the ERP [enterprise resource planning] system that produces [Endurance's] financial and *subscriber data*" and that, as such, the error "[did] not impact [Endurance's] GAAP financial result, adjusted revenue, adjusted EBITDA, free cash flow, or unlevered free cash flow metrics," nor "subscriber comp, churn, [and] unit economics."   (Emphasis added).   It also appears that the Company's ARPS is derived from data separate from the business intelligence system, since the Company continued to publish ARPS throughout the Class Period, and did not list ARPS as one of the metrics affected by the error.

72.    The Company's revised +$500 subscriber and PPS figures seem to be derived from the Company's main billing system rather than a corrected version of business intelligence system.   The charts that the Company published illustrating the original figures compared to the revised figures is accompanied by a footnote that states that the revised figures are "[b]ased on data for our HostGator, BlueHost, iPage, Fatcow, Homestead, A Small Orange and Domain.com brands and the smaller brands that *share a billing platform with those brands*, which together accounted for approximately 80% of our revenue for the twelve months ended December 31, 2015."   The footnote also states that "[p]reviously disclosed and revised figures are not directly comparable due to inconsistencies which have been corrected in the revised figures."

73.     Despite having access to "subscriber data" through the Company's ERP system and subscriber data through the Company's billing systems (which is possibly tied-in or otherwise related to the ERP system) from which it could have derived +$500 subscribers and PPS, the Company instead relied on its allegedly faulty business intelligence system, which the Company did not rely on for the vast majority of its other metrics and financial data.  Defendants chose to rely on the business intelligence system because it produced the figures that Defendants wanted.  At the very least, Defendants were reckless in publishing +$500 subscriber and PPS figures without checking them against the systems from which the Company produced the majority of its other metrics.

74.     Defendants knew, or recklessly disregarded the fact that their representations of +$500 subscribers and PPS were materially false and/or misleading because: (1) Defendants would have been closely monitoring, or were deliberately reckless in failing to monitor, metrics that drive one prong (ARPS) of Endurance's two-pronged growth strategy; and (2) Defendants had multiple systems from which Defendants could have derived subscriber data, including +$500 subscribers and PPS, but knowingly chose to use the faulty business intelligence system which produced inflated +$500 subscribers, or were at least deliberately reckless in not cross-checking the figures produced by the business intelligence system against the Company's other subscriber data sources.

## VI.    ADDITIONAL SCIENTER ALLEGATIONS

### A.    Management Was Heavily Focused on ARPS and Drivers of ARPS

75.     Throughout the Class Period, management pursued a growth strategy based in large part on increasing the Company's ARPS.  To that end, Defendants also aimed to increase +$500 subscribers and PPS numbers because Defendants viewed them as primary ARPS drivers.

76.     In addition, Defendants encouraged investors and analysts to focus on ARPS by consistently reiterating that ARPS was key to the Company's growth strategy and touting ARPS results in quarterly press releases, conference calls, and SEC filings. *See* ¶¶41-42. Specifically, ARPS was labeled a "key driver" of Endurance's growth, and the Company consistently touted ARPS under the "highlights" section of quarterly results press releases.

77.     Defendants also encouraged investors and analysts to focus on +$500 subscribers and PPS results by pointing to them as primary ARPS drivers, and Defendant Ravichandran even reassured investors by citing the Company's purportedly strong +$500 subscriber and PPS growth after the Company reported poor ARPS results in August, 2015. *See* ¶43-45.

78.     Given that ARPS, and the ARPS drivers were a central focus of Defendants' growth strategy and a central focus of the image of the Company that Defendants projected to investors and analysts, Defendants knew, or were deliberately reckless in not knowing, that their reported +$500 subscribers and PPS figures were false.

**B.     The Primary Drivers of ARPS Were Purportedly Increasing as ARPS Was Decreasing**

79.     Defendants were reporting decreasing ARPS results while at the same time reporting increases in the purported drivers of ARPS. In Q4 2014, Q1 2015, and Q2 2015, Defendants reported decreasing ARPS of $14.48 (down from $14.49 in Q3 2014), $14.37, and $14.30, respectively. For the same periods, Defendants reported an increase in the number of +$500 subscribers: 131,000 (up from 121,000 a quarter prior), 142,000, and 150,000, respectively. In addition, for the same periods, Defendants reported an increase in PPS: 4.7 (up from 4.6 a quarter prior), 4.8 , and 5.0, respectively. The following chart illustrates the relative growth of ARPS, +$500 subscribers, and PPS as initially reported by the Company.



80.     The apparent inconsistency between decreasing ARPS on the one hand, and increasing ARPS drivers on the other, should have prompted Defendants to investigate the cause of the discrepancy.  Indeed, because of the apparent direct correlation between ARPS, +$500 subscribers, and PPS, once ARPS began to fall while its drivers were purportedly growing, Defendants knew that one or all of the metrics were inaccurate, or Defendants were deliberately reckless in not knowing of their inaccuracy.  This is especially the case given that, throughout the Class Period, Defendants actively monitored ARPS and ARPS drivers.  Defendants claimed that they monitored the non-GAAP financial measures—including ARPS—in every 10-K and 10-Q financial report filed during the Class Period.  In addition, during the Q3 2014 quarterly earnings conference call on November 4, 2014 , Defendant Ravichandran stated that Defendants were monitoring on a daily basis "subscriber events," including "cash billings" and "product take-up rates"—which are related to +$500 subscribers and PPS:

> We monitor tens of millions of subscriber events including cash billings, subscriber adds and losses, product take-up rates and marketing spend on a daily basis.  Consequently, we're improving our ability to intervene and drive sales and marketing campaigns on a real-time basis thereby maximizing the ROI on our sales, support, and marketing investments.

81.     In addition, Defendants admit that they had another system that produced financial and subscriber data.  In the Nov 2, 2015 conference call, CFO Marc Montagner stated

> We recently identified an error while migrating some data from our legacy business intelligence system to an upgraded BI system which impacted these metrics. We're in the process of recalculating these numbers. ***This system is completely separate from the ERP system that produces our financial and subscriber data***.

(Emphasis added).

82.     Given the inconsistency between ARPS and ARPS drivers, Defendants' claims that they continually monitored those metrics, and the claim that they had another system that tracked financial and subscriber data, Defendants knew, or deliberately disregarded the fact that the +$500 subscribers and PPS numbers they were reporting were false.

### C.     The Elimination of Inactive Customers Unbelievably Had No Effect on PPS

83.     The fact that the Company eliminated inactive customers from the Company's Total Subscribers count for Q4 2014, but reported a 0.1 PPS increase for that period indicates that Defendants knew or were reckless in not knowing that the Company's PPS figures were false.

84.     The elimination of inactive customers should cause a "spike" in the Company's PPS metric figures.  Inactive customers are not purchasing any products, so they contribute nothing to the numerator of the PPS metric.  However, since the inactive customer was being counted by the Company as a subscriber prior to Q4 2014, the inactive subscriber was adding to the denominator of the PPS metric, dragging down PPS.  In the Company's revised PPS figures,

published in February 2016, the Company reported a Q4 2014 spike in PPS from 5.0 in Q3 2014 to 5.6 in Q4 2014 as shown in ¶69, which is exactly what one would expect to see.

85.     However, when the Company initially reported Q4 2014 PPS, the Company reported a mere 0.1 increase in PPS from 4.6 in Q3 2014 to 4.7 in Q4 2014 as show in ¶68—indicating no spike in PPS.

86.     At the time the Company reported the Q4 2014 0.1 PPS increase, Defendants knew, or were deliberately reckless in not knowing, that the Company had eliminated inactive customers from Total Subscribers; and therefore, Defendants should have expected a spike in PPS.  The lack of a spike put Defendants on notice that their reported PPS figures were likely false.  As such, Defendants knew, or recklessly disregarded the fact that their PPS figures (and especially the Q4 2014 PPS figure) were false.

**D.      Subscribers Paying More Than $500 Per Year Accounted for Approximately 11% of the Company's Revenue**

87.     +$500 subscribers purportedly accounted for a large portion of Endurance's revenue.  Since management was focused on revenue, they would have also been focused on the +$500 subscribers.   Therefore, Defendants knew or recklessly disregarded the fact that their reported +$500 subscriber numbers were false.

88.     Defendant Ravichandran stated that subscribers paying more than $500 per year account for approximately 11% of total revenue.  During the Company's quarterly earnings conference call with investors and analysts on February 23, 2015, Defendant Ravichandran stated:

> [W]e're getting better and better at fitting products to the customer base and that's driving better take rates.  At the same time, as people consume the product, you also learn a lot about what other products they need, so that's also fueling quite a bit of information and knowledge about what products would drive high value for these pockets of customers and how we can get them to adopt them better.  So

obviously with – *if you did the math at $500 plus, that's about 2.5% to 3% of base that's accounting for 10.5%, 11% of revenue, so that definitely has been a lot of goodness for the average revenue per subscriber side of it. So I think that's positive.  We see quite a bit more opportunity there going into this year, going into next year because we're only going to get better and better at this strategy.*  On the product take rate, on the more ubiquitous generic products where people are paying us between $15 and $20 a year per product, the benefit that we see there is as people get more and more engaged, the distribution there has gotten better as well. But that's the strategy we've had since 2007-2008 timeframe, that continues to grow very nicely, and the

(Emphasis added).

89.     In addition, Defendant Ellawala stated that the Company is always "fighting" for every bit of revenue it can get during the February 23, 2015 quarterly earnings conference call with investors and analysts: "we like to push ourselves and make sure that we're delivering kind of the best quarter possible. So a lot of the times as I tell our exec team here we're always fighting for that last 1% of revenues or 2%, we're always sort of working on it."

90.     Given that +$500 subscribers purportedly accounted for approximately 11% of Endurance's revenue and that management is "always fighting for that last 1% of revenues" Individual Defendants knew, or were deliberately reckless in not knowing, that their reported +$500 subscriber numbers were overstated.

### E.     The Defendants Ravichandran and Ellawala Were Motivated to Inflate the Company's Stock Price in Anticipation of the Offering in Late 2014

91.     Defendants Ravichandran and Ellawala knew, or were deliberately reckless in not knowing, their reported Total Subscribers, ARPS, +$500 subscribers, and PPS figures were false and/or misleading, and that subscriber churn was poor, but touted the metrics anyways in order to build investor confidence in the Company's growth potential.  They did this, in part, to inflate the Company's stock price so that they could personally benefit in the Company's November 21, 2014 offering.

92.     On or around November 21, 2014, Endurance conducted a public offering of 3,000,000 shares.  Selling stockholders also sold 10,000,000 shares in the offering, for a total offering of 13,000,000 shares.  The offering price was $14.50 per share, or $13.92, after the underwriting discount.   The underwriters held a 30-day option to purchase an additional 1,950,000 shares, which they exercised.

93.     Both Defendants Ravichandran and Ellawala sold shares they beneficially owned as "selling stockholders" in the offering.  Ravichandran sold 819,280 shares plus 122,892 more pursuant to the underwriters' option, for a total of 942,172 shares.  At $13.92 per share, after the underwriting discount, Ravichandran received $13,115,034 in the offering.  Ellawala sold 18,542 shares plus 2,781 more pursuant to the underwriters' option, for a total of 21,323 shares.  At $13.92 per share, after the underwriting discount, Ellawala received $296,816 in the offering.

