# UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| CHRISTOPHER MACHADO, Individually and on Behalf of All Others Similarly Situated,<br><br>                              Plaintiff,<br><br>        v.<br><br>ENDURANCE INTERNATIONAL GROUP HOLDINGS, INC., HARI RAVICHANDRAN, and TIVANKA ELLAWALA,<br><br>                              Defendants. | Case No. 1:15-cv-11775-GAO<br><br>Leave to File Excess Pages Granted on May 10, 2016 (ECF No. 24)<br><br>**LEAD PLAINTIFF'S OPPOSITION TO DEFENDANTS' MOTION TO DISMISS THE SECOND AMENDED COMPLAINT** |

## <u>TABLE OF CONTENTS</u>

I.      PRELIMINARY STATEMENT ......................................................................1

II.      BACKGROUND REGARDING ENDURANCE'S NON-GAAP METRICS ..................4

III.      DEFENDANTS' STATEMENTS AND OMISSIONS REGARDING ENDURANCE'S NON-GAAP METRICS WERE MATERIALLY FALSE AND MISLEADING...................................................................................................5

     A.      Standards For Pleading Material Misstatements And Omissions...........................5

     B.      Defendants Concede That Their Statements About +$500 Subscribers Were Materially False And Misleading............................................................6

     C.      Defendants' Statements About PPS Were Materially False And Misleading .........6

     D.      Defendants' Statements About ARPS Were Materially False And Misleading......8

     E.      Defendants' Statements About Total Subscriber Counts Were Materially False And Misleading ..........................................................................11

     F.      Defendants' Statements About Churn Were Materially False And Misleading....12

IV.      THE SAC ALLEGES A STRONG INFERENCE OF SCIENTER ................................13

     A.      The Nature And Pattern Of The Misstatements Support An Inference Of Scienter ..............................................................................................14

     B.      Defendants' Heavy Focus On And Close Monitoring Of ARPS And The Drivers Of ARPS Support An Inference Of Scienter ...........................................16

     C.      The Timing Of Ellawala's Resignation And Endurance's Disclosure Of "Errors" Two Months Later Support An Inference Of Scienter ...........................18

     D.      Red Flags Concerning Endurance's Non-GAAP Financial Measures Support An Inference Of Scienter ....................................................................19

     E.      Stock Sales By Ravichandran And Ellawala Support An Inference Of Scienter ..............................................................................................22

     F.      The SEC's Investigation And Endurance's Disclosures In Response To That Investigation Support An Inference Of Scienter....................................................25

V.      THE SAC ADEQUATELY ALLEGES LOSS CAUSATION ........................................26

A. The April 28, 2015 Gotham Report ................................................................27

B. The May 5, 2015 Release Of Q1 2015 Results.................................................29

C. The August 4, 2015 Release Of Q1 2015 Results ...........................................30

D. The November 2, 2015 Disclosure Of "Errors"..............................................31

E. The December 17, 2015 Disclosure Of The SEC Investigation ..........................32

F. The February 1, 2016 Response Letter By Endurance To The SEC ....................33

G. February 18, 2016 Disclosure Of Corrected +$500 Subscriber and PPS Figures....................................................................................................34

VI. CONCLUSION ....................................................................................................35

# <u>TABLE OF AUTHORITIES</u>

**Cases**

*ACA Fin. Guar. Corp. v. Advest, Inc.*,
  512 F.3d 46 (1st Cir. 2008) .......................................................................................... 14, 35

*Aldridge v. A.T. Cross Corp.*,
  284 F.3d 72 (1st Cir. 2002) ..................................................................................... 13, 14, 18

*Basic Inc. v. Levinson*,
  485 U.S. 224 (1988) ........................................................................................................ 5, 6

*Bradley Pharm., Inc. Sec. Litig.*,
  421 F. Supp. 2d 822 (D.N.J. 2006) ............................................................................... 26, 35

*Brumbaugh v. Wave Sys. Corp.*,
  416 F. Supp. 2d 239 (D. Mass. 2006) ............................................................................... 13

*Carpenters Pension Trust Fund of St. Louis v. Barclays PLC*,
  750 F.3d 227 (2d Cir. 2014) ............................................................................................. 26

*City of Roseville Emps.' Ret. Sys. v. Horizon Lines, Inc.*,
  713 F. Supp. 2d 378 (D. Del. 2010) .................................................................................. 10

*City of Roseville Emps.' Ret. Sys. v. EnergySolutions, Inc.*,
  814 F. Supp. 2d 395 (S.D.N.Y. 2011) ............................................................................... 25

*Crowell v. Ionics, Inc.*,
  343 F. Supp. 2d 1 (D. Mass. 2004) .............................................................................. 18, 20

*Danis v. USN Communications*,
  73 F. Supp. 2d 923 (N.D. Ill. 1999) ................................................................................. 12

*Dura Pharms., Inc. v. Broudo*,
  544 U.S. 336 (2005) ......................................................................................................... 26

*Fed. Home Loan Bank of Boston v. Ally Fin., Inc.*,
  2013 WL 5466628 (D. Mass. Sept. 30, 2013) .................................................................... 26

*Frank v. Dana Corp.*,
  646 F.3d 954 (6th Cir. 2011) ............................................................................................ 14

*Freudenberg v. E\*Trade Fin. Corp.*,
  712 F. Supp. 2d 171 (S.D.N.Y. 2010) ............................................................................... 26

*Ganino v. Citizens Util. Co.*,
 228 F.3d 154 (2d Cir. 2000) ................................................................ 7, 14

*George v. China Auto. Sys., Inc.*,
 2012 WL 3205062 (S.D.N.Y. Aug. 8, 2012) ...................................... 19, 26

*Glassman v. Computervision Corp.*,
 90 F.3d 617 (1st Cir. 1996) ....................................................................... 7

*Greebel v. FTP Software, Inc.*,
 194 F.3d 185 (1st Cir. 1999) ................................................................... 14

*Guerra v. Teradyne, Inc.*,
 2004 WL 1467069 (D. Mass. Jan. 16, 2004) ............................................ 4

*Henning v. Orient Paper, Inc.*,
 2011 WL 2909322 (C.D. Cal. July 20, 2011) ......................................... 28

*Ho v. Duoyuan Global Water Inc.*,
 887 F. Supp. 2d 547 (S.D.N.Y. 2012) .................................................... 18

*In re Adaptive Broadband Sec. Litig.*,
 2002 WL 989478 (N.D. Cal. Apr. 2, 2002) ............................................ 18

*In re ArthroCare Corp. Sec. Litig.*,
 726 F. Supp. 2d 696 (W.D. Tex. 2010) ................................................... 21

*In re ATI Techs., Inc. Sec. Litig.*,
 216 F. Supp. 2d 418 (E.D. Pa. 2002) ..................................................... 10

*In re Atlas Worldwide Holdings, Inc. Sec. Litig.*,
 324 F. Supp. 2d 474 (S.D.N.Y. 2004) .................................................... 18

*In re BP p.l.c. Sec. Litig.*,
 843 F. Supp. 2d 712 (S.D. Tex. 2012) .................................................... 17

*In re Cabletron Sys., Inc.*,
 311 F.3d 11 (1st Cir. 2002) ................................................................. 5, 14

*In re Campbell Soup Co. Sec. Litig.*,
 145 F. Supp. 2d 574 (D.N.J. 2001) ........................................................ 10

*In re Computer Associates Class Action Sec. Litig.*,
 75 F. Supp. 2d 68 (E.D.N.Y. 1999) ....................................................... 12

*In re Cooper Sec. Litig.*,
    691 F. Supp. 2d 1105 (C.D. Cal. 2010) ............................... 13

*In re Credit Suisse-AOL Sec. Litig.*,
    465 F. Supp. 2d 34 (D. Mass. 2006) ........................... 26, 27

*In re Evergreen Ultra Short Opportunities Fund Sec. Litig.*,
    705 F. Supp. 2d 86 (D. Mass. 2010) ............................... 27

*In re Fairway Grp. Holding Corp. Sec. Litig.*,
    2015 WL 249508 (S.D.N.Y. Jan. 20, 2015) ..................... 25

*In re First Marblehead Corp. Sec. Litig.*,
    639 F. Supp. 2d 145 (D. Mass. 2009) ............................. 24

*In re First Merchants Acceptance Corp. Sec. Litig.*,
    1998 WL 781118 (N.D. Ill. Nov. 4, 1998) ..................... 12

*In re Gen. Elec. Co. Sec. Litig.*,
    857 F. Supp. 2d 367 (S.D.N.Y. 2012) ........................ 17, 18

*In re Gentiva Sec. Litig.*,
    932 F. Supp. 2d 352 (2013) ............................................ 33

*In re Genzyme Corp. Sec. Litig.*,
    754 F.3d 31 (1st Cir. 2014) ............................................ 35

*In re Gilead Scis. Sec. Litig.*,
    536 F.3d 1049 (9th Cir. 2008) ...................................... 29

*In re Guilford Mills, Inc. Sec. Litig.*,
    1999 WL 33248953 (S.D.N.Y. July 21, 1999) ................. 23

*In re IMAX Securities Litigation*,
    587 F. Supp. 2d 471 (S.D.N.Y. 2008) ............................ 32

*In re Lehman Bros. Sec. & ERISA Litig.*,
    799 F. Supp. 2d 258 (S.D.N.Y. 2011) ............................ 19

*In re McKesson HBOC, Inc. Sec. Litig.*,
    126 F. Supp. 2d 1248 (N.D. Cal. 2000) .......................... 15

*In re Motorola Sec. Litig.*,
    505 F. Supp. 2d 501 (N.D. Ill. 2007) ...................... 26, 29, 32

*In re New Century*,
    588 F. Supp. 2d 1206 (C.D. Cal. 2008) .................................................................. 19

*In re Omnicom Grp., Inc. Sec. Litig.*,
    597 F.3d 501 (2d Cir. 2010) ................................................................................... 29

*In re Oxford Health Plans, Inc.*,
    187 F.R.D. 133 (S.D.N.Y. 1999) ............................................................................. 24

*In re PerkinElmer, Inc. Sec. Litig.*,
    286 F. Supp. 2d 46 (D. Mass. 2003) ............................................................... 6, 7, 16

*In re Prestige Brands Holding, Inc.*,
    2006 WL 2147719 (S.D.N.Y. July 10, 2006) .......................................................... 25

*In re Providian Fin. Corp. Sec. Litig.*,
    152 F. Supp. 2d 814 (E.D. Pa. 2001) ...................................................................... 10

*In re Refco, Inc. Sec. Litig.*,
    503 F. Supp. 2d 611 (S.D.N.Y. 2007) ..................................................................... 25

*In re Scholastic Corp. Sec. Litig.*,
    252 F.3d 63 (2d Cir. 2001) ..................................................................................... 21

*In re Seitel, Inc. Sec. Litig.*,
    447 F. Supp. 2d 693 (S.D. Tex. 2006) .................................................................... 35

*In re Spear & Jackson Sec. Litig.*,
    399 F. Supp. 2d 1350 (S.D. Fla. 2005) ................................................................... 21

*In re St. Jude Med., Inc. Sec. Litig.*,
    836 F. Supp. 2d 878 (D. Minn. 2011) ..................................................................... 17

*In re StockerYale Sec. Litig.*,
    453 F. Supp. 2d 345 (D.N.H. 2006) ........................................................................ 26

*In re Stone & Webster, Inc., Sec. Litig.*,
    424 F.3d 24 (1st Cir. 2005) .................................................................................... 35

*In re Sunbeam Sec. Litig.*,
    89 F. Supp. 2d 1326 (S.D. Fla. 1999) ..................................................................... 21

*In re: Suprema Specialties, Inc. Sec. Litig.*,
    438 F.3d 256 (3d Cir. 2006) ................................................................................... 23

*In re Take-Two Interactive Sec. Litig.*,
   551 F. Supp. 2d 247 (S.D.N.Y. 2008) ........................................................... 28, 33

*In re UTStarcom, Inc. Sec. Litig.*,
   617 F. Supp. 2d 964 (N.D. Cal. 2009) .................................................................. 35

*In re Washington Mutual, Inc. Sec., Derivative & ERISA Litig.*,
   259 F.R.D. 490 (W.D. Wash. 2009) ........................................................................ 4

*In re Washington Mutual, Inc. Sec., Derivative & ERISA Litig.*,
   694 F. Supp. 2d 1192 (W.D. Wash. 2009) ............................................................ 12

*In re Winstar Commc'ns*,
   2006 WL 473885 (S.D.N.Y. Feb. 27, 2006) ......................................................... 28

*Lentell v. Merrill Lynch & Co. Inc.*,
   396 F.3d 161 (2d Cir. 2005) ................................................................................... 26

*Lloyd v. CVB Fin. Corp.*,
   811 F.3d 1200 (9th Cir. 2016) ......................................................................... 27, 33

*Loos v. Immersion Corp.*,
   762 F.3d 880 (9th Cir. 2014) ................................................................................. 33

