## UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| CHRISTOPHER MACHADO, and MICHAEL RUBIN, Individually and on Behalf of All Others Similarly Situated, <br><br>                 Plaintiffs, <br><br>     v. <br><br> ENDURANCE INTERNATIONAL GROUP HOLDINGS, INC., HARI RAVICHANDRAN, and TIVANKA ELLAWALA, <br><br>                 Defendants. | Case No. 1:15-cv-11775-GAO <br><br><br> **THIRD AMENDED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS** <br><br> **JURY TRIAL DEMANDED** |

<u>**TABLE OF CONTENTS**</u>

I.      NATURE OF THE ACTION ........................................................................................ 1

II.     JURISDICTION AND VENUE ................................................................................ 13

III.    PARTIES .................................................................................................................... 14

IV.     BACKGROUND ........................................................................................................ 16

      A.      Endurance's Two-Pronged Growth Strategy, And The Two Metrics That Tracked Endurance's Execution Of Its Growth Strategy: Total Subscribers, And ARPS....................................................................................................................... 17

      B.      Endurance Reported And Touted Its Total Subscriber And ARPS Growth Throughout The Class Period ................................................................................ 19

      C.      Endurance Focused On And Touted The Number Of Subscribers Paying More Than $500 Per Year And The Average Number Of Products Per Subscriber As Drivers Of ARPS ............................................................................................... 20

V.      ENDURANCE REPORTED FALSE AND MISLEADING METRICS IN ITS IPO REGISTRATION STATEMENT ................................................................................ 21

VI.     DEFENDANTS REPORTED FALSE AND MISLEADING METRICS THROUGHOUT THE CLASS PERIOD ................................................................................................ 27

      A.      The Company Published False And/Or Misleading Total Subscribers Figures Because The Company Failed To Inform Investors Of Inactive Customers Improperly Included In The Count, And Their Subsequent Exclusion In Q4 2014........................................................................................................................ 27

      B.      The Company Published False And/Or Misleading ARPS Figures Because The Company Failed To Inform Investors That An Increasing Percentage Of The Company's ARPS Was Due To "Domain Monetization" And Not Organic Subscriber Revenue Growth ................................................................................ 31

      C.      The Company Published Inflated $500+ Subscribers Figures And PPS Figures Which Inaccurately Portrayed A Trend Of Steady Growth ................................. 34

VII.    DEFENDANTS' MATERIALLY FALSE AND/OR MISLEADING STATEMENTS REGARDING TOTAL SUBSCRIBERS, ARPS, $500+ SUBSCRIBERS, AND PPS ISSUED DURING THE CLASS PERIOD .................................................................... 38

A.    Defendants' Materially False And/Or Misleading Statements Regarding The Second Fiscal Quarter Of 2013 ................................................................................ 40

B.    Defendants' Materially False And/Or Misleading Statements Regarding The Third Fiscal Quarter Of 2013 .................................................................................. 41

C.    Defendants' Materially False And/Or Misleading Statements Regarding Fiscal Year 2013 .......................................................................................................... 42

D.    Defendants' Materially False And/Or Misleading Statements Regarding The First Fiscal Quarter Of 2014 ............................................................................... 44

E.    Defendants' Materially False And/Or Misleading Statements Regarding The Second Fiscal Quarter Of 2014 ............................................................................ 46

F.    Defendants' Materially False And/Or Misleading Statements Regarding The Third Fiscal Quarter Of 2014 .................................................................................. 48

G.    Defendants' Materially False And/Or Misleading Statements Regarding Fiscal Year 2014 And The Fourth Fiscal Quarter Of 2014 .............................................. 52

H.    Defendants' Materially False And/Or Misleading Statements Regarding The Gotham Report ........................................................................................................ 56

I.    Defendants' Materially False And/Or Misleading Statements Regarding The First Fiscal Quarter Of 2015 ................................................................................... 57

J.    Defendants' Materially False And/Or Misleading Statements Regarding The Second Fiscal Quarter Of 2015 ............................................................................ 60

K.    Defendants' Materially False And/Or Misleading Statements Regarding The Third Fiscal Quarter Of 2015 .................................................................................. 64

VIII.   LOSS CAUSATION AND DEFENDANTS' STATEMENTS ISSUED AT THE END OF THE CLASS PERIOD ................................................................................ 66

IX.   POST-CLASS PERIOD EVENTS ................................................................................ 75

X.   ADDITIONAL SCIENTER ALLEGATIONS ................................................................ 79

A.    Management Was Heavily Focused On ARPS And Drivers Of ARPS ................ 79

B.    The Primary Drivers Of ARPS Were Purportedly Increasing As ARPS Was Decreasing ............................................................................................................. 80

C.      The Elimination Of Inactive Customers Unbelievably Had No Effect On PPS ... 82

D.      Subscribers Paying More Than $500 Per Year Accounted For Approximately 11% Of The Company's Revenue ...................................................................... 83

E.      Defendants' Prompt Denial Following the Gotham Report Without Any Investigation Supports An Inference Of Scienter ................................................. 84

F.      Defendants Ravichandran And Ellawala Were Motivated To Inflate The Company's Stock Price In Anticipation Of The Offering In November 2014 And March 2015 ......................................................................................................... 85

G.      The Timing Of Ellawala's Resignation Relative To The Company's Disclosures .......................................................................................................... 88

H.      Defendant Ravichandran's Announced Exit Was Explicitly Linked To Endurance's Metrics And The Ongoing Eighteen Month Formal SEC Investigation ...................................................................................................... 89

I.      A Former Employee Confirmed That The Company's +$500 Subscriber Figures Were Unreliable ................................................................................................. 89

XI.     CLASS ACTION ALLEGATIONS ................................................................. 90

XII.    UNDISCLOSED ADVERSE FACTS ............................................................. 92

XIII.   APPLICABILITY OF PRESUMPTION OF RELIANCE ............................... 93

XIV.    NO SAFE HARBOR ....................................................................................... 95

XV.     CLAIMS ......................................................................................................... 96

XVI.    PRAYER FOR RELIEF ................................................................................. 104

XVII.   JURY TRIAL DEMANDED .......................................................................... 105

1.     Lead Plaintiff Christopher Machado, and Plaintiff Michael Rubin, ("Plaintiffs"), by and through their attorneys, allege the following upon information and belief, except as to those allegations concerning Plaintiffs, which are alleged upon personal knowledge. Plaintiffs' information and belief is based upon, among other things, their counsel's investigation, which includes without limitation: (a) review and analysis of regulatory filings made by Endurance International Group Holdings, Inc. ("Endurance" or the "Company"), with the United States ("U.S.") Securities and Exchange Commission ("SEC"); (b) review and analysis of press releases and media reports issued by and disseminated by Endurance; (c) interviews with former Endurance employees; and (d) review of other publicly available information concerning Endurance.

## I.      NATURE OF THE ACTION

2.     This is a federal securities class action on behalf of a class of persons and entities that purchased or acquired Endurance securities between October 25, 2013, and December 16, 2015, inclusive (the "Class Period"), including persons and entities that purchased or acquired Endurance securities pursuant or traceable to the registration statement and prospectus (the "Registration Statement") issued in connection with the Company's October 25, 2013 initial public offering (the "IPO" or "Offering"), seeking to pursue remedies under Sections 11, 12(a)(2), and 15 of the Securities Act of 1933 (the "Securities Act"), and Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act").

3.     In the Registration Statement, and/or during the Class Period, the Company and certain officers of the Company reported false and misleading metric figures relating to the Company's total subscriber count, the number of products the Company's customers were purchasing, and the amount customers were paying for those products.  On December 10, 2015,

as part of an SEC investigation into the Company, Endurance received a subpoena from the SEC's Boston Regional Office, requiring the production of certain documents, including documents related to Endurance's metrics.  As a result of the investigation, which has been ongoing for at least 18 months, the Company has recently announced that its CEO will be parting ways with Endurance.

4.      Endurance provides "cloud-based platform solutions" for small and medium-sized businesses ("SMBs").  The Company purportedly has approximately 5.37 million subscribers globally and offers "a comprehensive suite of products and services that help SMBs get online, get found and grow their businesses," including: web hosting, domains, security, site backup, website builders, search engine optimization, search engine marketing, Google Adwords, mobile solutions, mobile site builders, social media enablement, website analytics, email marketing, and productivity and e-commerce tools.

5.      Endurance's growth strategy, which the Company constantly reiterated to investors and analysts, was based on a two-pronged strategy of (1) increasing the Company's subscriber base while (2) simultaneously increasing the average revenue generated per subscriber.  The Company tracked the size of its subscriber base under a metric labeled "Total Subscribers," and tracked the average revenue generated per subscriber under the metric "Average Revenue Per Subscriber" (or "ARPS").  During the Class Period, Defendants routinely touted increases in the Company's Total Subscribers and ARPS as proof that it was executing its strategy.

6.      In addition to Total Subscribers and ARPS, the Company highlighted two additional metrics that Defendants claimed were "drivers" of ARPS: the number of subscribers of the Company's major brands who spend more than $500 per year (hereinafter, "$500+

Subscribers") and the average number of products purchased per subscriber ("PPS"). Defendants routinely attributed Endurance's purportedly positive ARPS results to increases in $500+ Subscribers and PPS, and cited purported $500+ Subscribers and PPS growth as a reason to expect ARPS growth.

7.      On October 25, 2013, the Company conducted its IPO.   In the Offering, Endurance sold 21,051,000 shares of common stock at a price of $12.00 per share.  Through the Offering, Endurance received net proceeds of approximately $232.1 million.

8.      In the Registration Statement filed by Defendants in connection with the IPO, Endurance made certain misrepresentations regarding $500+ Subscribers and Total Subscribers. Specifically, Endurance reported 88,000 $500+ Subscribers and 3.37 million Total Subscribers, as of June 30, 2013.[1]    Endurance also provided figures from earlier periods, purportedly demonstrating a picture perfect stepping growth pattern:

> As of December 31, 2010, 2011 and 2012, we had 2.5 million, 2.9 million and 3.2 million total subscribers, respectively. . . . Total subscribers increased from 3.1 million as of June 30, 2012 to 3.4 million as of June 30, 2013 . . . .
>
> *      *      *
>
> The number of subscribers paying $500 or more per year for our products and services as of December 31, 2010, 2011 and 2012 was approximately 61,000, 73,000 and 81,000, respectively, and increased to approximately 88,000 as of June 30, 2013.

As Endurance's later revelations indicate, these figures were false.

9.      The Company continued its misrepresentations throughout the Class Period. Quarterly and annual results reported by Defendants painted a picture-perfect growth-pattern for $500+ Subscribers and PPS, spanning the entire Class Period.  The Company reported growth in

---

[1] In some parts of the Registration Statement, the Company rounded up to "3.4 million" Total Subscribers.

$500+ Subscribers and PPS metrics that formed a consistent upward stepping pattern:[2]





10.    Defendants pointed to these picture perfect growth patterns to instill investor confidence that ARPS would grow.  Moreover, when the Company reported some negative

---

[2] The charts represent $500+ Subscribers and PPS data as reported by the Company at the end of each fiscal quarter in the company's press releases, investor conference calls, and/or SEC filings.

ARPS results for Q2 2015,[3] Defendant Hari Ravichandran ("Ravichandran") assuaged investors' concerns by pointing to $500+ Subscribers and PPS growth as a reason to be confident in the Company's future ARPS growth potential.

11.     It turns out, however, that the Company's reported picture perfect $500+ Subscribers and PPS growth was a fiction.  In November 2015, the Company stated that it had identified an error that affected in its $500+ Subscribers and PPS figures.  The true figures, eventually published by Endurance in February 2016, illustrate that $500+ Subscribers growth was near flat, and that quarter-to-quarter declines in PPS were more common than quarter-to-quarter increases.  In February 2016, Endurance issued the following corrections to $500+ Subscribers and PPS:



---

[3] The Company's fiscal year runs from January 1 to December 31, with each fiscal quarter spanning three months.  As a shorthand, fiscal quarters are represented as "Q[quarter number] [fiscal year]." For example, the second quarter of fiscal year 2015 which runs from April 1 through June 30, 2015 will be represented as "Q2 2015."

12.     Not only did Endurance publish false and misleading figures related to ARPS drivers ($500+ Subscribers and PPS), Endurance published false and misleading ARPS figures too.  The Company reported ARPS growth in every quarter throughout the Class Period, in both a sequential and year-over-year basis, until Q1 2015, when ARPS gradually began to decline:



13.     These ARPS figures, however, were highly misleading, particularly with respect to the third and fourth quarters of 2014 and the first three quarters of 2015, for two reasons. **First**, beginning in Q3 2014, and continuing throughout the Class Period, ARPS became increasingly inflated due to the Company's misleading treatment of domain-related revenue and customers.  In September of 2014, the Company acquired the assets of the BuyDomains business of NameMedia, Inc. ("BuyDomains").   As a result of the acquisition, Endurance's domain-related revenue became an ever-increasing portion of the Company's total revenue.   Yet, Endurance did not count customers that only purchased domains ("domain-only customers"), or customers responsible for the "domain monetization revenue"—which principally consisted of revenue from domain name products and services provided by BuyDomains—in the subscribers

denominator of its ARPS metric.  The net effect of the Company's treatment of domain-related revenue and customers artificially inflated ARPS, which helped boost ARPS Q3 2014 and Q4 2014, and cushioned the ARPS decline through the end of the Class Period.  The public was not made aware of the substantial effect that this treatment of domain-related revenue had in inflating the Company's ARPS figures until the SEC published a letter from the Company describing these effects in February 2016.

14.      **Second**, in Q4 2014, the Company removed a large number of inactive customers from its Total Subscribers figures.  The effect of this adjustment was to significantly boost ARPS,[4] because the number of subscribers in the denominator was decreased without a corresponding decrease in revenue in the numerator.  The Company did not disclose that it made this adjustment of removing inactive customers, however, until February 2016, more than a year after the adjustment was made.

15.      The combined effect of the undisclosed increase in domain-monetization revenue starting in Q3 2014 and the undisclosed removal of inactive customers in Q4 2014 was to artificially increase ARPS during those periods and to conceal the fact that organic growth in ARPS had stalled.  Because the Company was reporting false $500+ Subscribers and PPS figures, however, the growth in ARPS appeared to be a natural function of the seeming growth in these ARPS "drivers."

16.      In addition to the Company's false and misleading statement relating to the ARPS prong of the Company's growth strategy, the Company engaged in fraudulent conduct with respect to the other prong of its growth strategy: Total Subscribers.

---

[4] As described below, this adjustment also artificially boosted PPS.

17.     Endurance reported consistently increasing Total Subscribers throughout the Class Period.  Defendants failed to disclose, however, that the Total Subscribers figures provided in the Registration Statement, as well as those provided in the Company's Q3, 2013 through Q3 2014 results announcements, were overstated because the Company improperly included inactive customers in the published figures.  Moreover, when the Company eliminated the inactive customers from the Total Subscribers metric in Q4 2014, rather than disclose the elimination to investors, Endurance expanded the definition of Total Subscribers in order to conceal the elimination of the inactive customers.

18.     During the Class Period, Defendants painted a strong growth picture of increasing Total Subscribers, increasing ARPS, and increasing ARPS drivers.  But, in reality, the Company was bleeding subscribers and taking on lower revenue subscribers in order to offset the bleed. This practice was driving down the Company's ARPS.  In response, Defendants pointed to false and misleading ARPS, ARPS drivers, and Total Subscribers metrics to instill confidence in the Company's health and growth potential.

19.     In November 2014 and March 2015, shortly after the Company released its financial results for Q3 2014 and Q4 2014 (i.e., at the time when the Company's financial profile was heavily distorted due to Defendants' false growth metrics), Defendants Ravichandran and Ellawala sold significant amounts of their personal holdings of Endurance stock in secondary public offerings.  Defendants Ravichandran and Ellawala made millions of dollars in these transactions, at prices that were significantly artificially inflated by the false and misleading metrics published by Defendants.

20.     Soon thereafter, Defendants' multi-faceted scheme began to unravel as the truth gradually made its way to the market.

21.     On April 28, 2015, research firm Gotham City Research LLC ("Gotham") published a report entitled "Endurance International Group: A Web of Deceit."  The report cast doubt on certain of the Company's metrics including the Company's Total Subscribers, and ARPS.  Gotham alleged in the report that the Company's ARPS were overstated, and pointed out the Company had changed its definition of Total Subscribers in Q4 2014.  Gotham also pointed out that Endurance did not include domain-only purchasers in the Company's definition of Total Subscribers.  Gotham's report brought attention and scrutiny to the Company's misleading ARPS and Total Subscribers metrics.

22.     In response to the Gotham Report, Endurance doubled down and immediately issued a blanket denial the same day, without conducting a proper investigation, falsely stating that the claims in the report were "baseless and not rooted in reality," that "Endurance has beat expectations every quarter, showing consistent growth throughout the company," and that "Endurance is transparent in how it calculates all of its metrics" including "average revenue per subscriber," "subscriber counts," and "organic growth."

23.     On news of Gotham's report, Endurance's share price declined $2.24 per share, or more than 10%, to close on April 28, 2015, at $19.70 per share, on unusually heavy trading volume.  The stock price continued to decline on April 29, 2015, falling another $1.37 per share, or 6.9%, to close at $18.33 per share, on unusually heavy trading volume.

24.     On August 4, 2015, the Company announced a Q2 2015 ARPS of $14.30, compared to a Q2 2014 ARPS of $14.33, representing the first year-over-year quarterly decline in ARPS during the Class Period.[5]  These disappointing results constituted a materialization of

---

[5] The prior quarter, the Company announced a Q1 2015 ARPS of $14.37, which represented a sequential quarterly decline compared to the Q4 2014 ARPS of $14.78, but still represented a year-over-year improvement compared to the Q1 2014 ARPS of $14.18.

risks concealed by Defendants' publication of false $500+ Subscribers and PPS figures, which had given a false impression to the market that the underlying drivers of ARPS were strong and healthy and that ARPS was therefore likely to continue to grow organically.  Indeed, in a conference call discussing the Q2 2015 results, Defendant Ravichandran attempted to reassure and mislead investors about the ARPS decline, stating that the Company's reported $500+ Subscribers and PPS  figures continued to grow, and claiming that this boded well for ARPS to improve in the future.  While Ravichandran's assurances somewhat calmed the market's fears, the disconnect between growing ARPS drivers on the one hand, and decreasing ARPS on the other, cast doubt on the veracity of Endurance's reported metric figures.  In response to the Company's Q2 2015 reported results in ARPS and its drivers, one of the Company's analysts, Oppenheimer & Co. Inc., published a report calling on Endurance to increase quality disclosures surrounding ARPS and added subscribers.

25.     On this news, shares of Endurance declined $2.41 per share, or 11.7%, to close on August 4, 2015, at $18.12 per share, on unusually heavy volume.  The stock price continued to decline on August 5, 2015, falling another $0.78 per share, or 4.3%, to close at $17.34 per share, on unusually heavy trading volume.

26.     On November 2, 2015, during the Company's quarterly earnings conference call with investors and analysts for Q3 2015, Defendants announced a Q3 2015 ARPS of $14.29, representing another sequential and year-over-year quarterly decline in ARPS.  During the call, Defendants also revealed that Endurance's previously reported $500+ Subscribers and PPS figures were inaccurate.  Despite Defendants' high-profile prior reporting of $500+ Subscribers and PPS throughout the Class Period (and their insistence on April 28, 2015 in response to the Gotham Report that all of Endurance's metrics were accurate), Endurance did an about-face, and

told investors that it would not be publishing $500+ Subscribers and PPS for Q3 2015.  The

Company's lone excuse was that it had "recently identified an error while migrating some data

from our legacy business intelligence system to an upgraded [business intelligence] system

which impacted these metrics" without providing any detail regarding the alleged "error."

Endurance attempted to reassure investors by claiming that the business intelligence "system is

completely separate from the [Enterprise Resource Planning ("ERP")] system that produces our

financial and subscriber data."  The Company also promised that it would "provide updated

metrics information as soon as it is available."

27.     On this news, shares of Endurance fell $2.21 per share, or 16.5%, to close on

November 2, 2015, at $11.12 per share.

28.     On December 17, 2015, the Company filed a Current Report with the SEC

disclosing that on December 10, 2015, as part of an SEC investigation of the Company,

Endurance received a subpoena from the SEC's Boston Regional Office, requiring the

production of certain documents, including documents related to Endurance's metrics.

29.     On this news, Endurance's share price declined $1.81 per share, or 13.9%, to

close on December 17, 2015, at $11.20 per share, on unusually heavy volume.