94.     Defendants Ravichandran and Ellawala were motivated to inflate the Company's stock price in order to maximize the offering price, and as a result, maximize their own personal financial benefit as selling stockholders in the offering.

95.     As discussed above, Total Subscribers and ARPS were metrics that Defendants, investors, and analysts were focused on in evaluating the health and growth potential of Endurance.  In addition, the +$500 subscribers and PPS were primary drivers of ARPS, +$500 subscribers accounted for more than 10% of Endurance's revenue, and subscriber churn rate was a topic of focus for investors and analysts.  Individual Defendants were therefore motivated to make these metrics appear healthy, and/or ignore any signs that the metrics were not as healthy as stated, in order to boost the Company's image.

96.     Defendants Ravichandran and Ellawala knew, or were reckless in not knowing, that their reported Total Subscribers, ARPS, +$500 subscribers, and PPS, figures were false

and/or misleading, and that their statements regarding churn rate were false and/or misleading, but chose to tout those metrics anyway in order to enhance the appearance of Endurance to inflate Endurance's stock price and maximize their personal benefit in the offering.

**F.    A Former Employee Confirmed That the Company's +$500 Subscriber Figures were Unreliable**

97.    A former employee, Confidential Witness 1 ("CW1"), confirmed that the Company's +$500 subscriber figures were known to be unreliable to employees of Endurance.

98.    CW1 worked at Endurance from approximately February 2014 until October 2015.  For a portion of CW1's employment, CW1 was the Senior Data Warehouse Developer.

99.    CW1 stated that during the summer of 2014 (possibly in August), CW1 assisted a colleague with a common report that was initially called "the $500 report."  The purpose of the report was to clarify how much subscribers were paying for Endurance products.  CW1 stated that the report divided subscribers into categories based on how much the subscribers were paying.  There were different levels: $500 per year, $400 per year, $300 per year, $200 per year, *etc.*  However, CW1 stated that the numbers obviously "didn't add up."  CW1 stated that if one performed a simple check of the numbers by multiplying the number of subscribers in a category by the dollar value of the category, one would discover that the total was greater than actual revenue being produced—indicating, possibly, that subscribers were being double-counted. As CW1's statements indicate, the Company had internal evidence demonstrating that the Company's +$500 subscriber count was false, but published it anyway.

**VII.    DEFENDANTS' MATERIALLY FALSE AND/OR MISLEADING STATEMENTS REGARDING TOTAL SUBSCRIBERS, ARPS, +$500 SUBSCRIBERS, AND PPS ISSUED DURING THE CLASS PERIOD**

100.    During the Class Period, Endurance filed periodic reports with the SEC, including Quarterly Reports on Form 10-Q and Annual Reports on Form 10-K, containing the Company's

reported financial statements and metric figures.   The following chart identifies the date,

signatories, and period covered by each report filed with the SEC during the Class Period:

| Form | Period | Date Filed | Defendant Signatories | Referred to Below As |
|------|--------|-----------|----------------------|---------------------|
| 10-K | 2013 Fiscal Year | 2/28/2014 | Ravichandran | FY 2013 Form 10-K |
| 10-Q | 2014 Fiscal First Quarter | 5/9/2014 | Ellawala | Q1 2014 Form 10-Q |
| 10-Q | 2014 Fiscal Second Quarter | 8/8/2014 | Ellawala | Q2 2014 Form 10-Q |
| 10-Q | 2014 Fiscal Third Quarter | 11/7/2014 | Ellawala | Q3 2014 Form 10-Q |
| 10-K | 2014 Fiscal Year | 2/27/2015 | Ravichandran | FY 2014 Form 10-K |
| 10-Q | 2015 Fiscal First Quarter | 5/11/2015 | Ellawala | Q1 2015 Form 10-Q |
| 10-Q | 2015 Fiscal Second Quarter | 8/7/2015 | Ellawala | Q2 2015 Form 10-Q |
| 10-Q | 2015 Fiscal Third Quarter | 11/6/2015 | Montagner[5] | Q3 2015 Form 10-Q |

101.    Endurance issued the following press releases during the Class Period that

highlighted metrics and figures related to the Company's performance, including Total

Subscribers and ARPS:

| Period | Date | Referred to Below As |
|--------|------|---------------------|
| 2013 Fiscal Year | 2/25/2014 | FY 2013 PR |
| 2014 Fiscal First Quarter | 5/6/2014 | Q1 2014 PR |
| 2014 Fiscal Second Quarter | 8/7/2014 | Q2 2014 PR |
| 2014 Fiscal Third Quarter | 11/4/2014 | Q3 2014 PR |
| 2014 Fiscal Year | 2/23/2015 | FY 2014 PR |
| 2015 Fiscal First Quarter | 5/5/2015 | Q1 2015 PR |
| 2015 Fiscal Second Quarter | 8/4/2015 | Q2 2015 PR |
| 2015 Fiscal Third Quarter | 11/2/2015 | Q3 2015 PR |

102.    Endurance held the following conference calls with analysts and investors at the

conclusion of each fiscal quarter and fiscal year.   During the conference calls, Defendants made

false and/or misleading statements regarding Total Subscribers, ARPS, +$500 subscribers and

PPS:

---

[5] Montagner is not a defendant.  *See* ¶33.

| Period | Date | Referred to Below As |
|---|---|---|
| 2013 Fiscal Year | 2/25/2014 | FY 2013 CC |
| 2014 Fiscal First Quarter | 5/6/2014 | Q1 2014 CC |
| 2014 Fiscal Second Quarter | 8/7/2014 | Q2 2014 CC |
| 2014 Fiscal Third Quarter | 11/4/2014 | Q3 2014 CC |
| 2014 Fiscal Year | 2/23/2015 | FY 2014 CC |
| 2015 Fiscal First Quarter | 5/5/2015 | Q1 2015 CC |
| 2015 Fiscal Second Quarter | 8/4/2015 | Q2 2015 CC |
| 2015 Fiscal Third Quarter | 11/2/2015 | Q3 2015 CC |

103.    Endurance's Quarterly and Annual Reports filed during the Class Period, as well as Endurance's quarterly press releases and conference calls included materially false and/or misleading statements because, as set forth herein, Defendants issued false and or misleading Total Subscribers, ARPS, +$500 subscriber, and PPS figures.

**A.      Defendants' Materially False and/or Misleading Statements Regarding Fiscal Year 2013**

*Total Subscribers*

104.    Defendants issued materially false and/or misleading statements regarding Total Subscribers in the Company's FY 2013 PR, FY 2014 CC, and FY 2013 Form 10-K. During the FY 2013 CC, Defendant Ravichandran stated: "during the year, we added 279,000 net new subscribers on an organic basis, bringing our year-end total to just over 3.5 million . . . ." In the Company's FY 2013 PR and FY 2013 Form 10-K, the Company reported Total Subscribers of 3.502 million.

105.    Defendants' statements regarding Total Subscribers were materially false and/or misleading because the Company improperly included inactive customers in the reported figure as explained in ¶54.

106.    Defendants' statements regarding Total Subscribers were made with scienter since: (1) Defendants would have been closely monitoring, or were deliberately reckless in

failing to monitor, a metric that quantifies one prong of Endurance's two-pronged growth strategy; and (2) Defendants shifted the definition of Total Subscribers in an attempt to conceal the elimination of inactive customers, which indicates that Defendants knew, or were deliberately reckless in not knowing, that the Company was improperly including inactive customers in Total Subscribers as explained in ¶¶54-57.

### +$500 Subscribers

107.    Defendants issued materially false and/or misleading statements regarding +$500 subscribers during the Company's FY 2013 CC.  During the FY 2013 CC, Defendant Ellawala stated "Our average revenue per subscriber grew to $13.09 per month for the year.  Excluding the impact of 2012 acquisition, the year-over-year growth was 9%. ***Underlying this increasing ARPS is strong growth amongst those subscribers paying $500 or more per year with us***, which increased by approximately 20,000 in 2013 to nearly 100,000 by the year end." (Emphasis added).  In the Company's FY 2013 Form 10-K, the Company stated "The number of subscribers paying $500 or more per year for our products and services grew from approximately 73,000 as of December 31, 2011 to nearly 100,000 as of December 31, 2013."

108.    Defendants' statements regarding +$500 subscribers were materially false and/or misleading because the FY 2013 figure was overstated by approximately 17,000 subscribers, and the rate of growth was overstated as admitted by the Company and explained in ¶¶66-67.

109.    Defendants' statements regarding +$500 subscribers were made with scienter since: (1) Defendants would have been closely monitoring, or were deliberately reckless in failing to monitor, a metric that drives one prong (ARPS) of Endurance's two-pronged growth strategy; and (2) Defendants had multiple systems from which Defendants could have derived subscriber data, including +$500 subscribers, but knowingly chose to use the faulty business

intelligence system which produced inflated +$500 subscribers, or were at least deliberately reckless in not cross-checking the figures produced by the business intelligence system against the Company's other subscriber data sources as explained in ¶¶70-73.

**B.    Defendants' Materially False and/or Misleading Statements Regarding the First Fiscal Quarter of 2014**

*Total Subscribers*

110.    Defendants issued materially false and/or misleading statements regarding Total Subscribers in the Company's Q1 2014 PR, Q1 2014 CC, and Q1 2014 Form 10-Q.  During the Q1 2014 CC, Defendant Ravichandran stated: "In the first quarter we organically added 101,000 net new subscribers to our platform bringing our total subscribers to over 3.6 million."  In the Company's Q1 2014 PR and Q1 2014 Form 10-Q, the Company reported Total Subscribers of 3.654 million.

111.    Defendants' statements regarding Total Subscribers were materially false and/or misleading because the Company improperly included inactive customers in the reported figure as explained in ¶54.

112.    Defendants' statements regarding Total Subscribers were made with scienter since: (1) Defendants would have been closely monitoring, or were deliberately reckless in failing to monitor, a metric that quantifies one prong of Endurance's two-pronged growth strategy; and (2) Defendants shifted the definition of Total Subscribers in an attempt to conceal the elimination of inactive customers, which indicates that Defendants knew, or were deliberately reckless in not knowing, that the Company was improperly including inactive customers in Total Subscribers as explained in ¶¶54-57.

*+$500 Subscribers*

113.    Defendants issued materially false and/or misleading statements regarding +$500 subscribers in the Company's Q1 2014 CC.  During the Q1 2014 CC, Defendant Ellawala stated: "the total number of subscribers paying us $500 or more per year also grew to 106,000, 6,000 more than just 3 months prior."

114.    Defendants' statements regarding +$500 subscribers were materially false and/or misleading because the Q1 2014 figure was overstated by approximately 21,000 subscribers, and the rate of growth was overstated as admitted by the Company and explained in ¶¶66-67.

115.    Defendants' statements regarding +$500 subscribers were made with scienter since: (1) Defendants would have been closely monitoring, or were deliberately reckless in failing to monitor, a metric that drives one prong (ARPS) of Endurance's two-pronged growth strategy; and (2) Defendants had multiple systems from which Defendants could have derived subscriber data, including +$500 subscribers, but knowingly chose to use the faulty business intelligence system which produced inflated +$500 subscribers, or were at least deliberately reckless in not cross-checking the figures produced by the business intelligence system against the Company's other subscriber data sources as explained in ¶¶70-73.