*Lormand v. US Unwired, Inc.*,
   565 F.3d 228 (5th Cir. 2009) ................................................................................. 29

*Makor Issues & Rights, Ltd. v. Tellabs, Inc.*,
   437 F.3d 588 (7th Cir. 2006) ................................................................................. 17

*Malin v. XL Capital Ltd.*,
   499 F. Supp. 2d 117 (D. Conn. 2007) ................................................................... 13

*Marksman Partners, L.P. v. Chantal Pharm. Corp.*,
   927 F. Supp. 1297 (C.D. Cal. 1996) ..................................................................... 23

*Meridian Horizon Fund, L.P. v. Tremont Grp. Holdings, Inc.*,
   2012 WL 4049953 (S.D.N.Y. Sept. 14, 2012) ...................................................... 17

*Miss. Pub. Emp. Ret. Sys. v. Boston Scientific Corp.*,
   523 F.3d 75 (1st Cir. 2008) ......................................................................... 5, 13, 14

*Nathanson v. Polycom, Inc.*,
   87 F. Supp. 3d 966 (N.D. Cal. 2015) .................................................................... 32

*Plumbers & Pipefitters Nat'l Pension Fund v. Orthofix Int'l*,
    89 F. Supp. 602 (S.D.N.Y. 2015)........................................................................ 18

*Plumbers Union Local No. 12 Pension Fund v. Ambassador's Group*,
    2010 WL 2264962 (E.D. Wash. June 2, 2010) ................................................... 25

*Pub. Employees Ret. Sys. of Mississippi, Puerto Rico Teachers Ret. Sys. v. Amedisys, Inc.*,
    769 F.3d 313 (5th Cir. 2014) .................................................... 27, 29, 31, 33

*Reese v. Malone*,
    747 F.3d 557 (9th Cir. 2014) ............................................................................. 18

*Rehm v. Eagle Fin. Corp.*,
    954 F. Supp. 1246 (N.D. Ill. 1997) .................................................................... 21

*Richard v. Northwest Pipe Co.*,
    2011 WL 3813073 (W.D. Wash. Aug. 26, 2011) .............................................. 35

*SEC v Leslie*,
    2012 WL 116562 (N.D. Cal. Jan. 13, 2012) .................................................. 7, 11

*Simon v. Abiomed, Inc.*,
    37 F. Supp. 3d 499 (D. Mass. 2014) .................................................................. 10

*Snellink v. Gulf Res., Inc.*,
    870 F. Supp. 2d 930 (C.D. Cal. 2012) ............................................................... 28

*Special Situations Fund III, L.P. v. Am. Dental Partners, Inc.*,
    775 F. Supp. 2d 227 (D. Mass. 2011) .......................................................... 27, 30

*Takara Trust v. Molex Inc.*,
    429 F. Supp. 2d 960 (N.D. Ill. 2006) ................................................................... 7

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*,
    551 U.S. 308 (2007) ........................................................................................... 14

*Tricontinental Indus. Ltd. v. Anixter*,
    215 F. Supp. 2d 942 (N.D. Ill. 2002) ................................................................. 12

*Tutor Perini Corp. v. Banc of Am. Sec. LLC*,
    2013 WL 5376023 (D. Mass. Sept. 24, 2013) ................................................... 27

*Vazquez-Cruz v. Commonwealth of Puerto Rico*,
    618 F. Supp. 2d 120 (D.P.R. 2009) .................................................................. 2, 4

*Washtenaw County Emps. Ret. Sys. v. Avid Tech., Inc.*,
  28 F. Supp. 3d 93 (D. Mass. 2014) ....................................................................................... 25

**Statutes**

15 U.S.C. § 78u-4(b)(1)(A) ...................................................................................................... 5

15 U.S.C. § 78u-4(b)(1)(B) ...................................................................................................... 5

**Rules and Regulations**

Fed. R. Civ. P. 15(a)(2) .......................................................................................................... 35

17 C.F.R. § 210.4-01 ................................................................................................................ 4

64 Fed. Reg. 152 ...................................................................................................................... 7

64 Fed. Reg. 45150 (1999) ...................................................................................................... 7

Lead Plaintiff Christopher Machado ("Plaintiff") respectfully submits this Memorandum of Law in opposition to the motion to dismiss filed by defendants Endurance International Group Holdings, Inc. ("Endurance" or the "Company"), Hari Ravichandran and Tivanka Ellawala (collectively, the "Individual Defendants," and together with Endurance, "Defendants").

## I.    PRELIMINARY STATEMENT

Plaintiff's Second Amended Complaint ("SAC")[1] details a sophisticated and multifaceted securities fraud involving Endurance's non-GAAP financial measures.  A central aspect of this fraud was the creation of fictitious growth patterns in two metrics:  the number of Endurance subscribers paying more than $500 per year ("+$500 Subscribers") and the average number of products per subscriber ("PPS").  After touting steady, organic growth in these two metrics for the first twenty months of the Class Period,[2] Defendants were finally forced to admit that these figures had been incorrectly reported *for seven consecutive quarters*.  Endurance's stock price tanked, and the SEC initiated an investigation into Endurance's financial reporting, which is still ongoing.

Defendants begin their motion to dismiss with two sweeping, indisputably false assertions: (i) that the SAC fails "to plead *any single element* of a securities fraud claim" and (ii) that the SAC "fails to establish that *any* of the challenged statements were materially false or misleading."[3]  While Defendants challenge the falsity and materiality of their statements with respect to three of Endurance's non-GAAP financial metrics—average revenue per subscriber ("ARPS"), total subscribers, and churn, Defendants *do not* challenge the falsity of their statements regarding +$500 Subscribers and PPS.  Nor could they, as Defendants have already admitted that Endurance's +$500

---

[1] Although this is a second amended complaint, this motion presents the first opportunity for the Court to rule upon the sufficiency of a complaint in this case.  The first amended complaint was filed on December 8, 2015, a week before Endurance announced its receipt of an SEC subpoena and two months before it issued restated +$500 Subscriber and PPS numbers.  Amendment was required to include allegations concerning those events in the complaint.

[2] Plaintiff brings this action as a class action on behalf of the purchasers of Endurance's securities between February 25, 2014 and February 29, 2016, inclusive (the "Class Period"), seeking to pursue remedies under the Exchange Act.

[3] *See* Dkt. No. 29, Memorandum in Support of Defendants' Motion to Dismiss ("Def. Br.") at 1 (some emphasis added).

Subscriber and PPS numbers were misstated. ¶¶212, 218.[4] Moreover, while Defendants challenge the materiality of their misstatements concerning PPS, they do not challenge the materiality of their misstatements concerning +$500 Subscribers. For the purposes of this motion, therefore, Defendants have conceded that the SAC adequately pleads the existence of material misstatements regarding a financial metric (+$500 Subscribers) that is of central importance in this case and the only contested elements are scienter and loss causation.[5] For the reasons discussed *infra*, the SAC also adequately pleads that Defendants' statements concerning PPS, ARPS, total subscribers and churn were materially false or misleading.

With respect to scienter, the SAC pleads a compelling series of facts supporting a strong inference that the irregularities in Endurance's reported +$500 Subscriber and PPS figures were no mere accident. First, the nature and pattern of the errors bear strong hallmarks of intentional manipulation. The originally reported numbers indicated a perfect stepping pattern of growth, where each metric steadily increased without deviation over seven consecutive quarters. ¶¶6-8, 69, 193. When corrected, the numbers instead showed flat and sometimes even negative growth, and growth in both metrics was therefore grossly overstated over the duration of the Class Period. ¶¶8, 24. A graphical side-by-side comparison of the trends "before" and "after" Endurance's restatement provides powerful evidence that the numbers were doctored.

Second, Defendants claimed to have been closely monitoring these metrics and gave detailed responses to questions from analysts indicating a deep knowledge of the numbers, the trends, and the factors underlying those trends. When market participants began to question Endurance's non-GAAP metrics, Defendants vehemently (and falsely) denied any impropriety and doubled down on

---

[4] Throughout this brief, unless otherwise noted, all "¶__" references refer to the SAC, all emphasis has been added, and internal quotation marks, citations, and brackets have been omitted.

[5] *See, e.g.*, *Vazquez-Cruz v. Commonwealth of Puerto Rico*, 618 F. Supp. 2d 120, 123 (D.P.R. 2009) (where defendants' motion to dismiss addressed only some of plaintiff's claims, the unaddressed claims "remain pending until further disposition").

their misstatements.  But just a few months later, CFO Ellawala stepped down, and in the very next quarter his replacement discovered the errors and disclosed them to the public.  All of these facts point to Defendants' knowledge of and culpable participation in the fraud.

Finally, both Individual Defendants dumped substantial amounts of Endurance stock in secondary offerings, providing them with a motive to inflate Endurance's stock price. Ravichandran alone earned over $40 million in two days in trades that dwarfed his base salary. These facts, combined with other "red flags" discussed *infra*, raise a strong inference that Defendants knew, or at the very least recklessly disregarded, the fact that Endurance's non-GAAP financial measures were false and misleading.

The SAC also adequately alleges loss causation.  Endurance's stock price declined over a ten month period as the truth about Endurance's non-GAAP financial measures gradually became known to the market through a series of partial corrective disclosures and materializations of concealed risks.  These disclosures included, among others, third party reports casting doubt on the veracity of Endurance's non-GAAP metrics and Endurance's release of financial results for Q1 and Q2 of 2015.  Those two releases provided data that partially revealed the truth about Endurance's financial performance as the Company reported declining ARPS, a risk that had been concealed by Endurance's publication of false +$500 Subscriber and PPS figures for the previous five quarters.[6]

Endurance's stock price declined further when it announced the existence of "errors" in its +$500 Subscriber and PPS numbers, and disclosed the existence of an SEC subpoena concerning its financial reporting of non-GAAP metrics.   By the time Endurance released restated +$500 Subscriber and PPS numbers, Endurance's stock price had declined from $21.94 (on the day preceding the first partial corrective disclosure) to $10.28.  These facts more than suffice to plead

---

[6] Defendants identified +$500 Subscribers and PPS as the primary "drivers" of ARPS.  *See infra* at 16-17.

loss causation.[7]

## II.     BACKGROUND REGARDING ENDURANCE'S NON-GAAP METRICS

Endurance provides cloud-based platform solutions for small and medium-sized businesses.

¶3.  Endurance claims to have millions of subscribers globally and offers over 150 internet-related

products and services, including web hosting, website analytics, domains, email, storage, search

engine optimization, and social media services.  *Id.*  Since its inception, Endurance has never made a

profit in any fiscal year.[8]

Endurance is required to present its financial results in accordance with generally accepted

accounting principles ("GAAP").  *See* 17 C.F.R. §210.4-01.  Endurance, however, also monitors and

reports certain non-GAAP metrics, because it believes these metrics "reflect the operating

performance of [its] business and help management and investors gauge [its] ability to generate cash

flow."[9]  For a company with an operating history like that of Endurance, non-GAAP metrics are

particularly important to investors, because the Company's value is predicated less on its present

performance and more on the prospect that it will grow and become profitable in the future.[10]

---

[7] In the course of preparing this opposition to Defendants' motion, Lead Counsel discovered inadvertent errors in the SAC.  First, the SAC alleges that Endurance filed a letter with the SEC constituting a partial corrective disclosure on December 9, 2015.  While that letter was filed on December 9, 2015, per SEC policy it was not publicly available until February 1, 2016.  *See infra* at 34.  Second, the SAC reported ARPS for Q4 2014 as $14.48, when in fact it was $14.78. *See infra* at 27-28, 30.  This error impacted ¶¶9, 10, 17, 61, 63, 79, 193, 195, and 201.  Lead Counsel apologizes to the Court and to Defendants for these errors.

[8] *See* Declaration of Robert V. Prongay ("Prongay Decl."), Ex. O at 27 (Form 10-K filed Feb. 29, 2016) ("We have had a net loss in each year since inception.").  Throughout this brief, Plaintiff cites certain SEC filings, press releases and conference call transcripts, attached as exhibits to the Prongay Declaration, to provide additional context to the allegations in the SAC.  Plaintiff seeks judicial notice of each of these documents.  *See Guerra v. Teradyne, Inc.*, 2004 WL 1467069, at *2 (D. Mass. Jan. 16, 2004) ("It is clear that the court may take judicial notice of . . . SEC filings."); *In re Washington Mutual, Inc. Sec., Derivative & ERISA Litig.*, 259 F.R.D. 490, 495 (W.D. Wash. 2009) (taking judicial notice of SEC filings, conference call transcripts and press releases).

[9] Dkt. No. 30, Declaration of John J. Butts ("Butts Decl."), Ex. C at 51 (Form 10-K filed Feb. 28, 2014).  Throughout their brief, Defendants have cited SEC filings and various other items attached as exhibits to the Butts Declaration. Defendants have sought judicial notice of certain of these items and have referred to others without formally requesting judicial notice.  Plaintiff has no objection to Defendants' request for judicial notice or the Court's consideration of any of the items, except to the extent that Defendants rely on two news articles for the truth of their contents.  *See infra* at 32.