30.     In February 2016, a December 9, 2015 letter from Endurance to the SEC was

made public, in which the Company admitted that its domain-related revenue had been inflating

ARPS figures since Q4 2014, shortly after the Company acquired BuyDomains.  Specifically, the

Company stated:

> Our domain monetization adjusted revenue was $3.0 million in 2013, $19.1
> million in 2014, $8.2 million for the nine months ended September 30, 2014 and
> $29.7 million for the nine months ended September 30, 2015, and its exclusion
> from our ARPS calculation would have resulted in ARPS being $0.07, $0.25,

$0.43 and $0.77 lower for those periods, respectively.[6]

31.     Finally, in February 2016, in connection with the Company's Q4 2015 results conference call and 10-K year-end annual report filing, the Company published revised $500+ Subscribers and PPS figures for Q4 2013 through Q2 2015.  The revised figures revealed near-flat $500+ Subscribers growth, and PPS that experienced more quarter-to-quarter declines than quarter-to-quarter increases, in direct contradiction to Defendants' claims throughout the Class Period:





Additionally, in explaining the unexpected spike in the revised Q4 2014 PPS, from 5.0 to 5.6, the

---

[6] There was a typographical error in the Company's response.  The Company stated that exclusion of domain monetization revenue would decrease ARPS by $0.25 for 2014, and $0.43 for the nine months ended September 30, 2014.  Endurance appears to have accidentally transposed those figures: exclusion of domain monetization revenue would decrease ARPS by **$0.43 for 2014**, and **$0.25 for the nine months ended September 30, 2014**.  The fact that this was an error is confirmed by the Company's fiscal year 2015 Form 10-K, in which the Company stated that its domain monetization revenue was $19.2 million for the year ended December 31, 2014, and that its exclusion from the Company's ARPS calculation would have resulted in ARPS being $0.43 lower for that period.

Company revealed that it had eliminated inactive customers from the Company's Total Subscribers figure in Q4 2014, and that the spike was caused by the elimination of inactive customers.

32.     As a result of Defendants' wrongful acts and omissions, and the precipitous decline in the market value of the Company's securities, Plaintiffs and other Class members have suffered significant losses and damages.

## II.     JURISDICTION AND VENUE

33.     The claims asserted herein arise under Sections 11, 12(a)(2), and 15 of the Securities Act (15 U.S.C. §§ 77k, 77l(a)(2) & 77o) and Sections 10(b) and 20(a) of the Exchange Act (15 U.S.C. §§ 78j(b) & 78t(a)) and Rule 10b-5 promulgated thereunder by the SEC (17 C.F.R. § 240.10b-5).

34.     This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331, Section 22 of the Securities Act (15 U.S.C. § 77v), and Section 27 of the Exchange Act (15 U.S.C. § 78aa).

35.     Venue is proper in this Judicial District pursuant to 28 U.S.C. § 1391(b), Section 22 of the Securities Act (15 U.S.C. § 77v), and Section 27 of the Exchange Act (15 U.S.C. § 78aa).  Substantial acts in furtherance of the alleged fraud or the effects of the fraud have occurred in this Judicial District.  Many of the acts charged herein, including the preparation and dissemination of materially false and/or misleading information, occurred in substantial part in this Judicial District.  Additionally, Endurance's principal executive offices are located within this Judicial District.

36.     In connection with the acts, transactions, and conduct alleged herein, Defendants directly and indirectly used the means and instrumentalities of interstate commerce, including the

United States mail, interstate telephone communications, and the facilities of a national securities exchange.

## III.     **PARTIES**

37.     Lead Plaintiff Christopher Machado, as set forth in a previously-filed certification (Dkt. No. 1-3), incorporated by reference herein, purchased Endurance common stock during the Class Period, and suffered damages as a result of the federal securities law violations and false and/or misleading statements and/or material omissions alleged herein.

38.     Plaintiff Michael Rubin, as set forth in the accompanying certification, incorporated by reference herein, purchased Endurance common stock during the Class Period and pursuant and/or traceable to the Registration Statement issued in connection with the IPO, and suffered damages as a result of the federal securities law violations and false and/or misleading statements and/or material omissions alleged herein.

39.     Defendant Endurance is a Delaware corporation with its principal executive offices located at 10 Corporate Drive, Suite 300, Burlington, Massachusetts 01803.  During the Class Period, Endurance, through its officers and directors, published periodic filings with the SEC and made public statements that, as alleged herein, contained material misrepresentations and omissions that artificially inflated the price of the Company's common stock.  Endurance's common stock trades under the ticker symbol "EIGI" on the NASDAQ Stock Market, which is an efficient market.

40.     Defendant Hari Ravichandran was, at all relevant times, Chief Executive Officer ("CEO") of Endurance.  Ravichandran is the founder of Endurance, and has served as a director of the Company periodically since its inception, and continuously since 2007.  Defendant

Ravichandran signed the IPO Registration Statement issued in connection with the Company's IPO.

41.     Defendant Tivanka Ellawala ("Ellawala") was, at all relevant times, Chief Financial Officer ("CFO") of Endurance until September, 2015.  On August 3, 2015, Endurance announced that Ellawala would be stepping down as CFO of Endurance effective September 2015.  Ellawala actually left his position as CFO on September 15, 2015 and he was replaced by Marc Montagner.   Defendant Ellawala signed the IPO Registration Statement issued in connection with the Company's IPO.

42.     Defendants Ravichandran and Ellawala are collectively referred to hereinafter as the "Individual Defendants."   The Individual Defendants, because of their positions with the Company, possessed the power and authority to control the contents of Endurance's reports to the SEC, press releases and presentations to securities analysts, money and portfolio managers and institutional investors, *i.e.*, the market.  Each Individual Defendant, during their tenure, was provided with copies of the Company's reports and press releases alleged herein to be misleading prior to, or shortly after, their issuance and had the ability and opportunity to prevent their issuance or cause them to be corrected.  Because of their positions and access to material non-public information available to them, each of these defendants knew that the adverse facts specified herein had not been disclosed to, and were being concealed from, the public, and that the positive representations which were being made were then materially false and/or misleading.  The Individual Defendants are liable for the false statements pleaded herein, as those statements were each "group-published" information, the result of the collective actions of the Individual Defendants.

## IV.   **BACKGROUND**

43.   Endurance provides web solutions for SMBs.   The Company's products and services include domains, website builders, web hosting, email, security, storage, site backup, search engine optimization, search engine marketing, social media services, website analytics, mobile device tools and productivity, and e-commerce solutions.   Some of Endurance's products and services are subscription-based—customers pay for the product or service in installments over a period of time—and some of the Company's products are not subscription-based—the customer pays a one-time cost for the product or service.   Included in the subscription-based products is Endurance's web hosting service, and included in the non-subscription-based products are website domain names.

44.   As a publicly traded company, Endurance was required throughout the Class period to present its financial results in accordance with Generally Accepted Accounting Principles ("GAAP").   In addition to reporting its GAAP financial results, however, the Company also reported to investors throughout the Class Period a number of non-GAAP metrics that management felt were important to help investors assess the value of the Company, including ARPS, $500+ Subscribers, PPS, and Total Subscribers.   The Company stated in its fiscal year 2013 Form 10-K filed on February 28, 2014 that "[w]e monitor the non-GAAP financial measures . . . and we believe they are helpful to investors, because we believe they reflect the operating performance of our business and help management and investors gauge our ability to generate cash flow . . . ."   Because Endurance is a company that provides various web-related services, non-GAAP metrics such as ARPS, $500+ Subscribers, PPS, and Total Subscribers are particularly important to investors in assessing the value of the Company.

45.     Endurance's operating history further increases the importance of non-GAAP metrics to its investors.  Endurance has reported a net loss for fiscal years 2013 through 2015. As the Company admitted in its fiscal year 2015 Form 10-K filed on February 29, 2016:

> We have had a net loss in each year since inception. We had a net loss of $159.2 million for fiscal year 2013, a net loss of $42.8 million for fiscal year 2014 and a net loss of $25.8 million for fiscal year 2015 and we may incur losses in the future.

46.     Because Endurance was unable to generate a profit prior to and throughout the Class Period, the value that investors placed on Endurance was predicated less on the Company's present performance and more on the prospect that Endurance would grow and become profitable in the future.  Accordingly, investors in companies like Endurance are even more interested in metrics that show the future direction and growth potential of the company (including particularly the non-GAAP metrics discussed below) than investors in traditional companies with more established operating histories and track records.

A.      **Endurance's Two-Pronged Growth Strategy, And The Two Metrics That Tracked Endurance's Execution Of Its Growth Strategy: Total Subscribers, And ARPS**

47.     Throughout the Class Period, Endurance's growth strategy was centered on the two-pronged approach of (1) increasing the number of customers subscribed to the Company's products or services, and (2) increasing the average amount of revenue generated per subscriber by upselling those subscribers on one or more of the Company's purported 150 products and services.  The Company repeatedly informed investors of this strategy throughout the Class Period.  For example, Defendant Ravichandran noted the strategy during the quarterly earnings conference call with investors and analysts on February 25, 2014:

> Our company's strategy is based on two simple principles. Organically adding more high-quality subscribers to our platform and selling our subscribers more value-added services.

48.     The Company tracked and reported "Total Subscribers," a metric designed to provide insight into Endurance's execution of the first prong of its growth strategy.  "Total Subscribers" is defined in Endurance's Annual Report filed with the SEC on Form 10-K on February 28, 2014: "We define total subscribers as those that, as of the end of a period, are subscribing directly to our web presence solutions on a paid basis."  The definition also contained notable exclusions that are explained to the extent they are relevant below.

49.     The Company also tracked and reported "Average Revenue Per Subscriber" (or "ARPS"), a metric designed to provide insight into Endurance's execution of the second prong of its growth strategy.  ARPS is defined in the Endurance's Annual Report filed with the SEC on Form 10-K on February 28, 2014 as "the amount of revenue [Endurance] recognize[s] from subscribers in a period divided by the average of the number of total subscribers at the beginning of the period and at the end of the period."

50.     The Company reiterated its growth strategy, and the important role Total Subscribers and ARPS played in that strategy, on all quarterly and annual reports filed with the SEC at the end of fiscal years 2013 and throughout fiscal year 2014.  In the Company's Annual Reports filed on Form 10-K for the fiscal years 2013 and 2014 on February 28, 2014 and February 27, 2015, as well as the Quarterly Reports filed on Form 10-Q with the SEC on May 9, 2014, August 8, 2014, and November 7, 2014, the Company stated: "We believe total subscribers and ARPS will continue to be the key drivers of our revenue growth in the future, and we intend to drive growth in both of these metrics by leveraging the strengths of our approach to serving the SMB market."

51.     Defendants maintained the same growth strategy into fiscal year 2015 and emphasized the strategy during quarterly earnings conference calls with analysts and investors.

On February 23, 2015, Defendant Ravichandran stated: "We continue to focus on our two key growth drivers of adding more subscribers to our platform and increasing our average revenue per subscriber called ARPS."   Then again on May 5, 2015, Ravichandran stated: "We continue . . . supporting our key growth drivers of subscriber and ARPS growth."   Finally, on August 4, 2015, Ravichandran identified ARPS growth as key to Endurance's long-term growth and success:

> Our longer-term growth will be driven by our success in executing toward our initiatives in both the existing business and through M&A, and we see continued opportunity in the SMB market. We're very keen to capture market share by onboarding new subscribers with the introduction of new gateway products and utilizing our proven upsell model which we expect to drive better ARPS and subscriber retention over time.

**B.    Endurance Reported And Touted Its Total Subscriber And ARPS Growth Throughout The Class Period**

52.    As purported key drivers of the Company's growth, the Company tracked, reported, and highlighted Total Subscribers and ARPS growth.   Throughout the Class Period, Defendants touted the Company's Total Subscribers and ARPS growth in press releases, conference calls, and SEC filings.

53.    The Company highlighted the importance of Total Subscribers and ARPS by reporting them under the heading "Key Metrics" in all Form 10-K and Form 10-Q filings.   Total Subscribers and ARPS growth was also consistently touted in quarterly results press releases, typically appearing in the first paragraph of the press release, or alternatively, the "highlights" section of the press release.

**C.      Endurance Focused On And Touted The Number Of Subscribers Paying More Than $500 Per Year And The Average Number Of Products Per Subscriber As Drivers Of ARPS**

54.      In conjunction with ARPS, Endurance also tracked and reported the number of subscribers paying $500 or more per year for the Company's products and services ($500+ Subscribers), and the average number of products sold per subscriber (PPS).  $500+ Subscribers and PPS were metrics that purportedly provided additional insight into the Company's ability to increase ARPS.

55.      The Company claimed that increasing $500+ Subscribers and PPS would drive increases in ARPS, and, as such, the Company touted increases in $500+ Subscribers and PPS as evidence of ARPS health and growth potential.  For example, Defendant Ellawala attributed ARPS growth to $500+ Subscribers growth during the quarterly earnings conference call on February 25, 2014:

> Our average revenue per subscriber grew to $13.09 per month for the year.
> Excluding the impact of 2012 acquisition, the year-over-year growth was 9%.
> Underlying this increasing ARPS is strong growth amongst those subscribers
> paying $500 or more per year with us, which increased by approximately 20,000
> in 2013 to nearly 100,000 by the year end.

Defendant Ravichandran also referred to PPS and $500+ Subscribers as the "fundamentals behind [Endurance's] APRS growth" during the Company's May 5, 2015 conference call.

56.      The Company also pointed to $500+ Subscribers and PPS growth as ARPS drivers in the Company's SEC filings.  For example, in its Annual Report filed on Form 10-K with the SEC on February 28, 2014, the Company stated: "We expect ARPS to increase as we sell more products and services to existing subscribers . . . ."

57.      Even when the Company started to experience a slowing in its ARPS growth in Q2 2015, Ravichandran pointed to the Company's purported $500+ Subscribers and PPS figures

as reason to remain confident in the Company's future ARPS growth potential.  During the quarterly earnings conference call with investors and analysts on August 4, 2015, after reporting poor ARPS results, Defendant Ravichandran stated: "The increase in high-value subscribers and the increase in product attach rates give us confidence in our underlying ability to monetize our base of subscribers and grow ARPS over time."

## V.   ENDURANCE REPORTED FALSE AND MISLEADING METRICS IN ITS IPO REGISTRATION STATEMENT

58.    Endurance conducted its IPO of common stock on October 25, 2013.  The Company closed its Offering on October 30, 2013.  In the IPO, the Company sold 21,051,000 shares of common stock at a price of $12.00 per share, before underwriting discounts of $0.63 per share. Through the Offering, Endurance received gross proceeds of approximately $252.6 million, and net proceeds of approximately $232.1 million, after deducting underwriting discounts, commissions, and offering-related expenses payable by the Company.

59.    Endurance filed the Registration Statement for the IPO on Form S-1 with the SEC on September 9, 2013.  Defendant Ravichandran signed the Registration Statement in his capacity as President, CEO, and a Director of Endurance "[p]ursuant to the requirements of the Securities Act of 1933."  Defendant Ellawala also signed the Registration statement in his capacity as the Chief Financial Officer of Endurance "[p]ursuant to the requirements of the Securities Act of 1933."

60.    Subsequent to the filing of the Registration Statement on September 9, 2013, Endurance filed a series of five amendments to the Registration Statement.  The amendments were filed on September 13, 2013; October 8, 2013; October 11, 2013; October 15, 2013; and October 23, 2013.  As with Registration Statement, Defendants Ravichandran and Ellawala signed each amendment "[p]ursuant to the requirements of the Securities Act of 1933."  The

September 13, 2013 amendment did not contain any statements about $500+ Subscribers. However, the four other amendments did.  With Respect to $500+ Subscribers, the amendments filed on October 8, 2013; October 11, 2013; October 15, 2013; and October 23, 2013 stated, in relevant part:

> ***We intelligently engage with subscribers, consistent with their needs.***  We leverage our technology and proprietary data to identify subscriber needs and opportunities. This allows us to proactively engage with them via a myriad of customer engagement channels, including phone, email, chat, dashboards, an application marketplace and web video. This ongoing engagement allows us to offer the right solutions at the right time. We believe these capabilities, in turn, lead to greater adoption and deeper entrenchment of our technology and superior subscriber experience, thereby increasing our subscriber retention rates and revenue per subscriber. As of December 31, 2010, 2011 and 2012 and June 30, 2013, each of our subscribers had purchased an average of 2.3, 2.8, 3.3 and 3.7 add-on products from us, respectively, in addition to an initial web presence subscription. ***The number of subscribers paying $500 or more per year for our products and services as of December 31, 2010, 2011 and 2012 was approximately 61,000, 73,000 and 81,000, respectively, and increased to approximately 88,000 as of June 30, 2013***.

(Some emphasis added.)

61.     On information and belief, the $500+ Subscribers figures provided in the Registration Statement and subsequent amendments were false and misleading.  As admitted by Mr. Montagner during the Company's November 2, 2015, Q3 2015 conference call, the Company discovered an "error" when migrating data from the Company's legacy business intelligence system to an "upgraded" system, and the error impacted $500+ Subscribers.  The Company published revised $500+ Subscribers figures for Q4 2013 through Q2 2015 in its fiscal year 2015 Form 10-K filed with the SEC on February 29, 2016.  The chart contained in the 10-K illustrating the revisions is reproduced below:



62. Though the Company did not issue revised figures for Q2 2013, which would have captured and corrected the figures in the Registration Statement, the natural implication of the Company's revision is that the figures in the Registration Statement were false or misleading. First, the Company tacitly admitted that it did not review the calculations of $500+ Subscribers in the Registration Statement, stating in the February 29, 2016 10-K: "[W]e completed our review and recalculation of PPS and 500+ Subscribers for all past periods *beginning with the fourth quarter of 2013*."  (Emphasis added.)  Second, the Company claimed in the Registration Statement that $500+ Subscribers was 88,000 as of June 30, 2013.  This is simply not credible in light of the fact that the Company's revised $500+ Subscribers figures did not hit 88,000 until Q4 2014.[7]  The only reasonable inference from the Company's revision of $500+ Subscribers, and the disclosures surround that revision, is that the $500+ Subscribers figures in the Registration Statement were overstated, but that the Company simply neglected to correct these errors (perhaps in an effort to avoid conceding strict liability under the Securities Act).

---

[7] It would be incredible to claim that $500+ Subscribers hit 88,000 at June 30, 2013, then plummeted to 82,000 as of December 31, 2013, and then climbed back up to 88,000 by December 31, 2014.  To the best of Plaintiffs' knowledge, the Company does not put forward such a narrative.  Moreover, if there were such a dramatic drop in the Company's previously reported $500+ Subscribers figures between June 30, 2013 and the October 25, 2013 IPO, Endurance would have been obligated to disclose this fact/trend in the Registration Statement and failure to do so would render the Registration Statement materially false and misleading.

63.     The Registration Statement (including every amendment, except for the September 13, 2013 amendment) also reported Total Subscribers as of the end of 2010, 2011, 2012, and June 30, 2013:

> As of December 31, 2010, 2011 and 2012, we had 2.5 million, 2.9 million and 3.2 million total subscribers, respectively. We believe we added subscribers over these periods by refining our customer acquisition approach, expanding our portfolio of brands and offering compelling products and services. Total subscribers increased from 3.1 million as of June 30, 2012 to 3.4 million as of June 30, 2013, primarily as a result of expanding our sales and our support organizations and training them to better utilize our data and analytical capabilities.

64.     On information and belief, the Total Subscribers figures provided in the Registration Statement and subsequent amendments were false and misleading because the figure included "inactive customers" who should not have been included. As the Company later disclosed, inactive customers were eliminated from the Company's Total Subscribers figure in the fourth quarter of 2014. On information and belief, those inactive customers were included in the Total Subscribers figure presented in the Registration Statement.

65.     On October 24, 2013, the SEC filed a "Notice of Effectiveness" rendering the Company's Registration Statement, including the subsequent amendments, effective.

66.     On October 25, 2013, Endurance issued a press release entitled "Endurance International Group Prices Initial Public Offering." Therein, the Company announced the pricing of its initial public offering of 21,051,000 shares of common stock at a price to the public of $12.00 per share. Endurance also stated that the shares were expected to begin trading on the NASDAQ Global Select Market on October 25, 2013 under the symbol "EIGI." The press release also directed investors' attention to a written prospectus (the "Prospectus") which could be obtained from Goldman, Sachs & Co.

67.     The Offering Prospectus, which forms part of the Registration Statement for purposes of the Securities Act, and which was filed with the SEC on October 25, 2013, reaffirmed the $500+ Subscribers figures provided in the amendments to the Registration Statement.  In the Prospectus, the Company, in relevant part, stated:

> ***We intelligently engage with subscribers, consistent with their needs.***  We leverage our technology and proprietary data to identify subscriber needs and opportunities. This allows us to proactively engage with them via a myriad of customer engagement channels, including phone, email, chat, dashboards, an application marketplace and web video. This ongoing engagement allows us to offer the right solutions at the right time. We believe these capabilities, in turn, lead to greater adoption and deeper entrenchment of our technology and superior subscriber experience, thereby increasing our subscriber retention rates and revenue per subscriber. As of December 31, 2010, 2011 and 2012 and June 30, 2013, each of our subscribers had purchased an average of 2.3, 2.8, 3.3 and 3.7 add-on products from us, respectively, in addition to an initial web presence subscription. ***The number of subscribers paying $500 or more per year for our products and services as of December 31, 2010, 2011 and 2012 was approximately 61,000, 73,000 and 81,000, respectively, and increased to approximately 88,000 as of June 30, 2013***.