*PPS*

116.    Defendants issued materially false and/or misleading statements regarding PPS in the Company's Q1 2014 CC.  During the Q1 2014 CC, Defendant Ellawala stated: "Increased product adoption rate again led this growth as the number of additional products sold per subscriber increased to 4.3 from 3.5 products per subscriber in the first quarter of 2013."

117.    Defendants' statement regarding PPS was materially false and/or misleading because the figure represented a Q4 2013 to Q1 2014 PPS growth of 0.2, when, in reality, PPS

grew only 0.1 over that period as admitted by the Company and explained in more detail in ¶¶68-69.

118.    Defendants' statement regarding PPS was made with scienter since: (1) Defendants would have been closely monitoring a metric that drives one prong (ARPS) of Endurance's two-pronged growth strategy; and (2) Defendants had multiple systems from which Defendants could derive subscriber data, including PPS, but knowingly chose to use the faulty business intelligence system which produced purportedly consistent PPS growth, or were at least deliberately reckless in not cross-checking the figures produced by the business intelligence system against the Company's other subscriber data sources as explained in ¶¶70-73.

### C.    Defendants' Materially False and/or Misleading Statements Regarding the Second Fiscal Quarter of 2014

*Total Subscribers*

119.    Defendants issued materially false and/or misleading statements regarding Total Subscribers in the Company's Q2 2014 PR, Q2 2014 CC, and Q2 2014 Form 10-Q.  During the Q2 2014 CC, Defendant Ravichandran stated: "During Q2, we added approximately 93,000 net paying subscribers, bringing our total subscribers on platform to over 3.7 million."   In the Company's Q2 2014 PR and Q2 2014 Form 10-Q, the Company reported Total Subscribers of 3.747 million.

120.    Defendants' statements regarding Total Subscribers were materially false and/or misleading because the Company improperly included inactive customers in the reported figure as explained in ¶54.

121.    Defendants' statements regarding Total Subscribers were made with scienter since: (1) Defendants would have been closely monitoring, or were deliberately reckless in failing to monitor, a metric that quantifies one prong of Endurance's two-pronged growth

strategy; and (2) Defendants shifted the definition of Total Subscribers in an attempt to conceal the elimination of inactive customers, which indicates that Defendants knew, or were deliberately reckless in not knowing, that the Company was improperly including inactive customers in Total Subscribers as explained in ¶¶54-57.

### +$500 Subscribers

122.    Defendants issued materially false and/or misleading statements regarding +$500 subscribers in the Company's Q2 2014 CC.  During the Q2 2014 CC, Defendant Ellawala stated: "The number of subscribers who spend more than $500 per year on our products and services also increased to 114,000, an increase of $8,000 over the last quarter and a 14,000 increase over the end of last year."

123.    Defendants' statements regarding +$500 subscribers were materially false and/or misleading because the Q2 2014 figure was overstated by approximately 29,000 subscribers, and the rate of growth was overstated as admitted by the Company and explained in ¶¶66-67.

124.    Defendants' statements regarding +$500 subscribers were made with scienter since: (1) Defendants would have been closely monitoring, or were deliberately reckless in failing to monitor, a metric that drives one prong (ARPS) of Endurance's two-pronged growth strategy; and (2) Defendants had multiple systems from which Defendants could have derived subscriber data, including +$500 subscribers, but knowingly chose to use the faulty business intelligence system which produced inflated +$500 subscribers, or were at least deliberately reckless in not cross-checking the figures produced by the business intelligence system against the Company's other subscriber data sources as explained in ¶¶70-73.

*PPS*

125.   Defendants issued materially false and/or misleading statements regarding PPS in the Company's Q2 2014 CC.  During the Q2 2014 CC, Defendant Ellawala stated: "product adoption rate increased growing to an average of 4.5 products per subscriber in the quarter from 3.7 products per subscriber in the second quarter of 2013."

126.   Defendants' statement regarding PPS was materially false and/or misleading because the figure represented a Q1 2014 to Q2 2014 PPS growth of 0.2, when, in reality, PPS *declined* by 0.1 over that period as admitted by the Company and laid out in ¶¶68-69.

127.   Defendants' statement regarding PPS was made with scienter since: (1) Defendants would have been closely monitoring a metric that drives one prong (ARPS) of Endurance's two-pronged growth strategy; and (2) Defendants had multiple systems from which Defendants could derive subscriber data, including PPS, but knowingly chose to use the faulty business intelligence system which produced purportedly consistent PPS growth, or were at least deliberately reckless in not cross-checking the figures produced by the business intelligence system against the Company's other subscriber data sources as explained in ¶¶70-73.

**D.   Defendants' Materially False and/or Misleading Statements Regarding the Third Fiscal Quarter of 2014**

*Total Subscribers*

128.   Defendants issued materially false and/or misleading statements regarding Total Subscribers in the Company's Q3 2014 PR, Q3 2014 CC, and Q3 2014 Form 10-Q.  During the Q3 2014 CC, Defendant Ravichandran stated: "During Q3, our number of paying subscribers increased by approximately 94,000, bringing our total paying subscribers on platform to over 3.8 million."  In the Company's Q3 2014 PR and Q3 2014 Form 10-Q, the Company reported Total Subscribers of 3.841 million.

129.     Defendants' statements regarding Total Subscribers were materially false and/or misleading because the Company improperly included inactive customers in the reported figure as explained in ¶54.

130.     Defendants' statements regarding Total Subscribers were made with scienter since: (1) Defendants would have been closely monitoring, or were deliberately reckless in failing to monitor, a metric that quantifies one prong of Endurance's two-pronged growth strategy; and (2) Defendants shifted the definition of Total Subscribers in an attempt to conceal the elimination of inactive customers, which indicates that Defendants knew, or were deliberately reckless in not knowing, that the Company was improperly including inactive customers in Total Subscribers as explained in ¶¶54-57.

### +$500 Subscribers

131.     Defendants issued materially false and/or misleading statements regarding +$500 subscribers in the Company's Q3 2014 CC.  During the Q3 2014 CC, Defendant Ellawala stated: "The approximate number of subscribers of our major brands who spend more than $500 per year with us increased to 121,000 or 7,000 more than last quarter and 21,000 more than the end of last year."

132.     Defendants' statements regarding +$500 subscribers were materially false and/or misleading because the Q3 2014 figure was overstated by approximately 34,000 subscribers, and the rate of growth was overstated as admitted by the Company and explained in ¶¶66-67.

133.     Defendants' statements regarding +$500 subscribers were made with scienter since: (1) Defendants would have been closely monitoring, or were deliberately reckless in failing to monitor, a metric that drives one prong (ARPS) of Endurance's two-pronged growth strategy; and (2) Defendants had multiple systems from which Defendants could have derived

subscriber data, including +$500 subscribers, but knowingly chose to use the faulty business intelligence system which produced inflated +$500 subscribers, or were at least deliberately reckless in not cross-checking the figures produced by the business intelligence system against the Company's other subscriber data sources as explained in ¶¶70-73.

### PPS

134.     Defendants issued materially false and/or misleading statements regarding PPS in the Company's Q3 2014 CC.  During the Q3 2014 CC, Defendant Ellawala stated: "product attachment rates for our major brands increased, growing to an average of 4.6 products per subscriber in addition to an initial web presence subscription. This is up from 3.9 products per subscriber in the third quarter of 2013."

135.     Defendants' statement regarding PPS was materially false and/or misleading because the figure represented a Q2 2014 to Q3 2014 PPS growth of 0.1, when, in reality, PPS *declined* by 0.1 over that period as admitted by the Company and laid out in ¶¶68-69.

136.     Defendants' statement regarding PPS was made with scienter since: (1) Defendants would have been closely monitoring a metric that drives one prong (ARPS) of Endurance's two-pronged growth strategy; and (2) Defendants had multiple systems from which Defendants could derive subscriber data, including PPS, but knowingly chose to use the faulty business intelligence system which produced purportedly consistent PPS growth, or were at least deliberately reckless in not cross-checking the figures produced by the business intelligence system against the Company's other subscriber data sources as explained in ¶¶70-73.

### E.       Defendants' Materially False and/or Misleading Statements Regarding Fiscal Year 2014

*Total Subscribers*

137.    Defendants issued materially false and/or misleading statements regarding Total Subscribers in the Company's FY 2014 PR, FY 2014 CC, and FY 2014 Form 10-K.  During the FY 2014 CC, Defendant Ravichandran stated: "During the year, our subscriber base increased by 380,000 paying subscribers.  We also added 200,000 subscribers to our base through acquisitions resulting in a total increase of 580,000 subscribers for the year.  We now have 4.1 million paying subscribers on our platform."  During the same conference call, Defendant Ellawala stated "As a reminder, our Q4 subscriber adds are typically down sequentially from other quarters due to end of year seasonality."   In the Company's FY 2014 PR and FY 2014 Form 10-K, the Company reported Total Subscribers of 4.087 million.

138.    Defendants' statements regarding Total Subscribers were materially false and/or misleading because, as admitted by the Company, Endurance eliminated inactive customers from the Company's subscriber count in Q4 2014 while simultaneously expanding the definition of Total Subscribers to include paid subscribers to all of Endurance's subscription-based products, not just Endurance's web presence solutions, thereby concealing the elimination of inactive customers as explained in more detail in ¶¶54-57.  As such, the weakness in the Company's Total Subscribers growth was not due to "seasonality" alone and the Company's Total Subscribers results were distorted relative to previous quarters, rendering any implicit or explicit comparison misleading.

139.    Defendants' statements regarding Total Subscribers were made with scienter since: (1) Defendants knew, or were deliberately reckless in not knowing, about the elimination of inactive customers from a metric that represents one prong of Endurance's two-pronged

growth strategy; and (2) Individual Defendants knew about, or were deliberately reckless in not knowing about the change in definition of a metric that represents one prong of Endurance's two-pronged growth strategy as explained in more detail in ¶¶54-57.

### *ARPS*

140.    Defendants issued materially false and/or misleading statements regarding ARPS in the Company's FY 2014 PR, FY 2014 CC, and FY 2014 Form 10-K.  During the FY 2014 CC, Defendant Ravichandran stated: "we saw our average revenue per subscriber for 2014 grow over 11% year-over-year to $14.48 per month.  Our ARPS growth reflects the benefits from our improved analytics and CRM, which helps with identifying and targeting upsell opportunities and our focus on expanding distribution through new initiatives like mobile applications, growth of our applications marketplace updates to our PC-based control panel and training our support agents to initiate upsells."   In the Company's FY 2014 PR and FY 2014 Form 10-K, the Company reported ARPS of $14.48.

141.    Defendants' statements regarding ARPS were materially false and/or misleading because, as admitted by the Company, domain revenue was becoming an increasing percentage of the Company's revenue, while domain-only customers were not included in the Company's subscriber count, thus inflating ARPS as explained in ¶¶62-63.

142.    Defendants' statements regarding ARPS were made with scienter since: (1) Defendants would have been closely monitoring, or were deliberately reckless in failing to monitor, a metric that quantifies one prong of Endurance's two-pronged growth strategy; (2) Defendants knew, or were reckless in not knowing, that domain revenue was included in ARPS, but that domain-only customers were not counted as subscribers—thus causing an ARPS inflation; and (3) Defendants knew, or were reckless in not knowing that domain-related revenue

was accounting for an increasing portion of Endurance's total revenue as explained in more detail in ¶¶62-63.