[10] *See generally* Emily Chasan, *Four Reasons Non-GAAP Metrics Are Exploding*, Wall St. J., Jun. 25, 2013 ("the move to include more non-GAAP metrics is . . . driven by a need of both investors and corporate managers to focus on

Defendants repeatedly told investors that the two metrics that would be "the key drivers of [Endurance's] revenue growth in the future" and would make Endurance profitable were total subscribers and ARPS. ¶39.  In turn, Defendants repeatedly told investors that the primary drivers to growth in ARPS were +$500 Subscribers and PPS.  ¶¶39-45, 76-77; *see infra* at 16-17.  The SAC alleges that Defendants made false and misleading statements with respect to each of these four metrics, ¶¶100-172, and that Defendants made false and misleading statements with respect to two metrics related to Endurance's churn rates:  Monthly Recurring Revenue retention rate ("MRR," or also "cash churn") and subscriber churn, ¶¶48, 173-188.

## III.   DEFENDANTS' STATEMENTS AND OMISSIONS REGARDING ENDURANCE'S NON-GAAP METRICS WERE MATERIALLY FALSE AND MISLEADING

### A.   Standards For Pleading Material Misstatements And Omissions

Plaintiff is required to identify "the specific statements rendered materially misleading" by the fraud.  *In re Cabletron Sys., Inc.*, 311 F.3d 11, 33-34 (1st Cir. 2002).  Falsity is adequately alleged "when plaintiff claims that defendant made 'an untrue statement of a material fact,' . . . or 'omitted to state a material fact necessary in order to make the statements made, in light of the circumstances in which they were made, not misleading.'"  *Miss. Pub. Emp. Ret. Sys. v. Boston Scientific Corp.*, 523 F.3d 75, 85 (1st Cir. 2008) (quoting 15 U.S.C. §§ 78u-4(b)(1)(A) & 78u-4(b)(1)(B)).  "A fact is material if it is substantially likely 'that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the total mix of information made available.'"  *Cabletron*, 311 F.3d at 34 (citing *Basic Inc. v. Levinson*, 485 U.S. 224, 231-32 (1988)).  Because "the materiality of a statement or omission is a question of fact that

---

measures that . . . are clear drivers of the future direction of the business"), *available at* http://blogs.wsj.com/cfo/2013/06/25/four-reasons-non-gaap-metrics-are-exploding/; Boris Feldman, *Metrics Fraud*, The Industry Standard, Mar. 2000 (GAAP is "of limited relevance to the market valuation of many Net companies.  At least so far, most Internet companies have not been valued on traditional income-statement measures."), *available at* http://www.borisfeldman.com/Metrics_Fraud.htm.

should normally be left to a jury rather than resolved by the court on a motion to dismiss," courts "review the complaint only to determine that it pleads the existence of such statements and presents a plausible jury question of materiality." *Id.*[11]

### B.   Defendants Concede That Their Statements About +$500 Subscribers Were Materially False And Misleading

A chart published by Endurance in February 2016 when it issued the revised +$500 Subscriber numbers compellingly illustrates the magnitude of these misstatements:



¶¶67, 218.  While the originally reported +$500 Subscribers increased impressively each quarter and by 51.5% from Q4 2013 to Q2 2015 (from 99,000 to 150,000), in reality +$500 Subscribers was stagnant at points and increased by only 9.8% during this period (from 82,000 to 90,000).  Thus, the falsely reported numbers, which overstated the rate of growth in this metric ***by a factor of 5***, were undoubtedly material.

### C.   Defendants' Statements About PPS Were Materially False And Misleading

With respect to PPS, Defendants only challenge the materiality of their misstatements (not falsity).  Def. Br. 14-15.  The chart comparing the original PPS numbers to the revised PPS numbers demonstrates a pattern of misrepresentations that is unquestionably material:



---

[11] *Accord In re PerkinElmer, Inc. Sec. Litig.*, 286 F. Supp. 2d 46 (D. Mass. 2003).

¶¶69, 218.  While the originally reported PPS numbers steadily increased each quarter and by 22.0% from Q4 2013 to Q2 2015 (from 4.1 to 5.0), in reality PPS was often stagnant or declining in various quarters and only increased by 13.7% during this period (from 5.1 to 5.8).  The falsely reported numbers, therefore, overstated the rate of growth in PPS **by a factor of 1.6**.[12]

Defendants' assertion that "tiny unfavorable differences in trends" are immaterial as a matter of law misapprehends the standard for materiality.  Def. Br. 14.[13]  As this Court has recognized, "[m]ateriality requires assessment of qualitative and quantitative factors, so that even quantitatively small amounts can still present a materially misleading picture of a company's health." *PerkinElmer*, 286 F. Supp. 2d at 54 (citing, *inter alia*, SEC Staff Accounting Bulletin No. 99, 64 Fed. Reg. 45150, 45152 (1999) ("SAB 99")).[14]  In SAB 99, the SEC urges that both quantitative and qualitative factors be considered in assessing materiality.  64 Fed. Reg. at 45152.  The non-exhaustive list of factors that the SEC considers includes whether a misstatement:  (i) "masks a change in earnings or **other trends**," (ii) "hides a failure to meet analysts' consensus expectations," (iii) "changes a loss into income," or (iv) "concerns a segment or other portion of the registrant's business that has been identified as playing a significant role in the registrant's operations or profitability," as well as (v) whether "management . . . expects . . . that a known misstatement may

---

[12] Moreover, the uneven pattern in the revised trendline is due to Defendants' manipulation of the count of total subscribers, the denominator in PPS.  *See infra* at 12.  As the Company admitted, the sudden jump in PPS from 5.0 in Q3 2014 to 5.6 in Q4 2014 was caused by Defendants' decision to remove inactive subscribers from the count of total subscribers in Q4 2014.  *See* ¶¶56, 202.  If subscribers were counted consistently on an apples-to-apples basis throughout the Class Period, the trendline for actual PPS growth would likely be almost entirely flat.

[13] *Glassman v. Computervision Corp.*, 90 F.3d 617, 633 (1st Cir. 1996) (cited by Def. Br. 15) is inapposite.  In that case, the First Circuit held that a 3% drop in backlog levels between two quarters was not sufficiently material.  The case did not involve a trend over multiple quarters, and it did not involve falsely reported numbers; it involved an omission to disclose numbers.  As the Second Circuit explained in a decision discussing the case, *Glassman* did not set a bright-line quantitative materiality test; instead, "[t]he clear implication of [*Glassman*] is that a 3% to 9% drop **may be material depending on the circumstances**."  *Ganino v. Citizens Util. Co.*, 228 F.3d 154, 164 (2d Cir. 2000) (emphasis added).

[14] *Accord Ganino*, 228 F.3d at 163-64 (rejecting bright-line quantitative materiality test and finding SAB 99 "persuasive guidance for evaluating the materiality of an alleged misrepresentation");*Takara Trust v. Molex Inc.*, 429 F. Supp. 2d 960 (N.D. Ill. 2006) ("'[Q]ualitative factors may cause misstatements of quantitatively small amounts to be material.'") (quoting SAB 99); *SEC v Leslie*, 2012 WL 116562, at *6 (N.D. Cal. Jan. 13, 2012) (similar) (collecting cases).

result in a significant positive or negative market reaction."  *Id.* (emphasis added).

Here, a qualitative analysis of Defendants' misstatements regarding +$500 Subscribers and PPS easily satisfies the relatively low pleading standard for materiality.  The false numbers masked flat growth trends and created a false impression of perfect stepping growth.  ¶¶6, 66, 68.  For several quarters (Q2 2014, Q3 2014, Q2 2015), Endurance reported an ***increase*** in PPS when the corrected numbers showed a ***decrease*** in PPS, converting negative growth into positive growth.[15] PPS and +$500 Subscribers were identified as the key drivers of ARPS (¶41-42), and when ARPS results trended downwards, management pointed to positive growth in these metrics as reasons to be confident about Endurance's future growth.  ¶206; *see infra* at 31.  When the Company announced the existence of errors in these metrics, the market reacted swiftly and negatively.  ¶¶209-211.  All of these factors strongly support the conclusion that Defendants' misstatements were material.

### D. <u>Defendants' Statements About ARPS Were Materially False And Misleading</u>

Defendants argue that their challenged statements regarding ARPS were not false or misleading because (i) Endurance disclosed the manner in which it calculated ARPS, and (ii) there is no allegation that the ARPS numbers were not correctly calculated according to the disclosed methodology.  Def. Br. 7-9.  Defendants ignore that the SAC's allegations concern their ***omissions***. The SAC alleges that Defendants' statements regarding ARPS were materially false and/or misleading because "domain revenue was becoming an increasing percentage of the Company's revenue, while domain-only customers were not included in the Company's subscriber count, thus inflating ARPS as explained in ¶¶62-63."  ¶¶141, 150, 159, 171.  Paragraph 62, in turn, expressly predicates the inflation in ARPS on Defendants' "***fail[ure] to disclose*** that an increasing percentage

---

[15] Defendants argue that the differences between the original and revised PPS numbers are immaterial, focusing on the differences in particular quarters. Def. Br. 14.  Defendants also argue that "both of the corrected numbers were *better* than the original numbers."  *Id.* (emphasis in original).  But Defendants ignore the fact that investors were concerned with the ***trend*** and what that trend implied for the future growth prospects of the Company, not the absolute figures.

of the Company's ARPS was due to the sale of domains."  ¶62.

Defendants had a duty to disclose that domain revenue constituted an increasing percentage of ARPS in order to make Defendants' statements about the causes of growth not misleading.[16] Instead, Defendants made repeated false statements that the growth in ARPS was being driven by growth in +$500 Subscribers and PPS while failing to disclose the degree to which ARPS was being increasingly propped up by domain revenue.[17]   Illustrative of these statements is one from Endurance's Form 10-Q for Q1 2015 that Defendants misleadingly short-quote as saying that growth in ARPS was "'driven *primarily* by . . . an increase in premium domains sold through our BuyDomains and Directi businesses.'"  Def. Br. 8.  In fact, the quotation from the Form 10-Q says:

> ARPS increased from $14.18 for the three months ended March 31, 2014 to $14.37 for the three months ended March 31, 2015.  This growth in ARPS was driven primarily by an increase in the average number of products purchased per subscriber . . . ; an increase in . . . subscribers . . . who spend more than $500 . . . ; and an increase in premium domains sold through our BuyDomains and Directi businesses.

*See* Butts Decl., Ex. I at 26.

This very statement selected by Defendants to demonstrate the supposed thoroughness of their disclosures actually only highlights the manner in which Defendants' omissions rendered their statements false and misleading.[18]   Domain revenue was listed as only one of three factors contributing to growth in ARPS, the first two being increases in PPS and +$500 Subscribers.  More importantly, based on the numbers that Endurance later disclosed, it appears that ***the entire increase***

---

[16] Defendants incorrectly claim that they had no duty to disclose this information, arguing that "[a] company has no duty to disparage its own competitive position in the market where it has provided accurate hard data from which analysts and investors can draw their own conclusions about the company's condition and value of its stock."  Def. Br. 8-9.  But the issue here is not whether Defendants had a duty to disparage Endurance's competitive position; it is whether Defendants had a duty to disclose that domain revenue constituted an increasing percentage of ARPS once they chose to speak and make misleading statements about the causes about the causes of ARPS growth.  Defendants did not provide the "hard data" that would have allowed investors to reach their own conclusions, because the Company's financial statements did not separately break out domain revenue as a component of overall revenue.

[17] *See, e.g.*, ¶¶140, 149, 152, 158, 161, 164.

[18] Numerous similar statements discussing the factors causing ARPS growth are challenged in the Complaint.  *See, e.g.*, ¶¶107,140, 149, 152, 158, 161, 164.

*in ARPS* between Q1 2014 and Q1 2015 (and then some) was attributable to domain revenue.  In its December 9, 2015 letter to the SEC, Endurance stated that exclusion of domain revenue from ARPS would have lowered ARPS by $0.07 for 2013, $0.25 for 2014, $0.43 for the nine months ended September 30, 2014, and $0.77 for the nine months ended September 30, 2015.  ¶¶62, 213.[19]  The reasonable and plausible inference (which must be accepted and drawn in Plaintiff's favor on a motion to dismiss) is that on average domain revenue was responsible for somewhere between $0.34 to $0.52 of net accretion to ARPS in 2015 relative to 2014.[20]  If ARPS grew by only $0.19 between Q1 2014 and Q1 2015, *all* of that increase was likely due to domain revenue, and, indeed, absent domain revenue, ARPS growth likely would have been negative.