(Some emphasis added.)

68.     The Offering Prospectus also affirmed the Total Subscribers figures provided in the original Registration Statement and amendments:

> As of December 31, 2010, 2011 and 2012, we had 2.5 million, 2.9 million and 3.2 million total subscribers, respectively. We believe we added subscribers over these periods by refining our customer acquisition approach, expanding our portfolio of brands and offering compelling products and services. Total subscribers increased from 3.1 million as of June 30, 2012 to 3.4 million as of June 30, 2013, primarily as a result of expanding our sales and our support organizations and training them to better utilize our data and analytical capabilities.

69.     On information and belief, the $500+ Subscribers and Total Subscribers figures provided in the Prospectus were false and misleading for the same reasons provided in ¶¶61-62, 64, *supra*.

70.     The misrepresentations regarding $500+ Subscribers and Total Subscribers were material. As discussed, *infra*, $500+ Subscribers and Total Subscribers were metrics that purported to provide important information to investors regarding the Company's execution of its growth strategy.   Moreover, the Company statements in the Registration Statement, itself, confirm the materiality of these misstatements.  With respect to $500+ Subscribers, the Company held the metrics up as evidence that the Company was "leverag[ing] [its] technology and proprietary data to identify subscriber needs and opportunities" which allowed the Company to "engage with [customers] via a myriad of customer engagement channels" to, in turn, "offer the right solutions at the right time," and that these capabilities "lead to greater adoption and deeper entrenchment of [Endurance's] technology and superior subscriber experience, thereby increasing [the Company's] subscriber retention rates and revenue per subscriber."  With respect to Total Subscribers, Endurance stated that "total subscribers is an indicator of the scale of our platform and our ability to expand our subscriber base, and is a critical factor in our ability to monetize the opportunity we have identified in serving the SMB market."

71.     Under applicable SEC rules and regulations, the Company was required to disclose in the Registration Statement known trends, events or uncertainties that were having, and were reasonably likely to have, an impact on the Company's continuing operations.   The Company was also required to accurately report those metric figures it chose to include.  Here, however, the Registration Statement was, at the very least, negligently prepared and, as a result, contained untrue statements of material facts or omitted to state other facts necessary to make the statements made not misleading.   As such, the Registration Statement was not prepared in accordance with applicable SEC rules and regulations.

72.     By July 1, 2016, the Company's stock price had declined to $8.99 per share, which is $3.01 (or more than 25%) below the IPO price of $12.00 per share.  As such, investors that purchased shares pursuant or traceable to the Registration Statement have suffered damages under the Securities Act.

## VI.   DEFENDANTS REPORTED FALSE AND MISLEADING METRICS THROUGHOUT THE CLASS PERIOD

73.     Over the course of the Class Period, Defendants manipulated metric definitions and data, and concealed material events that affected the Company's key growth metrics (Total Subscribers, ARPS, $500+ Subscribers, and PPS) in order to conceal the Company's poor underlying economic realities.  The Company's scheme resulted in the publication of false and/or misleading Total Subscribers and ARPS figures—the two metrics at the heart of the Company's growth strategy—as well as $500+ Subscribers and PPS, the two metrics that purportedly provided insight into the Company's ARPS health and drove ARPS growth.

### A.     The Company Published False And/Or Misleading Total Subscribers Figures Because The Company Failed To Inform Investors Of Inactive Customers Improperly Included In The Count, And Their Subsequent Exclusion In Q4 2014

74.     As described above in ¶¶5, 16-17, growing the Company's Total Subscribers was one of two prongs in the Company's two-pronged growth strategy.  As such, the Company routinely touted Total Subscribers growth to investors in the Company's quarterly results press releases and on investor conference calls.

75.     From Q2 2013 through Q3 2015, the Company reported steady Total Subscribers growth:



76.    In reality, however, the Company's Q2 2013 through Q3 2014 Total Subscribers figures were overstated because they improperly included "inactive customers."  As admitted by the Company in its Annual Report filed on Form 10-K with the SEC on February 29, 2016, the Company adjusted its Total Subscribers figure in Q4 2014 to "eliminate inactive customers that were first identified as inactive in that quarter."

77.    Moreover, the Company's Q4 2014 Total Subscribers figures, and all subsequent Total Subscribers figures reported during the Class Period, were misleading because the Company failed to inform investors of the Q4 2014 elimination of inactive customers from the figures until February of 2016.  As such, the Total Subscriber figures post-elimination of inactive customers were not directly comparable to pre-elimination Total Subscribers figures, and it was misleading for the Company to compare them (explicitly or implicitly).

78.    The SEC has indicated that such undisclosed adjustments in analogous contexts can render metrics misleading.  In answering the question: "Can a non-GAAP measure be misleading if it is presented inconsistently between periods?" the SEC answered:

Yes. For example, a non-GAAP measure that adjusts a particular charge or gain in the current period and for which other, similar charges or gains were not also

adjusted in prior periods could violate Rule 100(b) of Regulation G unless the change between periods is disclosed and the reasons for it explained. In addition, depending on the significance of the change, it may be necessary to recast prior measures to conform to the current presentation and place the disclosure in the appropriate context.[8]

79.    Not only did the Company fail to inform investors of the adjustment until February 2016, but the Company deceptively changed the definition of its Total Subscribers metric in Q4 2014 to include more subscribers, and thus offset and conceal from investors the elimination of inactive subscribers from Total Subscribers.  Defendants slipped a change in the definition of Total Subscribers into the Company's 2014 annual report filed with the SEC on Form 10-K on February 27, 2015, which stated: "[I]n the fourth quarter of 2014, we modified our definition of total subscribers to better reflect our expanding product mix by including paid subscribers to all of our subscription-based products, rather than limiting the definition to paid subscribers to our web presence solutions."  However, the Company failed to mention, let alone discuss, this important change in the definition of a metric that the company described as "key" to Endurance's growth on the Q4 2014 conference call with investors.  In fact, when discussing the Company's relatively weak Total Subscriber growth in Q4 2014 on the call, instead of informing investors of the elimination of inactive customers, Defendant Ellawala blamed the weak growth on "seasonality": "[A]s a reminder, our Q4 subscriber adds are typically down sequentially from other quarters due to end of year seasonality."  The elimination of inactive customers was offset by the change in the definition of Total Subscribers.  As the Company eventually disclosed in the 10-K filed February 29, 2016:  "The impact of [the elimination of inactive customers] on our total subscriber count in [Q4 2014] was offset by our inclusion,

---

[8]    Compliance    &    Disclosure    Interpretations    ("C&DIs"),    available    at https://www.sec.gov/divisions/corpfin/guidance/nongaapinterp.htm  (last  visited  June  23, 2017).

beginning in the fourth quarter of 2014, of customers of subscription-based products other than our hosted web presence solutions . . . ."   Thus, the expansion of the definition of Total Subscribers concealed the extent to which the Company had purged inactive customers in Q4 2014, which, as discussed in ¶¶15-19, had the effect of artificially boosting ARPS and PPS in Q4 2014, right before Defendants Ravichandran and Ellawala sold stock at artificially inflated prices in March 2015.

80.     Through the elimination of inactive customers, and manipulation of the Company's Total Subscribers definition, the Defendants were able to fine-tune the results they wanted, when they wanted them.  Inclusion of inactive customers inflated the Company's Total Subscriber count when Defendants desired that result, and the subsequent elimination of inactive customers, while decreasing Total Subscribers, improved the Company's ARPS when Defendants desired *that* result.   The elimination of inactive customers decreased Total Subscribers, which is included in the calculation of the denominator of the Company's ARPS metric, thus increasing ARPS.

81.     Defendants knew, or recklessly disregarded the fact that their representations of Q2 2013 through Q3 2014 Total Subscribers figures were materially false and/or misleading since: (1) Defendants would have been closely monitoring, or were deliberately reckless in failing to monitor, a metric that quantifies one prong of Endurance's two-pronged growth strategy; and (2) Defendants shifted the definition of Total Subscribers in an attempt to conceal the elimination of inactive customers, which indicates that Defendants knew, or were deliberately reckless in not knowing, that the Company was improperly including inactive customers in Total Subscribers.

82.     Defendants knew, or recklessly disregarded the fact that their representations of Q4 2014 through Q3 2015 Total Subscribers figures were materially misleading for the reasons described in ¶81 and because: (1) Defendants eliminated inactive customers from a metric that represents one prong of Endurance's two-pronged growth strategy; (2) Defendants changed the definition of Total Subscribers or, at the very least, knew of the change, since Total Subscribers is an important metric—representing one prong of Endurance's two-pronged growth strategy; and (3) Defendants knew or recklessly disregarded the fact that the undisclosed elimination of inactive subscribers distorted any explicit or implicit comparisons between pre Q4 2014 and post Q4 2014 Total Subscribers figures.

**B.      The Company Published False And/Or Misleading ARPS Figures Because The Company Failed To Inform Investors That An Increasing Percentage Of The Company's ARPS Was Due To "Domain Monetization" And Not Organic Subscriber Revenue Growth**

83.     As described above in ¶¶5-15, growing the Company's ARPS was one of two prongs in the Company's growth strategy.  As such, the Company routinely touted ARPS growth to investors in the Company's quarterly results press releases and on investor conference calls.

84.     From Q2 2013 through Q3 2015, the Company reported the following ARPS results demonstrating sequential quarterly growth in ARPS up to Q4 2014, and then decreasing sequential quarterly ARPS from Q1 2015 onward:



85.     However, the Company failed to disclose that an increasing percentage of the Company's ARPS was due to domain-related revenue.  While the Company was including revenue generated from domain-related sales in the ARPS revenue numerator, the Company was not including domain-related and domain-only customers in the denominator—since domain-only customers are not "subscribers."   In November 2015, the SEC requested a clarifying statement from Endurance regarding the amount of ARPS actually attributable to subscribers. As admitted by the Company in its SEC response letter dated December 9, 2015, the Company stated that "the contribution of domain monetization activities to our adjusted revenue has been insignificant, but has been increasing beginning in 2014 due primarily to our acquisition of BuyDomains in September 2014."   Getting into the specific figures, the Company stated: "Our domain monetization adjusted revenue was $3.0 million in 2013, $19.1 million in 2014, $8.2 million for the nine months ended September 30, 2014 and $29.7 million for the nine months ended September 30, 2015, and *its exclusion from our ARPS calculation would have resulted*

*in ARPS being $0.07, $0.25, $0.43 and $0.77 lower for those periods, respectively*."[9] (Emphasis added.)

86.     By failing to inform investors that an increasing portion of ARPS was attributable to non-subscriber domain-related revenue after the acquisition of BuyDomains in September 2014, Defendants published ARPS results that were misleading in that the metric was not truly "an indicator of [Endurance's] ability to optimize [its] mix of products and services and pricing and sell products and services to new and existing subscribers" as claimed by the Company. Rather, ARPS was a metric so distorted by the Company's product mix shift to domains and domain-related products, that it provided little insight into the Company's ability to grow subscriber revenue.  In fact, absent domain-related revenue's impact on ARPS, the drop in ARPS would have been far more substantial in Q1 2015 through the end of the Class Period, and would have given investors a clear indication that the Company was in major trouble.

87.     Defendants knew, or recklessly disregarded the fact that their representations of ARPS after the acquisition of BuyDomains in September 2014 were materially false and/or misleading because: (1) Defendants would have been closely monitoring, or were deliberately reckless in failing to monitor, a metric that quantifies one prong of Endurance's two-pronged growth strategy; (2) Defendants knew, or were reckless in not knowing, that domain-related revenue was included in ARPS, but that domain-only customers were not counted as subscribers—thus causing an ARPS inflation; and (3) Defendants knew, or were reckless in not knowing that domain-related revenue was accounting for an increasing portion of Endurance's total revenue.

---

[9] The Company accidentally transposed the "$0.25" and "$0.43" figures.  *See* n.6, s*upra*.

**C.      The Company Published Inflated $500+ Subscribers Figures And PPS Figures Which Inaccurately Portrayed A Trend Of Steady Growth**

88.      Growing the Company's ARPS was one of two prongs in the Company's growth strategy, and as described in ¶¶6, 54-57, $500+ Subscribers and PPS were indicators of ARPS health and drivers of ARPS growth.  As such, the Company routinely touted $500+ Subscribers and PPS growth to investors on the Company's quarterly investor conference calls and in certain SEC filings.

89.      From Q2 2013 through Q2 2015, the Company reported the following $500+ Subscribers results:



90.      However, the Company failed to disclose that its published $500+ Subscribers results were overstated.  The Company published $500+ Subscribers figures that grew from 88,000 to 150,000 between Q2 2013 and Q2 2015 (70.4% growth over the Class period), and 100,000 to 150,000 between Q4 2013 and Q2 2015 (50% growth over that period).  In reality, and as disclosed by the Company in February 2016, $500+ Subscribers grew from 82,000 to 92,000 between Q4 2013 and Q2 2015 (only 12.2% growth, compared to the 50% growth

previously reported). The Company published a chart in February 2016, illustrating the overstatement:



91. In addition, from Q2 2013 through Q2 2015, the Company reported the following PPS results:



92. However, the Company failed to disclose that its published PPS results were misleading because PPS was not growing in a perfect stepping pattern/trend as portrayed by the Company. As disclosed by the Company in February 2016, the Company experienced more quarter-to-quarter PPS declines than increases. The Company published a chart in February 2016, illustrating the extent of the false PPS representation:



93.     The Company first revealed that its previously issued $500+ Subscribers and PPS figures were false during the Company's quarterly investor conference call on November 2, 2015.  On that call, the Company attributed the false figures to an "error" in the Company's business intelligence system, but did not elaborate on what the error was.  The Company disclosed that $500+ Subscribers, PPS, and MRR were affected by the error.  Mr. Montagner noted during the conference call that the business intelligence system was "completely separate from the ERP [enterprise resource planning] system that produces [Endurance's] financial and **subscriber data**" and that, as such, the error "[did] not impact [Endurance's] GAAP financial results, adjusted revenue, adjusted EBITDA, free cash flow, or unlevered free cash flow metrics," nor "subscriber count, churn, or unit economics."  (Emphasis added).

94.     The Company's revised $500+ Subscribers and PPS figures seem to be derived from the Company's main billing system rather than a corrected version of business intelligence system.  The charts that the Company published illustrating the original figures compared to the revised figures is accompanied by a footnote that states that the revised figures are "[b]ased on data for our HostGator, BlueHost, iPage, Fatcow, Homestead, A Small Orange and Domain.com brands and the smaller brands that **share a billing platform with those brands**, which together accounted for approximately 80% of our revenue for the twelve months ended December 31, 2015." (Emphasis added.)   The footnote also states that "[p]reviously disclosed and revised

figures are not directly comparable due to inconsistencies which have been corrected in the revised figures."

95.     Despite having access to "subscriber data" through the Company's ERP system and subscriber data through the Company's billing systems (which is possibly tied-in or otherwise related to the ERP system) from which it could have derived $500+ Subscribers and PPS, the Company instead relied on the business intelligence system, which the Company did not rely on for the vast majority of its other metrics and financial data.  Defendants chose to rely on the business intelligence system because it produced the figures that Defendants wanted.  At the very least, Defendants were reckless in publishing $500+ Subscribers and PPS figures without checking them against the systems from which the Company produced the majority of its other metrics and financial data.

96.     Defendants knew, or recklessly disregarded the fact that their representations of $500+ Subscribers and PPS were materially false and/or misleading because: (1) Defendants would have been closely monitoring, or were deliberately reckless in failing to monitor, metrics that drive one prong (ARPS) of Endurance's two-pronged growth strategy; and (2) Defendants had multiple systems from which Defendants could have derived subscriber data, including $500+ Subscribers and PPS, but knowingly chose to use the business intelligence system which produced inflated $500+ Subscribers, or were at least deliberately reckless in not cross-checking the figures produced by the business intelligence system against the Company's other subscriber data sources.

**VII.** **DEFENDANTS' MATERIALLY FALSE AND/OR MISLEADING STATEMENTS REGARDING TOTAL SUBSCRIBERS, ARPS, $500+ SUBSCRIBERS, AND PPS ISSUED DURING THE CLASS PERIOD**

97.     During the Class Period, Endurance filed periodic reports with the SEC, including Quarterly Reports on Form 10-Q and Annual Reports on Form 10-K, containing the Company's reported financial statements and metric figures.  The following chart identifies the filing date, signatories, and period covered by each report filed with the SEC during the Class Period:

| Form | Period | Date Filed | Signatories | Referred to Below As |
|------|--------|------------|-------------|----------------------|
| 10-Q | 2013 Fiscal Third Quarter | 12/6/2013 | Ellawala | Q3 2013 Form 10-Q |
| 10-K | 2013 Fiscal Year | 2/28/2014 | Ravichandran | FY 2013 Form 10-K |
| 10-Q | 2014 Fiscal First Quarter | 5/9/2014 | Ellawala | Q1 2014 Form 10-Q |
| 10-Q | 2014 Fiscal Second Quarter | 8/8/2014 | Ellawala | Q2 2014 Form 10-Q |
| 10-Q | 2014 Fiscal Third Quarter | 11/7/2014 | Ellawala | Q3 2014 Form 10-Q |
| 10-K | 2014 Fiscal Year | 2/27/2015 | Ravichandran | FY 2014 Form 10-K |
| 10-Q | 2015 Fiscal First Quarter | 5/11/2015 | Ellawala | Q1 2015 Form 10-Q |
| 10-Q | 2015 Fiscal Second Quarter | 8/7/2015 | Ellawala | Q2 2015 Form 10-Q |
| 10-Q | 2015 Fiscal Third Quarter | 11/6/2015 | Montagner[10] | Q3 2015 Form 10-Q |

98.     Endurance issued the following press releases during the Class Period.  These press releases highlighted metrics and figures related to the Company's performance, including Total Subscribers and ARPS.  The following chart identifies the issue date and period covered by each relevant press release issued during the Class Period:

---

[10] Mr. Montagner is not a defendant.  *See* ¶41.

| Period | Date | Referred to Below As |
|---|---|---|
| 2013 Fiscal Third Quarter | 12/3/2013 | Q3 2013 PR |
| 2013 Fiscal Year | 2/25/2014 | FY 2013 PR |
| 2014 Fiscal First Quarter | 5/6/2014 | Q1 2014 PR |
| 2014 Fiscal Second Quarter | 8/7/2014 | Q2 2014 PR |
| 2014 Fiscal Third Quarter | 11/4/2014 | Q3 2014 PR |
| 2014 Fiscal Year | 2/23/2015 | FY 2014 PR |
| 2015 Fiscal First Quarter | 5/5/2015 | Q1 2015 PR |
| 2015 Fiscal Second Quarter | 8/4/2015 | Q2 2015 PR |
| 2015 Fiscal Third Quarter | 11/2/2015 | Q3 2015 PR |

99.     Endurance held the following conference calls with analysts and investors after the conclusion of each fiscal quarter and fiscal year.  During the conference calls, Defendants made false and/or misleading statements regarding Total Subscribers, ARPS, $500+ Subscribers and PPS.  The following chart identifies the date of the call, and period covered by each relevant conference call held during the Class Period:

| Period | Date | Referred to Below As |
|---|---|---|
| 2013 Fiscal Third Quarter | 12/3/2013 | Q3 2013 CC |
| 2013 Fiscal Year | 2/25/2014 | FY 2013 CC |
| 2014 Fiscal First Quarter | 5/6/2014 | Q1 2014 CC |
| 2014 Fiscal Second Quarter | 8/7/2014 | Q2 2014 CC |
| 2014 Fiscal Third Quarter | 11/4/2014 | Q3 2014 CC |
| 2014 Fiscal Year | 2/23/2015 | FY 2014 CC |
| 2015 Fiscal First Quarter | 5/5/2015 | Q1 2015 CC |
| 2015 Fiscal Second Quarter | 8/4/2015 | Q2 2015 CC |
| 2015 Fiscal Third Quarter | 11/2/2015 | Q3 2015 CC |

100.     Endurance's quarterly and annual reports filed during the Class Period, as well as Endurance's quarterly press releases and conference calls included materially false and/or misleading statements because, as set forth herein, Defendants issued false and/or misleading

Total Subscribers, ARPS, $500+ Subscribers, and PPS figures, as well as made materially false and/or misleading Statements About Those Metrics.

**A.     Defendants' Materially False And/Or Misleading Statements Regarding The Second Fiscal Quarter Of 2013**

*Total Subscribers*

101.    Defendants issued materially false and/or misleading statements regarding Total Subscribers for Q2 2013 in the Company's Registration Statement.   In the Registration Statement, the Company reported Total Subscribers of 3.37 million as of June 30, 2013.

102.    Defendants' statements regarding Total Subscribers were materially false and/or misleading because the Company improperly included inactive customers in the reported figure as explained in ¶76.