### +$500 Subscribers

143.    Defendants issued materially false and/or misleading statements regarding +$500 subscribers in the Company's FY 2014 CC.  During the FY 2014 CC, Defendant Ellawala stated: "The approximate number of subscribers for our major brands who spend more than $500 per year with us increased to 131,000 or 10,000 more than last quarter and 32,000 more than the end of last year."  In the Company's FY 2014 10-K, the Company stated: "The number of subscribers of our major brands paying $500 or more per year for our products and services grew from approximately 73,000 as of December 31, 2011 to nearly 130,000 as of December 31, 2014."

144.    Defendants' statements regarding +$500 subscribers were materially false and/or misleading because the FY 2014 figure was overstated by approximately 43,000 subscribers, and the rate of growth was overstated as admitted by the Company and explained in ¶¶66-67.

145.    Defendants' statements regarding +$500 subscribers were made with scienter since: (1) Defendants would have been closely monitoring, or were deliberately reckless in failing to monitor, a metric that drives one prong (ARPS) of Endurance's two-pronged growth strategy; and (2) Defendants had multiple systems from which Defendants could have derived subscriber data, including +$500 subscribers, but knowingly chose to use the faulty business intelligence system which produced inflated +$500 subscribers, or were at least deliberately reckless in not cross-checking the figures produced by the business intelligence system against the Company's other subscriber data sources as explained in ¶¶70-73.

### F.     Defendants' Materially False and/or Misleading Statements Regarding the First Fiscal Quarter of 2015

***Total Subscribers***

146.     Defendants issued materially false and/or misleading statements regarding Total Subscribers in the Company's Q1 2015 PR, Q1 2015 CC, and Q1 2015 Form 10-Q.  During the Q1 2015 CC, Defendant Ravichandran stated: "In Q1 2015, subscribers on our platform reached 4.2 million, an increase of 119,000 over Q4 of 2014."  In the Company's Q1 2015 PR and Q1 2015 Form 10-Q, the Company reported Total Subscribers of 4.206 million.

147.     Defendants' statements regarding Total Subscribers were materially false and/or misleading because, as admitted by the Company, Endurance eliminated inactive customers from the Company's subscriber count in Q4 2014 while simultaneously expanding the definition of Total Subscribers to include paid subscribers to all of Endurance's subscription-based products, not just Endurance's web presence solutions, thereby concealing the elimination of inactive customers as explained in more detail in ¶¶54-57.  As such, the Company's Total Subscribers results were distorted relative to previous quarters, rendering any implicit or explicit comparison misleading.

148.     Defendants' statements regarding Total Subscribers were made with scienter since: (1) Defendants knew, or were deliberately reckless in not knowing, about the elimination of inactive customers from a metric that represents one prong of Endurance's two-pronged growth strategy; and (2) Individual Defendants knew about, or were deliberately reckless in not knowing about the change in definition of a metric that represents one prong of Endurance's two-pronged growth strategy as explained in more detail in ¶¶54-57.

### *ARPS*

149.    Defendants issued materially false and/or misleading statements regarding ARPS in the Company's Q1 2015 PR, Q1 2015 CC, and Q1 2015 Form 10-Q.  During the Q1 2015 CC, Defendant Ravichandran stated: "we saw our average revenue per subscriber or ARPS grow to $14.37. Once again, we saw a seasonally high number of net adds in Q1 as more SMBs came online in the new calendar year."  In the Company's Q1 2015 PR and Q1 2015 Form 10-Q, the Company reported ARPS of $14.37.

150.    Defendants' statements regarding ARPS were materially false and/or misleading because, as admitted by the Company, domain revenue was becoming an increasing percentage of the Company's revenue, while domain-only customers were not included in the Company's subscriber count, thus inflating ARPS as explained in ¶¶62-63.

151.    Defendants' statements regarding ARPS were made with scienter since: (1) Defendants would have been closely monitoring, or were deliberately reckless in failing to monitor, a metric that quantifies one prong of Endurance's two-pronged growth strategy; (2) Defendants knew, or were reckless in not knowing, that domain revenue was included in ARPS, but that domain-only customers were not counted as subscribers—thus causing an ARPS inflation; and (3) Defendants knew, or were reckless in not knowing that domain-related revenue was accounting for an increasing portion of Endurance's total revenue as explained in more detail in ¶¶62-63.

### *+$500 Subscribers*

152.    Defendants issued materially false and/or misleading statements regarding +$500 subscribers in the Company's Q1 2015 CC.  During the Q1 2015 CC, Defendant Ellawala stated: "the number of subscribers of our major brands who spend more than $500 per year with us

increased to approximately 142,000, or 11,000 more than last quarter, and 36,000 more than in Q1 of 2014, representing year-over-year growth of 34%."  In the Company's Q1 2015 10-Q, the Company stated: "growth in ARPS was driven primarily by [among other items] . . . an increase in the number of subscribers of our major brands who spend more than $500 per year with us from 106,000 for the three months ended March 31, 2014 to 142,000 for the three months ended March 31, 2015 . . . ."

153.    Defendants' statements regarding +$500 subscribers were materially false and/or misleading because Q1 2015 figure was overstated by approximately 54,000 subscribers, and the rate of growth was overstated as admitted by the Company and explained in ¶¶66-67.

154.    Defendants' statements regarding +$500 subscribers were made with scienter since: (1) Defendants would have been closely monitoring, or were deliberately reckless in failing to monitor, a metric that drives one prong (ARPS) of Endurance's two-pronged growth strategy; and (2) Defendants had multiple systems from which Defendants could have derived subscriber data, including +$500 subscribers, but knowingly chose to use the faulty business intelligence system which produced inflated +$500 subscribers, or were at least deliberately reckless in not cross-checking the figures produced by the business intelligence system against the Company's other subscriber data sources as explained in ¶¶70-73.

### G.    Defendants' Materially False and/or Misleading Statements Regarding the Second Fiscal Quarter of 2015

*Total Subscribers*

155.    Defendants issued materially false and/or misleading statements regarding Total Subscribers in the Company's Q2 2015 PR, Q2 2015 CC, and Q2 2015 Form 10-Q.  During the Q2 2015 CC, Defendant Ravichandran stated: "At the end of Q2 2015, our total subscribers on platform were 4.4 million, including approximately 86,000 subscribers contributed by the

acquisitions of Verio and Site5." In the Company's Q2 2015 PR and Q2 2015 Form 10-Q, the Company reported Total Subscribers of 4.394 million.

156.     Defendants' statements regarding Total Subscribers were materially false and/or misleading because, as admitted by the Company, Endurance eliminated inactive customers from the Company's subscriber count in Q4 2014 while simultaneously expanding the definition of Total Subscribers to include paid subscribers to all of Endurance's subscription-based products, not just Endurance's web presence solutions, thereby concealing the elimination of inactive customers as explained in more detail in ¶¶54-57. As such, the Company's Total Subscribers results were distorted relative to previous quarters, rendering any implicit or explicit comparison misleading.

157.     Defendants' statements regarding Total Subscribers were made with scienter since: (1) Defendants knew, or were deliberately reckless in not knowing, about the elimination of inactive customers from a metric that represents one prong of Endurance's two-pronged growth strategy; and (2) Individual Defendants knew about, or were deliberately reckless in not knowing about the change in definition of a metric that represents one prong of Endurance's two-pronged growth strategy as explained in more detail in ¶¶54-57.

### *ARPS*

158.     Defendants issued materially false and/or misleading statements regarding ARPS in the Company's Q2 2015 PR, Q2 2015 CC, and Q2 2015 Form 10-Q. During the Q2 2015 CC, Defendant Ravichandran stated: "Average revenue per subscriber in Q2 remained robust at $14.30, a decrease of $0.03 over Q2 of 2014. As a reminder, ARPS growth rates can be impacted by factors such as introductory pricing for new subscribers, our ability to migrate and increase product attach rates for subscribers acquired through M&A, and our ability to upsell

existing subscribers."  In the Company's Q2 2015 PR and Q2 2015 Form 10-Q, the Company reported ARPS of $14.30.

159.     Defendants' statements regarding ARPS were materially false and/or misleading because, as admitted by the Company, domain revenue was becoming an increasing percentage of the Company's revenue, while domain-only customers were not included in the Company's subscriber count, thus inflating ARPS as explained in ¶¶62-63.

160.     Defendants' statements regarding ARPS were made with scienter since: (1) Defendants would have been closely monitoring, or were deliberately reckless in failing to monitor, a metric that quantifies one prong of Endurance's two-pronged growth strategy; (2) Defendants knew, or were reckless in not knowing, that domain revenue was included in ARPS, but that domain-only customers were not counted as subscribers—thus causing an ARPS inflation; and (3) Defendants knew, or were reckless in not knowing that domain-related revenue was accounting for an increasing portion of Endurance's total revenue as explained in more detail in ¶¶62-63.

### +$500 Subscribers

161.     Defendants issued materially false and/or misleading statements regarding +$500 subscribers in the Company's Q2 2015 CC.  During the Q2 2015 CC, Defendant Ravichandran stated: "The number of subscribers in our major brands spending over $500 per year with us increased 32% to 150,000 from 114,000 in Q2 of 2014."  During the question and answer portion of the Call, Defendant Ravichandran elaborated on +$500 subscribers:

> So the number of subscriber spending over $500 with us, it's gone up year-over-year by about 32%. It's at about 150,000 of them now as compared to 114,000 in Q2 of 2014. So, pretty good, robust increase. A lot of it are coming again from the introduction of new products, both on the frontend whereas customers are getting onboarded, we're able to price segment a little bit better. But also from our existing base of customers, graduating

up as we get better and better with product distribution. So, we're pretty excited about that opportunity set.

In the Company's Q2 2015 10-Q, the Company stated: "growth in ARPS, was driven primarily by [among other items] . . . an increase in the number of subscribers of our major brands who spend more than $500 per year with us from 114,000 as of June 30, 2014 to 150,000 as of June 30, 2015 . . . ."

162. Defendants' statements regarding +$500 subscribers were materially false and/or misleading because the Q2 2015 figure was overstated by approximately 60,000 subscribers, and the rate of growth was overstated as admitted by the Company as explained in ¶¶66-67.

163. Defendants' statements regarding +$500 subscribers were made with scienter since: (1) Defendants would have been closely monitoring, or were deliberately reckless in failing to monitor, a metric that drives one prong (ARPS) of Endurance's two-pronged growth strategy; and (2) Defendants had multiple systems from which Defendants could have derived subscriber data, including +$500 subscribers, but knowingly chose to use the faulty business intelligence system which produced inflated +$500 subscribers, or were at least deliberately reckless in not cross-checking the figures produced by the business intelligence system against the Company's other subscriber data sources as explained in ¶¶70-73.

### *PPS*

164. Defendants issued materially false and/or misleading statements regarding PPS in the Company's Q2 2014 CC.  During the Q2 2014 CC, Defendant Ravichandran stated: "The average number of additional products per subscriber we sold over and above the base solution bundle for our major brands reached 5, an increase from 4.5 in Q2 2014.  The increase in high-value subscribers and the increase in product attach rates give us confidence in our underlying ability to monetize our base of subscribers and grow ARPS over time."  In the Company's Q2

2015 10-Q, the Company stated: "growth in ARPS, was driven primarily by [among other items] an increase in the average number of products purchased per subscriber in addition to an initial web presence subscription for our major brands, which rose from 4.5 products per subscriber as of June 30, 2014 to 5.0 products per subscriber as of June 30, 2015. . . ."