Once Defendants chose to speak about the causes of growth in ARPS, they triggered a duty to speak truthfully about those causes.  *See In re Providian Fin. Corp. Sec. Litig.*, 152 F. Supp. 2d 814, 824-25 (E.D. Pa. 2001) ("[h]aving put the issue in play" by attributing its success to a particular cause, company was "obligated to disclose information concerning the source of its success").  Defendants' omission to disclose domain revenue constituted an increasing percentage of ARPS rendered all of their statements regarding ARPS false and misleading.  *See, e.g.*, *Simon v. Abiomed, Inc.*, 37 F. Supp. 3d 499, 519 (D. Mass. 2014) ("If a company provides false explanations for revenue growth, those statements may be materially misleading.").[21]

While Defendants' omissions regarding ARPS were qualitatively material, Defendants claim

---

[19] As noted in the SAC, Endurance may have transposed the 2014 numbers, because the domain revenue adjustment for the entirety of 2014 is lower than the domain revenue adjustment for the first nine months of 2014.  *See* ¶62 n.4.

[20] The domain revenue adjustment for the first nine months of 2015 was $0.77, which is $0.34 higher than the adjustment for the first nine months of 2014 and $0.52 higher than the adjustment for all of 2014.  Whichever comparison one uses, these numbers suggest that if ARPS was only $0.19 higher in Q1 2015 than Q1 2014, then the entire difference (and then some) is accounted for by the increase in domain revenue.

[21] *See also City of Roseville Emps.' Ret. Sys. v. Horizon Lines, Inc.*, 713 F. Supp. 2d 378, 389 (D. Del. 2010) ("A statement regarding financial performance, even when accurate, is still misleading under the securities laws if the speaker attributes the performance to the wrong source."); *In re ATI Techs., Inc. Sec. Litig.*, 216 F. Supp. 2d 418, 436 (E.D. Pa. 2002) (similar); *In re Campbell Soup Co. Sec. Litig.*, 145 F. Supp. 2d 574, 581, 588-89 (D.N.J. 2001) (similar).

that "ARPS was, at worst, 'inflated' by one half of one percent in 2013, 1.7% in 2014, and 5.3% for the first nine months of 2015," Def. Br. 9,  these percentages are not immaterial.  Rather, they demonstrate a growing trend of domain revenue comprising an increasingly large percentage of ARPS.  *See SEC v. Leslie*, 2012 WL 116562, at *6-*7 (holding that a reasonable trier of fact could conclude that management's efforts to "smooth" reported data to manipulate various financial indicators—including the creation of an artificial "deferred revenue trend"—was "qualitatively material even if the numbers in question were quantitatively small").

### E.  Defendants' Statements About Total Subscriber Counts Were Materially False And Misleading

Before the fourth quarter of 2014, Endurance's count of total subscribers included inactive customers.  ¶¶53-57.  In Q4 2014, Endurance made two important changes affecting its count of total subscribers:  (i) it removed inactive customers, and (ii) it expanded the definition of total subscribers to include paid subscribers to all of Endurance's subscription-based products.[22]  The net effect of these two changes (plus, possibly, some organic subscriber growth during the quarter) was to increase total subscribers in the aggregate.  ¶¶53-57.

Importantly, while Endurance disclosed the modified definition of total subscribers, it did ***not*** disclose the elimination of inactive customers until almost a year later, on February 18, 2016, when it released the corrected +$500 Subscriber and PPS figures.  ¶¶56, 219-220.  The failure to disclose the elimination of inactive customers was important, because (i) for periods prior to Q4 2014, inclusion of inactive customers caused the total subscriber counts to be inflated,[23] and (ii) for Q4 2014 and subsequent periods, the undisclosed elimination of inactive customers concealed the extent to which the definitional change artificially bolstered the total subscriber count.[24]  The most

---

[22] Previously, total subscribers included only the paid subscribers to Endurance's web presence solutions.  ¶56.

[23] *See* ¶¶105, 111, 120, 129.

[24] *See* ¶¶138, 147, 156, 168.

plausible inference is that Defendants concocted the definitional change to cover up and avoid a devastating disclosure about inactive subscribers after their November 2014 secondary offering and ahead of their March 2015 offering.  *See infra* at 22-25.

Defendants argue that Plaintiff does not identify the specific number of inactive customers that were removed in Q4 2014 (Def. Br. 12-13), but there is no requirement or need to do so. Defendants admitted when they released their corrected numbers that the elimination of inactive customers generated a significant quarterly spike in PPS in Q4 2014.  ¶¶24, 220.  As originally reported, PPS increased 2.2% in Q4 2014.  As corrected, PPS actually increased 12.0% in Q4 2014. These figures plausibly establish that the number of inactive customers eliminated was material. Defendants also ignore that courts do not require an exacting level of specificity when information is exclusively in the control of the Defendants.  *See, e.g.*, *Tricontinental Indus. Ltd. v. Anixter*, 215 F. Supp. 2d 942, 947 (N.D. Ill. 2002) ("Even under the PSLRA, a complaint need not . . . allege the precise amount of overstatement on a period by period basis, especially where most of the evidence necessary to prove these allegations is in the hands of the defendants.").[25]

### F.   Defendants' Statements About Churn Were Materially False And Misleading

Defendants also misled the market regarding the Company's subscriber churn rate.  When asked by analysts regarding subscriber churn, Defendants would generally redirect to a different metric called MRR, which Defendants sometimes referred to as "cash churn."   ¶¶173-188. However, Ravichandran also misrepresented on May 6, 2014 that "all" of Endurance's churn rates— *i.e.*, both MRR and subscriber churn—were "doing really well."  ¶174.  This statement was false and misleading because Endurance's subscriber churn rate for FY 2014 was 20%, which was very high

---

[25] *Accord In re Washington Mutual, Inc. Sec., Derivative & ERISA Litig.*, 694 F. Supp. 2d 1192, 1222 (W.D. Wash. 2009); *In re Computer Associates Class Action Sec. Litig.*, 75 F. Supp. 2d 68, 73 (E.D.N.Y. 1999); *Danis v. USN Communications*, 73 F. Supp. 2d 923, 935 n.6 (N.D. Ill. 1999); *In re First Merchants Acceptance Corp. Sec. Litig.*, 1998 WL 781118, at *8 (N.D. Ill. Nov. 4, 1998).

compared to Endurance's competitors.  ¶¶47, 174-175.[26]

Ravichandran's statement is actionable puffery because it was verifiably false.  Whether such a statement is actionable, however, turns on the context and "whether the statement is so vague, so general, or so loosely optimistic that a reasonable investor would find it unimportant to the total mix of information."  *Brumbaugh v. Wave Sys. Corp.*, 416 F. Supp. 2d 239, 250 (D. Mass. 2006).[27] Moreover, an opinion statement is actionable "if Plaintiffs can plead with particularity that defendants did not sincerely believe the opinion they purported to hold."  *Malin v. XL Capital Ltd.*, 499 F. Supp. 2d 117, 144-45 (D. Conn. 2007), *aff'd*, 312 Fed. Appx. 400 (2d Cir. 2009).  Here, Ravichandran's prevarication and refusal to disclose subscriber churn in response to direct questions is a strong indicator that he believed investors would not react positively if they learned Endurance's subscriber churn rate.[28]

## IV.    THE SAC ALLEGES A STRONG INFERENCE OF SCIENTER

Scienter may be alleged by showing that defendants either "consciously intended to defraud, or that they acted with a high degree of recklessness."  *Aldridge v. A.T. Cross Corp.*, 284 F.3d 72, 82 (1st Cir. 2002); *Boston Scientific*, 523 F.3d at 85 ("[k]nowingly omitting material information is probative . . . of scienter.").  Supreme Court precedent instructs that scienter is adequately alleged if the facts, taken as true, give rise to an inference that the defendants intentionally or recklessly misled the public which is "at least as compelling" as an inference that defendants acted non-culpably.

---

[26] For example, the annual churn rate of Endurance competitor GoDaddy Inc. was 15% and the monthly churn rate of Endurance competitor Web.com Group, Inc. was 1%. ¶¶47, 179.

[27] *See, e.g.*, *In re Cooper Sec. Litig.*, 691 F. Supp. 2d 1105, 1118 (C.D. Cal. 2010) (statement that company was "doing very well against . . . daily silicon products" was not mere puffery because "[i]f, in fact, [the company] was doing very poorly against silicone hydrogel lenses, then the statement could be false").

[28] Defendants argue that the SAC fails to explain how subscriber churn was calculated at Endurance's competitors and does not include allegations regarding all of Endurance's competitors. Def. Br. 10 n.6. These issues, however, are more appropriately directed to a motion for summary judgment.

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 324 (2007).[29]  The proper inquiry "is whether ***all*** of the facts alleged, taken collectively, give rise to a strong inference of scienter, not whether any individual allegation, scrutinized in isolation, meets that standard." *Tellabs*, 551 U.S. at 322-23 & 326 (allegations are to be read "holistically").[30]

Read holistically,[31] the SAC's allegations regarding the too perfect stepping pattern of the errors in +$500 Subscribers and PPS, Defendants' close monitoring of ARPS and ARPS drivers, the suspicious timing of Ellawala's resignation and Montagner's rapid discovery of the errors, Defendants' false denials of third-party reports questioning the reliability of their metrics, the multiple red flags, Defendants' substantial stock sales, and the pending SEC investigation all combine to create a cogent, compelling, and, indeed, overwhelming inference of scienter.  Given this mountain of facts, the competing inference that Defendants attempt to develop—that the errors were merely inadvertent and that the artificial picture perfect growth patterns appeared by accident—is barely plausible, let alone more compelling than the inference of intentional or reckless misconduct.

### A.   <u>The Nature And Pattern Of The Misstatements Support An Inference Of Scienter</u>

The First Circuit has recognized that "[a]ccounting shenanigans are among the characteristic types of circumstances which may demonstrate scienter for securities fraud."  *Cabletron*, 311 F.3d at 39; *accord Aldridge*, 284 F.3d at 83 ("accounting shenanigans" may be evidence of scienter).  While these cases involve violations of GAAP, the same principles apply to misstatements concerning non-

---

[29] *See also ACA Fin. Guar. Corp. v. Advest, Inc.*, 512 F.3d 46, 59 (1st Cir. 2008) ("[W]here there are equally strong inferences for and against scienter, *Tellabs* now awards the draw to the plaintiff."); *Boston Scientific*, 523 F.3d at 86 (complaint survives "when there are equally compelling inferences for and against scienter").

[30] Scienter allegations "need not be irrefutable, *i.e.*, of the 'smoking-gun' genre, or even the 'most plausible of competing inferences.'"  *Id.* at 324.  A plaintiff is not required to plead scienter with "great specificity."  *Ganino* , 228 F.3d at 169.  Indeed, scienter can be inferred from "indirect and circumstantial evidence."  *Greebel v. FTP Software, Inc.*, 194 F.3d 185, 195 (1st Cir. 1999).

[31] Defendants' method of attempting to disaggregate each scienter allegation by, for example, looking at scienter separately with respect to each metric (Def. Br. 17-21), misapprehends and misapplies the approach required by *Tellabs*. *See, e.g.*, *Frank v. Dana Corp.*, 646 F.3d 954, 961 (6th Cir. 2011) ("reviewing each allegation individually before reviewing them holistically risks losing the forest for the trees").

GAAP financial measures.  *See generally* SEC Release Nos. 33-8176, 34-47226, "Conditions for Use of Non-GAAP Financial Measures," 2003 WL 161117, at *7 (Jan. 22, 2003) (if materially false or misleading, "disclosures of non-GAAP financial measures could give rise to actions under Rule 10b-5").[32]

While the mere existence of an accounting error may not by itself give rise to a strong inference of scienter, the ***nature*** and the ***pattern*** of the errors in Endurance's reported figures for +$500 Subscribers and PPS, on their face, bear strong hallmarks of conscious manipulation.[33]  For each quarter between Q4 2013 and Q2 2015, Endurance reported both sequential and year-over-year growth in +$500 Subscribers and PPS.  *See* ¶6 (graphic illustrations of perfect stepping pattern in these two metrics).  Not a single quarter deviated from this trend for either metric.  In reality, though, growth in +$500 Subscribers was virtually flat, with no growth at all in multiple quarters and minimal growth in others.  Over the entire relevant period, +$500 Subscribers did not grow anywhere near the 51.5% originally reported.  With respect to PPS, the corrected numbers show that PPS declined in as many quarters as it increased.

Defendants would have the Court believe that the transformation of these trends into perfect stepping growth patterns was a mere coincidence.  But as one court has observed, "books do not cook themselves."  *In re McKesson HBOC, Inc. Sec. Litig.*, 126 F. Supp. 2d 1248, 1273 (N.D. Cal. 2000).  Defendants may be correct as a general matter that "mistakes can be made" (Def. Br. 20), but the inference that ***these*** mistakes were inadvertent is not plausible and substantially weaker than the competing inference that Endurance's numbers were intentionally manipulated to create the perfect

---

[32] Defendants acknowledge that Endurance's non-GAAP "metrics were restated" and that the same legal principles applying to GAAP restatements should also apply to corrections of "non-GAAP numbers."  Def. Br. 19.