103.    Defendants' statements regarding Total Subscribers were made with scienter since: (1) Defendants would have been closely monitoring, or were deliberately reckless in failing to monitor, a metric that quantifies one prong of Endurance's two-pronged growth strategy; and (2) Defendants, when they eliminated inactive customers from the Total Subscribers figure for Q4 2014, shifted the definition of Total Subscribers in an attempt to conceal the elimination of inactive customers, which indicates a culpable state of mind and that Defendants knew, or were deliberately reckless in not knowing, that the Company was improperly including inactive customers in Total Subscribers as explained in ¶¶76-80.

*$500+ Subscribers*

104.    Defendants issued materially false and/or misleading statements regarding $500+ Subscribers in the Registration Statement.  In the Registration Statement, the Company stated: "The number of subscribers paying $500 or more per year for our products and services as of

December 31, 2010, 2011 and 2012 was approximately 61,000, 73,000 and 81,000, respectively, and increased to approximately 88,000 as of June 30, 2013."

105.    Defendants' statements regarding $500+ Subscribers were materially false and/or misleading because the figures were overstated, and the rate of growth was overstated as explained in ¶¶89-90.

106.    Defendants' statements regarding $500+ Subscribers were made with scienter since: (1) Defendants would have been closely monitoring, or were deliberately reckless in failing to monitor, a metric that drives one prong (ARPS) of Endurance's two-pronged growth strategy; and (2) Defendants had multiple systems from which Defendants could have derived subscriber data, including $500+ Subscribers, but knowingly chose to use the faulty business intelligence system which produced inflated $500+ Subscribers, or were at least deliberately reckless in not cross-checking the figures produced by the business intelligence system against the Company's other subscriber data sources as explained in ¶¶93-96.

**B.      Defendants' Materially False And/Or Misleading Statements Regarding The Third Fiscal Quarter Of 2013#**

*Total Subscribers*

107.    Defendants issued materially false and/or misleading statements regarding Total Subscribers in the Company's Q3 2013 PR, Q3 2014 CC, and Q3 2013 Form 10-Q.  During the Q3 2013 CC, Defendant Ravichandran stated: "For the first nine months of the year" the Company "organically grew our subscriber base by 217,000, bringing the total to over 3.4 million."  In the Company's Q3 2013 PR and Q3 2013 Form 10-Q, the Company reported Total Subscribers of 3.440 million.

108.    Defendants' statements regarding Total Subscribers were materially false and/or misleading because the Company improperly included inactive customers in the reported figure as explained in ¶76.

109.    Defendants' statements regarding Total Subscribers were made with scienter since: (1) Defendants would have been closely monitoring, or were deliberately reckless in failing to monitor, a metric that quantifies one prong of Endurance's two-pronged growth strategy; and (2) Defendants shifted the definition of Total Subscribers in an attempt to conceal the elimination of inactive customers, which indicates that Defendants knew, or were deliberately reckless in not knowing, that the Company was improperly including inactive customers in Total Subscribers as explained in ¶¶76-80.

### C.    Defendants' Materially False And/Or Misleading Statements Regarding Fiscal Year 2013

*Total Subscribers*

110.    Defendants issued materially false and/or misleading statements regarding Total Subscribers in the Company's FY 2013 PR, FY 2014 CC, and FY 2013 Form 10-K.  During the FY 2013 CC, Defendant Ravichandran stated: "during the year, we added 279,000 net new subscribers on an organic basis, bringing our year-end total to just over 3.5 million . . . ."  In the Company's FY 2013 PR and FY 2013 Form 10-K, the Company reported Total Subscribers of 3.502 million.

111.    Defendants' statements regarding Total Subscribers were materially false and/or misleading because the Company improperly included inactive customers in the reported figure as explained in ¶76.

112.    Defendants' statements regarding Total Subscribers were made with scienter since: (1) Defendants would have been closely monitoring, or were deliberately reckless in

failing to monitor, a metric that quantifies one prong of Endurance's two-pronged growth strategy; and (2) Defendants shifted the definition of Total Subscribers in an attempt to conceal the elimination of inactive customers, which indicates that Defendants knew, or were deliberately reckless in not knowing, that the Company was improperly including inactive customers in Total Subscribers as explained in ¶¶76-80.

### *$500+ Subscribers*

113.    Defendants issued materially false and/or misleading statements regarding $500+ Subscribers during the Company's FY 2013 CC.  During the FY 2013 CC, Defendant Ellawala stated "Our average revenue per subscriber grew to $13.09 per month for the year.  Excluding the impact of 2012 acquisition, the year-over-year growth was 9%. ***Underlying this increasing ARPS is strong growth amongst those subscribers paying $500 or more per year with us, which increased by approximately 20,000 in 2013 to nearly 100,000 by the year end***." (Emphasis added).  In the Company's FY 2013 Form 10-K, the Company stated "The number of subscribers paying $500 or more per year for our products and services grew from approximately 73,000 as of December 31, 2011 to nearly 100,000 as of December 31, 2013."

114.    Defendants' statements regarding $500+ Subscribers were materially false and/or misleading because the FY 2013 figure was overstated by approximately 17,000 subscribers, and the rate of growth was overstated as admitted by the Company and explained in ¶¶89-90.

115.    Defendants' statements regarding $500+ Subscribers were made with scienter since: (1) Defendants would have been closely monitoring, or were deliberately reckless in failing to monitor, a metric that drives one prong (ARPS) of Endurance's two-pronged growth strategy; and (2) Defendants had multiple systems from which Defendants could have derived subscriber data, including $500+ Subscribers, but knowingly chose to use the faulty business

intelligence system which produced inflated $500+ Subscribers, or were at least deliberately reckless in not cross-checking the figures produced by the business intelligence system against the Company's other subscriber data sources as explained in ¶¶93-96.

    **D.**    **Defendants' Materially False And/Or Misleading Statements Regarding The First Fiscal Quarter Of 2014**

*Total Subscribers*

116.    Defendants issued materially false and/or misleading statements regarding Total Subscribers in the Company's Q1 2014 PR, Q1 2014 CC, and Q1 2014 Form 10-Q.  During the Q1 2014 CC, Defendant Ravichandran stated: "In the first quarter we organically added 101,000 net new subscribers to our platform bringing our total subscribers to over 3.6 million."  In the Company's Q1 2014 PR and Q1 2014 Form 10-Q, the Company reported Total Subscribers of 3.654 million.

117.    Defendants' statements regarding Total Subscribers were materially false and/or misleading because the Company improperly included inactive customers in the reported figure as explained in ¶76.

118.    Defendants' statements regarding Total Subscribers were made with scienter since: (1) Defendants would have been closely monitoring, or were deliberately reckless in failing to monitor, a metric that quantifies one prong of Endurance's two-pronged growth strategy; and (2) Defendants shifted the definition of Total Subscribers in an attempt to conceal the elimination of inactive customers, which indicates that Defendants knew, or were deliberately reckless in not knowing, that the Company was improperly including inactive customers in Total Subscribers as explained in ¶¶76-80.

*$500+ Subscribers*

119.    Defendants issued materially false and/or misleading statements regarding $500+ Subscribers in the Company's Q1 2014 CC.  During the Q1 2014 CC, Defendant Ellawala stated: "the total number of subscribers paying us $500 or more per year also grew to 106,000, 6,000 more than just 3 months prior."

120.    Defendants' statements regarding $500+ Subscribers were materially false and/or misleading because the Q1 2014 figure was overstated by approximately 21,000 subscribers, and the rate of growth was overstated as admitted by the Company and explained in ¶¶89-90.

121.    Defendants' statements regarding $500+ Subscribers were made with scienter since: (1) Defendants would have been closely monitoring, or were deliberately reckless in failing to monitor, a metric that drives one prong (ARPS) of Endurance's two-pronged growth strategy; and (2) Defendants had multiple systems from which Defendants could have derived subscriber data, including $500+ Subscribers, but knowingly chose to use the faulty business intelligence system which produced inflated $500+ Subscribers, or were at least deliberately reckless in not cross-checking the figures produced by the business intelligence system against the Company's other subscriber data sources as explained in ¶¶93-96.

*PPS*

122.    Defendants issued materially false and/or misleading statements regarding PPS in the Company's Q1 2014 CC.  During the Q1 2014 CC, Defendant Ellawala stated: "Increased product adoption rate again led this growth as the number of additional products sold per subscriber increased to 4.3 from 3.5 products per subscriber in the first quarter of 2013."

123.    Defendants' statement regarding PPS was materially false and/or misleading because the figure represented a Q4 2013 to Q1 2014 PPS growth of 0.2, when, in reality, PPS

grew only 0.1 over that period as admitted by the Company and explained in more detail in ¶¶91-92.

124.     Defendants' statement regarding PPS was made with scienter since: (1) Defendants would have been closely monitoring a metric that drives one prong (ARPS) of Endurance's two-pronged growth strategy; and (2) Defendants had multiple systems from which Defendants could derive subscriber data, including PPS, but knowingly chose to use the faulty business intelligence system which produced purportedly consistent PPS growth, or were at least deliberately reckless in not cross-checking the figures produced by the business intelligence system against the Company's other subscriber data sources as explained in ¶¶93-96.

**E.     Defendants' Materially False And/Or Misleading Statements Regarding The Second Fiscal Quarter Of 2014**

*Total Subscribers*

125.     Defendants issued materially false and/or misleading statements regarding Total Subscribers in the Company's Q2 2014 PR, Q2 2014 CC, and Q2 2014 Form 10-Q.  During the Q2 2014 CC, Defendant Ravichandran stated: "During Q2, we added approximately 93,000 net paying subscribers, bringing our total subscribers on platform to over 3.7 million."   In the Company's Q2 2014 PR and Q2 2014 Form 10-Q, the Company reported Total Subscribers of 3.747 million.

126.     Defendants' statements regarding Total Subscribers were materially false and/or misleading because the Company improperly included inactive customers in the reported figure as explained in ¶76.

127.     Defendants' statements regarding Total Subscribers were made with scienter since: (1) Defendants would have been closely monitoring, or were deliberately reckless in failing to monitor, a metric that quantifies one prong of Endurance's two-pronged growth

strategy; and (2) Defendants shifted the definition of Total Subscribers in an attempt to conceal the elimination of inactive customers, which indicates that Defendants knew, or were deliberately reckless in not knowing, that the Company was improperly including inactive customers in Total Subscribers as explained in ¶¶76-80.

### *$500+ Subscribers*

128.   Defendants issued materially false and/or misleading statements regarding $500+ Subscribers in the Company's Q2 2014 CC.  During the Q2 2014 CC, Defendant Ellawala stated: "The number of subscribers who spend more than $500 per year on our products and services also increased to 114,000, an increase of $8,000 over the last quarter and a 14,000 increase over the end of last year."

129.   Defendants' statements regarding $500+ Subscribers were materially false and/or misleading because the Q2 2014 figure was overstated by approximately 29,000 subscribers, and the rate of growth was overstated as admitted by the Company and explained in ¶¶89-90.

130.   Defendants' statements regarding $500+ Subscribers were made with scienter since: (1) Defendants would have been closely monitoring, or were deliberately reckless in failing to monitor, a metric that drives one prong (ARPS) of Endurance's two-pronged growth strategy; and (2) Defendants had multiple systems from which Defendants could have derived subscriber data, including $500+ Subscribers, but knowingly chose to use the faulty business intelligence system which produced inflated $500+ Subscribers, or were at least deliberately reckless in not cross-checking the figures produced by the business intelligence system against the Company's other subscriber data sources as explained in ¶¶93-96.

*PPS*

131.    Defendants issued materially false and/or misleading statements regarding PPS in the Company's Q2 2014 CC.  During the Q2 2014 CC, Defendant Ellawala stated: "product adoption rate increased growing to an average of 4.5 products per subscriber in the quarter from 3.7 products per subscriber in the second quarter of 2013."

132.    Defendants' statement regarding PPS was materially false and/or misleading because the figure represented a Q1 2014 to Q2 2014 PPS growth of 0.2, when, in reality, PPS declined by 0.1 over that period as admitted by the Company and laid out in ¶¶91-92.

133.    Defendants' statement regarding PPS was made with scienter since: (1) Defendants would have been closely monitoring a metric that drives one prong (ARPS) of Endurance's two-pronged growth strategy; and (2) Defendants had multiple systems from which Defendants could derive subscriber data, including PPS, but knowingly chose to use the faulty business intelligence system which produced purportedly consistent PPS growth, or were at least deliberately reckless in not cross-checking the figures produced by the business intelligence system against the Company's other subscriber data sources as explained in ¶¶93-96.

### F.    Defendants' Materially False And/Or Misleading Statements Regarding The Third Fiscal Quarter Of 2014

*Total Subscribers*

134.    Defendants issued materially false and/or misleading statements regarding Total Subscribers in the Company's Q3 2014 PR, Q3 2014 CC, and Q3 2014 Form 10-Q.  During the Q3 2014 CC, Defendant Ravichandran stated: "During Q3, our number of paying subscribers increased by approximately 94,000, bringing our total paying subscribers on platform to over 3.8 million."  In the Company's Q3 2014 PR and Q3 2014 Form 10-Q, the Company reported Total Subscribers of 3.841 million.

135.    Defendants' statements regarding Total Subscribers were materially false and/or misleading because the Company improperly included inactive customers in the reported figure as explained in ¶76.

136.    Defendants' statements regarding Total Subscribers were made with scienter since: (1) Defendants would have been closely monitoring, or were deliberately reckless in failing to monitor, a metric that quantifies one prong of Endurance's two-pronged growth strategy; and (2) Defendants shifted the definition of Total Subscribers in an attempt to conceal the elimination of inactive customers, which indicates that Defendants knew, or were deliberately reckless in not knowing, that the Company was improperly including inactive customers in Total Subscribers as explained in ¶¶76-80.

*ARPS*

137.    Defendants issued materially false and/or misleading statements regarding ARPS in the Company's Q3 2014 PR, and Q3 2014 Form 10-Q.  In the Company's Q3 2014 PR the Company stated that "Average revenue per subscriber (ARPS) was $14.49, an increase of 10 percent compared to $13.14 for Q3 2013."  In the Company's Q3 2014 Form 10-Q, the Company reported Q3 2014 ARPS of $14.48.  In the 10-Q, the Company elaborated on its ARPS results, stating, in relevant part:

> For the three months ended September 30, 2013 and 2014, ARPS increased from $13.14 to $14.49, respectively, and for the nine months ended September 30, 2013 and 2014, ARPS increased from $13.02 to $14.35, respectively. . . . *These increases in ARPS were driven by increasing demand for our solutions as we improved product adoption rates from both new and existing subscribers*.

138.    Defendants' statements regarding ARPS were materially false and/or misleading because: (1) though the Company is in exclusive possession of the data underlying the correct PPS figure for Q3 2013, PPS was probably flat from Q3 2013 to Q3 2014 since, as the Company

disclosed, PPS fell from 5.1 in Q4 2013 to 5.0 in Q3 2014, so the Company did not in fact achieve "improved product adoption rates"; (2) domain monetization revenue spiked in Q3 2014, comprising $0.39 of ARPS,[11] whereas the Q3 2013 domain monetization contribution to ARPS was negligible, given that fiscal year 2013 domain monetization comprised only $0.07 of fiscal year 2013 ARPS, and (3) (on information and belief) without domain monetization revenue artificially inflating ARPS in Q3 2014, ARPS would have decreased as compared to Q2 2014.

139.    Defendants' statements regarding ARPS were made with scienter since: (1) Defendants would have been closely monitoring, or were deliberately reckless in failing to monitor, a metric that quantifies one prong of Endurance's two-pronged growth strategy; and (2) Defendants knew, or were reckless in not knowing, that domain monetization revenue was included in ARPS, but that domain-only customers and certain other customers responsible for domain monetization revenue were not counted as subscribers—thus causing an ARPS inflation as explained in ¶¶83-87.

*$500+ Subscribers*

140.    Defendants issued materially false and/or misleading statements regarding $500+ Subscribers in the Company's Q3 2014 CC.  During the Q3 2014 CC, Defendant Ellawala stated: "The approximate number of subscribers of our major brands who spend more than $500 per year with us increased to 121,000 or 7,000 more than last quarter and 21,000 more than the end of last year."

---

[11] The Company disclosed this figure in an attachment to a current report filed on a Form 8-K with the SEC on January 20, 2016, stating: "Our domain monetization revenue (and adjusted revenue) was $4.4 million . . . for the three months ended September 30, 2014 . . . and its exclusion from our ARPS calculation would have resulted in ARPS being $0.39 . . . lower for the three months ended September 30, 2014. . . ."

141.    Defendants' statements regarding $500+ Subscribers were materially false and/or misleading because the Q3 2014 figure was overstated by approximately 34,000 subscribers, and the rate of growth was overstated as admitted by the Company and explained in ¶¶89-90.

142.    Defendants' statements regarding $500+ Subscribers were made with scienter since: (1) Defendants would have been closely monitoring, or were deliberately reckless in failing to monitor, a metric that drives one prong (ARPS) of Endurance's two-pronged growth strategy; and (2) Defendants had multiple systems from which Defendants could have derived subscriber data, including $500+ Subscribers, but knowingly chose to use the faulty business intelligence system which produced inflated $500+ Subscribers, or were at least deliberately reckless in not cross-checking the figures produced by the business intelligence system against the Company's other subscriber data sources as explained in ¶¶93-96.

### PPS

143.    Defendants issued materially false and/or misleading statements regarding PPS in the Company's Q3 2014 CC.  During the Q3 2014 CC, Defendant Ellawala stated: "product attachment rates for our major brands increased, growing to an average of 4.6 products per subscriber in addition to an initial web presence subscription. This is up from 3.9 products per subscriber in the third quarter of 2013."

144.    Defendants' statement regarding PPS was materially false and/or misleading because the figure represented a Q2 2014 to Q3 2014 PPS growth of 0.1, when, in reality, PPS *declined* by 0.1 over that period as admitted by the Company and laid out in ¶¶91-92.

145.    Defendants' statement regarding PPS was made with scienter since: (1) Defendants would have been closely monitoring a metric that drives one prong (ARPS) of Endurance's two-pronged growth strategy; and (2) Defendants had multiple systems from which

Defendants could derive subscriber data, including PPS, but knowingly chose to use the faulty business intelligence system which produced purportedly consistent PPS growth, or were at least deliberately reckless in not cross-checking the figures produced by the business intelligence system against the Company's other subscriber data sources as explained in ¶¶93-96.

### G.   Defendants' Materially False And/Or Misleading Statements Regarding Fiscal Year 2014 And The Fourth Fiscal Quarter Of 2014

*Total Subscribers*

146.   Defendants issued materially false and/or misleading statements regarding Total Subscribers in the Company's FY 2014 PR, FY 2014 CC, and FY 2014 Form 10-K.  During the FY 2014 CC, Defendant Ravichandran stated: "During the year, our subscriber base increased by 380,000 paying subscribers.  We also added 200,000 subscribers to our base through acquisitions resulting in a total increase of 580,000 subscribers for the year.  We now have 4.1 million paying subscribers on our platform."  During the same conference call, Defendant Ellawala stated "As a reminder, our Q4 subscriber adds are typically down sequentially from other quarters due to end of year seasonality."  In the Company's FY 2014 PR and FY 2014 Form 10-K, the Company reported Total Subscribers of 4.087 million.

147.   Defendants' statements regarding Total Subscribers were materially false and/or misleading because, as admitted by the Company, Endurance eliminated inactive customers from the Company's subscriber count in Q4 2014 while simultaneously expanding the definition of Total Subscribers to include paid subscribers to all of Endurance's subscription-based products, not just Endurance's web presence solutions, thereby concealing the elimination of inactive customers as explained in more detail in ¶¶76-80.  As such, the weakness in the Company's Total Subscribers growth was not due to "seasonality" alone and the Company's Total

Subscribers results were distorted relative to previous quarters, rendering any implicit or explicit comparison misleading.

148.    Defendants' statements regarding Total Subscribers were made with scienter since: (1) Defendants knew, or were deliberately reckless in not knowing, about the elimination of inactive customers from a metric that represents one prong of Endurance's two-pronged growth strategy; and (2) Individual Defendants knew about, or were deliberately reckless in not knowing about the change in definition of a metric that represents one prong of Endurance's two-pronged growth strategy as explained in more detail in ¶¶76-80.

*ARPS*

149.    Defendants issued materially false and/or misleading statements regarding ARPS in the Company's FY 2014 PR, FY 2014 CC, and FY 2014 Form 10-K.  During the FY 2014 CC, Defendant Ravichandran stated:

> [W]e saw our average revenue per subscriber for 2014 grow over 11% year-over-year to $14.48 per month.  Our ARPS growth reflects the benefits from our improved analytics and CRM, which helps with identifying and targeting upsell opportunities and our focus on expanding distribution through new initiatives like mobile applications, growth of our applications marketplace updates to our PC-based control panel and training our support agents to initiate upsells.

In the Company's FY 2014 PR the Company reported fourth quarter 2014 ARPS of $14.78.  In the Company's FY 2014 PR and FY 2014 Form 10-K, the Company reported fiscal year 2014 ARPS of $14.48.  In the 10-K, the Company elaborated on its ARPS results, stating, in relevant part:

> For the years ended December 31, 2012, 2013 and 2014, ARPS increased from $12.92 to $13.09 to $14.48, respectively. ***These increases in ARPS were driven primarily by increasing demand for our solutions as we improved product adoption rates from both new and existing subscribers***, as well as by the acquisition of Directi in 2014.