165.    Defendants' statement regarding PPS was materially false and/or misleading because the figure represented a Q1 2015 to Q2 2015 PPS growth of 0.2, when, in reality, PPS *declined* by 0.1 over that period as admitted by the Company and laid out in ¶¶68-69.

166.    Defendants' statement regarding PPS was made with scienter since: (1) Defendants would have been closely monitoring a metric that drives one prong (ARPS) of Endurance's two-pronged growth strategy; and (2) Defendants had multiple systems from which Defendants could derive subscriber data, including PPS, but knowingly chose to use the faulty business intelligence system which produced purportedly consistent PPS growth, or were at least deliberately reckless in not cross-checking the figures produced by the business intelligence system against the Company's other subscriber data sources as explained in ¶¶70-73.

**H.      Defendants' Materially False and/or Misleading Statements Regarding the Third Fiscal Quarter of 2015**

*Total Subscribers*

167.    Defendants issued materially false and/or misleading statements regarding Total Subscribers in the Company's Q3 2015 PR, Q3 2015 CC, and Q3 2015 Form 10-Q.  During the Q3 2015 CC, Marc Montagner stated: "we increased net subscribers by over 87,000 in the third quarter, bringing total subscribers on our platform to approximately 4.5 million subs."  In the Company's Q3 2015 PR and Q3 2015 Form 10-Q, the Company reported Total Subscribers of 4.482 million.

168.     Defendants' statements regarding Total Subscribers were materially false and/or misleading because, as admitted by the Company, Endurance eliminated inactive customers from the Company's subscriber count in Q4 2014 while simultaneously expanding the definition of Total Subscribers to include paid subscribers to all of Endurance's subscription-based products, not just Endurance's web presence solutions, thereby concealing the elimination of inactive customers as explained in more detail in ¶¶54-57.  As such, the Company's Total Subscribers results were distorted relative to previous quarters, rendering any implicit or explicit comparison misleading.

169.     Defendants' statements regarding Total Subscribers were made with scienter since: (1) Defendants knew, or were deliberately reckless in not knowing, about the elimination of inactive customers from a metric that represents one prong of Endurance's two-pronged growth strategy; and (2) Individual Defendants knew about, or were deliberately reckless in not knowing about the change in definition of a metric that represents one prong of Endurance's two-pronged growth strategy as explained in more detail in ¶¶54-57.

### *ARPS*

170.     Defendants issued materially false and/or misleading statements regarding ARPS in the Company's Q3 2015 PR, Q3 2015 CC, and Q3 2015 Form 10-Q.  During the Q3 2015 CC, Marc Montagner stated: "Average revenue per subscriber, ARPS, was $14.29.  On a year-to-year basis – year-to-date basis, ARPS was $14.36 versus $14.35 for the same period a year-ago."  In the Company's Q3 2015 PR and Q3 2015 Form 10-Q, the Company reported ARPS of $14.29.

171.     Defendants' statements regarding ARPS were materially false and/or misleading because, as admitted by the Company, domain revenue was becoming an increasing percentage

of the Company's revenue, while domain-only customers were not included in the Company's subscriber count, thus inflating ARPS as explained in ¶¶62-63.

172.   Defendants' statements regarding ARPS were made with scienter since: (1) Defendants would have been closely monitoring, or were deliberately reckless in failing to monitor, a metric that quantifies one prong of Endurance's two-pronged growth strategy; (2) Defendants knew, or were reckless in not knowing, that domain revenue was included in ARPS, but that domain-only customers were not counted as subscribers—thus causing an ARPS inflation; and (3) Defendants knew, or were reckless in not knowing that domain-related revenue was accounting for an increasing portion of Endurance's total revenue as explained in more detail in ¶¶62-63.

## VIII.   DEFENDANTS' MATERIALLY FALSE AND/OR MISLEADING STATEMENTS REGARDING THE COMPANY'S CHURN RATE ISSUED DURING THE CLASS PERIOD

173.   Throughout the Class Period, Defendants hid the true subscriber churn rate by misleadingly shifting the discussion to the topic of cash churn whenever churn was brought up by analysts or investors.

174.   On May 6, 2014, during the Q1 2014 CC, Defendant Ravichandran claimed that the Company looks at the subscriber churn rate, and that subscriber churn continues to "keep doing really well" when asked about Endurance's competitors:

> [I]n general we've kind of co-existed with the folks at GoDaddy for the last ten years.  In general we've always thought -- found them to be thoughtful, good operators of their business. The benefit we both have is that it's quite a large space. . . . So really we have not had a lot of channel conflict with the folks at GoDaddy and really at the end of the day we look at the metrics, we look at the SACs, *we look at the churn rates*, we look at our net subscriber addition, *we look at MMR*. *All of those metrics continue to keep doing really well*, and that's not that inconsistent with the last eight or ten years we've all coexisted together in the space.

(Emphasis added).

175.    The statement contained in ¶174 is materially false and/or misleading because the Company's subscriber churn rate was 20% in fiscal year 2014, as admitted on the Q1 2015 CC (*see* ¶202), which is very high compared to competitors, and was not "doing really well" as claimed by Ravichandran.

176.    On August 12, 2014, at the Oppenheimer Technology, Internet & Communication Conference, an investor/analyst specifically asked about Endurance's churn rate.   Defendant Ellawala shifted the conversation away from discussing subscriber churn, stating "[a]nd our churn rates; well, we publish cash churn rates.  Our MRR churn rate was about 1% a month or 99% renewal per month, which then equates to about 88% to 89% cash renewal rates year-over-year."

177.    Again, during the question and answer portion of the conference call, an investor/analyst asked Ravichandran about churn, stating "So maybe talk a little about – I mean, you said churn is basically 1% a month.  Basically, what is your lifetime value of a customer and have you been around long enough to know?"  Again, rather than correcting the investor/analyst by clarifying the difference between cash and subscriber churn, Ravichandran simply stated: "churn, again, as we said, the cash churn is about 1%."

178.    The statements contained in ¶¶176-177 are materially false and/or misleading because the Company's subscriber churn rate was 20% in fiscal year 2014, as admitted on the Q1 2015 CC, which is very high compared to competitors.   In addition, shifting discussion of subscriber churn to a similarly-named metric—that by definition would almost always produces a more favorable "churn rate"—was misleading because it concealed Endurance's poor subscriber churn rate.

179.    Defendants also routinely touted Endurance's purported 1% cash churn per month, which made Endurance's churn rate appear comparable to Web.com's 1% per month or GoDaddy's approximately 15% per year.

180.    On September 11, 2014, during the Goldman Sachs Communacopia Conference, an analyst/investor asked Ravichandran generally about customer acquisition and return on investment. Ravichandran responded in part by mentioning "1% cash churn per month."

181.    Again, on December 2, 2014, Ravichandran touted the Company's churn rate, stating "churn has been very consistent, so we're still generating kind of 1% cash churn a month, which is about an eight-year useful life for customers" at the Credit Suisse Technology Conference.

182.    On January 13, 2015, Ravichandran touted the Company's churn rate at the Needham Growth Conference, stating:

> Cash churn rate a month is about 11.5% to 12% cash churn a year. So, it's a great thing about our business is that it's almost all recurring. It doesn't vary very much. It's a very kind of Steady Eddy business, because you've got four million, almost, customers that are paying you small amounts of dollars every month, that's all auto pay, it's credit card based. So, a variance in terms of revenue, up or down, is typically unusual in our business, because the churn rates are pretty low as well.

183.    During the same event, Defendant Ravichandran again touted churn rate, making the same 1% churn claim, stating:

> Our marginal economics are pretty spectacular. So you end up with about $12 of contribution margin per customer. You've got about 1% churn rate; so useful life is about eight years. So you end up with about $1,200 plus of total contribution profit per customer over the course of their life on a PV basis.

184.    The statements contained in ¶¶180-183 are materially misleading because the Company's subscriber churn rate was 20% in fiscal year 2014, as admitted on the Q1 2015 CC, which is very high compared to competitors. These statements were also misleading because by

touting 1% "cash churn" when "churn" has a clear definition within the industry (it applies to subscriber churn) without explaining the difference, Endurance was able to conceal its poor subscriber churn.

185.     On February 23, 2015, during the Q4 2014 CC, Ravichandran discussed subscriber churn and gave investors reason to be confident in Endurance's subscriber churn, while never disclosing the true subscriber churn rate:

> On the churn side, we have the good benefit of having a very tenured base of customer.  What we've found with small businesses in our churn anyway, we find that 80% plus of our customers leave us because they're going out of business.  80% of churn happens because they're leaving, that their business is not performing anymore.  So what we find though is that that number starts to get to be smaller and smaller in terms of churn number as businesses get older because the infant mortality in the first 14 months, 15 months of a small business lifecycle, there's a lot of risk as business.  So as we get older as our base gets tenured, we keep getting good benefit from getting into the long tail of the survival curve where churn rates go down.  The net impact of both of those really drives the net subscriber number and it is something that has been performing well for us as a business.

186.     The statement contained in ¶185 is materially false and/or misleading because the Company's subscriber churn rate was 20% in fiscal year 2014, as admitted on the May 5, 2015 Q1 2015 CC, which is very high compared to competitors' rates.  In addition, given such poor churn rates, it was false and/or misleading for Ravichandran to claim that "we keep getting good benefit from getting into the long tail of the survival curve where churn rates go down" because any benefit was far outweighed by other subscriber losses, resulting in Endurance's poor churn rate.

187.     On March 4, 2015, at the Morgan Stanley Technology Media and Telecom Conference, Ravichandran was asked to "review some of the trends in your churn which I know has always been very impressive."  Ravichandran responded by again shifting the discussion away from subscriber churn, to talk about cash churn, stating:

From the SMB standpoint, our churn that we kind of guide to is a cash churn number externally. It's about 1% a month, about 88% renewal rate on an annualized basis. So the good news is going into this year, we knew that 88% of the revenue base from last year was already in the bag, right.

188.    The statement contained in ¶187 is materially misleading because the Company's subscriber churn rate was approximately 20% in fiscal year 2014, as admitted on the May 5, 2015 Q1 2015 CC, which is very high compared to competitors.  In addition, shifting discussion to a similarly-named metric—that by definition would almost always produces a more favorable "churn rate"—concealed Endurance's poor subscriber churn rate.

## IX.    LOSS CAUSATION AND DEFENDANTS' STATEMENTS ISSUED AT THE END OF THE CLASS PERIOD

189.    Defendants' wrongful conduct, as alleged herein, directly and proximately caused the economic losses suffered by Plaintiff and the Class.

190.    The truth regarding Endurance's metrics and churn rate was partially revealed, and/or the concealed risks materialized, on or about: February 23, 2015, April 28, 2015, May 5, 2015, August 4, 2015, November 2, 2015, November 6, 2015, December 9, 2015, December 17, 2015, February 18, 2016, and February 29, 2016.  As a direct result of these partial disclosures, the price of Endurance's stock declined precipitously, often on heavy trading volume.

191.    During the Class Period, investors were focused on the performance of Endurance's Total Subscribers, ARPS, +$500 subscribers, and PPS, metrics as well as the Company's churn rate.