[33] Defendants misinterpret the allegations concerning the stepping patterns as an allegation of *motive*, which Defendants argue is too generic to support a pleading of scienter.  Def. Br. 22.  The stepping pattern allegations are not allegations of motive; rather, the improbable data patterns that Defendants manufactured are evidence of conscious doctoring of Endurance's financial metrics.

appearance of consistent, steady growth.

**B.     Defendants' Heavy Focus On And Close Monitoring Of ARPS And The Drivers Of ARPS Support An Inference Of Scienter**

The strong inference of scienter is strengthened by (i) Defendants' multiple representations to investors that ARPS and the drivers of ARPS were fundamental to Endurance's growth strategy, and (ii) the personal role of Ravichandran and Ellawala in monitoring and analyzing those metrics. Throughout the Class Period, Defendants repeatedly emphasized that ARPS was a "key driver" of Endurance's future revenue growth (¶¶39-40) and that ARPS, in turn, was "driven primarily" by growth in +$500 Subscribers and PPS (¶¶152, 161, 164).[34] Ravichandran referred to growth in PPS and +$500 Subscribers as the "fundamentals behind our ARPS growth."[35] Even as ARPS began to decline in 2015, he reassured investors by pointing to continued strength in PPS and +$500 Subscribers as reasons to remain confident in Endurance's future ARPS growth prospects. *See, e.g.*, ¶45.

As the CEO and CFO of Endurance, Ravichandran and Ellawala were both highly involved in the analytics underlying Endurance's non-GAAP financial measures. Ravichandran was the CEO of Endurance for the entirety of the Class Period (and still is). ¶32.[36] Ellawala was the CFO of Endurance from the beginning of the Class Period until September 2015. ¶33. Both signed SEC filings containing alleged misstatements[37] and orally made alleged misstatements at conferences and on earnings calls with analysts.[38] These factors support an inference of scienter. *See PerkinElmer*,

---

[34] *See also* ¶¶44, 107 ,116.

[35] *See* Butts Decl., Ex. H at 5 (Q1 2015 conference call on May 5, 2015).

[36] He also is a founder of Endurance and has continually served as a director since 2007.

[37] Ravichandran signed the Form 10-Ks for FY 2013 and FY 2014, and Ellawala signed the Form 10-Qs for Q1 2014, Q2 2014, Q3 2014, Q1 2015, and Q2 2015. ¶100. Each of these SEC filings contains statements alleged to be false or misleading. *See* ¶¶104, 107, 110, 119, 128, 137, 140, 143, 146, 149, 152, 155, 158, 161, 164.

[38] Ravichandran is alleged to have made false or misleading oral statements on February 25, May 6, August 7, August 12, September 11, November 4, and December 2, 2014, and January 13, February 23, March 4, May 5, and August 4, 2015. ¶¶104, 110, 119, 128, 137, 140, 146, 149, 155, 158, 161, 164, 174, 177, 180, 181, 182, 183, 185, 187. Ellawala

286 F. Supp. 2d at 54-5 (finding a strong inference of scienter where defendants' respective positions as CEO and CFO afforded them "not only access to, but close familiarity with, the details of [the company's] affairs," each defendant "personally made a number of" alleged false statements, and the CFO "signed some of the financial reports the company issued during the class period").

The SAC alleges a number of well-pled facts showing not only that Defendants "would have been monitoring" but that they did in fact monitor these metrics. First, Defendants held themselves out as actively monitoring ARPS and ARPS drivers. ¶¶80-82. *See Meridian Horizon Fund, L.P. v. Tremont Grp. Holdings, Inc.*, 2012 WL 4049953, at *2-3 (S.D.N.Y. Sept. 14, 2012) (scienter adequately pled where defendants represented "they closely monitored" the subject of their false statements).[39] Second, Ravichandran answered detailed questions from analysts indicating his deep technical knowledge of Endurance's non-GAAP metrics and trends underlying the data. *See, e.g.*, ¶¶88, 161. *See In re St. Jude Med., Inc. Sec. Litig.*, 836 F. Supp. 2d 878, 888 (D. Minn. 2011) (actionable misrepresentations found where "[m]any of the statements at issue were provided in direct response to questions from financial analysts").[40]

Finally, the inference of scienter is bolstered by the fact that ARPS and ARPS drivers (along with subscriber counts) were metrics that went to the core of Endurance's business. *See* ¶¶36-40. Defendants repeatedly stated that ARPS and total subscribers were Endurance's "key growth drivers" and that +$500 Subscribers and PPS were the "primar[y]" drivers of ARPS. ¶¶39-40, 152, 161, 164. Ravichandran also stated that +$500 Subscribers accounted for approximately 11% of the

---

is alleged to have made false or misleading oral statements on February 25, May 6, August 7, August 12, and November 4, 2014, and February 23 and May 5, 2015. ¶¶107, 113, 116, 122, 125, 131, 134, 137, 143, 152, 176.

[39] *Accord In re BP p.l.c. Sec. Litig.*, 843 F. Supp. 2d 712, 783 (S.D. Tex. 2012) (defendant's repeated statements "weigh strongly in favor of the inference that" he "paid special attention" to the subject of the fraud "or, at the least, was reckless in not doing so while continuing to publicly tout improvements").

[40] *Accord Makor Issues & Rights, Ltd. v. Tellabs, Inc.*, 437 F.3d 588, 597-98 (7th Cir. 2006) (specific statements to analyst "went well beyond puffery: it was a direct response to an analyst's inquiry about a possible decline" in sales), *vacated in part on other grounds*, 551 U.S. 308 (2007); *In re Gen. Elec. Co. Sec. Litig.*, 857 F. Supp. 2d 367, 397-98 (S.D.N.Y. 2012) (CEO's detailed responses to questions from investors at presentation bolstered inference of scienter).

Company's revenue (¶88) and that he expected that percentage to grow.[41]  *See Aldridge*, 284 F.3d at 84 (inference of scienter bolstered by the fact that relevant product line was very important to the company and a "primary driver" of growth).[42]

**C.      The Timing Of Ellawala's Resignation And Endurance's Disclosure Of "Errors" Two Months Later Support An Inference Of Scienter**

The timing and the circumstances surrounding Ellawala's resignation and Endurance's disclosure of "errors" in its calculations of +$500 Subscribers and PPS just two months later support an inference of scienter.  On August 3, 2015, just one day before Endurance would release its quarterly results for the second quarter of 2015, Endurance announced that Ellawala would be stepping down as CFO, effective September 15, 2015.  ¶¶33, 101-102.  Endurance also announced that Marc Montanger, an executive from outside the Company, would be taking over as Endurance's CFO.[43]  Then, on November 2, 2015, less than two full months following Mr. Montagner taking over as CFO, Endurance announced an "error" that would require revision of the Company's previously reported +$500 Subscriber and PPS figures for the preceding seven quarters.  ¶¶21, 209.

As multiple courts have held, "the timing and circumstances of individual defendants' resignations may add . . . further weight to an overall inference of scienter."  *Plumbers & Pipefitters Nat'l Pension Fund v. Orthofix Int'l*, 89 F. Supp. 3d 602, 619 (S.D.N.Y. 2015).[44]  Here, a number of

---

[41] Ravichandran's statement that +$500 Subscribers accounted for 11% of Endurance's revenue was in response to an analyst's question.  *See* Prongay Decl., Ex. V at 9 (FY 2014 conference call on Feb. 23, 2015).  The analyst first noted that substantial growth in +$500 Subscribers had "to be fueling your [ARPS] in a pretty strong way" and then asked whether this was a function of expanded product offerings by Endurance.  *Id.*  Ravichandran responded that Endurance was actively targeting these customers and predicted that Endurance would "get better and better at this strategy."  *Id.*

[42] *Accord In re Atlas Worldwide Holdings, Inc. Sec. Litig.*, 324 F. Supp. 2d 474, 489 (S.D.N.Y. 2004) (that misstatements concern "the core operations of the company supports the inference that the defendant knew or should have known the statements were false when made"); *Reese v. Malone*, 747 F.3d 557, 575 (9th Cir. 2014) ("we can impute scienter based on the inference that key officers have knowledge of the 'core operations' of the company"); *Crowell v. Ionics, Inc.*, 343 F. Supp. 2d 1, 3, 19 (D. Mass. 2004) (similar).

[43] *See* ¶33; Prongay Decl., Ex. BB.

[44] *Accord Ho v. Duoyuan Global Water Inc.*, 887 F. Supp. 2d 547, 575 (S.D.N.Y. 2012) (CFO's resignation at approximately the same time that the accounting difficulties at his company became public contributed to an inference of scienter); *In re Adaptive Broadband Sec. Litig.*, 2002 WL 989478, at *14-*15 (N.D. Cal. Apr. 2, 2002) (similar).

---

factors mark the timing and circumstances of Ellawala's resignation as suspicious: (i) it was announced just three months after Gotham City Research LLC ("Gotham") published a report challenging the veracity of Endurance's non-GAAP financial metrics (¶¶18-19, 196-200); (ii) one week following Gotham's report, Endurance was forced to admit that its subscriber churn was 20% (¶19); (iii) one day after Ellawala's resignation was announced, Oppenheimer published a report noting the continued lack of clarity surrounding Endurance's disclosures concerning ARPS and added subscribers (¶¶20, 206-208); and (iv) in connection with releasing its financial results for the very next quarter, Endurance was forced to admit "errors" in its previously reported +$500 Subscriber and PPS figures (¶¶209, 212, 218-219). These factors support the inference that Ellawala was actively involved in the manipulation of Endurance's non-GAAP financial measures and that his resignation was a result of the market beginning to realize the truth concerning these metrics.

The rapid discovery of the "errors" in Endurance's previously reported +$500 Subscribers and PPS figures by new CFO Montagner also supports an inference of scienter with respect to Ellawala. *See, e.g.*, *In re New Century*, 588 F. Supp. 2d 1206, 1231 (C.D. Cal. 2008) ("[T]he fact that the new CEO . . . discovered the accounting violations within months of taking the position is a strong indication that these accounting violations were obvious.").[45]

### D.  Red Flags Concerning Endurance's Non-GAAP Financial Measures Support An Inference Of Scienter

The strong inference of scienter in this case is bolstered further by a number of red flags suggesting that Defendants either knew about the errors and misleading omissions in their statements regarding Endurance's non-GAAP financial measures or that they were, at a minimum, reckless for failing to discover those errors and omissions. *See generally In re Lehman Bros. Sec. & ERISA Litig.*, 799 F. Supp. 2d 258 (S.D.N.Y. 2011) ("A complaint may allege facts sufficient to give rise to

---

[45] *See also George v. China Auto. Sys., Inc.*, 2012 WL 3205062, at *14 (S.D.N.Y. Aug. 8, 2012) ("[Q]uick discovery of an alleged error in the defendant-company's financial statements" "support[s] an inference of recklessness.").

an inference of scienter . . . where it alleges that a corporate officer knew of or recklessly failed to learn of 'red flags' indicating that the officer's public statements were false or misleading.").

First, the **absence** of a spike in PPS when Endurance removed a large number of inactive customers in Q4 2014 was a red flag that should have prompted Defendants to investigate and confirm the reliability of their reported PPS figures.  *See* ¶¶83-86.  As originally reported, the PPS trendline showed steady growth throughout the Class Period, but as corrected, the PPS trendline showed flat growth over the first three quarters of 2014 followed by a sudden spike in Q4 2014 when inactive customers were removed.  *See supra* at 12.  That spike was concealed by the "errors" that Endurance first disclosed in November 2015 and corrected in February 2016.  ¶¶69, 84-85.  The inference that these errors were deliberate is bolstered by the fact that Endurance did not disclose its removal of inactive customers that had occurred in Q4 2014 until February 2016 (only after the SEC served a subpoena in December 2015).  ¶¶220.[46]

Second, the release of the Gotham report on April 28, 2015, which raised serious questions regarding the accuracy of Endurance's non-GAAP metrics and disclosures, presented another red flag that should have caused Defendants to investigate.  Instead, on the very same day, Defendants issued an unequivocal denial of the allegations in the Gotham report and doubled down on the accuracy and reliability of their numbers:

> The claims in this 'report' are baseless and not rooted in reality.  The reality is, since going public, Endurance has beat expectations every quarter, ***showing consistent growth throughout the company***. . . . ***Endurance is transparent in how it calculates all of its metrics*** including [ARPS], subscriber counts, organic growth and revenue monthly revenue retention.  ***The company has always been clear in its financial***

---

[46] Defendants argue that they should not have necessarily expected a spike in PPS in 4Q 2014, because in the same quarter Endurance also expanded the definition of subscribers.  Def. Br. 21.  But an increase in subscribers based on the new definition would not have materially affected PPS unless the new subscribers, on average, used substantially fewer (or more) products than previous subscribers.  Removing inactive customers, on the other hand, could only operate to increase PPS, because it would decrease the subscribers in the denominator without affecting the number of products in the numerator.  The most plausible inference is that Defendants calculated the precise effect on PPS and total subscribers of both the definitional change and the removal of inactive customers, and the aggregate effect of both adjustments.  That the PPS spike was mysteriously smoothed away is unlikely to have occurred without Defendants' knowledge.