150.    Defendants' statements regarding ARPS were materially false and/or misleading because: (1) ARPS for fiscal year and fourth quarter 2014 was aided by the elimination of "inactive customers" from the Company's Total Subscribers metric because the elimination of such customers decreased the denominator of ARPS without a corresponding decrease to the numerator as explained in ¶¶14-15, 80, 239, 214; (2) PPS was lower at the end of fiscal year 2014 than it was at the end of fiscal year 2013, comparing apples-to-apples, falling from 5.1 at the end of Q4 2013 to 5.0 at the end of Q4 2014,[12] so the Company did not in fact achieve "improved product adoption rates"; (3) domain monetization revenue spiked in Q4 2014, comprising an estimated $0.75 to $0.80 of Q4 2014 ARPS, as consistent with Q1, Q2, and Q3 2015 figures, and which accounts for the increase in ARPS attributable for domain monetization going from $0.25 for the first nine months of 2014, to $0.43 for the full year of 2014, and (4) (on information and belief) without domain monetization revenue artificially inflating ARPS, and the elimination of inactive customers, Q4 2014 ARPS would have decreased, as compared to ARPS in Q3 2014.

151.    Defendants' statements regarding ARPS were made with scienter since: (1) Defendants would have been closely monitoring, or were deliberately reckless in failing to monitor, a metric that quantifies one prong of Endurance's two-pronged growth strategy; and (2) Defendants knew, or were reckless in not knowing, that domain monetization revenue was included in ARPS, but that domain-only customers and certain other customers responsible for

---

[12] PPS was 5.6 at the end of Q4 2014 according to the Company, but Endurance attributed the spike from 5.0 at the end of Q3 2014 to 5.6 at the end of Q4 2014 to the elimination of inactive customers, stating: "The significant increase in PPS in the fourth quarter of 2014 is attributable to an adjustment to the number of our total subscribers to eliminate inactive customers that were first identified as inactive in that quarter."   As such, adjusting for the impact of the elimination of inactive customers, PPS actually fell in Q4 2014 as compared to Q4 2013.

domain monetization revenue were not counted as subscribers—thus causing an ARPS inflation as explained in ¶¶83-87.

### *$500+ Subscribers*

152.    Defendants issued materially false and/or misleading statements regarding $500+ Subscribers in the Company's FY 2014 CC.  During the FY 2014 CC, Defendant Ellawala stated: "The approximate number of subscribers for our major brands who spend more than $500 per year with us increased to 131,000 or 10,000 more than last quarter and 32,000 more than the end of last year."   In the Company's FY 2014 10-K, the Company stated: "The number of subscribers of our major brands paying $500 or more per year for our products and services grew from approximately 73,000 as of December 31, 2011 to nearly 130,000 as of December 31, 2014."

153.    Defendants' statements regarding $500+ Subscribers were materially false and/or misleading because the FY 2014 figure was overstated by approximately 43,000 subscribers, and the rate of growth was overstated as admitted by the Company and explained in ¶¶89-90.

154.    Defendants' statements regarding $500+ Subscribers were made with scienter since: (1) Defendants would have been closely monitoring, or were deliberately reckless in failing to monitor, a metric that drives one prong (ARPS) of Endurance's two-pronged growth strategy; and (2) Defendants had multiple systems from which Defendants could have derived subscriber data, including $500+ Subscribers, but knowingly chose to use the faulty business intelligence system which produced inflated $500+ Subscribers, or were at least deliberately reckless in not cross-checking the figures produced by the business intelligence system against the Company's other subscriber data sources as explained in ¶¶93-96.

**H.     Defendants' Materially False And/Or Misleading Statements Regarding The Gotham Report**

155.     In response to the Gotham report, Endurance issued the following response on

April 28, 2015, which contained false and misleading statements of material fact:

> BURLINGTON, Mass., April 28, 2015 /PRNewswire/ -- Endurance International Group (NASDAQ: EIGI) today released the following statement in response to a report released by Gotham City Research:
>
> "***The claims in this 'report' are baseless*** and not rooted in reality. The reality is, since going public, ***Endurance has beat expectations every quarter, showing consistent growth throughout the company***. Endurance senior executives still own a significant stake in the company and are deeply invested in its future success. To suggest otherwise, is ridiculous.
>
> "***Endurance is transparent in how it calculates all of its metrics including its average revenue per subscriber, subscriber counts, organic growth and monthly revenue retention***. The company has always been clear in its financial disclosures and reports on its financial health and growth. KPMG serves as Endurance's internal auditor including auditing Sarbanes-Oxley controls. BDO serves as the company's external auditor.
>
> "As previously disclosed, the company's free cash flow for operations in 2014 was $143 million. Additionally, Warburg Pincus and Goldman Sachs own more than 40 percent of the company. Endurance has never interacted with Gotham City Research or the unnamed analyst who authored this report."

(Emphasis added.)

156.     The statements identified above were materially false or misleading because: (1)

the Company's Total Subscribers, ARPS, and $500+ Subscribers metrics were false and/or

misleading for the reasons described in ¶¶14-15, 74-96, 214, 239; (2) as such, the Company was

not transparent in how it calculated its metrics; (3) the claims in the Gotham report were

therefore not "baseless"; and (4) Endurance's purported "consistent growth" was a fabrication

based (at least in part) on false and misleading metrics.

157.     Defendants made these statements with scienter for the same reasons described in

¶¶73-154, above.

I.      **Defendants' Materially False And/Or Misleading Statements Regarding The First Fiscal Quarter Of 2015**

*Total Subscribers*

158.    Defendants issued materially false and/or misleading statements regarding Total Subscribers in the Company's Q1 2015 PR, Q1 2015 CC, and Q1 2015 Form 10-Q.  During the Q1 2015 CC, Defendant Ravichandran stated: "In Q1 2015, subscribers on our platform reached 4.2 million, an increase of 119,000 over Q4 of 2014."  In the Company's Q1 2015 PR and Q1 2015 Form 10-Q, the Company reported Total Subscribers of 4.206 million.

159.    Defendants' statements regarding Total Subscribers were materially false and/or misleading because, as admitted by the Company, Endurance eliminated inactive customers from the Company's subscriber count in Q4 2014 while simultaneously expanding the definition of Total Subscribers to include paid subscribers to all of Endurance's subscription-based products, not just Endurance's web presence solutions, thereby concealing the elimination of inactive customers as explained in more detail in ¶¶76-80.  As such, the Company's Total Subscribers results were distorted relative to previous quarters, rendering any implicit or explicit comparison misleading.

160.    Defendants' statements regarding Total Subscribers were made with scienter since: (1) Defendants knew, or were deliberately reckless in not knowing, about the elimination of inactive customers from a metric that represents one prong of Endurance's two-pronged growth strategy; and (2) Individual Defendants knew about, or were deliberately reckless in not knowing about the change in definition of a metric that represents one prong of Endurance's two-pronged growth strategy as explained in more detail in ¶¶76-80.

***ARPS***

161.   Defendants issued materially false and/or misleading statements regarding ARPS in the Company's Q1 2015 PR, Q1 2015 CC, and Q1 2015 Form 10-Q.  During the Q1 2015 CC, Defendant Ravichandran stated: "we saw our average revenue per subscriber or ARPS grow to $14.37. Once again, we saw a seasonally high number of net adds in Q1 as more SMBs came online in the new calendar year."  In the Company's Q1 2015 PR and Q1 2015 Form 10-Q, the Company reported ARPS of $14.37.  In the 10-Q, the Company, in relevant part, stated:

> ARPS increased from $14.18 for the three months ended March 31, 2014 to $14.37 for the three months ended March 31, 2015. ***This growth in ARPS was driven primarily by*** an increase in the average number of products purchased per subscriber in addition to an initial web presence subscription for our major brands, which rose from 4.3 products per subscriber for the three months ended March 31, 2014 to 4.8 products per subscriber for the three months ended March 31, 2015; ***an increase in the number of subscribers of our major brands who spend more than $500 per year with us from 106,000 for the three months ended March 31, 2014 to 142,000 for the three months ended March 31, 2015***; and an increase in premium domains sold through our BuyDomains and Directi businesses.

(Emphasis added.)

162.   Defendants' statements regarding ARPS were materially false and/or misleading because, as admitted by the Company in its Q1 2016 Form 10-Q filed May 9, 2016, domain monetization revenue accounted for $0.80 of Q1 2015 ARPS, which amounted to ***all***, ***and then some***, of the Company's year-over-year ARPS growth—given that domain monetization revenue accounted for only $0.25 of ARPS for the first nine months of 2014. Moreover, without domain monetization revenue artificially inflating ARPS, ARPS would have massively declined year-over-year.

163.   Defendants' statements regarding ARPS were made with scienter since: (1) Defendants would have been closely monitoring, or were deliberately reckless in failing to

monitor, a metric that quantifies one prong of Endurance's two-pronged growth strategy; and (2) Defendants knew, or were reckless in not knowing, that domain monetization revenue was included in ARPS, but that domain-only customers and certain other customers responsible for domain monetization revenue were not counted as subscribers—thus causing an ARPS inflation as explained in ¶¶83-87.

### *$500+ Subscribers*

164.    Defendants issued materially false and/or misleading statements regarding $500+ Subscribers in the Company's Q1 2015 CC.  During the Q1 2015 CC, Defendant Ellawala stated: "the number of subscribers of our major brands who spend more than $500 per year with us increased to approximately 142,000, or 11,000 more than last quarter, and 36,000 more than in Q1 of 2014, representing year-over-year growth of 34%."  In the Company's Q1 2015 10-Q, the Company stated: "growth in ARPS was driven primarily by [among other items] . . . an increase in the number of subscribers of our major brands who spend more than $500 per year with us from 106,000 for the three months ended March 31, 2014 to 142,000 for the three months ended March 31, 2015 . . . ."

165.    Defendants' statements regarding $500+ Subscribers were materially false and/or misleading because Q1 2015 figure was overstated by approximately 54,000 subscribers, and the rate of growth was overstated as admitted by the Company and explained in ¶¶89-90.

166.    Defendants' statements regarding $500+ Subscribers were made with scienter since: (1) Defendants would have been closely monitoring, or were deliberately reckless in failing to monitor, a metric that drives one prong (ARPS) of Endurance's two-pronged growth strategy; and (2) Defendants had multiple systems from which Defendants could have derived subscriber data, including $500+ Subscribers, but knowingly chose to use the faulty business

intelligence system which produced inflated $500+ Subscribers, or were at least deliberately reckless in not cross-checking the figures produced by the business intelligence system against the Company's other subscriber data sources as explained in ¶¶93-96.

**J.      Defendants' Materially False And/Or Misleading Statements Regarding The Second Fiscal Quarter Of 2015**

***Total Subscribers***

167.      Defendants issued materially false and/or misleading statements regarding Total Subscribers in the Company's Q2 2015 PR, Q2 2015 CC, and Q2 2015 Form 10-Q.  During the Q2 2015 CC, Defendant Ravichandran stated: "At the end of Q2 2015, our total subscribers on platform were 4.4 million, including approximately 86,000 subscribers contributed by the acquisitions of Verio and Site5."  In the Company's Q2 2015 PR and Q2 2015 Form 10-Q, the Company reported Total Subscribers of 4.394 million.

168.      Defendants' statements regarding Total Subscribers were materially false and/or misleading because, as admitted by the Company, Endurance eliminated inactive customers from the Company's subscriber count in Q4 2014 while simultaneously expanding the definition of Total Subscribers to include paid subscribers to all of Endurance's subscription-based products, not just Endurance's web presence solutions, thereby concealing the elimination of inactive customers as explained in more detail in ¶¶76-80.  As such, the Company's Total Subscribers results were distorted relative to previous quarters, rendering any implicit or explicit comparison misleading.

169.      Defendants' statements regarding Total Subscribers were made with scienter since: (1) Defendants knew, or were deliberately reckless in not knowing, about the elimination of inactive customers from a metric that represents one prong of Endurance's two-pronged growth strategy; and (2) Individual Defendants knew about, or were deliberately reckless in not

knowing about the change in definition of a metric that represents one prong of Endurance's two-pronged growth strategy as explained in more detail in ¶¶76-80.

### *ARPS*

170.    Defendants issued materially false and/or misleading statements regarding ARPS in the Company's Q2 2015 PR, Q2 2015 CC, and Q2 2015 Form 10-Q.  During the Q2 2015 CC, Defendant Ravichandran stated: "Average revenue per subscriber in Q2 remained robust at $14.30, a decrease of $0.03 over Q2 of 2014.   As a reminder, ARPS growth rates can be impacted by factors such as introductory pricing for new subscribers, our ability to migrate and increase product attach rates for subscribers acquired through M&A, and our ability to upsell existing subscribers."   In the Company's Q2 2015 PR and Q2 2015 Form 10-Q, the Company reported ARPS of $14.30.  In the 10-Q, the Company, in relevant part, stated:

> ARPS decreased from $14.33 for the three months ended June 30, 2014 to $14.30 for the three months ended June 30, 2015. . . .
>
> ARPS increased from $14.26 for the six months ended June 30, 2014 to $14.35 for the six months ended June 30, 2015. ***This $0.09 growth in ARPS, was driven primarily by an increase in the average number of products purchased per subscriber in addition to an initial web presence subscription for our major brands, which rose from 4.5 products per subscriber as of June 30, 2014 to 5.0 products per subscriber as of June 30, 2015; an increase in the number of subscribers of our major brands who spend more than $500 per year with us from 114,000 as of June 30, 2014 to 150,000 as of June 30, 2015***; and an increase in premium domains sold through our BuyDomains and Directi businesses.

171.    Defendants' statements regarding ARPS were materially false and/or misleading because, as admitted by the Company in its Q2 2016 Form 10-Q filed August 8, 2016, domain monetization revenue accounted for $0.75 of Q2 2015 ARPS, which amounted to ***all***, ***and then some***, of the Company's year-over-year ARPS growth—given that domain monetization revenue accounted for only $0.25 of ARPS for the first nine months of 2014. Without domain

monetization revenue artificially inflating ARPS, ARPS would have massively declined year-over-year.

172.    Defendants' statements regarding ARPS were made with scienter since: (1) Defendants would have been closely monitoring, or were deliberately reckless in failing to monitor, a metric that quantifies one prong of Endurance's two-pronged growth strategy; and (2) Defendants knew, or were reckless in not knowing, that domain monetization revenue was included in ARPS, but that domain-only customers and certain other customers responsible for domain monetization revenue were not counted as subscribers—thus causing an ARPS inflation as explained in ¶¶83-87.

### *$500+ Subscribers*

173.    Defendants issued materially false and/or misleading statements regarding $500+ Subscribers in the Company's Q2 2015 CC.  During the Q2 2015 CC, Defendant Ravichandran stated: "The number of subscribers in our major brands spending over $500 per year with us increased 32% to 150,000 from 114,000 in Q2 of 2014."  During the question and answer portion of the Call, Defendant Ravichandran elaborated on $500+ Subscribers:

> So the number of subscriber spending over $500 with us, it's gone up year-over-year by about 32%. It's at about 150,000 of them now as compared to 114,000 in Q2 of 2014. So, pretty good, robust increase. A lot of it are coming again from the introduction of new products, both on the frontend whereas customers are getting onboarded, we're able to price segment a little bit better. But also from our existing base of customers, graduating up as we get better and better with product distribution. So, we're pretty excited about that opportunity set.

In the Company's Q2 2015 10-Q, the Company stated: "growth in ARPS, was driven primarily by [among other items] . . . an increase in the number of subscribers of our major brands who spend more than $500 per year with us from 114,000 as of June 30, 2014 to 150,000 as of June 30, 2015 . . . ."

174.    Defendants' statements regarding $500+ Subscribers were materially false and/or misleading because the Q2 2015 figure was overstated by approximately 60,000 subscribers, and the rate of growth was overstated as admitted by the Company as explained in ¶¶89-90.

175.    Defendants' statements regarding $500+ Subscribers were made with scienter since: (1) Defendants would have been closely monitoring, or were deliberately reckless in failing to monitor, a metric that drives one prong (ARPS) of Endurance's two-pronged growth strategy; and (2) Defendants had multiple systems from which Defendants could have derived subscriber data, including $500+ Subscribers, but knowingly chose to use the faulty business intelligence system which produced inflated $500+ Subscribers, or were at least deliberately reckless in not cross-checking the figures produced by the business intelligence system against the Company's other subscriber data sources as explained in ¶¶93-96.

### PPS

176.    Defendants issued materially false and/or misleading statements regarding PPS in the Company's Q2 2014 CC.  During the Q2 2014 CC, Defendant Ravichandran stated: "The average number of additional products per subscriber we sold over and above the base solution bundle for our major brands reached 5, an increase from 4.5 in Q2 2014.  The increase in high-value subscribers and the increase in product attach rates give us confidence in our underlying ability to monetize our base of subscribers and grow ARPS over time."  In the Company's Q2 2015 10-Q, the Company stated: "growth in ARPS, was driven primarily by [among other items] an increase in the average number of products purchased per subscriber in addition to an initial web presence subscription for our major brands, which rose from 4.5 products per subscriber as of June 30, 2014 to 5.0 products per subscriber as of June 30, 2015. . . ."

177.   Defendants' statement regarding PPS was materially false and/or misleading because the figure represented a Q1 2015 to Q2 2015 PPS growth of 0.2, when, in reality, PPS *declined* by 0.1 over that period as admitted by the Company and laid out in ¶¶91-92.

178.   Defendants' statement regarding PPS was made with scienter since: (1) Defendants would have been closely monitoring a metric that drives one prong (ARPS) of Endurance's two-pronged growth strategy; and (2) Defendants had multiple systems from which Defendants could derive subscriber data, including PPS, but knowingly chose to use the faulty business intelligence system which produced purportedly consistent PPS growth, or were at least deliberately reckless in not cross-checking the figures produced by the business intelligence system against the Company's other subscriber data sources as explained in ¶¶93-96.

### K.   Defendants' Materially False And/Or Misleading Statements Regarding The Third Fiscal Quarter Of 2015

#### *Total Subscribers*

179.   Defendants issued materially false and/or misleading statements regarding Total Subscribers in the Company's Q3 2015 PR, Q3 2015 CC, and Q3 2015 Form 10-Q.  During the Q3 2015 CC, Mr. Montagner stated: "we increased net subscribers by over 87,000 in the third quarter, bringing total subscribers on our platform to approximately 4.5 million subs."  In the Company's Q3 2015 PR and Q3 2015 Form 10-Q, the Company reported Total Subscribers of 4.482 million.

180.   Defendants' statements regarding Total Subscribers were materially false and/or misleading because, as admitted by the Company, Endurance eliminated inactive customers from the Company's subscriber count in Q4 2014 while simultaneously expanding the definition of Total Subscribers to include paid subscribers to all of Endurance's subscription-based products, not just Endurance's web presence solutions, thereby concealing the elimination of inactive

customers as explained in more detail in ¶¶76-80.  As such, the Company's Total Subscribers results were distorted relative to previous quarters, rendering any implicit or explicit comparison misleading.

181.  Defendants' statements regarding Total Subscribers were made with scienter since: (1) Defendants knew, or were deliberately reckless in not knowing, about the elimination of inactive customers from a metric that represents one prong of Endurance's two-pronged growth strategy; and (2) Individual Defendants knew about, or were deliberately reckless in not knowing about the change in definition of a metric that represents one prong of Endurance's two-pronged growth strategy as explained in more detail in ¶¶76-80.

### *ARPS*

182.  Defendants issued materially false and/or misleading statements regarding ARPS in the Company's Q3 2015 PR and Q3 2015 Form 10-Q.  In the Company's Q3 2015 PR and Q3 2015 Form 10-Q, the Company reported ARPS of $14.29.  In the 10-Q, the Company elaborated on ARPS, stating:

> ARPS decreased from $14.49 for the three months ended September 30, 2014 to $14.29 for the three months ended September 30, 2015. ARPS may be impacted by such factors as introductory pricing on new subscribers, our ability to migrate and increase product attach rates for subscribers acquired through mergers and acquisitions and our ability to upsell existing subscribers.

183.  Defendants' statements regarding ARPS were materially false and/or misleading because, as admitted by the Company in its Q3 2016 Form 10-Q filed November 4, 2016, domain monetization revenue accounted for $0.76 of Q3 2015 ARPS, but domain monetization revenue only accounted for $0.39 of Q3 2014 ARPS, so without domain monetization revenue artificially inflating ARPS, ARPS would have massively declined year-over-year.  As such, ARPS was *already* being "impacted by such factors as introductory pricing on new subscribers,

our ability to migrate and increase product attach rates for subscribers acquired through mergers and acquisitions and our ability to upsell existing subscribers."