192.    The damage suffered by Plaintiff and other members of the Class was a direct result of Defendants' fraudulent scheme to issue false information and withhold material information from Endurance investors, and the subsequent significant decline in the value of Endurance securities when the truth was revealed.

193.     On February 23, 2015, the Company's misrepresentations regarding ARPS and ARPS drivers (+$500 subscribers and PPS), as well as the Company's fraudulent churn rate reporting started to reveal themselves to investors.  In the Company's Q4 2014 PR, and on the Company's Q4 2014 CC the Defendants disclosed that the Company's ARPS for the quarter were $14.48, which was $0.01 lower than the quarter prior.  Despite slipping ARPS, the Company continued its positive reporting of ARPS drivers, claiming on the conference call that +$500 subscribers and PPS continued to grow, continuing the perfect stepping pattern.

194.     On this news, shares of Endurance fell $0.80, or 4%, to close at $19.09 on February 23, 2015.

195.     The disclosures on February 23, 2015 raised investors' suspicions that the Company's reported +$500 subscribers and PPS figures were inaccurate since consistent growth in the two ARPS drivers seems inconsistent with an ARPS decline.

196.     On April 28, 2015, research firm Gotham City Research LLC published a report entitled "Endurance International Group: A Web of Deceit."  The report cast doubt on certain of the Company's metrics, claiming they were inaccurate and misleading—including the Company's churn rate, Total Subscribers, and ARPS (of which, +$500 subscribers and PPS are key drivers).  With respect to ARPS, the report cast doubt on the accuracy of the Endurance's previously released figures.  The report noted that Endurance omits domain-only customers from the Company's subscribers count, but still includes the revenue in ARPS: "[Endurance] does not count as subscribers those who purchase only domain names as subscribers (but they count the revenue!)."  The report also claimed that Endurance's true ARPS "actually declined in 2014 by around - 13%.":

**Average Revenue per Subscriber is Down -13%, Not Up +11%**

\*      \*      \*

**Reported Average Revenue per Subscriber ("ARPS") is Growing but Actual ARPS is Declining**

Despite the related party transactions, suspect international revenue, undisclosed subsidiary, and the undisclosed subsidiary's lies, perhaps Endurance possesses a strong core business. After all, EIGI reports very strong ARPU (they call it "ARPS" or Average Revenue per Subscriber", which in tech-land is similar to "Camp Store Sales") of over -10%:

| EIGI's Reported ARPS | | | | | | |
|---|---|---|---|---|---|---|
| | 2011 | | 2012 | | 2013 | 2014 |
| Adjusted revenue | | $ | 474,115 | $ 528,119 | $ | 651,945 |
| Total subscribers | 2,845 | | 3,223 | | 3,502 | 4,087 |
| Reported ARPS | $12.84 | | $12.92 | | $13.09 | $14.48 |
| % change | | | 0.62% | | 1.32% | 10.62% |

Revenue in 1,000s of $s, and total subscribers in 1,000s

Not only is EIGI's reported ARPS growing, Endurance appears to be outperforming its peers:

| EIGI ARPU & ARPU Growth vs Peers | | | |
|---|---|---|---|
| | 2012 | 2013 | 2014 |
| GDDY | $7.75 | $8.67 | $9.50 |
| WWWW | $13.44 | $14.24 | $14.62 |
| EIGI | $12.92 | $13.09 | $14.48 |
| | | | % change in ARPU |
| GDDY | | 11.8% | 9.6% |
| WWWW | | 6.0% | 2.7% |
| EIGI | | 1.3% | 10.6% |

Icing on the cake: Directi's ARPS looks breathtakingly amazing and "accretive" to overall ARPS. The implied Directi ARPS is $72 per month or 5x-6x EIGI's historical ARPS:

**DIRECTI ARPS ACCORDING TO EIG**

|  | 2013 | 2014 |
|---|---|---|
| Directi revenue | n.a. | $48,499 |
| Directi subscribers | n.a. | 56 |
| **Directi ARPS** | n.a. | **$72.17** |
| **EIGI Reported ARPS** | $13.09 | $14.48 |

$ & subscribers in 1,000s except ARPS

We estimate that EIGI's true ARPS actually declined in 2014 by around - 13%:

**EIGI Actual 2014 ARPS Declined**

|  | 2011 | 2012 | 2013 | 2014 |
|---|---|---|---|---|
| Adjusted revenue | $ 474,115 | $ 528,119 | $ | 651,945 |
| total subscribers - reported | 2,845 | 3,223 | 3,502 | 4,031 |
| Directi end subscribers |  |  | 1,000 | 1,000 |
| total subscribers - actual |  |  | 4,502 | 5,031 |
| Reported ARPS | ##### | $12.92 | $13.09 | $14.48 |
| **Actual ARPS** | **12.84** | **$12.92** | **$13.09** | **$11.40** |
| % growth in ARPS | $ | 0.01 | 1.3% | (12.9%) |

All figures except ARPS are in 1,000s
total subscribers subtracts the 56 implied directi resellers.

197.    With respect to Total Subscribers, the report pointed out that "In Q4 2014 the company changed the definition of a subscriber (which added increases subscribers)," but "did not discuss this change on the quarterly call."

198.    With respect to churn, Gotham shed light on the misleading nature of Endurance's reported "cash churn."   Specifically, Gotham alleged that "EIGI's True Churn is Very High." Gotham noted that "[t]he implied churn rate of 1% (since EIGI does not disclose churn), implies the company has industry leading churn" which Gotham pointed out, was likely false:

> EIGI's CEO has claimed that:
>
>> "85% to sometimes it's higher than 90% of the subscriber churn that happens is businesses just going out of business. So this is off the churn number. 85% to 90% would be people going out of business."
>
> So if we are to trust Ravichandran and EIGI, churn is %1 per month, and 85%-90% of that is from "people going out of business." Yet US statistics regarding business survival consistently shows that businesses closure (due to failure or

voluntary closure) within the first year has been a remarkably steady 20-25% the 1994-2010 period.

Ravichandran's explanation would imply that new customers hosting on EIGI brands only close shop at a rate of 10%- 11%, significantly less than the 20-26% historical rate. We don't think that's the case, especially coupled with the significant service outages, customer complaints, integration issues, and other problems we've discussed in prior sections.

199.    On news of Gotham's report on the Company, shares of Endurance declined $2.24 per share, over 10%, to close on April 28, 2015, at $19.70 per share, on unusually heavy volume.

200.    Gotham's April 28, 2015 report partially revealed: (1) that the domain-only revenue was included in the Company's ARPS calculation, but that domain-only customers were not included in the ARPS calculation, raising investors' suspicions regarding the possibility that Endurance's domain business was inflating ARPS; (2) that Total Subscribers' definition changed in Q4 2014; (3) that the Company's use of the term "churn" is misleading; and (4) that, generally, Endurance's metrics, the Company's definitions of them, and the way the Company calculates them is suspicious and open to fraud.

201.    On May 5, 2015, Endurance issued its Q1 2015 quarterly results press release disclosing that ARPS for the first quarter of fiscal year 2015 was $14.37, a decrease of $0.11 compared to the quarter prior.  In the press release, the Company, in relevant part, stated:

**<u>First Quarter Operating Highlights</u>**

- Total subscribers on platform were approximately 4.206 million, an increase of approximately 119,000 in the first quarter. See "Total Subscribers" below.

- Average revenue per subscriber (ARPS) was $14.37, an increase of 1 percent compared to $14.18 for the first quarter of 2014.

Endurance's significant drop in ARPS heaped even more doubt on the Company's +$500 subscribers and PPS metrics because of the apparent inconsistency between purportedly growing +$500 subscribers and PPS (ARPS drivers) on the one hand, and plummeting ARPS on the other.

202.     Additionally, on the same day, during the quarterly conference call with investors and analysts, Defendant Ravichandran finally disclosed that the Company's true subscriber churn rate was approximately 20% for fiscal year 2014:

> Given that we manage our business to cash flow, we believe the most appropriate way to evaluate our churn is to look at cash churn. To help with this, we report monthly recurring revenue retention rate or MRR. MRR is a combination of both subscriber churn and of increases in cash collected from subscribers as we sell more products to them. Our MRR has consistently been approximately 99% or 1% monthly cash churn or approximately 12% annually. ***Our pure subscriber churn in 2014 was approximately 20% annually***.

(Emphasis added).

203.     On this news, shares of Endurance declined $0.47 per share, or 2.3%, to close on May 5, 2015, at $19.18 per share, on unusually heavy volume.

204.     The disclosures on May 5, 2015 partially revealed (and/or raised investors' suspicions): (1) that prior reports of the Company's +$500 subscribers and PPS were inaccurate since growth in the two ARPS drivers seems inconsistent with an ARPS decline; and (2) that the Company's true subscriber churn rate was 20% for fiscal year 2014.

205.     On August 4, 2015, Endurance issued a press release disclosing that ARPS declined even further, to $14.30 for the quarter, a decrease of $0.07 from the quarter prior.  The press release was entitled "Endurance International Group Reports 2015 Second Quarter Results."  Therein, the Company stated:

**Second Quarter Operating Highlights**

- Total subscribers on platform were approximately 4.394 million, including approximately 86,000 subscribers from businesses acquired during the quarter. See "Total Subscribers" below.

- Average revenue per subscriber (ARPS) was $14.30, compared to $14.33 for the second quarter of 2014.

- During the quarter, the company acquired assets of Verio and Site5. The total cash consideration for these acquisitions is expected to be approximately $36 million.

206.    However, the same day, August 4, 2015, during the Company's earnings conference call with investors and analysts, Defendant Ravichandran reassured investors regarding the Company's falling ARPS by citing the false in +$500 subscribers and PPS metrics, stating: "the increase in high-value subscribers and the increase in product attach rates give us confidence in our underlying ability to monetize our base of subscribers and grow ARPS over time."   Additionally, on that day, Oppenheimer & Co. Inc. published an analyst report on Endurance.  The report, discussing the slowdown in ARPS, stated that the Company needed to increase quality disclosures surrounding the company's newly added subscribers and ARPS drivers.  The report noted that the lack of clarity in the Company's disclosures surrounding ARPS was leading Oppenheimer to question whether the Company was adding lower quality subscribers, that were paying less, and which could lead to higher churn rates over time.

207.    On this news, shares of Endurance declined $2.41 per share, or 11.7%, to close on August 4, 2015, at $18.12 per share, on unusually heavy volume.

208.    The disclosures on August 4, 2015 continued to raise investors' suspicions that the Company's reported +$500 subscribers and PPS figures were inaccurate since consistent growth in the two ARPS drivers seemed inconsistent with an ARPS decline.  The Oppenheimer report intensified investors' suspicions by asking for increased clarity into ARPS.  However,

Defendant Ravichandran heaped more confusion on the matter when he reassured investors regarding the Company's ARPS potential by pointing to the Company's purportedly strong ARPS growth drivers.

209.    Investors' concerns regarding +$500 subscribers and PPS were confirmed on November 2, 2015.  On that day, during the Q3 2015 CC, the Company disclosed that past representations of the number of subscribers paying $500 or more per year and the number of products per subscriber were false.  Endurance attributed the false figures to an "error" on which the Company did not elaborate.  The Company, in relevant part, stated:

> Turning to other metrics, I would like to mention that we are not showing three performance metric this quarter, monthly recurring revenue or MRR, number of product per subs, PPS, and the number of subscribers paying us over $500 per year. We recently identified an error while migrating some data from our legacy business intelligence system to an upgraded BI system which impacted these metrics. We're on the process of recalculating these numbers. This system is completely separate from the ERP system that produces our financial and subscriber data. We believe that our previously reported MRR numbers will remain at 99% for at least the last four quarters.