*disclosures and reports on its financial growth and health*.

Prongay Decl., Ex. AA at 1 (emphasis added).   These brash assertions, which were later shown to be false and misleading when Endurance disclosed the "errors," support a strong inference of scienter. *See In re ArthroCare Corp. Sec. Litig.*, 726 F. Supp. 2d 696, 712-18 (W.D. Tex. 2010) (strong inference of scienter where CEO dismissed media reports alleging accounting improprieties as "lies, rumor-mongering, and propaganda by short sellers" and CFO remained silent; "the red flags in the media should have led [defendants] to investigate discrepancies between the media reports and their own knowledge, and thus are strong indicia they acted with scienter").[47]

Third, the discrepancies between Endurance's business intelligence ("BI") system, the purported source of the misreported +$500 Subscriber and PPS data, and Endurance's Enterprise Resource Planning ("ERP") system, which produces Endurance's financial and subscriber data, presents a red flag that should have prompted an investigation.  ¶¶21, 70-74, 81, 209, 212.  That Defendants had multiple systems from which they could have derived subscriber data but chose to use the inflated and picture perfect +$500 Subscriber data from the faulty BI system raises an inference that Defendants either knew the metrics were misstated or at the very least were severely reckless in disregarding the data simultaneously available to them from their ERP system which would have shown drastically different and obviously unfavorable metrics.  *See In re Scholastic Corp. Sec. Litig.*, 252 F.3d 63 (2d Cir. 2001) ("Where the complaint alleges that defendants . . . had access to nonpublic information contradicting their public statements, recklessness is adequately

---

[47] *See also In re Spear & Jackson Sec. Litig.*, 399 F. Supp. 2d 1350 (S.D. Fla. 2005) ("If [the CEO] had not become suspicious looking over the financial statements before he signed them, he certainly should have suspected problems when StockLemon.com raised a significant red flag about S & J's accounting.")*; In re Sunbeam Sec. Litig.*, 89 F. Supp. 2d 1326, 1338 (S.D. Fla. 1999) (defendants' denial of reports alleging accounting fraud—including assertion that reports were "propaganda stirred up by 'shorts'"—indicated that defendants "were either sufficiently familiar with the facts, or severely reckless in not being familiar, to be in a position to issue a denial"); *Rehm v. Eagle Fin. Corp.*, 954 F. Supp. 1246, 1256 (N.D. Ill. 1997) ("defendant's attempts to mollify public doubt about [the corporation's] financial health by putting an optimistic and reassuring 'spin' on otherwise damaging [reports] shows defendants acted with knowledge").

pled for defendants who knew or should have known they were misrepresenting material facts.").[48]

The fact that Defendants subsequently relied on their ERP system for this purpose is a concession they had this information during the Class Period.

Fourth, ARPS decreased in Q1 2015 and Q2 2015, even while Endurance continued to report strong growth in +$500 Subscribers and PPS.  ¶¶79-82.  If the purported primary drivers of ARPS were experiencing robust growth,[49] then ARPS should have been increasing, particularly since domain revenue was also becoming an increasingly large contributor to the numerator in ARPS.  ¶¶22, 62.  Defendants should have investigated the cause of this discrepancy.  ¶80.  Defendants raise a number of arguments why +$500 Subscribers and PPS need not move in lockstep with ARPS (Def. Br. 20), but even if these arguments are valid, they only mean that there is no *per se* contradiction between declining ARPS and growing ARPS drivers, due to other factors that contribute to ARPS. The discrepancy in reported trends for ARPS and its drivers was still a red flag that warranted investigation, and that investigation would have revealed that growth in PPS and especially in +$500 Subscribers was far weaker than originally reported.  *See supra* at 6-8.[50]

### E.    Stock Sales By Ravichandran And Ellawala Support An Inference Of Scienter

As alleged in the SAC, the Individual Defendants had a motive to inflate Endurance's stock price in anticipation of a secondary offering that occurred in November 2014.  ¶¶91-94.[51]

---

[48] Defendants argue that there are no facts indicating that Defendants knew the BI system was faulty.  Def. Br. 21.  But once Defendants were publicly accused of manipulating their metrics and chose to deny those allegations and reaffirm their numbers, it was reckless for Defendants not to confirm the data against Endurance's other subscriber data sources.

[49] In Q2 2015, Ravichandran stated that there had been a "pretty good, robust increase" in +$500 Subscribers to 150,000, an increase of 32% from the 114,000 in Q2 20145.  In reality, however, +$500 Subscribers was only 90,000 in Q2 2015, an increase of 6% from the 85,000 in Q2 2014.  *See* ¶¶8, 161-62.

[50] Additionally, CW1, a former Senior Data Warehouse Developer, stated that he observed a report in the summer of 2014 indicating that Endurance's +$500 Subscriber numbers "didn't add up."  ¶¶97-99.  Defendants argue that the inferences that can be drawn from CW1's statements are limited.  Def. Br. 22-24.  But considered together with the other allegations in the SAC, the statements of CW1 support the conclusion that Defendants knew, or were reckless in not knowing, that Endurance's +$500 Subscriber numbers were misstated.

[51] The SAC alleges that the November 2014 Offering was conducted "[o]n or around November 21, 2014."  ¶92.  More precisely, the November 2014 Offering was announced on November 21, 2014, and the relevant sales by the Individual

Ravichandran sold a total of 942,172 shares in the offering, netting over $13 million, and Ellawala sold a total of 21,323 shares, netting just under $300,000.  ¶93.  But Defendants' stock sales in the November 2014 offering were not the only relevant insider trades during the Class Period.  On March 6, 2015, Endurance announced a further offering.[52]  Ravichandran sold a total of 1,490,526 shares in the March 2015 offering, netting over $28 million, and Ellawala sold a total of 20,000 shares, netting $380,000.[53]  While both the November 2014 and March 2015 sales provide evidence of Defendants' motives to inflate Endurance's stock price, the March 2015 sales are particularly probative of scienter, due to the timing of those transactions and the prices at which they occurred.

Defendants note that the sales in the November 2014 offering represented 10% and 5% of Ravichandran's and Ellawala's respective holdings at the time.  Def. Br. 25.  But when both the November 2014 and March 2015 sales are considered, Ravichandran sold 23.7% of his holdings during the Class Period and Ellawala sold 8.3% of his holdings during the Class Period.[54]  These amounts support a strong inference of scienter—particularly as to Ravichandran—especially when the absolute dollar amounts are considered in relation to Defendants' salaries.  *See, e.g.*, *In re Guilford Mills, Inc. Sec. Litig.*, 1999 WL 33248953, at *5 (S.D.N.Y. July 21, 1999) (strong inference of scienter where four directors sold 10% of their holdings during class period for aggregate proceeds of $6.5 million); *Marksman Partners, L.P. v. Chantal Pharm. Corp.*, 927 F. Supp. 1297, 1313 (C.D. Cal. 1996) ("Twenty percent of a corporate insider's shares, especially where the dollar amounts involved are high, may constitute a 'suspicious amount' sufficient to support a scienter allegation."); *In re: Suprema Specialties, Inc. Sec. Litig.*, 438 F.3d 256, 278 (3d Cir. 2006) (sales suspicious where they netted defendant over four times his annual salary).  Ravichandran earned

---

Defendants as part of that offering occurred on November 26, 2014.  *See* Prongay Decl., Exs. D & K (Form 4s filed Nov. 26, 2014).

[52] *See* Prongay Decl., Ex. Z.
[53] *See* Prongay Decl., Exs. E & L (Form 4s filed Mar. 11, 2015)
[54] *See* Prongay Decl., ¶¶1-17, Exs. M & N.

over $41 million in two days of trading (*see* Prongay Decl. Ex. M at n. 3), which represented more than 30 times his combined annual salaries for 2014 and 2015.[55] That amount is "massive by any measure." *In re Oxford Health Plans, Inc.*, 187 F.R.D. 133 (S.D.N.Y. 1999).

The timing of the November 2014 sales was highly suspicious.  While the November 2014 sales occurred only eight months into a two year Class Period, by November 2014 Defendants had issued four sets of financial statements (FY 2013, Q1 2014, Q2 2014, and Q3 2014) with false +$500 Subscriber and PPS figures showing false growth trends.  ¶¶100, 103.  And the $13.92 price, while not close to the Class Period high, was still artificially inflated by Defendants' misstatements.  Once Endurance announced there were errors in its +$500 Subscriber and PPS numbers on November 2, 2015, Endurance's stock dropped to $11.12 per share (¶¶21, 210), and by the time of the last corrective disclosure, Endurance's stock price had fallen to $10.28 per share.  *See infra* at 34-35.

The timing of the March 2015 sales is even more suspicious.  The shares were sold at a price of $19, a price considerably closer to the Class Period high ($23.03) than the price following the final corrective disclosure ($10.28).  *See infra* at 34-35.  The March 2015 sales occurred less than two weeks after Endurance's filing of its Form 10-K for FY 2014 on February 27, 2015, which contained numerous materially false and misleading statements concerning Endurance's non-GAAP financial measures.[56]  Less than two months after the sales occurred, the truth about Endurance's metrics and financial condition began to leak out, as the Gotham report was published on April 28, 2015 and Endurance released its financial results for Q1 2015 on May 5, 2015.  *See infra* at 27-30.[57]

---

[55] Ravichandran's base salary was $750,000 for 2014 and $618,846 for 2015, for a combined salary of $1,368,846 over the two year period.  *See* Prongay Decl., Ex. P at 36.  Ellawala's base salary for $375,000 for each of 2014 and 2015, for a combined salary of $750,000 over the two year period.  *See* Prongay Decl., Ex. P at 36.  In comparison, Ellawala's trades during the Class Period netted him approximately $675,000.  *See* Prongay Decl., Ex. N at n.3.

[56] These false and misleading statements included false +$500 Subscriber figures and a failure to disclose the removal of large numbers of inactive customers from the subscriber count in Q4 2014.

[57] Defendants argue that a long gap between stock sales and the revelation of the truth undermines an inference that the sale was suspicious.  Def. Br. 26 (citing *In re First Marblehead Corp. Sec. Litig.*, 639 F. Supp. 2d 145, 164 (D. Mass. 2009)).  But *Marblehead* involved an ***eleven month*** gap between the last insider sale and the first corrective disclosure.

Finally, Defendants incorrectly argue that "there is nothing unusual or suspicious about significant shareholders selling shares into public offerings." Def. Br. 24 (citing *In re Prestige Brands Holding, Inc.*, 2006 WL 2147719, at *7 (S.D.N.Y. July 10, 2006)).  Their suggestion that shares sold into public offerings categorically cannot be a basis for pleading motive and scienter has been rejected by multiple courts.  *See, e.g.*, *City of Roseville Emps.' Ret. Sys. v. EnergySolutions, Inc.*, 814 F. Supp. 2d 395, 422 (S.D.N.Y. 2011) (rejecting defendants' argument, which "essentially amounts to a claim that an interest in stock sold in an IPO or significant public offering could *never* qualify as motive for purposes of scienter") (emphasis in original).[58]

### F.    The SEC's Investigation And Endurance's Disclosures In Response To That Investigation Support An Inference Of Scienter

The fact that the SEC is actively investigating Endurance's disclosures regarding non-GAAP metrics also supports an inference of scienter.  *See, e.g.*, *Washtenaw County Emps. Ret. Sys. v. Avid Tech., Inc.*, 28 F. Supp. 3d 93, 114-15 (D. Mass. 2014) (document preservation request from SEC and subpoena from DOJ "can be seen as one more piece of the puzzle, a series of circumstances that add up to a strong inference of scienter); *Plumbers Union Local No. 12 Pension Fund v. Ambassador's Group*, 2010 WL 2264962, at *8 (E.D. Wash. June 2, 2010) (SEC investigation contributed to strong inference of scienter).  In its letter responding to the SEC comment letter, Endurance promised to improve the quality of its disclosures concerning ARPS, a tacit admission that its prior disclosures did not allow investors to see the extent to which domain revenue materially

---

Here, there was a only a seven week gap between the March 2015 sales and the Gotham report and only an eight week gap between the sales and the Company's announcement of its Q1 2015 financial results. *See infra* at 27-30.  Even regarding the November 2014 sales, the gap between the sales and those events was only about five months.