184.    Defendants' statements regarding ARPS were made with scienter since: (1) Defendants would have been closely monitoring, or were deliberately reckless in failing to monitor, a metric that quantifies one prong of Endurance's two-pronged growth strategy; and (2) Defendants knew, or were reckless in not knowing, that domain monetization revenue was included in ARPS, but that domain-only customers and certain other customers responsible for domain monetization revenue were not counted as subscribers—thus causing an ARPS inflation as explained in ¶¶83-87.

## VIII.   LOSS CAUSATION AND DEFENDANTS' STATEMENTS ISSUED AT THE END OF THE CLASS PERIOD

185.    Defendants' wrongful conduct, as alleged herein, directly and proximately caused the economic losses suffered by Plaintiffs and the Class.

186.    The truth regarding Endurance's metrics was partially revealed, and/or the concealed risks materialized, on or about: April 28, 2015, August 4, 2015, November 2, 2015, and December 17, 2015.  As a direct result of these partial disclosures, the price of Endurance's stock declined precipitously, often on heavy trading volume.

187.    During the Class Period, investors were focused on the performance of Endurance's Total Subscribers, ARPS, $500+ Subscribers, and PPS metrics.

188.    The damage suffered by Plaintiffs and other members of the Class was a direct result of Defendants' fraudulent scheme to issue false information and withhold material information from Endurance investors, and the subsequent significant decline in the value of Endurance securities when the truth was revealed.

189.   On April 28, 2015, research firm Gotham City Research LLC published a report entitled "Endurance International Group: A Web of Deceit."  The report cast doubt on certain of the Company's metrics, claiming they were inaccurate and misleading—including Total Subscribers and ARPS.  With respect to ARPS, the report cast doubt on the accuracy of the Endurance's previously released figures.  The report noted that Endurance omits domain-only customers from the Company's subscribers count, but still includes the revenue in ARPS: "[Endurance] does not count as subscribers those who purchase only domain names as subscribers (but they count the revenue!)."  The report also claimed that Endurance's true ARPS "actually declined in 2014 by around - 13%.":

**Average Revenue per Subscriber is Down -13%, Not Up +11%**

\*        \*        \*

**Reported Average Revenue per Subscriber ("ARPS") is Growing but Actual ARPS is Declining**

Despite the related party transactions, suspect international revenue, undisclosed subsidiary, and the undisclosed subsidiary's lies, perhaps Endurance possesses a strong core business. After all, EIGI reports very strong ARPU (they call it "ARPS" or Average Revenue per Subscriber", which in tech-land is similar to "Camp Store Sales") of over -10%:

### EIGI's Reported ARPS

|  | 2011 | 2012 | 2013 | 2014 |
|---|---|---|---|---|
| Adjusted revenue |  | $ 474,115 | $ 528,119 | $ 651,945 |
| Total subscribers | 2,845 | 3,223 | 3,502 | 4,087 |
| Reported ARPS | $12.84 | $12.92 | $13.09 | $14.48 |
| % change |  | 0.62% | 1.32% | 10.62% |

Revenue in 1,000s of $s, and total subscribers in 1,000s

Not only is EIGI's reported ARPS growing, Endurance appears to be outperforming its peers:

**EIGI ARPU & ARPU Growth vs Peers**

|  | 2012 | 2013 | 2014 |
|---|---|---|---|
| GDDY | $7.75 | $8.67 | $9.50 |
| WWWW | $13.44 | $14.24 | $14.62 |
| EIGI | $12.92 | $13.09 | $14.48 |
|  |  | % change in ARPU | |
| GDDY |  | 11.8% | 9.6% |
| WWWW |  | 6.0% | 2.7% |
| EIGI |  | 1.3% | 10.6% |

Icing on the cake: Directi's ARPS looks breathtakingly amazing and "accretive" to overall ARPS. The implied Directi ARPS is $72 per month or 5x-6x EIGI's historical ARPS:

**DIRECTI ARPS ACCORDING TO EIG**

|  | 2013 | 2014 |
|---|---|---|
| Directi revenue | n.a. | $48,499 |
| Directi subscribers | n.a. | 56 |
| **Directi ARPS** | n.a. | **$72.17** |
| **EIGI Reported ARPS** | $13.09 | $14.48 |

$ & subscribers in 1,000s except ARPS

We estimate that EIGI's true ARPS actually declined in 2014 by around - 13%:

**EIGI Actual 2014 ARPS Declined**

|  | 2011 | 2012 | 2013 | 2014 |
|---|---|---|---|---|
| Adjusted revenue |  | $  474,115 | $  528,119 | $  651,945 |
| total subscribers - reported | 2,845 | 3,223 | 3,502 | 4,031 |
| Directi end subscribers |  |  | 1,000 | 1,000 |
| total subscribers - actual |  |  | 4,502 | 5,031 |
| Reported ARPS | ###### | $12.92 | $13.09 | $14.48 |
| **Actual ARPS** | **12.84** | **$12.92** | **$13.09** | **$11.40** |
| % growth in ARPS |  | $     0.01 | 1.3% | (12.9%) |

All figures except ARPS are in 1,000s
total subscribers subtracts the 56 implied directi resellers.

190.    With respect to Total Subscribers, the report pointed out that "In Q4 2014 the company changed the definition of a subscriber (which added increases subscribers)," but "did not discuss this change on the quarterly call."

191.    On the same day the Gotham Report was released, before the close of market, the Company issued a denial of the claims in the report, stating that the claims in the report were "baseless and not rooted in reality." that Endurance was "transparent in how it calculates all of its metrics," and that Endurance "has always been clear in its financial disclosures and reports on its financial health and growth."

192.    On news of Gotham's report on the Company and the Company's denial, Endurance's share price declined $2.24 per share, or more than 10%, to close on April 28, 2015, at $19.70 per share, on unusually heavy trading volume.  The stock price continued to decline on April 29, 2015, falling another $1.37 per share, or 6.9%, to close at $18.33 per share, on unusually heavy trading volume.

193.    Gotham's April 28, 2015 report partially revealed: (1) that the inclusion of domain-only revenue was being used to distort Endurance's true ARPS performance, calling into question whether Endurance's domain business was inflating ARPS or masking a decline in ARPS; (2) that a change to the definition of Total Subscribers in Q4 2014 may have masked declines in the Company's operating performance; and (3) that, generally, Endurance's Total Subscriber and ARPS metrics, the Company's definitions of them, and the way the Company calculated them were susceptible to manipulation and were being manipulated to overstate ARPS.  The market's speculation in response to this report (i.e., concerns that Endurance's ARPS and Total Subscriber metrics were false and misleading) was later confirmed by subsequent disclosures.

194.    On May 5, 2015, Endurance issued its Q1 2015 quarterly press release, disclosing that ARPS for the first quarter of fiscal year 2015 was $14.37.  While that amount represented a

sequential quarterly decrease compared to the Q4 2014 ARPS of $14.78, it represented a year-over-year quarterly increase compared to the Q1 2014 ARPS of $14.18.

195.     On August 3, 2015, after the close of trading, the Company disclosed in a press release that Ellawala was resigning as CFO.  In relevant part, the Company stated:

> BURLINGTON, Mass., Aug. 3, 2015 (GLOBE NEWSWIRE) -- Endurance International Group Holdings, Inc. (NASDAQ:EIGI), a leading provider of cloud-based platform solutions designed to help small and medium-sized businesses succeed online, today announced that Tivanka Ellawala, chief financial officer, will transition from his current position and take on a new role driving the company's e-commerce strategy, working out of the Seattle area where his family is based. The company concurrently announced the appointment of Marc Montagner to the role of CFO, effective next month. Mr. Ellawala will continue in his capacity as CFO until that time.

196.     On August 4, 2015, Endurance issued its Q2 2015 quarterly press release, disclosing that ARPS was only $14.30 for the second quarter of 2015, representing both a sequential and year-over-year quarterly decline.  Not only was the Q2 2015 ARPS down from the $14.37 for Q1 2015, but it also marked the first time during the Class Period that the Company reported a year-over-year ARPS decline.  In the press release, the Company, in relevant part, stated: "Average revenue per subscriber (ARPS) was $14.30, compared to $14.33 for the second quarter of 2014."

197.     Defendant Ravichandran, however, partially dampened the Company's stock price by continuing to offer false $500+ Subscribers and PPS metrics.  On the same day, August 4, 2015, during the Company's earnings conference call with investors and analysts, Defendant Ravichandran reassured investors regarding the Company's falling ARPS by citing the false in $500+ Subscribers and PPS metrics, stating:

> The number of subscribers in our major brands spending over $500 per year with us increased 32% to 150,000 from 114,000 in Q2 of 2014. The average number of additional products per subscriber we sold over and above the base solution bundle for our major brands reached 5, an increase from 4.5 in Q2 2014. ***The***

*increase in high-value subscribers and the increase in product attach rates give us confidence in our underlying ability to monetize our base of subscribers and grow ARPS over time.*

(Emphasis added.)

198.   On this news, shares of Endurance declined $2.41 per share, or 11.7%, to close on August 4, 2015, at $18.12 per share, on unusually heavy volume.  The stock price continued to decline on August 5, 2015, falling another $0.78 per share, or 4.3%, to close at $17.34 per share, on unusually heavy trading volume.

199.   The disclosures on August 3 and August 4, 2015 constituted both a partial materialization of concealed risks and a partial corrective disclosure.  The likelihood that Endurance's ARPS (and its financial performance overall) would decline in Q2 2015  was a risk, the magnitude of which was concealed by (i) the publication of false $500+ Subscribers and PPS figures—the principal supposed drivers of ARPS—for each of the quarters preceding Q2 2015, (ii) the undisclosed extent to which domain monetization revenue was inflating ARPS starting in Q3 2014, and (iii) the undisclosed one-time spike in ARPS in Q4 2014 caused by Defendants' removal of inactive customers from the count of Endurance's subscribers.  The disclosures of August 3 and August 4, 2015 also partially revealed that the Company's reported $500+ Subscribers and PPS figures were not reliable, or, at the very least, were weakly correlated with ARPS.  The resignation of Ellawala further suggested to the market the possibility that Endurance's metrics were not accurate, which was later confirmed by subsequent disclosures.

200.   The market's reaction to the August 4, 2015 disclosures is partially captured in certain analyst reports published after the Company announced its results.  Oppenheimer & Co. Inc. published a report on August 4, 2015.  The lead paragraph in the report discussed the slowdown in ARPS, and called on the Company to increase quality disclosures surrounding the

company's newly added subscribers and ARPS drivers.  The report noted that the lack of clarity in the Company's disclosures surrounding ARPS was leading Oppenheimer to question whether the Company was adding lower quality subscribers, that were paying less.  Morgan Stanley also published a report on August 4, 2015.  The lead sentence in Morgan Stanley's report noted that the "[u]nexpected ARPS decline and CFO transition will likely pressure the stock in [the] near-term."   The Morgan Stanley report listed "[i]ncreasing products per customer driving ARPS growth" as one of four "Key Value Drivers" of the Company, and noted in the first full paragraph of the report that "[a]ttach rates for major brands grew to an average 5.0 products per subscriber in 2Q15, up from 4.5 products per subs last year, while the number of customers generating over $500/year grew to 150k (32% y/y growth) in the quarter."  Deutsche Bank issued a report on August 5, 2015.  In the second paragraph of the report entitled "2Q In-Line, But Little To Get Excited About," Deutsche Bank noted that "APRS growth still remains muted" but stated that "High ARPS subs who spend more than $500/yr increased +32% y/y to 150k in 2Q. Meanwhile, product attach rates improved to +5.0 from 4.5 in 2Q14 . . . ."  Thus, these analyst reports reflected both an acknowledgement that ARPS growth had slowed but also a belief by some market observers of Ravichandran's assurances (which were themselves based on false figures) that continued growth in the ARPS drivers of $500+ Subscribers and PPS figures indicated a likelihood that ARPS would start to grow again in the near future.

201.   On November 2, 2015, Endurance issued its Q3 2015 quarterly press release, disclosing that ARPS was only $14.29 for the third quarter of 2015, representing another sequential and year-over-year quarterly decline, compared to an ARPS of $14.30 for Q2 2015 and an ARPS of $14.49 for Q3 2015.  On the same day, during the Company's Q3 2015 conference call, Endurance disclosed that its previously reported $500+ Subscribers and PPS

figures were false.  The Company attributed the false figures to an "error" but it did not elaborate

on the nature of the error.  On the call, Mr. Montagner, in relevant part, stated:

> Turning to other metrics, I would like to mention that we are not showing three performance metric this quarter, monthly recurring revenue or MRR, number of product per subs, PPS, and the number of subscribers paying us over $500 per year. We recently identified an error while migrating some data from our legacy business intelligence system to an upgraded BI system which impacted these metrics. We're on the process of recalculating these numbers. This system is completely separate from the ERP system that produces our financial and subscriber data. We believe that our previously reported MRR numbers will remain at 99% for at least the last four quarters.
>
> ***Revised numbers for both the number of product per subs and number of 500-plus subs are expected to be lower than the previously reported numbers.*** This does not impact our GAAP financial results, adjusted revenue, adjusted EBITDA, free cash flow, or unlevered free cash flow metrics. This also does not impact our subscriber count, churn, or unit economics. We will provide updated metrics information as soon as it is available.
>
> The purpose of the PPS and the 500-plus metrics was to provide additional insights to element that can directionally impact ARPS.

(Emphasis added.)

202.    On this news, Endurance's share price fell $2.21 per share, or 16.5%, to close on

November 2, 2015, at $11.12 per share, on unusually heavy trading volume.

203.    The disclosures on November 2, 2015 constituted both a further partial

materialization of concealed risks and a further partial corrective disclosure.  The likelihood that

Endurance's ARPS (and its financial performance overall) would decline in Q3 2015  was a risk,

the magnitude of which was concealed by (i) the publication of false $500+ Subscribers and PPS

figures—the principal supposed drivers of ARPS—for each of the quarters preceding Q3 2015,

(ii) the undisclosed extent to which domain monetization revenue was inflating ARPS starting in

Q3 2014, and (iii) the undisclosed one-time spike in ARPS in Q4 2014 caused by Defendants'

removal of inactive customers from the count of Endurance's subscribers.  The disclosures of

November 2, 2015 also revealed that the Company's reported $500+ Subscribers and PPS figures were likely misstated.

204.     The market's reaction to the November 2, 2015 disclosures is partially captured in certain analyst reports published after the Company announced its results.  Morgan Stanley published a report on November 2, 2015 highlighting the slowdown in ARPS:  "ARPS was essentially flat q/q but continues to be depressed y/y after declining last Q."  A report published by Deutsche Bank on November 3, 2015 reiterated these concerns:  "In terms of key metrics, ARPS was down 1% y/y for the second straight quarter in 3Q . . . ."  A November 3, 2015 report published by Craig-Hallum Capital Group LLC attributed the decline in the Company's stock price on November 2, 2015 to a number of factors, including the Company's announced errors in $500+ Subscribers.  Specifically, the report pointed to "downward revisions in the number of high end subscribers in its base (i.e. customers above $500 in annual spend)" and "a growing distrust of management and forward guidance."

205.     On November 6, 2015, in the Company's Q3 2015 Form 10-Q, Endurance stated that "our revised figures for both the number of subscribers paying us $500 or more per year and the number of products per subscriber will be lower than our previously reported figures for those metrics."

206.     On December 17, 2015, the Company filed a Current Report with the SEC on Form 8-K disclosing that the Company was the subject of an SEC investigation relating to, among other issues, the Company's reporting of metrics.  In the Current Report, the Company, in relevant part, disclosed:

> Endurance International Group Holdings, Inc. ("Endurance") received a subpoena dated December 10, 2015 from the Boston Regional Office of the Securities and Exchange Commission (the "SEC"), requiring the production of certain documents, including, among other things, documents related to Endurance's

financial reporting, ***including operating and non-GAAP metrics***, refund, sales and marketing practices and transactions with related parties. Endurance will fully cooperate with the SEC's investigation. Endurance can make no assurances as to the time or resources that will need to be devoted to this investigation or its final outcome, or the impact, if any, of this investigation or any proceedings on Endurance's business, financial condition, results of operations and cash flows.

(Emphasis added).

207.   On this news, Endurance's share price declined $1.81 per share, or 13.9%, to close on December 17, 2015, at $11.20 per share, on unusually heavy volume.

208.   The Company's disclosure on December 17, 2015, partially revealed that the Company's Total Subscribers, ARPS, $500+ Subscribers, and PPS metrics were false and/or misleading.   The SEC investigation into the Company's "non-GAAP" metrics confirmed investors' suspicions—previously stirred up by the Company's and analysts' earlier disclosures and comments—that Endurance's metrics were inaccurate.   The inaccuracy of Endurance's metrics figures was further confirmed by subsequent disclosures.

## IX.   POST-CLASS PERIOD EVENTS

209.   On or around February 1, 2016, a letter filed by Endurance with the SEC on December 9, 2015, was made public by the SEC.  The letter was in response to an SEC letter dated November 17, 2015.  Therein, Endurance attempted to clarify issues with certain of the Company's metrics identified by the SEC.  With respect to ARPS, the SEC noted that ARPS (i.e. Average Revenue Per ***Subscriber***) included revenue ***not attributable to subscribers***, and asked Endurance to clarify the impact of such amounts on the metric.  In response, Endurance admitted that there were multiple sources of revenue that were not attributable to subscribers—domain-only customers, domain monetization, and marketing development funds—and partially clarified the impact of those revenue sources:

Domain-Only Customers. ***Domain-Only Customers are expressly excluded from our Total Subscribers definition***. We are unable to quantify the amount of our revenue attributable to Domain-Only Customers because our billing systems are not able to distinguish between revenue from Domain-Only Customers and revenue from customers who purchase domains from us in addition to other products. Although we are able to measure the total amount of our revenue from domains (approximately 20% of our total adjusted revenue), ***we cannot further break down domain revenue into revenue from Domain-Only Customers versus revenue from customers who purchase additional products from us and therefore meet our Total Subscribers definition***. We are also unable to quantify the number of Domain-Only Customers, which precludes us from including them in our Total Subscribers definition.

Domain Monetization. Domain monetization revenue consists principally of revenue from our BuyDomains brand, which provides premium domain name products and services. Domain monetization revenue also includes, to a lesser extent, revenue from advertisements placed on unused domains (often referred to as "parked" pages) owned by us or our customers. ***Historically, the contribution of domain monetization activities to our adjusted revenue has been insignificant, but has been increasing beginning in 2014 due primarily to our acquisition of BuyDomains in September 2014***. Our domain monetization adjusted revenue was $3.0 million in 2013, $19.1 million in 2014, $8.2 million for the nine months ended September 30, 2014 and $29.7 million for the nine months ended September 30, 2015, and ***its exclusion from our ARPS calculation would have resulted in ARPS being $0.07, $0.25, $0.43 and $0.77 lower for those periods, respectively***.[13]

Marketing Development Funds. Marketing development funds are amounts that certain of our partners pay to us to assist in and incentivize our marketing of their products. ***Our marketing development fund adjusted revenue was $7.5 million in 2013, $9.1 million in 2014, $6.7 million for the nine months ended September 30, 2014 and $8.8 million for the nine months ended September 30, 2015, and its exclusion from our ARPS calculation would have resulted in ARPS being $0.19, $0.20, $0.20 and $0.23 lower for those periods, respectively.***

(Emphasis added.)

210.   In the letter, Endurance tacitly admitted that, by failing to clarify the impact of non-subscriber revenue in its ARPS calculations, the metric was misleading, stating:

> ***In our future reports on Form 10-Q and 10-K, we will*** continue to ***enhance our disclosure about Non-Subscriber Revenue contribution to ARPS***, ***including*** a more detailed qualitative description of the sources of Non-Subscriber Revenue

---

[13] The Company accidentally transposed the "$0.25" and "$0.43" figures. *See* n.6, s*upra*.

included in the ARPS calculation and ***an express statement that ARPS does not represent an exact measure of the amount an average subscriber actually spends with us each month***. We will also highlight instances where we believe Non-Subscriber Revenue has materially contributed to period-over-period changes in ARPS.

(Emphasis added.)

211.    The letter definitively confirmed that the Company's ARPS metric was misleading because it was being artificially inflated by the Company's treatment of non-subscriber revenue, as well as domain-related customers and revenue.

212.    On February 18, 2016, the Company released revised PPS and $500+ Subscribers figures. During the Company's quarterly earnings conference call with analysts and investors, the Company disclosed the revised PPS and $500+ Subscribers figures for the fourth quarter of 2013 through the second quarter of 2015—demonstrating that the figures had been incorrectly reported for (at least) seven consecutive quarters.  The Company also released the previously unreleased PPS and $500+ Subscribers figures for the third and fourth quarter of 2015.  In connection with the conference call, the Company published a PowerPoint slide, illustrating the true PPS and $500+ Subscribers figures compared to the previously issued false figures, the content of which was reproduced in Company's Annual Report filed with the SEC on Form 10-K on February 29, 2016:



THIRD AMENDED CLASS ACTION COMPLAINT



213.     With respect to PPS, the revised figures illustrate only three instances of PPS growth over sequential quarters, one of which (Q4 2014) was not organic, but, as disclosed on the conference call, was due to an adjustment that eliminated inactive customers from the subscriber count—contrary to Defendants' prior claims of consistent PPS growth.  The revised figures also demonstrate relatively flat $500+ Subscribers growth, contrary to Defendants' prior claims of drastically increasing $500+ Subscribers.   Specifically, the Company's $500+ Subscribers figure grew from 82,000 to 90,000 (9.7% growth) from the Q4 2013 through the Q2 2015, rather than 99,000 to 150,000 (51.5% growth).