> Revised numbers for both the number of product per subs and number of 500-plus subs are expected to be lower than the previously reported numbers. This does not impact our GAAP financial result, adjusted revenue, adjusted EBITDA, free cash flow, or unlevered free cash flow metrics. This also does not impact our subscriber comp, churn, unit economics. We will provide updated metrics information as soon as it is available.

> The purpose of the PPS and the 500-plus metrics was to provide additional insights to element that can directionally impact ARPS.

210.    On this news, shares of Endurance declined $2.21 per share, or 16.5%, to close on November 2, 2015, at $11.12 per share, on unusually heavy volume.

211.    The disclosures on November 2, 2015 partially revealed that the Company's previously reported +$500 subscribers and ARPS figures were inaccurate, but did not reveal the extent of the inaccuracy.

212.   On November 6, 2015, in the Company's Q3 2015 Form 10-Q, Endurance elaborated on the reason it was not reporting the three performance metrics identified in the earlier earnings call, which included +$500 subscribers and PPS.  The Company also stated that it was recalculating and verifying the metrics and intended to provide "updated information" when available.  In the Company's 10-Q, the Company, in relevant part, stated:

> We are not reporting monthly recurring revenue, or MRR, retention rate figures in this Quarterly Report on Form 10-Q because we recently identified errors in our business intelligence system that impacted MRR as well as two of our other previously reported performance metrics, the number of products per subscriber and the number of subscribers paying us $500 or more per year. We are in the process of recalculating and verifying revised numbers for these metrics using an upgraded version of the business intelligence system that we believe has corrected these errors. Based on the work we have done to date, we believe that our previously reported MRR figures will remain at 99% for at least the last four quarters, which is as far back as we have completed our preliminary assessment, and that our revised figures for both the number of subscribers paying us $500 or more per year and the number of products per subscriber will be lower than our previously reported figures for those metrics. These are preliminary conclusions and are subject to change based on the final results of our recalculation and verification process. These errors only affect these three performance metrics and do not impact our GAAP financial results, our adjusted EBITDA, free cash flow or unlevered free cash flow metrics, ARPS, or total subscriber figures. We intend to provide updated information for MRR and these other performance metrics once it is available.

213.   On December 9, 2015, Endurance filed a letter with the SEC responding to an SEC letter dated November 17, 2015.  Therein, Endurance attempted to clarify issues with the Company's metrics that the SEC identified.  With respect to ARPS, the SEC noted that ARPS includes revenue not attributable to subscribers, and asked Endurance to clarify the impact of such amounts on the metric.  In response, Endurance admitted that domain revenue was becoming an increasingly large percentage of the Company's ARPS:

> Domain monetization revenue consists principally of revenue from our BuyDomains brand, which provides premium domain name products and services. Domain monetization revenue also includes, to a lesser extent, revenue from advertisements placed on unused domains (often referred to as "parked" pages) owned by us or our customers. ***Historically, the contribution of domain***

*monetization activities to our adjusted revenue has been insignificant, but has been increasing beginning in 2014 due primarily to our acquisition of BuyDomains in September 2014*. Our domain monetization adjusted revenue was $3.0 million in 2013, $19.1 million in 2014, $8.2 million for the nine months ended September 30, 2014 and $29.7 million for the nine months ended September 30, 2015, and *its exclusion from our ARPS calculation would have resulted in ARPS being $0.07, $0.25, $0.43 and $0.77 lower for those periods, respectively*.[6]

214.    The December 9, 2015 disclosure definitively confirmed that the Company's ARPS metric was misleading because it was being artificially inflated by the Company's treatment of domain-related customers and revenue.

215.    On December 17, 2015, the Company filed a Current Report with the SEC on Form 8-K disclosing that the Company was the subject of an SEC investigation relating to, among other issues, the Company's reporting of metrics.  In the Current Report, the Company, in relevant part, disclosed:

> Endurance International Group Holdings, Inc. ("Endurance") received a subpoena dated December 10, 2015 from the Boston Regional Office of the Securities and Exchange Commission (the "SEC"), requiring the production of certain documents, including, among other things, documents related to Endurance's financial reporting, *including operating and non-GAAP metrics*, refund, sales and marketing practices and transactions with related parties. Endurance will fully cooperate with the SEC's investigation. Endurance can make no assurances as to the time or resources that will need to be devoted to this investigation or its final outcome, or the impact, if any, of this investigation or any proceedings on Endurance's business, financial condition, results of operations and cash flows.

(Emphasis added).

216.    On this news, shares of Endurance declined $1.81 per share, or 13.9%, to close on December 17, 2015, at $11.20 per share, on unusually heavy volume.

---

[6] There appears to be a typographical error in the Company's response.  The Company stated that exclusion of domain revenue would decrease ARPS by $0.25 for 2014, and $0.43 for the nine months ended September 30, 2014.  The reverse is probably correct: exclusion of domain revenue would decrease ARPS by *$0.43 for 2014*, and *$0.25 for the nine months ended September 30, 2014*.

217.    The Company's disclosure on December 17, 2015, partially revealed and helped confirm, that the Company's Total Subscribers, ARPS, +$500 subscribers, PPS, and churn rate metrics were false and/or misleading because the SEC investigation confirmed the investors' suspicions—previously stirred up by the Company's and analysts' earlier disclosures and comments—that Endurance's metrics were false and/or misleading.

218.    On February 18, 2016, the Company released revised PPS and +$500 subscriber figures, revealing the full extent of the Defendants' fraud.   During the Company's quarterly earnings conference call with analysts and investors, the Company disclosed the revised PPS and +$500 subscriber figures for the fourth quarter of 2013 through the second quarter of 2015.   The Company also released the previously unreleased PPS and +$500 subscriber figures for the third and fourth quarter of 2015.   In connection with the conference call, the Company published a PowerPoint slide, illustrating the true PPS and +$500 subscriber figures compared to the previously issued false figures, the content of which was reproduced in Company's Annual Report filed with the SEC on Form 10-K on February 29, 2016:





219.    The February 18 (and February 29), 2016 disclosures fully revealed the extent of Defendants' prior false +$500 subscribers and PPS figures.  Specifically, with respect to PPS, the revised figures illustrate only three instances of quarter-to-quarter PPS growth, one of which (Q4 2014) was not organic, but, as disclosed on the conference call, was due to an adjustment that eliminated inactive customers from the subscriber count, contrary to Defendants' prior claims of consistent PPS growth.  The revised figures also illustrate relatively flat +$500 subscriber growth, contrary to Defendants' prior claims of drastically increasing +$500 subscribers, since, as demonstrated by the revised figures, +$500 subscriber grew from 82,000 to 90,000 (9.7% growth) rather than 99,000 to 150,000 (51.5% growth) from the Q4 2013 through the Q2 2015.

220.    Additionally, the Company revealed on the February 18, 2016, conference call (and confirmed in the February 29, 2016 10-K), that Defendants manipulated Endurance's Total Subscribers in Q4 2014.  In explaining the spike that occurred in the revised Q4 2014 PPS, the Company, in relevant part, stated: "You will note that there was a significant increase in PPS in the fourth quarter of 2014 due to an adjustment that eliminated inactive customers from a subscriber count, which refers identify such in the same quarter."

221.    Finally, the Company announced during the February 18, conference call (and confirmed in the February 29, 2016 10-K), that it would not be releasing PPS and +$500 subscriber figures in the future: "Due to the significant size of the Constant Contact acquisition and the difference in subscriber profile between Endurance and Constant Contact, we will no longer report PPS or 500+ Subscribers going forward."

222.    On news of the Company's final revelation (to date) of the Company's false metrics as laid out in Endurance's fiscal year 2015 Form 10-K filed with the SEC after market close on February 29, 2016, shares of Endurance declined $0.06 per share to close on March 1, 2016, at $11.18 per share.

## X.  CLASS ACTION ALLEGATIONS

223.   Plaintiff brings this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a class, consisting of all those who purchased Endurance's securities between February 25, 2014 and February 29, 2016, inclusive (the "Class Period") and who were damaged thereby (the "Class").  Excluded from the Class are Defendants, the officers and directors of the Company, at all relevant times, members of their immediate families and their legal representatives, heirs, successors or assigns and any entity in which Defendants have or had a controlling interest.

224.   The members of the Class are so numerous that joinder of all members is impracticable.  Throughout the Class Period, Endurance's securities were actively traded on the Nasdaq Stock Market (the "NASDAQ").  While the exact number of Class members is unknown to Plaintiff at this time and can only be ascertained through appropriate discovery, Plaintiff believes that there are hundreds or thousands of members in the proposed Class.  Millions of Endurance shares were traded publicly during the Class Period on the NASDAQ.  As of February 19, 2016, Endurance had 137,479,304 shares of common stock outstanding.  Record owners and other members of the Class may be identified from records maintained by Endurance or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

225.   Plaintiff's claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

226.   Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation.

227.     Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class.   Among the questions of law and fact common to the Class are:

(a)     whether the federal securities laws were violated by Defendants' acts as alleged herein;

(b)     whether statements made by Defendants to the investing public during the Class Period omitted and/or misrepresented material facts about the business, operations, and prospects of Endurance; and

(c)     to what extent the members of the Class have sustained damages and the proper measure of damages.

228.     A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable.   Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation makes it impossible for members of the Class to individually redress the wrongs done to them.   There will be no difficulty in the management of this action as a class action.

## XI.     UNDISCLOSED ADVERSE FACTS

229.     The market for Endurance's securities was open, well-developed and efficient at all relevant times.   As a result of these materially false and/or misleading statements, and/or failures to disclose, Endurance's securities traded at artificially inflated prices during the Class Period.   Plaintiff and other members of the Class purchased or otherwise acquired Endurance's securities relying upon the integrity of the market price of the Company's securities and market information relating to Endurance, and have been damaged thereby.

230.    During the Class Period, Defendants materially misled the investing public, thereby inflating the price of Endurance's securities, by publicly issuing false and/or misleading statements and/or omitting to disclose material facts necessary to make Defendants' statements, as set forth herein, not false and/or misleading.  Said statements and omissions were materially false and/or misleading in that they failed to disclose material adverse information and/or misrepresented the truth about Endurance's business, operations, and prospects as alleged herein.

231.    At all relevant times, the material misrepresentations and omissions particularized in this Complaint directly or proximately caused or were a substantial contributing cause of the damages sustained by Plaintiff and other members of the Class.  As described herein, during the Class Period, Defendants made or caused to be made a series of materially false and/or misleading statements about Endurance's financial well-being and prospects.  These material misstatements and/or omissions had the cause and effect of creating in the market an unrealistically positive assessment of the Company and its financial well-being and prospects, thus causing the Company's securities to be overvalued and artificially inflated at all relevant times.  Defendants' materially false and/or misleading statements during the Class Period resulted in Plaintiff and other members of the Class purchasing the Company's securities at artificially inflated prices, thus causing the damages complained of herein.