[58] *See also In re Refco, Inc. Sec. Litig.*, 503 F. Supp. 2d 611, 646 (S.D.N.Y. 2007) (proceeds of $349,800 and $201,135 to two defendants who supplied over-allotment shares in the IPO were sufficient to infer motive); *In re Fairway Grp. Holding Corp. Sec. Litig.*, 2015 WL 249508, at *14 (S.D.N.Y. Jan. 20, 2015) (defendants benefitted in a "direct, personal and concrete way from the fraud" where "defendants were able to raise millions of dollars in the offering, nearly recouping their entire $150 million investment in Fairway").

propped up ARPS.[59]  The SEC investigation, when considered together with the other facts, bolsters the already strong inference of scienter.

## V.     THE SAC ADEQUATELY ALLEGES LOSS CAUSATION

To plead loss causation, a plaintiff must simply "provide a defendant with some indication of the loss and the causal connection that the plaintiff has in mind."  *Dura Pharms., Inc. v. Broudo*, 544 U.S. 336, 347 (2005);  *see also In re Credit Suisse-AOL Sec. Litig.*, 465 F. Supp. 2d 34, 45-46 (D. Mass. 2006) (*Dura* "reaffirmed the notion that the loss causation pleading requirements should be interpreted so as not to impose a significant burden on plaintiffs").  Because "[l]oss causation is a fact-based inquiry," all reasonable inferences should be drawn in plaintiff's favor on a motion to dismiss.  *Lentell v. Merrill Lynch & Co. Inc.*, 396 F.3d 161, 174 (2d Cir. 2005).[60]

Defendants' brief addresses loss causation solely through the prism of "corrective disclosures."  Def. Br. 26-27 (arguing that in order to adequately plead loss causation, "a plaintiff must identify a corrective disclosure").  While Plaintiff does identify a number of partial corrective disclosures, that is not the only way to plead loss causation.  *See, e.g.*, *Freudenberg v. E*Trade Fin. Corp.*, 712 F. Supp. 2d 171, 202 (S.D.N.Y. 2010) ("A 'corrective disclosure' is not required under this Court's post-*Dura* law.").[61]  For example, a number of courts in this District have held that loss

---

[59] Prongay Decl., Ex. Q at 15 (Dec. 9, 2015 letter to SEC) ("In our future reports . . . we will continue to enhance our disclosure about Non-Subscriber Revenue contribution to ARPS . . . . We will also highlight instances where we believe Non-Subscriber Revenue has materially contributed to period-over-period changes in ARPS.").

[60] The possibility of other price depressive factors will not defeat Plaintiffs' allegations of loss causation on a motion to dismiss.  *See, e.g.*, *Carpenters Pension Trust Fund of St. Louis v. Barclays PLC*, 750 F.3d 227, 233 (2d Cir. 2014) ("Plaintiffs need not demonstrate on a motion to dismiss that the corrective disclosure was the *only* possible cause for decline in the stock price.") (emphasis in original); *In re StockerYale Sec. Litig.*, 453 F. Supp. 2d 345, 359 (D.N.H. 2006) ("Defendants' reference to a wide range of . . . factors that may have caused or contributed to the decline in price . . . raises issues that will be addressed at later stages of this litigation."); *George*, 2012 WL 3205062, at *12 ("Neither *Dura* nor *Lentell* . . . imposes on plaintiffs the heavy burden of pleading facts sufficient to *exclude* other non-fraud explanations."); *cf. Fed. Home Loan Bank of Boston v. Ally Fin., Inc.*, 2013 WL 5466628, at *3 (D. Mass. Sept. 30, 2013) (applying the same principle to state law fraud claim).

[61] *See also In re Bradley Pharm., Inc. Sec. Litig.*, 421 F. Supp. 2d 822, 828 (D.N.J. 2006) (*Dura* only suggests that "plaintiffs needed to have alleged in some fashion that 'the truth became known' before 'the share price fell'") (quoting *Dura*, 544 U.S. at 347); *In re Motorola Sec. Litig.*, 505 F. Supp. 2d 501, 540 (N.D. Ill. 2007) (loss causation can be pled without "an announcement that points directly to a previous representation and proclaims its falsity").

causation may be pled under a "materialization of the risk" theory. *See, e.g.*, *Tutor Perini Corp. v. Banc of Am. Sec. LLC*, 2013 WL 5376023, at *20 (D. Mass. Sept. 24, 2013).[62] Under the framework of "materialization of the risk," a plaintiff may successfully plead loss causation by alleging (1) a loss that was "within the zone of risk *concealed* by the misrepresentations and omissions alleged by the disappointed investor," and that (2) the concealed risk materialized. *Id. at* *20.

Recent circuit court decisions have emphasized that courts must look at multiple disclosing events collectively and that even events that may not by themselves constitute corrective disclosures may combine with subsequent disclosures to plead loss causation. *See Pub. Employees Ret. Sys. of Mississippi, Puerto Rico Teachers Ret. Sys. v. Amedisys, Inc.*, 769 F.3d 313, 322-27 (5th Cir. 2014) (reviewing a series of five partial disclosures and concluding that while several of the events by themselves did not constitute corrective disclosures, together they "collectively constitute[d] and culminate[d] in a corrective disclosure that adequately pleads loss causation"); *Lloyd v. CVB Fin. Corp.*, 811 F.3d 1200, 1209-11 (9th Cir. 2016) (loss causation adequately pled where stock price dropped following the announcement of an SEC investigation but market did not react to subsequent corrective disclosure regarding charge-offs) (citing *Amedisys* with approval). Here, Plaintiff alleges a series of partial corrective disclosures and materializations of concealed risks spanning from April 28, 2015 to February 18, 2016, through which knowledge of Defendants' fraud leaked into the market, and Endurance's stock price fell from $21.94 to $10.28, a decline of more than 50%.

A.     **The April 28, 2015 Gotham Report**

The first partial corrective disclosure was the report issued by Gotham on April 28, 2015.[63]

---

[62] *Accord Special Situations Fund III, L.P. v. Am. Dental Partners, Inc.*, 775 F. Supp. 2d 227, 245 (D. Mass. 2011); ; *In re Evergreen Ultra Short Opportunities Fund Sec. Litig.*, 705 F. Supp. 2d 86, 94-95 (D. Mass. 2010); *Credit Suisse-AOL*, 465 F. Supp. 2d at 47-50.

[63] The SAC alleges that the first partial corrective disclosure occurred on February 23, 2015. ¶¶190, 193-195. Plaintiff no longer claims that this disclosure was corrective, because ARPS for 4Q 2014 was $14.78, not $14.48. *See* Prongay Decl., Ex. Y at 2 (press release dated Feb. 23, 2015). The $14.48 figure referred to ARPS for FY 2014. *See id.*

The report questioned the disclosures about Endurance's ARPS, total subscribers, and churn. *See* ¶¶196-200. For example, Gotham noted that Endurance "does not count as subscribers those who purchase only domain names as subscribers (but they count the revenue!)"—raising the inference that domain revenue was potentially inflating ARPS (which it later turned out was so). ¶196. With respect to total subscribers, Gotham stated that in "Q4 2014 the company changed the definition of a subscriber (which added increase[d] subscribers)," but pointed out that Endurance failed to address the important change during its FY 2014 earnings call, burying the disclosure.[64] *See* ¶¶56, 100, 102, 197. Gotham also claimed that Endurance's subscriber churn was "very high" despite its representations of low cash churn. ¶198. On news of the Gotham report, Endurance's stock price dropped by more than 10%. ¶199.

Defendants argue that the Gotham report cannot constitute a corrective disclosure because it was an "attack" by a short seller and based on already public information. Def. Br. 29-30. This argument fails. First, multiple courts have held that "[a] short seller report may be used to establish loss causation." *Snellink v. Gulf Res., Inc.*, 870 F. Supp. 2d 930, 942 (C.D. Cal. 2012) (citing *Henning v. Orient Paper, Inc.*, 2011 WL 2909322, at *8 (C.D. Cal. July 20, 2011); *accord In re Winstar Commc'ns*, 2006 WL 473885, at *14 (S.D.N.Y. Feb. 27, 2006) (loss causation pled where stock price dropped following publication of report by a "notorious, self-described short seller").

Second, the fact that the Gotham report included already public information does not preclude loss causation. *See, e.g.*, *Winstar*, 2006 WL 473885, at *15 (loss causation may be pled where "findings in [short seller] reports are not attributed to any non-public information").[65] Gotham's report about Defendants' manipulation of Endurance's non-GAAP metrics adequately

---

[64] The later admission by Endurance that it secretly removed a number of inactive subscribers in Q4 2014 is a strong indication that the definitional change was a contrivance to hide the removal of the inactive subscribers.

[65] *See also In re Take-Two Interactive Sec. Litig.*, 551 F. Supp. 2d 247, 283 (S.D.N.Y. 2008) ("loss causation may be [based] upon . . . third-party analyses of a company's financials, which contradict representations made by defendants").

establishes loss causation because subsequent events further revealed that Endurance was in fact manipulating its non-GAAP metrics. *See Winstar*, 2006 WL 473885, at *14 ("Allegations that the market reacted negatively to an opinion or speculation which in fact exposes the falsity of defendants' representations can be sufficient to plead loss causation").[66]

Moreover, unlike *In re Omnicom Grp., Inc. Sec. Litig.*, 597 F.3d 501, 511 (2d Cir. 2010) (cited by Def. Br. 30), this is not a case where the already public information was unquestionably impounded into Endurance's stock price. In *Omnicom*, the court held that a *Wall Street Journal* article that recharacterized information already disclosed to the public more than a year earlier could not be a corrective disclosure. *Id.* at 511-12. Here, Gotham's report analyzed information that had been included in Endurance's Form 10-K filed two months earlier, which included a buried disclosure concerning a definitional change of total subscribers that was not mentioned in the FY 2014 conference call. *Motorola*, 505 F. Supp. 2d 552 (holding on a motion for summary judgment that there was a material issue of fact as to whether a news article caused investor losses by "unearthing" information buried in a proxy statement).[67]

Defendants argue that other information in the Gotham report unrelated to Endurance's non-GAAP metrics may have been responsible for the stock price decline. Def. Br. 31. But Plaintiff is not required to exclude other possible causes of his loss or quantify the amount of the price drop due to the fraud-related information. *See supra* at 26 n.60; *infra* at 32.

### B.      The May 5, 2015 Release Of Q1 2015 Results

The second relevant disclosure occurred on May 5, 2015, when Endurance issued a press

---

[66] *See also Amedisys, Inc.*, 769 F.3d at 318, 322, 324 (publication of a Citron Research report that merely "raised questions about [a company's] accounting and Medicare billing practices" while "by itself" not "a corrective disclosure" did "constitute and culminate in a corrective disclosure" when considered together with subsequent disclosures).

[67] Several courts have held that even in an efficient market, a company's stock price may not always immediately reflect all publicly available information. *See, e.g.*, *In re Gilead Scis. Sec. Litig.*, 536 F.3d 1049, 1057-58 (9th Cir. 2008) (rejecting a "bright-line rule requiring an immediate market reaction"); *Lormand v. US Unwired, Inc.*, 565 F.3d 228, 267 n.33 (5th Cir. 2009) ("a delayed reaction can still satisfy the pleading requirements for loss causation").

release announcing its Q1 2015 financial results.  ¶201.  Endurance disclosed a Q1 2015 ARPS of $14.37, a $0.41 decrease compared to its Q4 2014 ARPS.[68]  This was the first time in six quarters that ARPS did not increase over the prior quarter.  ¶9.[69]  Given that reported +$500 Subscribers and PPS continued to grow, coupled with the allegations in the Gotham report, the reported results partly confirmed and encouraged investor skepticism of Endurance's ARPS, PPS, and +$500 Subscriber metrics.  On a conference call on the same day, Ravichandran disclosed for the first time that the Company's subscriber churn was 20% in 2014.  ¶202.  On this news, the Company's stock price declined $0.47 per share, or 2.3%.  ¶203.[70]

### C.      The August 4, 2015 Release Of Q1 2015 Results

On August 4, 2015, Endurance reported yet another ARPS decline in the face of purportedly growing ARPS drivers.  ¶205.  Endurance reported ARPS of $14.30, $0.07 below the prior quarter. *Id.*  This disclosure further confirmed and encouraged investor skepticism regarding the Company's ARPS, PPS, and +$500 Subscriber metrics.  That investors were growing skeptical of Endurance's ARPS and ARPS driver metrics is confirmed by the fact that on the same day, Oppenheimer published an analyst report calling on Endurance to increase quality disclosures surrounding its ARPS drivers.  ¶206.  On this news, Endurance's stock price fell $2.41, or 11.7%.  ¶207.

The price of Endurance's stock remained artificially inflated because Defendants prevented the full truth from being revealed by disseminating further misstatements.  In particular,

---

[68] Paragraph 201 incorrectly states that the decrease was "$0.11" due to the mistaken comparison to FY 2014 ARPS ($14.48) rather than the proper Q4 2014 ARPS ($14.78).  *See* note 7, *supra*.

[69] The chart at ¶9 incorrectly presents the ARPS for Q4 2014, which was $14.78 rather than $14.48.  *See* note 7, *supra*.