214.     Additionally, the Company stated on the February 18, 2016, conference call (and confirmed in the February 29, 2016 10-K), that Defendants manipulated Endurance's Total Subscribers in Q4 2014.  In explaining the spike that occurred in the revised Q4 2014 PPS, the Company, in relevant part, stated: "You will note that there was a significant increase in PPS in the fourth quarter of 2014 due to an adjustment that eliminated inactive customers from a subscriber count, which were first identified as such in that same quarter."

215.     Finally, the Company announced during the February 18, conference call (and confirmed in the February 29, 2016 10-K), that it would not be releasing PPS and $500+ Subscribers figures in the future:

Due to the significant size of the Constant Contact acquisition and the difference in subscriber profile between Endurance and Constant Contact, we will no longer report PPS or 500+ Subscribers going forward.

## X.   ADDITIONAL SCIENTER ALLEGATIONS

### A.   Management Was Heavily Focused On ARPS And Drivers Of ARPS

216.   Throughout the Class Period, management pursued a growth strategy based in large part on increasing the Company's ARPS.  To that end, Defendants purportedly endeavored to grow $500+ Subscribers and PPS because Defendants viewed them as primary drivers of ARPS.

217.   Defendants also encouraged investors and analysts to focus on ARPS by consistently reiterating that ARPS was key to the Company's growth strategy and touting ARPS results in quarterly press releases, conference calls, and SEC filings.  *See* ¶¶52-53.  Specifically, ARPS was labeled a "key driver" of Endurance's growth, and the Company consistently touted ARPS under the "highlights" section of quarterly results press releases.  Likewise, Defendants encouraged investors and analysts to focus on $500+ Subscribers and PPS results by pointing to them as primary ARPS drivers.  When ARPS faltered in August 2015, Defendant Ravichandran even reassured investors regarding the Company's prospects by citing to the Company's purportedly strong and consistent $500+ Subscribers and PPS growth.  *See* ¶197.

218.   Given that ARPS, $500+ Subscribers and PPS were a central focus of Defendants' growth strategy, and given that Defendants repeatedly and consistently directed investor attention to these metrics as evidence of the Company's growth prospects, Defendants knew, or were deliberately reckless in not knowing, that their reported $500+ Subscribers and PPS figures were false.

### B.      The Primary Drivers Of ARPS Were Purportedly Increasing As ARPS Was Decreasing

219.     Defendants were reporting decreasing ARPS results while at the same time reporting increases in the purported drivers of ARPS.  In Q1 2015, and Q2 2015, Defendants reported decreasing ARPS of $14.37 (down from $14.78 the quarter prior), and $14.30, respectively.  For the same periods, Defendants reported an increase in the number of $500+ Subscribers: 142,000 (up from 131,000 a quarter prior), and 150,000, respectively.  Likewise, Defendants reported an increase in PPS: 4.8 (up from 4.7 the quarter prior), and 5.0, respectively.  The following chart illustrates the relative trends for ARPS, $500+ Subscribers, and PPS as initially reported by the Company:



220.    The apparent inconsistency between decreasing ARPS on the one hand, and increasing ARPS drivers on the other, should have prompted Defendants to investigate the cause of the discrepancy.  Indeed, because of the apparent direct correlation between ARPS, $500+ Subscribers, and PPS, once ARPS began to fall while its drivers were purportedly growing, Defendants were presented with an indication that one or all of the metrics were inaccurate. Defendants either knew of the inaccuracy at that point, were deliberately reckless regarding the accuracy.  Defendants' knowledge or recklessness is especially apparent given that, throughout the Class Period, Defendants actively monitored ARPS and ARPS drivers.  Defendants claimed that they monitored the non-GAAP financial measures—including ARPS—in every 10-K and 10-Q financial report filed during the Class Period.  In addition, during the Q3 2014 quarterly earnings conference call on November 4, 2014, Defendant Ravichandran stated that Defendants were monitoring on a daily basis "subscriber events," including "cash billings" and "product take-up rates"—which are related to $500+ Subscribers and PPS:

> We monitor tens of millions of subscriber events including cash billings, subscriber adds and losses, product take-up rates and marketing spend on a daily basis.  Consequently, we're improving our ability to intervene and drive sales and marketing campaigns on a real-time basis thereby maximizing the ROI on our sales, support, and marketing investments.

221.    Defendants also admitted that they had another system that produced financial and subscriber data.  In the Nov 2, 2015 conference call, CFO Marc Montagner stated

> We recently identified an error while migrating some data from our legacy business intelligence system to an upgraded BI system which impacted these metrics. We're in the process of recalculating these numbers. ***This system is completely separate from the ERP system that produces our financial and subscriber data***.

(Emphasis added).

222.    Given the inconsistency between ARPS and ARPS drivers, Defendants' claims that they continually monitored those metrics, and the claim that they had another system that tracked financial and subscriber data, Defendants knew, or deliberately disregarded the fact that the $500+ Subscribers and PPS figures they were reporting were false.

**C.    The Elimination Of Inactive Customers Unbelievably Had No Effect On PPS**

223.    The fact that the Company eliminated inactive customers from the Company's Total Subscribers count for Q4 2014, but reported a 0.1 PPS increase for that period indicates that Defendants knew or were reckless in not knowing that the Company's PPS figures were false.

224.    The elimination of inactive customers should cause a "spike" in the Company's PPS metric figures.  Inactive customers are not purchasing any products, so they contribute nothing to the numerator of the PPS metric.  However, since the inactive customers were being counted by the Company as a subscriber prior to Q4 2014, the inactive subscribers were adding to the denominator of the PPS metric, dragging down PPS.  In the Company's revised PPS figures, published in February 2016, the Company reported a Q4 2014 spike in PPS from 5.0 in Q3 2014 to 5.6 in Q4 2014 as shown in ¶212, which is exactly what one would expect to see after eliminating inactive customers.  Moreover, the Company explicitly attributed the spike to the elimination of inactive customers when issuing the revised figures, stating: "The significant increase in PPS in the fourth quarter of 2014 is attributable to an adjustment to the number of our total subscribers to eliminate inactive customers that were first identified as inactive in that quarter."

225.    However, when the Company initially reported Q4 2014 PPS, the Company reported a mere 0.1 increase in PPS from 4.6 in Q3 2014 to 4.7 in Q4 2014 as show in ¶91—indicating no spike in PPS.

226.    At the time the Company reported the Q4 2014 0.1 PPS increase, Defendants knew, or were deliberately reckless in not knowing, that the Company had eliminated inactive customers from Total Subscribers; and therefore, Defendants should have expected a spike in PPS.  The lack of a spike put Defendants on notice that their reported PPS figures were likely false.  As such, Defendants knew, or recklessly disregarded the fact that their PPS figures (and especially the Q4 2014 PPS figure) were false.

## D.    Subscribers Paying More Than $500 Per Year Accounted For Approximately 11% Of The Company's Revenue

227.    $500+ Subscribers purportedly accounted for a large portion of Endurance's revenue. Defendant Ravichandran stated that subscribers paying more than $500 per year account for approximately 11% of total revenue.   Ravichandran's statement that $500+ Subscribers accounted for 11% of Endurance's revenue was in response to an analyst's question during the Company's quarterly earnings conference call with investors and analysts on February 23, 2015.  The analyst first noted that substantial growth in $500+ Subscribers had "to be fueling your [ARPS] in a pretty strong way" and then asked whether this was a function of expanded product offerings by Endurance.  Ravichandran responded, stating, in relevant part:

> [W]e're getting better and better at fitting products to the customer base and that's driving better take rates.  At the same time, as people consume the product, you also learn a lot about what other products they need, so that's also fueling quite a bit of information and knowledge about what products would drive high value for these pockets of customers and how we can get them to adopt them better.  So obviously with – *if you did the math at $500 plus, that's about 2.5% to 3% of base that's accounting for 10.5%, 11% of revenue, so that definitely has been a lot of goodness for the average revenue per subscriber side of it. So I think that's positive.  We see quite a bit more opportunity there going into this year,*

***going into next year because we're only going to get better and better at this strategy.*** On the product take rate, on the more ubiquitous generic products where people are paying us between $15 and $20 a year per product, the benefit that we see there is as people get more and more engaged, the distribution there has gotten better as well. But that's the strategy we've had since 2007-2008 timeframe, that continues to grow very nicely, and the addition of the higher-value products into the stack has been helping on the average revenue per subscriber side.

(Emphasis added).

228.    In addition, on the February 7, 2014 conference call, Defendant Ellawala stated that the Company is always "fighting" for every bit of revenue it can get, stating, in relevant part: "we like to push ourselves and make sure that we're delivering kind of the best quarter possible. So a lot of the times as I tell our exec team here we're always fighting for that last 1% of revenues or 2%, we're always sort of working on it."

229.    Given that $500+ Subscribers purportedly accounted for approximately 11% of Endurance's revenue and that management is "always fighting for that last 1% of revenues," Defendants would have been focused on the $500+ Subscribers metric, and would have known, or at least recklessly disregarded, that their reported $500+ Subscribers numbers were false.

E.    **Defendants' Prompt Denial Following the Gotham Report Without Any Investigation Supports An Inference Of Scienter**

230.    Gotham issued its report on the Company on April 28, 2015 which raised serious questions regarding the accuracy of Endurance's non-GAAP metrics and disclosures, which presented a red flag to Defendants that should have caused Defendants to investigate the matter. *See* ¶¶189-191, 193.

231.    In response however, Endurance issued a denial on the very same day—April 28, 2015—doubling down on the Company's non-GAAP metrics.  The press release issued by Defendants, in relevant part, stated:

"The claims in this 'report' are baseless and not rooted in reality. The reality is, since going public, *Endurance has beat expectations every quarter, showing consistent growth throughout the company*. Endurance senior executives still own a significant stake in the company and are deeply invested in its future success. To suggest otherwise, is ridiculous.

"*Endurance is transparent in how it calculates all of its metrics including its average revenue per subscriber, subscriber counts, organic growth and monthly revenue retention*. *The company has always been clear in its financial disclosures and reports on its financial health and growth*. KPMG serves as Endurance's internal auditor including auditing Sarbanes-Oxley controls. BDO serves as the company's external auditor.

(Emphasis added.)

232. Defendants' assertions in their denial were shown to be false when the Company disclosed the "error" in its business intelligence system that affected certain non-GAAP metrics. The brash denial, without any investigation, supports the inference that Defendants knew or were deliberately reckless in not knowing that certain of their non-GAAP metrics were false or misleading.

### F. Defendants Ravichandran And Ellawala Were Motivated To Inflate The Company's Stock Price In Anticipation Of The Offering In November 2014 And March 2015

233. Defendants Ravichandran and Ellawala had reason to inflate the Company's stock price: so that they could personally benefit in the Company's November 21, 2014 offering and March 11, 2015 offering.

234. On November 21, 2014, Endurance issued a press release announcing a public offering of 13,000,000 shares of common stock.  10,000,000 shares were to be sold by selling stockholders.  The offering price was $14.50 per share, or $13.92, after the underwriting discount.  The underwriters held a 30-day option to purchase an additional 1,950,000 shares, which they exercised.  Endurance announced the completion of the offering on November 26, 2014.

235.    Both Defendants Ravichandran and Ellawala sold shares they beneficially owned as "selling stockholders" in the offering.  Ravichandran sold 819,280 shares plus 122,892 more pursuant to the underwriters' option, for a total of 942,172 shares on November 26, 2014.  At $13.92 per share, after the underwriting discount, Ravichandran received $13,115,034 in the offering.  Ellawala sold 18,542 shares plus 2,781 more pursuant to the underwriters' option, for a total of 21,323 shares on November 26, 2017.  At $13.92 per share, after the underwriting discount, Ellawala received $296,816 in the offering.

236.    On March 6, 2015, the Company announced another offering of its common stock by selling stockholders.  On March 11, 2015, Endurance closed the offering, in which selling stockholders sold 12,000,000 shares of common stock at a public offering price of $19.00 per share.  The underwriter also exercised its overallotment option to purchase an additional 1,800,000 shares of common stock from the selling stockholders.

237.    In the offering, Defendant Ravichandran sold a total of 1,490,526 shares at $19.00 per share on March 11, 2015 as a "selling stockholder," receiving $28,319,994.  Ellawala likewise sold a total of 20,000 shares at $19.00 per share on March 11, 2015 offering as a "selling stockholder," receiving $380,000.  Individual Defendant's proceeds from stock sales during the Class Period dwarf their salaries.  According to the Company's Proxy Statement filed with the SEC on April 4, 2016, Ravichandran's base salary was $750,000 for 2014 and $618,846 for 2015, for a combined salary of $1,368,846 over the two year period.  The offering sales identified above netted Ravichandran more than $41 million, or more than thirty times his combined salary. Likewise, Ellawala's base salary was $375,000 for each of 2014 and 2015, for a combined salary of $750,000 over the two year period.  The offering sales identified above netted Ellawala more than $676,816, or more than 90% of his combined salary.

238.    As discussed above, Total Subscribers and ARPS were metrics that Defendants, investors, and analysts were focused on in evaluating the health and growth potential of Endurance.  In addition, the $500+ Subscribers and PPS were primary drivers of ARPS, and $500+ Subscribers accounted for more than 10% of Endurance's revenue.  Individual Defendants were therefore motivated to make these metrics appear healthy, and/or ignore any signs that the metrics were not as healthy as stated, in order to maximize the price of the shares they were selling in these offerings.

239.    The Defendants' stock sales were suspiciously timed to coincide with the times during the Class Period when Endurance's false and misleading non-GAAP metrics figures most strongly distorted the picture of the Company's financial health.  As discussed in ¶¶12-15, 19, in the latter half of 2014, organic growth in ARPS was stalling, and Defendants artificially boosted the appearance of continued ARPS growth by, *inter alia*, (1) the acquisition of BuyDomains in September 2014, which led to a spike in domain-monetization revenue, *i.e.*, non-subscriber-based revenue that increased the numerator of ARPS without affecting the denominator, and (2) an undisclosed "adjustment" to the Company's calculation of Total Subscribers in Q4 2014 that involved the removal of a sizable number of inactive customers, which caused an artificial spike in ARPS and PPS.  Defendants did not disclose to the public the substantial effect of domain-monetization revenue on ARPS until the Company's December 9, 2015 letter was revealed by the SEC on February 1, 2016, and Defendants did not disclose the "adjustment" removing the inactive customers in Q4 2014 until February 18, 2016, over a year later.  This undisclosed, adverse inside information, in addition to the Company's false $500+ Subscribers and PPS figures, caused the Company's ARPS to appear much stronger than it actually was in Q3 2014 and Q4 2014, before ARPS began to sputter and then decline during the first three

quarters of 2015.  The Company's Q3 2014 results were released on November 4, 2014, just seventeen days before the November 2014 offering was announced, and the Company's Q4 2014 results were released on February 23, 2015, just nine days before the March 2015 offering was announced.

240.    Defendants Ravichandran and Ellawala knew, or were reckless in not knowing, that their reported Total Subscribers, ARPS, $500+ Subscribers, and PPS, figures were false and/or misleading, but chose to tout those metrics anyway in order to inflate Endurance's stock price and maximize their personal benefit in the offerings.

### G.    The Timing Of Ellawala's Resignation Relative To The Company's Disclosures

241.    On August 3, 2015, Endurance announced that Ellawala would be stepping down as CFO of Endurance effective September 2015.  The Company, in relevant part, stated:

> Tivanka Ellawala, chief financial officer, will transition from his current position and take on a new role driving the company's e-commerce strategy, working out of the Seattle area where his family is based. The company concurrently announced the appointment of Marc Montagner to the role of CFO, effective next month. Mr. Ellawala will continue in his capacity as CFO until that time.

242.    Ellawala left his position as CFO on September 15, 2015 and he was replaced by Mr. Montagner, as earlier indicated by the Company.

243.    Less than two months after Ellawala stepped down, on November 2, 2015, Montagner disclosed on a conference call with investors that the Company had discovered an "error" which affected the Company's $500+ Subscribers and PPS metrics.

244.    The extremely short period of time between Ellawala stepping down and the discovery of the "error" supports the inference that the error was obvious, and that Defendant Ellawala knew or recklessly disregarded the fact that the Company's metrics, including $500+ Subscribers and PPS were false and/or misleading.

**H.      Defendant Ravichandran's Announced Exit Was Explicitly Linked To Endurance's Metrics And The Ongoing Eighteen Month Formal SEC Investigation**

245.    On April 17, 2017, the Company announced that on April 12, 2017, its Board of Directors and its Chief Executive Officer Hari Ravichandran adopted a "CEO transition plan" to remove Ravichandran from his position as CEO.  The Company further disclosed that the Board and Ravichandran had been discussing his exit "over an extended period of time."

246.    The Company explicitly connected Ravichandran's exit to the SEC's investigation of the Company's metrics, stating:

> ***Given*** the significant expansion of the business, the substantial focus on free cash flow generation and risk management, and ***the previously disclosed SEC investigation regarding non-GAAP metrics, the Board decided, and Mr. Ravichandran agreed, to accelerate the succession planning***.

(Emphasis added.)

247.    The removal of Defendant's Ravichandran in connection with the SEC's investigation into the Company's metrics—probably the very metrics at issue in this case—supports the inference that Ravichandran had a culpable state of mind with respect to the publication of those metrics.  Ravichandran knew about, or recklessly disregarded, the falsity of those metrics.

**I.      A Former Employee Confirmed That The Company's +$500 Subscriber Figures Were Unreliable**

248.    A former employee, Confidential Witness 1 ("CW1"), confirmed that the Company's $500+ Subscribers figures were known to be unreliable to employees of Endurance.

249.    CW1 worked at Endurance from approximately February 2014 until October 2015.  For a portion of CW1's employment, CW1 was the Senior Data Warehouse Developer.

250.    CW1 stated that during the summer of 2014 (possibly in August), CW1 assisted a colleague with a common report that was initially called "the $500 report."  The purpose of the report was to clarify how much subscribers were paying for Endurance products.  CW1 stated that the report divided subscribers into categories based on how much the subscribers were paying.  There were different levels: $500 per year, $400 per year, $300 per year, $200 per year, etc.  However, CW1 stated that the numbers obviously "didn't add up."  CW1 stated that if one performed a simple check of the numbers by multiplying the number of subscribers in a category by the dollar value of the category, one would discover that the total was greater than actual revenue being produced—indicating, possibly, that subscribers were being double-counted.

251.    As CW1's statements indicate, the Company had internal evidence demonstrating that the Company's $500+ Subscribers count was inaccurate, but published it anyway.

## XI.    CLASS ACTION ALLEGATIONS

252.    Plaintiffs bring this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a class, consisting of all persons and entities that purchased or acquired Endurance securities during the Class Period and were damaged thereby (the "Class").  The Class also includes persons and entities that purchased or acquired Endurance securities pursuant or traceable to the Registration Statement issued in connection with the IPO.  Excluded from the Class are Defendants, the officers and directors of the Company, at all relevant times, members of their immediate families and their legal representatives, heirs, successors or assigns and any entity in which Defendants have or had a controlling interest.

253.    The members of the Class are so numerous that joinder of all members is impracticable.  Throughout the Class Period, Endurance's securities were actively traded on the NASDAQ.  While the exact number of Class members is unknown to Plaintiffs at this time and

can only be ascertained through appropriate discovery, Plaintiffs believe that there are hundreds or thousands of members in the proposed Class. Millions of Endurance shares were traded publicly during the Class Period on the NASDAQ. As of October 31, 2015, Endurance had 136,999,800 shares of common stock outstanding. Record owners and other members of the Class may be identified from records maintained by Endurance or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

254.   Plaintiffs' claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

255.   Plaintiffs will fairly and adequately protect the interests of the members of the Class and have retained counsel competent and experienced in class and securities litigation.

256.   Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

(a)   whether the federal securities laws were violated by Defendants' acts as alleged herein;

(b)   whether statements made by Defendants to the investing public during the Class Period omitted and/or misrepresented material facts about the business, operations, and prospects of Endurance; and

(c)   to what extent the members of the Class have sustained damages and the proper measure of damages.

257.    A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable.  Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation makes it impossible for members of the Class to individually redress the wrongs done to them.  There will be no difficulty in the management of this action as a class action.

## XII.   **UNDISCLOSED ADVERSE FACTS**

258.    The market for Endurance's securities was open, well-developed and efficient at all relevant times.  As a result of these materially false and/or misleading statements, and/or failures to disclose, Endurance's securities traded at artificially inflated prices during the Class Period.  Plaintiffs and other members of the Class purchased or otherwise acquired Endurance's securities relying upon the integrity of the market price of the Company's securities and market information relating to Endurance, and have been damaged thereby.