## XII.    APPLICABILITY OF PRESUMPTION OF RELIANCE (FRAUD-ON-THE-MARKET DOCTRINE)

232.    The market for Endurance's securities was open, well-developed and efficient at all relevant times.  As a result of the materially false and/or misleading statements and/or failures to disclose, Endurance's securities traded at artificially inflated prices during the Class Period.  On April 23, 2015, the Company's stock closed at a Class Period high of $23.03 per share.  Plaintiff and other members of the Class purchased or otherwise acquired the Company's

securities relying upon the integrity of the market price of Endurance's securities and market information relating to Endurance, and have been damaged thereby.

233.    During the Class Period, the artificial inflation of Endurance's stock was caused by the material misrepresentations and/or omissions particularized in this Complaint causing the damages sustained by Plaintiff and other members of the Class.  As described herein, during the Class Period, Defendants made or caused to be made a series of materially false and/or misleading statements about Endurance's business, prospects, and operations.  These material misstatements and/or omissions created an unrealistically positive assessment of Endurance and its business, operations, and prospects, thus causing the price of the Company's securities to be artificially inflated at all relevant times, and when disclosed, negatively affected the value of the Company stock.  Defendants' materially false and/or misleading statements during the Class Period resulted in Plaintiff and other members of the Class purchasing the Company's securities at such artificially inflated prices, and each of them has been damaged as a result.

234.    At all relevant times, the market for Endurance's securities was an efficient market for the following reasons, among others:

(a)     Endurance stock met the requirements for listing, and was listed and actively traded on the NASDAQ, a highly efficient and automated market;

(b)     As a regulated issuer, Endurance filed periodic public reports with the SEC and/or the NASDAQ;

(c)     Endurance regularly communicated with public investors *via* established market communication mechanisms, including through regular dissemination of press releases on the national circuits of major newswire services and through other wide-ranging public

disclosures, such as communications with the financial press and other similar reporting services; and/or

(d)     Endurance was followed by securities analysts employed by brokerage firms who wrote reports about the Company, and these reports were distributed to the sales force and certain customers of their respective brokerage firms.  Each of these reports was publicly available and entered the public marketplace.

235.     As a result of the foregoing, the market for Endurance's securities promptly digested current information regarding Endurance from all publicly available sources and reflected such information in Endurance's stock price.  Under these circumstances, all purchasers of Endurance's securities during the Class Period suffered similar injury through their purchase of Endurance's securities at artificially inflated prices and a presumption of reliance applies.

236.     A Class-wide presumption of reliance is also appropriate in this action under the Supreme Court's holding in *Affiliated Ute Citizens of Utah v. U.S.*, 406 U.S. 128 (1972), because the Class's claims are, in large part, grounded on Defendants' material misstatements and/or omissions.  Because this action involves Defendants' failure to disclose material adverse information regarding the Company's business operations and financial prospects—information that Defendants were obligated to disclose—positive proof of reliance is not a prerequisite to recovery.  All that is necessary is that the facts withheld be material in the sense that a reasonable investor might have considered them important in making investment decisions. Given the importance of the Class Period material misstatements and omissions set forth above, that requirement is satisfied here.

## XIII. NO SAFE HARBOR

237.    The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the allegedly false statements pleaded in this Complaint. The statements alleged to be false and misleading herein all relate to then-existing facts and conditions.  In addition, to the extent certain of the statements alleged to be false may be characterized as forward looking, they were not identified as "forward-looking statements" when made and there were no meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements.  In the alternative, to the extent that the statutory safe harbor is determined to apply to any forward-looking statements pleaded herein, Defendants are liable for those false forward-looking statements because at the time each of those forward-looking statements was made, the speaker had actual knowledge that the forward-looking statement was materially false or misleading, and/or the forward-looking statement was authorized or approved by an executive officer of Endurance who knew that the statement was false when made.

## XIV. COUNTS

### FIRST CLAIM
### Violation of Section 10(b) of
### The Exchange Act and Rule 10b-5
### Promulgated Thereunder Against All Defendants

238.    Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

239.    During the Class Period, Defendants carried out a plan, scheme and course of conduct which was intended to and, throughout the Class Period, did: (i) deceive the investing public, including Plaintiff and other Class members, as alleged herein; and (ii) cause Plaintiff and other members of the Class to purchase Endurance's securities at artificially inflated prices.  In

furtherance of this unlawful scheme, plan and course of conduct, defendants, and each of them, took the actions set forth herein.

240.   Defendants (i) employed devices, schemes, and artifices to defraud; (ii) made untrue statements of material fact and/or omitted to state material facts necessary to make the statements not misleading; and (iii) engaged in acts, practices, and a course of business which operated as a fraud and deceit upon the purchasers of the Company's securities in an effort to maintain artificially high market prices for Endurance's securities in violation of Section 10(b) of the Exchange Act and Rule 10b-5.  All Defendants are sued either as primary participants in the wrongful and illegal conduct charged herein or as controlling persons as alleged below.

241.   Defendants, individually and in concert, directly and indirectly, by the use, means or instrumentalities of interstate commerce and/or of the mails, engaged and participated in a continuous course of conduct to conceal adverse material information about Endurance's financial well-being and prospects, as specified herein.

242.   These defendants employed devices, schemes and artifices to defraud, while in possession of material adverse non-public information and engaged in acts, practices, and a course of conduct as alleged herein in an effort to assure investors of Endurance's value and performance and continued substantial growth, which included the making of, or the participation in the making of, untrue statements of material facts and/or omitting to state material facts necessary in order to make the statements made about Endurance and its business operations and future prospects in light of the circumstances under which they were made, not misleading, as set forth more particularly herein, and engaged in transactions, practices and a course of business which operated as a fraud and deceit upon the purchasers of the Company's securities during the Class Period.

243.   Each of the Individual Defendants' primary liability, and controlling person liability, arises from the following facts: (i) the Individual Defendants were high-level executives and/or directors at the Company during the Class Period and members of the Company's management team or had control thereof; (ii) each of these defendants, by virtue of their responsibilities and activities as a senior officer and/or director of the Company, was privy to and participated in the creation, development and reporting of the Company's internal budgets, plans, projections and/or reports; (iii) each of these defendants enjoyed significant personal contact and familiarity with the other defendants and was advised of, and had access to, other members of the Company's management team, internal reports and other data and information about the Company's finances, operations, and sales at all relevant times; and (iv) each of these defendants was aware of the Company's dissemination of information to the investing public which they knew and/or recklessly disregarded was materially false and misleading.

244.   The defendants had actual knowledge of the misrepresentations and/or omissions of material facts set forth herein, or acted with reckless disregard for the truth in that they failed to ascertain and to disclose such facts, even though such facts were available to them. Such defendants' material misrepresentations and/or omissions were done knowingly or recklessly and for the purpose and effect of concealing Endurance's financial well-being and prospects from the investing public and supporting the artificially inflated price of its securities.  As demonstrated by Defendants' overstatements and/or misstatements of the Company's business, operations, financial well-being, and prospects throughout the Class Period, Defendants, if they did not have actual knowledge of the misrepresentations and/or omissions alleged, were reckless in failing to obtain such knowledge by deliberately refraining from taking those steps necessary to discover whether those statements were false or misleading.

245.    As a result of the dissemination of the materially false and/or misleading information and/or failure to disclose material facts, as set forth above, the market price of Endurance's securities was artificially inflated during the Class Period.  In ignorance of the fact that market prices of the Company's securities were artificially inflated, and relying directly or indirectly on the false and misleading statements made by Defendants, or upon the integrity of the market in which the securities trades, and/or in the absence of material adverse information that was known to or recklessly disregarded by Defendants, but not disclosed in public statements by Defendants during the Class Period, Plaintiff and the other members of the Class acquired Endurance's securities during the Class Period at artificially high prices and were damaged thereby.

246.    At the time of said misrepresentations and/or omissions, Plaintiff and other members of the Class were ignorant of their falsity, and believed them to be true.  Had Plaintiff and the other members of the Class and the marketplace known the truth regarding the problems that Endurance was experiencing, which were not disclosed by Defendants, Plaintiff and other members of the Class would not have purchased or otherwise acquired their Endurance securities, or, if they had acquired such securities during the Class Period, they would not have done so at the artificially inflated prices which they paid.

247.    By virtue of the foregoing, Defendants have violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

248.    As a direct and proximate result of Defendants' wrongful conduct, Plaintiff and the other members of the Class suffered damages in connection with their respective purchases and sales of the Company's securities during the Class Period.

**SECOND CLAIM**
**Violation of Section 20(a) of**
**The Exchange Act Against the Individual Defendants**

249.    Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

250.    The Individual Defendants acted as controlling persons of Endurance within the meaning of Section 20(a) of the Exchange Act as alleged herein.  By virtue of their high-level positions, and their ownership and contractual rights, participation in and/or awareness of the Company's operations and/or intimate knowledge of the false financial statements filed by the Company with the SEC and disseminated to the investing public, the Individual Defendants had the power to influence and control and did influence and control, directly or indirectly, the decision-making of the Company, including the content and dissemination of the various statements which Plaintiff contends are false and misleading.  The Individual Defendants were provided with or had unlimited access to copies of the Company's reports, press releases, public filings and other statements alleged by Plaintiff to be misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected.

251.    In particular, each of these Defendants had direct and supervisory involvement in the day-to-day operations of the Company and, therefore, is presumed to have had the power to control or influence the particular transactions giving rise to the securities violations as alleged herein, and exercised the same.

252.    As set forth above, Endurance and the Individual Defendants each violated Section 10(b) and Rule 10b-5 by their acts and/or omissions as alleged in this Complaint.  By virtue of their positions as controlling persons, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act.  As a direct and proximate result of Defendants' wrongful

conduct, Plaintiff and other members of the Class suffered damages in connection with their purchases of the Company's securities during the Class Period.

## XV.   <u>PRAYER FOR RELIEF</u>

WHEREFORE, Plaintiff prays for relief and judgment, as follows:

(a)      Determining that this action is a proper class action under Rule 23 of the Federal Rules of Civil Procedure;

(b)      Awarding compensatory damages in favor of Plaintiff and the other Class members against all defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

(c)      Awarding Plaintiff and the Class their reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

(d)      Such other and further relief as the Court may deem just and proper.

## XVI.  <u>JURY TRIAL DEMANDED</u>

Plaintiff hereby demands a trial by jury.


DATED:  March 18, 2016               **BLOCK & LEVITON LLP**


By:  *s/ Jason M. Leviton*
Jason M. Leviton (BBO #678331)
155 Federal Street, Suite 400
Boston, MA 02110
Telephone:  (617) 398-5600
Facsimile:  (617) 507-6020
jason@blockesq.com

*Liaison Counsel for Lead Plaintiff Christopher Machado and the Class*

**GLANCY PRONGAY & MURRAY LLP**
Lionel Z. Glancy
Robert V. Prongay
Charles H. Linehan
1925 Century Park East, Suite 2100
Los Angeles, CA 90067
Telephone:  (310) 201-9150
Facsimile:  (310) 201-9160
lglancy@glancylaw.com
rprongay@glanyclaw.com
clinehan@glancylaw.com

*Lead Counsel for Lead Plaintiff Christopher
Machado and the Class*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that this document filed through the CM/ECF system will be sent

electronically to the registered participants as identified on the Notice of Electronic Filing (NEF).

Dated: March 18, 2016


*/s/ Jason M. Leviton*
Jason M. Leviton