[70] Defendants argue that "the decline in ARPS itself," rather than the market beginning to understand there was a disconnect between ARPS and its purported drivers, likely caused the price drop. Def. Br. 28-29.  Plaintiff, however, is not obligated to disprove competing loss causation theories at the pleading stage.  *See supra* at 26 n.30; *infra* at 32. Moreover, Defendants' theory is entirely consistent with loss causation under a "materialization of the risk" theory. Defendants concealed the likelihood that ARPS would stop growing by reporting materially false +$500 Subscriber and PPS numbers, misstating both the consistency and rate of growth of these two ARPS drivers.  ¶¶6-8, 65-69.  *See Special Situations*, 775 F. Supp. 2d at 245 (loss causation sufficiently alleged when defendants' misrepresentations "materially misled investors and analysts *in such a way as to impede assessments of the nature and gravity of the risk*").

Ravichandran pointed to continued growth in +$500 Subscribers and PPS to inspire investor confidence in future ARPS growth, stating that "the increase in high-value subscribers and the increase in product attach rates give us confidence in our underlying ability to monetize our base of subscribers and grow ARPS over time." ¶206. *See Amedisys*, 769 F.3d at 324 ("After each negative disclosure, Defendants attempted to mitigate the impact of those disclosures by making contemporaneous misstatements to the market and prevented the full truth from being revealed at once.").

Defendants argue, as they do with the May 5 disclosure, that the decline in ARPS was responsible for the decline. Def. Br. 28-29. And just as with the May 5 disclosure, the likelihood of a decline in ARPS was a risk that was concealed by Defendants' publication of false +$500 Subscriber and PPS metrics. *See supra* at 30 n.70. Defendants also argue that the price reaction on August 4 was related in part to Ellawala's resignation as CFO. Def. Br. 32 n.24. But Ellawala's resignation was part of the unraveling of Defendants' fraudulent scheme. *See supra* at 31; *Amedisys*, 769 F.3d at 322-23 (resignation of officers did not by themselves constitute a corrective disclosure, but together with subsequent disclosures constituted a corrective disclosure). Plaintiff is not required to rule out other factors that may have contributed to the loss. *See supra* at 26 n.60; *infra* at 32.

### D.      The November 2, 2015 Disclosure Of "Errors"

On November 2, 2015, Endurance disclosed during its quarterly conference call that it was not presenting +$500 Subscribers or PPS for Q3 2015 because it "identified an error . . . which impacted these metrics" and that the Company was in the process of recalculating the figures. ¶209. Endurance stated that revised figures for both +$500 Subscribers and PPS were expected to be lower than previously reported figures. *Id.* The Company added that "the purpose of the PPS and the 500-plus metrics was to provide additional insights to element that can directionally impact ARPS." *Id.*

On this news, Endurance's stock price fell $2.21 per share, or 16.5%.  ¶210.

Recognizing that this constituted a textbook corrective disclosure, Defendants improperly raise a factual dispute and argue that the price drop on this date was related to Endurance's simultaneous announcement that it would be acquiring Constant Contact, citing two news articles suggesting that the stock drop may have been related to the acquisition announcement.  *See* Def. Br. 33-34; Butts Decl., Exs. N, O.  However, while the Court may take judicial notice of the fact that the articles were published, it may not take judicial notice "of the truth of their contents."  *In re Celexa & Lexapro Mktg. & Sales Practices Litig.*, 2015 WL 3751422, at *3 (D. Mass. June 15, 2015). Neither of these articles constitutes an authoritative, let a dispositive, analysis of the market's reaction.[71]  Moreover, when a corrective disclosure occurs simultaneously with the disclosure of other bad news unrelated to the fraud, a complaint is not required to rule out other causes of the loss or quantify the portion of the loss attributable to the fraud.  *See, e.g.*, *Nathanson v. Polycom, Inc.*, 87 F. Supp. 3d 966, 985 (N.D. Cal. 2015) (rejecting defendant's argument that "Plaintiff must isolate what portion of the stock drop was caused by the revelation of the alleged fraud as opposed to . . . simultaneously-announced poor financial results at the pleading stage").[72]

## E.    The December 17, 2015 Disclosure Of The SEC Investigation

On December 17, 2015, the Company filed a Form 8-K disclosing an SEC investigation and the receipt of a subpoena from the SEC on December 10, 2015 requiring production of documents related to Endurance's financial reporting, ***including operating and non-GAAP metrics***.  ¶215.  On

---

[71] The first article appears to be based only on an interview with Ravichandran, who self-servingly attributes the market reaction to investor anxiety concerning the acquisition rather than the disclosure of material errors in Endurance's metrics, and one analyst report questioning the synergies of the deal.  Butts Decl., Ex. N.  The second article mentions no link between the acquisition and the stock price drop except in the headline.  Butts Decl., Ex. O.

[72] *See also Motorola*, 505 F. Supp. 2d at 551 (where two adverse disclosures were made on the same day, plaintiff did not bear the burden "at either the pleading or summary judgment stages, to apportion and quantify which part of its loss is attributable to disclosures of [fraud]-related information, and which part might be attributable to other factors"); *In re IMAX Securities Litigation*, 587 F. Supp. 2d 471, 486 (S.D.N.Y. 2008) (similar).

this news, Endurance shares fell $1.81, or 13.9% on unusually heavy volume.  ¶216.

Defendants argue that this disclosure does not, in fact, qualify as corrective since the "better reasoned cases hold that the disclosure of the commencement of an SEC investigation, **without more**, is insufficient to constitute a corrective disclosure for purposes of § 10(b)."  Def. Br. 33 (citing, *inter alia*, *Loos v. Immersion Corp.*, 762 F.3d 880, 890 (9th Cir. 2014)).  As the Ninth Circuit recently clarified, however, the something "more" that will allow an adequate pleading of loss causation can include a subsequent corrective disclosure, even if there is no negative price reaction to that later disclosure.  *Lloyd*, 811 F.3d at 1210 (market's non-reaction to subsequent "bombshell disclosure" about charge-offs showed that "investors understood the SEC announcement [of an investigation] as at least a partial disclosure of the inaccuracy" of the company's previous statements).  Moreover, as the Fifth Circuit held in *Amedisys*, an SEC investigation, combined with **prior** partial disclosures, can together form a corrective disclosure, even if the other events by themselves do not adequately reveal the fraud.  769 F.3d at 322-26.

Here, the announcement of the SEC investigation was followed by further partial corrective disclosures:  the release of Endurance's letter to the SEC containing previously withheld ARPS data that Defendants had a duty to disclose, and the issuance of corrected +$500 Subscriber and PPS figures.  The announcement was also preceded by partial corrective disclosures and materializations of concealed risks.  As in *Lloyd* and *Amedisys*, loss causation has been adequately pled.[73]

F.      **The February 1, 2016 Response Letter By Endurance To The SEC**

The SAC alleges that on December 9, 2015, Endurance filed a letter in response to an earlier

---

[73] Numerous courts have held that the announcement of an SEC investigation, without a further finding of wrongdoing, can adequately plead loss causation.  *See, e.g.*, *In re Gentiva Sec. Litig.*, 932 F. Supp. 2d 352, 385-87 (2013) (reviewing authorities on both sides of issue and rejecting "idea that the disclosure of an investigation, absent an actual revelation of fraud, is not a corrective disclosure"); *Take-Two*, 551 F. Supp. 2d at 287 ("Other courts have found that similar allegations of significant stock drops in response to announced SEC investigations are sufficient to plead loss causation under the framework established by *Dura* and its progeny.") (collecting cases).

comment letter from the SEC.  ¶213.  Endurance's response letter, however, was not made public until February 1, 2016.  *See* Prongay Decl., ¶¶20-25, Exs. Q-U.

In the response letter, Endurance disclosed that domain revenue was becoming an increasing portion of its ARPS beginning in FY 2014 and continuing through FY 2015, confirming what Gotham had questioned back in April 2015.  ¶213.  This letter was a corrective disclosure because it revealed previously withheld material information that Defendants had a duty to disclose, *see supra* at 9, and corrected in part the market's misunderstanding of the true sources of ARPS growth caused by Defendants' misstated +$500 Subscriber and PPS metrics.  On the day following the release of the letter, Endurance's stock price fell by $0.87 to close at $8.68 on February 2, 2016, a decline of 9.1%.  *See* Butts Decl., Ex. U.

### G.  February 18, 2016 Disclosure Of Corrected +$500 Subscriber and PPS Figures

On February 18, 2016, in connection with its conference call for FY 2015, Endurance published corrected +$500 Subscriber and PPS figures that painted a very different picture from the one that Defendants represented to investors during the Class Period.  ¶218; *see supra* at 6-7.  Defendants also disclosed that the Company had eliminated inactive customers from its total subscriber count in Q4 2014, causing a significant spike in PPS during that quarter.  ¶220.

Defendants argue that the partial recovery in Endurance's stock price following the February 18, 2016 conference call undermines Plaintiff's pleading of loss causation.  Def. Br. 34.  The Company's stock price, however, only rebounded to $10.28, still well below the price following Endurance's first announcement of errors in its +$500 Subscriber and PPS figures on November 2, 2015, when the price dropped to $11.12.[74]  And the $10.28 price was less than half the price that immediately preceded the first partial corrective disclosure ($21.94), the issuance of the Gotham

---

[74] Defendants argue that the republication of the corrected figures on February 29, 2016 cannot be a corrective disclosure because the information was already disclosed on February 18, 2016.  Def. Br. 35.  Plaintiff concedes this point.  The appropriate date for measuring the full impoundment of the fraud into Endurance's stock price is February 18, 2016.

report.[75]  Multiple courts have rejected the precise argument that Defendants offer here—that a price increase following a restatement negates loss causation—when earlier disclosures already impounded the effect of the fraud into a company's stock price.  *See, e.g.*, *Bradley*, 421 F. Supp. 2d at 828 (D.N.J. 2006) (by the time of restatement, "the market had already incorporated that the previously released financial statements could not be relied upon").[76]

## VI.  <u>CONCLUSION</u>

For all of the foregoing reasons, Plaintiff requests that Defendants' motion to dismiss be denied in its entirety.[77]  Alternatively, if the Court is inclined to grant any part of the motion, Plaintiff seeks leave to amend.  *See* Fed. R. Civ. P. 15(a)(2); *In re Genzyme Corp. Sec. Litig.*, 754 F.3d 31, 47 (1st Cir. 2014) ("we again make clear that the PSLRA has not modified the liberal amendment policy of Rule 15(a)") (citing *Advest*, 512 F.3d at 56).

DATED:  July 1, 2016

**GLANCY PRONGAY & MURRAY LLP**

By:  *s/ Robert V. Prongay*
Robert V. Prongay (*pro hac vice*)
Jason L. Krajcer (*pro hac vice*)
Charles H. Linehan (*pro hac vice*)
1925 Century Park East, Suite 2100
Los Angeles, CA 90067
Telephone:  (310) 201-9150
Facsimile:  (310) 201-9160
rprongay@glancylaw.com
jkrajcer@glancylaw.com
clinehan@glancylaw.com

---

[75] The price increase on February 18, 2016 may be unrelated to the issuance of the corrected figures.  For example, Ravichandran announced during the conference call approximately $30 million in savings in annual run rate costs due to recent "head count reductions."  Prongay Decl., Ex. X at 2 (transcript of Feb. 18, 2016 conference call).

[76] *See also In re UTStarcom, Inc. Sec. Litig.*, 617 F. Supp. 2d 964, 977-78 (N.D. Cal. 2009) (even though company's stock price "increased after the issuance of several financial restatements," plaintiffs adequately pled loss causation based on prior partial corrective disclosures); *In re Seitel, Inc. Sec. Litig.*, 447 F. Supp. 2d 693, 710-711 (S.D. Tex. 2006) (similar); *Richard v. Northwest Pipe Co.*, 2011 WL 3813073, at *2-3 (W.D. Wash. Aug. 26, 2011) (similar).

[77] Because Plaintiff alleges a primary violation of the securities laws and Defendants do not dispute that Individual Defendants exercised control, the SAC adequately alleges "control person" liability under Section 20(a) of the Exchange Act.  *See In re Stone & Webster, Inc., Sec. Litig.*, 424 F.3d 24, 27 (1st Cir. 2005).

*Lead Counsel for Lead Plaintiff*
*Christopher Machado and the Class*

**BLOCK & LEVITON LLP**
Jason M. Leviton (BBO #678331)
155 Federal Street, Suite 400
Boston, MA 02110
Telephone:  (617) 398-5600
Facsimile:  (617) 507-6020
jason@blockesq.com

*Liaison Counsel for Lead Plaintiff Christopher*
*Machado and the Class*

## **CERTIFICATE OF SERVICE**

I hereby certify that this document filed through the CM/ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing and paper copies will be sent to those indicated as non-registered participants on July 1, 2016.

_s/ Robert V. Prongay_
Robert V. Prongay