259.    During the Class Period, Defendants materially misled the investing public, thereby inflating the price of Endurance's securities, by publicly issuing false and/or misleading statements and/or omitting to disclose material facts necessary to make Defendants' statements, as set forth herein, not false and/or misleading.  Said statements and omissions were materially false and/or misleading in that they failed to disclose material adverse information and/or misrepresented the truth about Endurance's business, operations, and prospects as alleged herein.

260.    At all relevant times, the material misrepresentations and omissions particularized in this Complaint directly or proximately caused or were a substantial contributing cause of the damages sustained by Plaintiffs and other members of the Class.  As described herein, during the Class Period, Defendants made or caused to be made a series of materially false and/or

misleading statements about Endurance's financial well-being and prospects.  These material misstatements and/or omissions had the cause and effect of creating in the market an unrealistically positive assessment of the Company and its financial well-being and prospects, thus causing the Company's securities to be overvalued and artificially inflated at all relevant times.  Defendants' materially false and/or misleading statements during the Class Period resulted in Plaintiffs and other members of the Class purchasing the Company's securities at artificially inflated prices, thus causing the damages complained of herein.

## XIII.   APPLICABILITY OF PRESUMPTION OF RELIANCE

261.   The market for Endurance's securities was open, well-developed and efficient at all relevant times.  As a result of the materially false and/or misleading statements and/or failures to disclose, Endurance's securities traded at artificially inflated prices during the Class Period.  On April 23, 2015, the Company's stock closed at a Class Period high of $23.03 per share.  Plaintiffs and other members of the Class purchased or otherwise acquired the Company's securities relying upon the integrity of the market price of Endurance's securities and market information relating to Endurance, and have been damaged thereby.

262.   During the Class Period, the artificial inflation of Endurance's stock was caused by the material misrepresentations and/or omissions particularized in this Complaint causing the damages sustained by Plaintiffs and other members of the Class.  As described herein, during the Class Period, Defendants made or caused to be made a series of materially false and/or misleading statements about Endurance's business, prospects, and operations.  These material misstatements and/or omissions created an unrealistically positive assessment of Endurance and its business, operations, and prospects, thus causing the price of the Company's securities to be artificially inflated at all relevant times, and when disclosed, negatively affected the value of the

Company stock.  Defendants' materially false and/or misleading statements during the Class Period resulted in Plaintiffs and other members of the Class purchasing the Company's securities at such artificially inflated prices, and each of them has been damaged as a result.

263.    At all relevant times, the market for Endurance's securities was an efficient market for the following reasons, among others:

(a)    Endurance stock met the requirements for listing, and was listed and actively traded on the NASDAQ, a highly efficient and automated market;

(b)    As a regulated issuer, Endurance filed periodic public reports with the SEC and/or the NASDAQ;

(c)    Endurance regularly communicated with public investors *via* established market communication mechanisms, including through regular dissemination of press releases on the national circuits of major newswire services and through other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services; and/or

(d)    Endurance was followed by securities analysts employed by brokerage firms who wrote reports about the Company, and these reports were distributed to the sales force and certain customers of their respective brokerage firms.  Each of these reports were publicly available and entered the public marketplace.

264.    As a result of the foregoing, the market for Endurance's securities promptly digested current information regarding Endurance from all publicly available sources and reflected such information in Endurance's stock price.  Under these circumstances, all purchasers of Endurance's securities during the Class Period suffered similar injury through their purchase of Endurance's securities at artificially inflated prices and a presumption of reliance applies.

265.    A Class-wide presumption of reliance is also appropriate in this action under the Supreme Court's holding in *Affiliated Ute Citizens of Utah v. U.S.*, 406 U.S. 128 (1972), because the Class's claims are, in large part, grounded on Defendants' material misrepresentations and/or omissions.  Because this action involves Defendants' failure to disclose material adverse information regarding the Company's business operations and financial prospects—information that Defendants were obligated to disclose—positive proof of reliance is not a prerequisite to recovery.  All that is necessary is that the facts withheld be material in the sense that a reasonable investor might have considered them important in making investment decisions. Given the importance of the Class Period material misstatements and omissions set forth above, that requirement is satisfied here.

## XIV.   <u>NO SAFE HARBOR</u>

266.    The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the allegedly false statements pleaded in this Complaint. The statements alleged to be false and misleading herein all relate to then-existing facts and conditions.   In addition, to the extent certain of the statements alleged to be false may be characterized as forward looking, they were not identified as "forward-looking statements" when made and there were no meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements.  In the alternative, to the extent that the statutory safe harbor is determined to apply to any forward-looking statements pleaded herein, Defendants are liable for those false forward-looking statements because at the time each of those forward-looking statements was made, the speaker had actual knowledge that the forward-looking statement was materially false or

misleading, and/or the forward-looking statement was authorized or approved by an executive officer of Endurance who knew that the statement was false when made.

## XV.   CLAIMS

### FIRST CLAIM
### Violations of Section 11 of the Securities Act
### Against All Defendants

267.   Plaintiffs repeat and re-allege each allegation set forth in ¶¶1-2, 33-41, 58-72, 252-257. above as if fully set forth herein, except any allegation of fraud, recklessness, or intentional misconduct. This claim is based solely on strict liability and negligence, and expressly disclaims any allegation of fraud or intentional misconduct.

268.   This claim is asserted against Defendants Endurance, Ravichandran and Ellawala, and is based upon Section 11 of the Securities Act.  Defendants Ravichandran and Ellawala as directors and/or officers of Endurance signed the Registration Statement in connection with the IPO.

269.   The Registration Statement contained untrue statements of material fact and omitted material facts necessary to render those statements not misleading.

270.   Plaintiffs and members of the Class acquired shares pursuant and/or traceable to the Registration Statement.

271.   At the time Plaintiffs and members of the Class obtained their shares, they did so without knowledge of the true facts concerning the misstatements or omissions alleged herein.

272.   Defendant Endurance is strictly liable to Plaintiffs and all other persons who purchased or otherwise acquired shares sold pursuant to the Registration Statement.

273.   Defendants Ravichandran and Ellawala had a duty to make a reasonable and diligent investigation of the truthfulness and accuracy of the statements contained in the

Registration Statement. Each had a duty to ensure that such statements were true and accurate and that there were no omissions of material facts that would make the statements in the Registration Statement inaccurate. By virtue of Defendants Ravichandran and Ellawala's failure to make a reasonable and diligent investigation of the truthfulness and accuracy of the statements contained in the Registration Statement, the Registration Statement contained misrepresentations and/or omissions of material fact. As such, the Section 11 Defendants are strictly liable to Plaintiffs and the Class.

274.    Plaintiffs and the members of the Class have sustained damages. The value of their shares has declined substantially, subsequent to, and due to, the violations of the Section 11 Defendants named in this claim.

275.    By virtue of the foregoing, Plaintiffs and the members of the Class are entitled to damages under Section 11.

**SECOND CLAIM**
**Violations of Section 12(a)(2) of the Securities Act**
**<u>Against All Defendants</u>**

276.    Plaintiffs repeat and re-allege each allegation forth in ¶¶1-2, 33-41, 58-72, 252-257, except any allegation of fraud, recklessness or intentional misconduct.  This claim is based solely on strict liability and negligence claims, and expressly disclaim any allegation of fraud or intentional misconduct.

277.    This claim is brought under Section 12(a)(2) of the Securities Act, 15 U.S.C. § 77l on behalf of Plaintiffs, and all persons or entities who purchased Endurance securities pursuant to the Registration Statement and Prospectus, against Defendants.

278.    Endurance was a seller, offeror, or solicitor of sales of a security, specifically Endurance common stock issued in the IPO pursuant to the Registration Statement.

THIRD AMENDED CLASS ACTION COMPLAINT
97

279.     Defendants Ravichandran and Ellawala were sellers, offerors, or solicitors of sales of Endurance securities in the IPO.  On information and belief, Defendants Ravichandran and Ellawala substantially participated in drafting and revising the Registration Statement and Prospectus, and participated in roadshows and other meetings with potential investors in connection with the IPO.

280.     By means of the Registration Statement and Prospectus, Endurance offered common stock to  members of the Class in return for $12.00 per share.  Defendants Ravichandran and Ellawala's actions of solicitation included the preparation and/or dissemination of the Registration Statement and Prospectus.

281.     Endurance common stock was sold through the use of interstate communication, the use of interstate commerce, and the use of the mails, including the use of the Registration Statement and Prospectus, which contained untrue statements of material fact or omitted to state material facts necessary in order to make the statements made not misleading.

282.     Defendants cannot prove that they did not know, or in the exercise of reasonable care, could not have known, of the untruth or omissions described in the preceding paragraph.

283.     Plaintiffs and members of the Class purchased Endurance securities by means of the materially misstated Registration Statement and Prospectus. At the time they purchased shares in the IPO, no member of the Class knew, or by the reasonable exercise of care could have known, of the material misstatements in and omissions in the Registration Statement.

284.     By reason of the conduct alleged herein, Endurance violated Section 12(a)(2) of the Securities Act. As a direct and proximate result of the Endurance's conduct, Plaintiffs, and other members of the Class who purchased Endurance common stock pursuant to the Offering

have sustained damages as a result of the untrue statements of material facts and omissions in the Endurance Registration Statement and Prospectus.

### THIRD CLAIM
### Violations of Section 15 of the Securities Act
### Against Defendants Ravichandran and Ellawala

285.    Plaintiffs repeat and re-allege each allegation set forth in ¶¶1-2, 33-41, 58-72, 252-257, 267-284 above as if fully set forth herein, except any allegation of fraud, recklessness or intentional misconduct. This claim is based solely on strict liability and negligence, and expressly disclaims any allegation of fraud or intentional misconduct.

286.    This claim is asserted against Defendants Ravichandran and Ellawala, and is based upon Section 15 of the Securities Act.

287.    As alleged herein, Defendants committed primary violations of Sections 11 and 12 of the Securities Act.

288.    Defendants Ravichandran and Ellawala, by virtue of their control, ownership, offices, directorship, and specific acts were, at the time of the wrongs alleged herein and as set forth herein, controlling persons of Endurance within the meaning of Section 15 of the Securities Act. Defendants Ravichandran and Ellawala had the power, influence, and knowledge—and exercised the same—to cause Endurance to engage in the acts described herein.

289.    Defendants Ravichandran and Ellawala at all relevant times participated in the operation and management of Endurance, and conducted and participated, directly and indirectly, in the conduct of Endurance's business affairs. Defendants Ravichandran and Ellawala were under a duty to disseminate accurate and truthful information with respect to Endurance's financial condition. Because of their positions of control and authority as officers and directors of Endurance, Defendants Ravichandran and Ellawala were able to, and did, control the contents

of the Registration Statement and Prospectus, which contained materially untrue and/or misleading statements and/or omitted to state material facts required to be stated therein.

290.    By reason of the aforementioned conduct, Defendants Ravichandran and Ellawala are liable under Section 15 of the Securities Act to Plaintiffs and the members of the Class who purchased or acquired shares pursuant to the Registration Statement and Prospectus. As a direct and proximate result of the conduct of Defendants Ravichandran and Ellawala, Plaintiffs and the other members of the Class suffered damages in connection with their purchase or acquisition of shares pursuant to the Registration Statement.

**FOURTH CLAIM**
**Violations of Section 10(b) of the Exchange Act and**
**Rule 10b-5 Promulgated Thereunder**
**<u>Against All Defendants</u>**

291.    Plaintiffs repeat and re-allege each and every allegation contained above as if fully set forth herein.

292.    During the Class Period, Defendants carried out a plan, scheme and course of conduct which was intended to and, throughout the Class Period, did: (i) deceive the investing public, including Plaintiffs and other Class members, as alleged herein; and (ii) cause Plaintiffs and other members of the Class to purchase Endurance's securities at artificially inflated prices. In furtherance of this unlawful scheme, plan and course of conduct, defendants, and each of them, took the actions set forth herein.

293.    Defendants (i) employed devices, schemes, and artifices to defraud; (ii) made untrue statements of material fact and/or omitted to state material facts necessary to make the statements not misleading; and (iii) engaged in acts, practices, and a course of business which operated as a fraud and deceit upon the purchasers of the Company's securities in an effort to maintain artificially high market prices for Endurance's securities in violation of Section 10(b) of

the Exchange Act and Rule 10b-5.  All Defendants are sued either as primary participants in the wrongful and illegal conduct charged herein or as controlling persons as alleged below.

294.    Defendants, individually and in concert, directly and indirectly, by the use, means or instrumentalities of interstate commerce and/or of the mails, engaged and participated in a continuous course of conduct to conceal adverse material information about Endurance's financial well-being and prospects, as specified herein.

295.    These defendants employed devices, schemes and artifices to defraud, while in possession of material adverse non-public information and engaged in acts, practices, and a course of conduct as alleged herein in an effort to assure investors of Endurance's value and performance and continued substantial growth, which included the making of, or the participation in the making of, untrue statements of material facts and/or omitting to state material facts necessary in order to make the statements made about Endurance and its business operations and future prospects in light of the circumstances under which they were made, not misleading, as set forth more particularly herein, and engaged in transactions, practices and a course of business which operated as a fraud and deceit upon the purchasers of the Company's securities during the Class Period.

296.    Each of the Individual Defendants' primary liability, and controlling person liability, arises from the following facts: (i) the Individual Defendants were high-level executives and/or directors at the Company during the Class Period and members of the Company's management team or had control thereof; (ii) each of these defendants, by virtue of their responsibilities and activities as a senior officer and/or director of the Company, was privy to and participated in the creation, development and reporting of the Company's internal budgets, plans, projections and/or reports; (iii) each of these defendants enjoyed significant personal contact and

familiarity with the other defendants and was advised of, and had access to, other members of the Company's management team, internal reports and other data and information about the Company's finances, operations, and sales at all relevant times; and (iv) each of these defendants was aware of the Company's dissemination of information to the investing public which they knew and/or recklessly disregarded was materially false and misleading.

297.    The defendants had actual knowledge of the misrepresentations and/or omissions of material facts set forth herein, or acted with reckless disregard for the truth in that they failed to ascertain and to disclose such facts, even though such facts were available to them. Such defendants' material misrepresentations and/or omissions were done knowingly or recklessly and for the purpose and effect of concealing Endurance's financial well-being and prospects from the investing public and supporting the artificially inflated price of its securities.  As demonstrated by Defendants' overstatements and/or misstatements of the Company's business, operations, financial well-being, and prospects throughout the Class Period, Defendants, if they did not have actual knowledge of the misrepresentations and/or omissions alleged, were reckless in failing to obtain such knowledge by deliberately refraining from taking those steps necessary to discover whether those statements were false or misleading.

298.    As a result of the dissemination of the materially false and/or misleading information and/or failure to disclose material facts, as set forth above, the market price of Endurance's securities was artificially inflated during the Class Period.  In ignorance of the fact that market prices of the Company's securities were artificially inflated, and relying directly or indirectly on the false and misleading statements made by Defendants, or upon the integrity of the market in which the securities trades, and/or in the absence of material adverse information that was known to or recklessly disregarded by Defendants, but not disclosed in public

statements by Defendants during the Class Period, Plaintiffs and the other members of the Class acquired Endurance's securities during the Class Period at artificially high prices and were damaged thereby.

299.    At the time of said misrepresentations and/or omissions, Plaintiffs and other members of the Class were ignorant of their falsity, and believed them to be true.  Had Plaintiffs and the other members of the Class and the marketplace known the truth regarding the Company's metrics, which were not disclosed by Defendants, Plaintiffs and other members of the Class would not have purchased or otherwise acquired their Endurance securities, or, if they had acquired such securities during the Class Period, they would not have done so at the artificially inflated prices which they paid.

300.    By virtue of the foregoing, Defendants have violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

301.    As a direct and proximate result of Defendants' wrongful conduct, Plaintiffs and the other members of the Class suffered damages in connection with their respective purchases and sales of the Company's securities during the Class Period.

### FIFTH CLAIM
### Violations of Section 20(a) of  the Exchange Act
### Against the Individual Defendants

302.    Plaintiffs repeat and re-allege each and every allegation contained above as if fully set forth herein.

303.    The Individual Defendants acted as controlling persons of Endurance within the meaning of Section 20(a) of the Exchange Act as alleged herein.  By virtue of their high-level positions, and their ownership and contractual rights, participation in and/or awareness of the Company's operations and/or intimate knowledge of the false financial statements filed by the

Company with the SEC and disseminated to the investing public, the Individual Defendants had the power to influence and control and did influence and control, directly or indirectly, the decision-making of the Company, including the content and dissemination of the various statements which Plaintiffs contend are false and misleading.  The Individual Defendants were provided with or had unlimited access to copies of the Company's reports, press releases, public filings and other statements alleged by Plaintiffs to be misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected.

304.    In particular, each of these Defendants had direct and supervisory involvement in the day-to-day operations of the Company and, therefore, is presumed to have had the power to control or influence the particular transactions giving rise to the securities violations as alleged herein, and exercised the same.

305.    As set forth above, Endurance and the Individual Defendants each violated Section 10(b) and Rule 10b-5 by their acts and/or omissions as alleged in this Complaint.  By virtue of their positions as controlling persons, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act.  As a direct and proximate result of Defendants' wrongful conduct, Plaintiffs and other members of the Class suffered damages in connection with their purchases of the Company's securities during the Class Period.

## XVI.  <u>PRAYER FOR RELIEF</u>

WHEREFORE, Plaintiffs pray for relief and judgment, as follows:

(a)    A determination that this action is a proper class action under Rule 23 of the Federal Rules of Civil Procedure;

THIRD AMENDED CLASS ACTION COMPLAINT

(b)     An award of compensatory damages in favor of Plaintiffs and the other Class members against all Defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

(c)     With respect to members of the Class that purchased or acquired Endurance securities pursuant or traceable to the Registration Statement and/or Prospectus issued in connection with the IPO, an award of rescissory damages in favor of Plaintiffs and the other Class members against all Defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

(d)     An award to Plaintiffs and the Class of their reasonable costs and expenses incurred in this action, including counsel fees and expert fees;

(e)     Awarding extraordinary, equitable, and/or injunctive relief as permitted by law (including, but not limited to, rescission); and

(f)     Such other and further relief as the Court may deem just and proper.

## XVII.  **JURY TRIAL DEMANDED**

Plaintiffs hereby demand a trial by jury.

DATED:  June 30, 2017          **GLANCY PRONGAY & MURRAY LLP**

By:  _s/ Robert V. Prongay_
Lionel Z. Glancy
Robert V. Prongay
Charles H. Linehan
1925 Century Park East, Suite 2100
Los Angeles, CA 90067
Telephone:  (310) 201-9150
Facsimile:  (310) 201-9160
lglancy@glancylaw.com
rprongay@glancylaw.com
clinehan@glancylaw.com

*Lead Counsel for Lead Plaintiff Christopher*
*Machado, Plaintiff Michael Rubin, and the Class*

**BLOCK & LEVITON LLP**
Jason M. Leviton (BBO #678331)
155 Federal Street, Suite 400
Boston, MA 02110
Telephone:  (617) 398-5600
Facsimile:  (617) 507-6020
jason@blockesq.com

*Liaison Counsel for Lead Plaintiff Christopher*
*Machado, Plaintiff Michael Rubin, and the Class*

**SWORN CERTIFICATION OF PLAINTIFF**

**ENDURANCE INTERNATIONAL GROUP HOLDINGS, INC. SECURITIES LITIGATION**

I, **Michael Rubin** individually, and/or in my capacity as trustee and/or principal for accounts listed on Schedule A, certify that:

1.    I have reviewed the complaint and authorize its filing and/or the filing of a Lead Plaintiff motion on my behalf.

2.    I did not purchase the Endurance International Group Holdings, Inc. securities that are the subject of this action at the direction of plaintiff's counsel, or in order to participate in any private action arising under this title.

3.    I am willing to serve as a representative party on behalf of a class and will testify at deposition and trial, if necessary.

4.    My transactions in Endurance International Group Holdings, Inc. securities during the Class Period set forth in the complaint are as follows:

      (See attached transactions)

5.    I have not served as a representative party on behalf of a class under this title during the last three years, except for the following:

6.    I will not accept any payment for serving as a representative party, except to receive my pro rata share of any recovery or as ordered or approved by the court, including the award to a representative plaintiff of reasonable costs and expenses (including lost wages) directly relating to the representation of the class.

I declare under penalty of perjury that the foregoing are true and correct statements.

6/28/17
Date

_____
Michael Rubin

341986.1

**Michael Rubin's Transactions in**
**Endurance International Group Holdings, Inc. (EIGI)**

| Date | Transaction Type | Quantity | Unit Price |
|---|---|---|---|
| 10/25/2013 | Bought* | 100 | $12.0000 |
| 12/30/2016 | Sold | -100 | $9.3300 |

*Purchased pursuant to registration statement/prospectus.

## **CERTIFICATE OF SERVICE**

I hereby certify that this document filed through the CM/ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing and paper copies will be sent to those indicated as non-registered participants on June 30, 2017.


*s/ Robert V. Prongay*
Robert V. Prongay